UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| URSULA MILDE, | : | CIV NO. 3:00CV2423 (AVC) |
| **Plaintiff** | : | |
| | : | |
| v. | : | |
| | : | |
| THE TOWN OF GREENWICH; | : | COPY |
| HOUSING AUTHORITY OF THE | : | |
| TOWN OF GREENWICH; | : | May 13, 2004 |
| THE HOUSING AUTHORITY OF THE | : | |
| TOWN OF GREENWICH BOARD OF | : | |
| COMMISSIONERS; and | : | |
| BENJAMIN LITTLE, CEO, | : | |
| | : | |
| **Defendants.** | : | |

## DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56(a)(1), the Defendants Housing Authority of the Town of Greenwich, the Housing Authority of the Town of Greenwich Board of Commissioners, and Benjamin Little, CEO, hereby assert the following material facts that are not in dispute for purposes of their motion for summary judgment.

## A.    MILDE'S EMPLOYMENT HISTORY

1.    The Housing Authority hired Plaintiff Ursula Milde on September 30, 1996.  (Tr. 8:18-19).

2.    The Housing Authority hired Milde as the Administrator of Parsonage Cottage Senior Residence ("PCSR").  (Tr. 8:20-22).[1]

---

[1]    These facts are assumed true for the purposes of the instant motion only.  Throughout this Memorandum, "Tr. __" refers to pages of the transcript of Plaintiff's deposition.  Other individuals deposed during the course of discovery are abbreviated using the surname of the deponent.  Copies of all relevant deposition transcript pages and exhibits cited herein are annexed to the Alvarez Affirmation.  "Milde Dep. Ex." refers to the exhibits introduced

3.      Milde's date of birth is July 12, 1940.  (Tr. 228:12-13).

4.      Milde was 56 years of age when hired by the Housing Authority.  (Tr. 228:14-16).

5.      When hired, Milde believed she was in complete charge of the day-to-day operations of PCSR. (Tr. 18:21-25).

6.      Milde believed she would report what she did to the Executive Director and the Deputy Director of the Housing Authority but she would make the decisions on everything that pertained to the operations of PCSR as long as they were within the guidelines of the law and PCSR's operating certificate. (Tr. 21:7-18).

7.      Milde's job description stated that the Administrator performed her job responsibilities "under the general direction of the Deputy Director." (Tr. 43:5-44:1).

## B.      THE HOUSING AUTHORITY'S MANAGEMENT

8.      In April 1999, Tom Crawford retired as Executive Director and Ben Little, the Deputy Director, at the time, replaced Crawford. (Tr. 229:2-7).

9.      Little later changed the title of his position to Chief Executive Officer.  (Tr. 229:8-10).

## C.      MILDE'S RELATIONSHIP WITH LITTLE BEFORE MARCH 2000 AND THE BEGINNING OF THEIR "CONTROL" PROBLEM.

10.      While Milde claims Little's actions toward her were unlawfully motivated by gender and age animus, Milde only began to feel that Little was treating her differently at the end of March 2000. (Tr. 340:16-341:18).

11.      Before that time, Little was friendly toward Milde and had not complained about her work performance. (Tr. 341:16-21).

during Plaintiff's deposition by counsel for Defendant.  "Pl. Dep. Ex." refers to the exhibits introduced during Plaintiff's counsel's questioning of his own client.

12.    At a meeting with staff at Parsonage Cottage in 1998, Little said he "wished he had 10 Ursulas." (Tr. 415:22-416:10).

13.    Milde told Debra Littlejohn, an employee of PCSR, that the problem between Little and her was "who is in control." (Tr. 279:16-24).

14.    Milde told Littlejohn that she was very consistent in the way she carried out her job and suddenly, in 2000, Little started to change the rules on Milde. (Tr. 307:19-22).

**D.    MILDE COMPLAINED ABOUT A LACK OF "AUTHORITY" WELL BEFORE LITTLE WAS CEO**

15.    Milde's six month battle with Little over the authority to control PCSR was not the first one she waged.  On November 30, 1997, Milde wrote a memo to Tom Crawford and complained that she was accountable and responsible under the PCSR's license but was not being given the authority to carry out that responsibility. (Tr. 57:19-58:2, 64:8-13; Milde Dep. Ex. 4).

16.    In the memo, Milde stated that: "[w]hen I was hired as the administrator of Parsonage Cottage Senior Residence, my understanding was that I would be responsible for all the aspects of operations at the residence." (Milde Dep. Ex. 4).

17.    Milde further wrote that: "[s]ince my name is on the state license, I am, naturally accountable for the entire operation, a responsibility I do not avoid.  However, there are certain consequences which follow from this, which I think, need to be clearly understood by all." (Milde Dep. Ex. 4).  Milde proceeded to "propose" a course of action in five areas: (1) Facility; (2) Budget; (3) Staffing; (4) Surveys and Audits; and (5) Communication.  (Tr. 58:20-59:6) (Milde Dep. Ex. 4).

3

18.     In a harbinger of the position she would adopt in 2000, Milde wrote: "[m]y 'modus operandi' generally is one of handling matters on my own . . .  I work best if am given the authority . . . ." (Milde Dep. Ex. 4).

19.     Crawford responded to Milde on December 4, 1997, and conceded that discussions had been held about PCSR in which Milde should have been involved, and suggested that the same had transpired from Milde's end.  (Milde Dep. Ex. 5, p. 3).

20.     Milde disagreed with Crawford's criticism and believed, at that point, there was still some misunderstanding as to the level of communication the HATG management expected from Milde.  (Tr. 71:2-72:3).

21.     Crawford also wrote in his memo:

a.    "Any contract agreement, whether new or renewals, should also be reviewed by us prior to execution." (Tr. 74:14-18) (Milde Dep. Ex. 5, p. 2).

b.    "Ben and I do reserve the right to a final review of all personnel evaluations." (Tr. 74:1-5) (Milde Dep. Ex. 5, p. 2).

22.     Despite her claim that similar challenges to her authority by Little were discriminatorily motivated, Milde believes the actions that prompted her to write the November 30, 1997 memo to Little's predecessor were not age or gender based.  (Tr. 76:8-18).

23.     Milde also does not believe that Crawford's December 4, 1997 directives were retaliation for Milde's expression of opinions about matters of public concern. (Tr. 76:19-24).

## E.    THE INITIAL DISPUTE OVER HIRING AN IN-HOUSE RECREATION COORDINATOR

24.     Milde first raised the issue of hiring an in-house recreation coordinator for Parsonage Cottage at a senior staff meeting on February 3, 2000. (Tr. 94:8-23; 176:14-178:8).

25.     When Milde raised the issue, Little did not say anything.  (Tr. 178:4-5).

4

26.    Milde understood that it was Little's "modus operandi" to listen to a staff member's report and not respond; and that sometimes Little did not respond until "much later". (Tr. 178:7-11).

27.    According to Milde, sometimes Little would not respond at all; sometimes, when the person would take an action, if things went well, the matter was "done"; sometimes, if things did not go well, Little blamed the person. (Tr. 179:6-13).

28.    Little followed this same "modus operandi" with the other senior staff managers, all of whom were men. (Tr. 179:14-19).

29.    On March 24, 2000, Little wrote Milde a memo referencing a number of concerns Little had about Milde's conversation about the recreation coordinator. (Tr. 92:17-93:17) (Milde Dep. Ex. 6).

30.    On March 25, 2000, Milde responded to Little's March 24th memo.  (Tr. 95:25-96:25) (Milde Dep. Ex. 7).

31.    On April 13, 2000, Milde wrote Little again concerning the Recreation Coordinator position. (Tr. 97:3-21) (Milde Dep. Ex. 8).

32.    On April 17, 2000, Little responded to Milde's April 13th memo stating that: "[t]he procedure that you have followed in hiring a Recreational Coordinator causes a few problems" and proceeded to list five specific concerns.  (Tr. 97:22-98:10) (Milde Dep. Ex. 9).

33.    The following day, Little presented the Board's Personnel Committee with a memo outlining his concerns about the hiring of full-time Recreation Coordinator. (Milde Dep. Ex. 11).

34.    On April 24, Milde responded to Little's April 17th memo.  (Milde Dep. Ex. 12).

5

35.    Milde ended the memo by writing: "[l]et me assure you that I have proceeded with this not because I want to usurp your authority but because I know you are very busy and it is my responsibility to do what needs to be done and what is best for the residents at PCSR and the total operation." (Milde Dep. Ex. 12).

F.    **MILDE'S ATTEMPTS TO PRESENT HER CASE TO THE BOARD**

36.    On April 24th, after her request to present her issue regarding the in-house recreation coordinator position to the Board's personnel committee was denied, Milde wrote a memo to Little in which she requested a grievance hearing with the Board.  (Tr. 82:13-18) (Milde Dep. Ex. 13).

37.    In that memo, Milde wrote: "[s]ince the Executive Director prevented me from presenting the case to the Personnel Committee as I had requested, I have no other choice but to ask for a formal hearing." (Milde Dep. Ex. 13).

38.    The substance of Milde's grievance was that she was not allowed to present the reason or the rationale for her plan to hire an in-house recreation coordinator even though she was told that the committee was the body that made that decision.  (Tr. 82:18-23).

39.    Milde does not know who made the decision to deny her request to appear at the personnel committee meeting but the decision was communicated by Little. (Tr. 81:18-19).

40.    Little called Milde and told her she was not permitted to come to the personnel committee meeting and was not welcome there.  (Tr. 81:23-25).

41.    Little did not say anything else and Milde does not know whether Little was motivated by age or gender discrimination; she did not know what Little was thinking. (Tr. 82:1-9).

42. On April 26th, Milde wrote another memo to Little regarding the hiring of the recreation coordinator and copied all the members of the Board. (Milde Dep. Ex. 20).

43. In that memo, Milde wrote:

> I can only conclude that the way in which you and the Board proceeded regarding this matter, and the way the decision was "un-communicated" to me (I learned it first through the newspaper) showed a high disregard for me and my staff. But, more importantly, it demonstrated a lack of concern for the needs of the residents whom we have, after all, pledged to serve.
>
> I like to remind you, therefore, that what matters is not your, or my, authority nor, "who is in charge here" but what best serves the residents of Parsonage Cottage Senior Residence. All of us, including you as the CEO of the managing agent, as well the Board of Commissioners, the Parsonage Cottage staff, and I, must always be cognizant of this responsibility.

(Milde Dep. Ex. 20).

44. About 15 days later, Milde received a memo stating that there would be a grievance hearing on May 15, 2000. (Tr. 82:23-83:3).

45. Shortly before the hearing, Milde received a fax from Mr. Little stating that the grievance hearing was cancelled but no explanation for the cancellation was provided. (Tr. 83:4-10).

46. When Milde arrived at the Board meeting on May 22, 2000, she was given a letter dated May 19, 2000 and signed by Barry Nova, the Board's Vice Chair, stating that her grievance had been denied and she was not going to have a hearing. (Tr. 83:10-12; 84:20-85:11).

47. The Board's letter, in part, stated:

> The subject of your request, i.e., the hiring of a Recreation Director at Parsonage Cottage, we believe, is an operations matter that should be discussed and resolved between you and the CEO of the Housing Authority of the Town of

> Greenwich to whom you report. The Board of
> Commissioners should not, and will not, become the arbiter
> in "turf wars" among Managers; nor will it usurp the
> responsibilities and accountabilities of Benjamin Little.

(Milde Dep. Ex. 30).

48.    In response to the Board's denial of Milde's grievance, on May 23, 2000, Milde

wrote a memo to the Board. (Tr. 159:19-21).

49.    That memo, in part, read:

> **My grievance is a grievance against the CEO, who**
> **prevented me from presenting the reasons for my desire**
> **to hire an in-house Recreation Coordinator to the**
> **Personnel Committee, after he had informed me via a**
> **memo dated 4/17/00 that it was up to the Personnel**
> **Committee of the Board of Commissioners to make the**
> **decision.**

(Tr. 159:23-160:15; Milde Dep. Ex. 31) (emphasis in original).

## G.    THE MAY 22, 2000 BOARD MEETING

50.    The HATG Board meetings follow Robert's Rule of Parliamentary Procedure.

(Tr. 163:10-12).

51.    If someone wanted to speak during the meeting, the Chairperson had to recognize

them. (Tr. 163:13-16).

52.    When Milde began to speak at the Board meeting on May 22, 2000, Sue

McClenachan, the Board Chairperson, told Milde more than once that she was "out of order".

(Tr. 161:16-22).

53.    Milde did not stop speaking but insisted that she wanted to be heard. (Tr. 161:23-

25).

54.    McClenachan then told Milde the matter should be dealt with in Executive

Session and that the issue Milde was raising was a personnel matter. (Tr. 164:4-9).

55.    Milde continued to speak and insisted she be permitted to come to an Executive Session. (Tr. 164:10-13).

56.    The Board then permitted Milde to speak in Executive Session. (Tr. 164:14-16).

57.    During Executive Session, Milde "said that she felt she had a right to be heard by the commissioners and that systematically that right was being taken away from her and "I was really protesting about that." (Tr. 165:1-5).

58.    Milde also told the Board during Executive Session that she had opened the PCSR, had a track record with this, and was treated very unprofessionally throughout the whole process." (Tr. 165:5-9).

## H.    LITTLE'S MAY 30, 2000 DISCIPLINARY REPRIMAND AND CORRECTIVE DIRECTIVES TO MILDE

59.    On June 2, 2000, Little provided Milde with a performance evaluation and two memos entitled, "Corrective Directives" and "Disciplinary Reprimand and 90 Day Opportunity to Improve". (Tr. 414:17-415:11; 166:2-15; 168:9-23) (Pl's Dep. Ex. 16; Milde Dep Exs. 33 and 34).

60.    On the review, Little provided Milde with an overall rating of 3.81 out of 7 on her performance review.  (Tr. 419:9-22).

61.    In the Corrective Directives memo, Little wrote:

> Your actions regarding the issue of Recreational Coordinator are serious.  You have failed to keep lines of communications open between you and me and therefore I have been unaware of your activities.  You have evidenced a willful and intentional position of not recognizing that I am your supervisor.  You have acted without the authority of myself or the Board of Commissioners.    These, combined with your reluctance not to change, have caused me to consider disciplinary actions ranging from a written reprimand to possible termination.  However, because of your dedication to the elderly residing at Parsonage, I have

decided to only give a written reprimand which will be placed in your personnel file. In addition, I have decided to give you 90 days to take the following corrective actions . . . .

(Milde Dep. Ex. 33, p. 2).

62.     Milde believed the "Corrective Directives" memo to be an "extremely adverse action". (Tr. 168:1-3).

63.     Milde understood that if she did not do as directed by Little in the memo, she would be subject to further disciplinary action. (Tr. 168:4-8).

64.     In the Disciplinary Reprimand, Little listed seven reasons for the reprimand. (Tr. 169:10-14).

65.     Milde disagreed with Little's assessment of those seven items. (Tr. 169:15-17).

66.     On page two of the Disciplinary Reprimand, however, Little stated truthfully that, based on a review of the CCI contract dated 2/3/97, Tom Crawford contracted with CCI, not Milde. (Tr. 590:2-24).

67.     Milde also conceded that she indicated to Barbara Nolan that she wanted to terminate some of the CCI services or that she did not want to "go on with them" after Jo Gonzalez left. (Tr. 592:24-593:2).

68.     On page three of the Reprimand, Little stated that Milde gave the impression in her March 25th memo that the position of "recreational activities therapist" was in the planning stages. (Milde Dep. Ex. 34, p. 3).

69.     In her March 25th memo, Milde did not tell Little she had already posted for the position (Tr. 604:3-10) and had not told that to Little prior to the March 25th memo. (Tr. 604:15-20).

10

70.     In her March 25th memo, Milde did not mention that she had interviewed Agata Wilinski (Tr. 604:21-25) and had not mentioned this to Little prior to the March 25th memo. (Tr. 605:2-5).

71.     Milde also unilaterally changed the degree requirement on the job posting from "associate degree required" to one where a degree was "not necessary but advisable." (Tr. 606:5-22).

72.     Milde made this change without discussing it with Little. (Tr. 605:25-607:2).

73.     The second sentence of the finding under "G" was a truthful statement. (Tr. 611:10-16).

74.     Milde added the words, "Closing Date for Final Application: April 28, 2000" to the posting that was faxed to Town Hall. (Tr. 609:20-610:4).

75.     The posting Milde sent to Norwalk Community College did not have a closing date. (Tr. 610:10-11).

## I.    MILDE'S RESPONSE TO LITTLE'S MAY 30, 2000 DISCIPLINARY REPRIMAND AND CORRECTIVE DIRECTIVES

76.     Milde responded to the Disciplinary Reprimand with a five page memo that included eleven attachments. (Tr. 171:12-172:14) (Milde Dep. Ex. 35).

77.     On the final page of this memo, among other things, Milde stated that she believed the Disciplinary Reprimand to be:  (1) A violation of her contractual agreement as delineated in her job description . . .; (3) An attempt to undermine her authority as the administrator, who is responsible to the CT State Health Department, under our license, for all the operations at PCSR . . .; (5) In direct conflict with past messages of the Housing Authority and verbal statements by Little that Milde's work was very good; and (6) Indication of a difficult working relationship between Milde and Little. (Tr. 173:2-15) (Milde Dep. Ex. 35, p. 5).

78.    In her response, Milde also stated that Little had previously described her work as "very good". (Milde Dep. Ex. 35, p. 5).

79.    At the time she wrote her response to the Disciplinary Reprimand, Milde's relationship with Little was so poor that she suggested they use a mediator to work through their problems. (Tr. 174:12-25) (Milde Dep. Ex. 35, p. 5).

80.    Milde felt the only way she and Little could get anywhere was to have a third party that would be more objective, and believed a mediator was necessary to facilitate communication between her and Little. (Tr. 174:23-175:5).

81.    After she received the Disciplinary Reprimand, Milde did not have open communications with Little. (Tr. 352:21-25).

82.    At the time Milde responded to the Disciplinary Reprimand, she felt Little did not care about PCSR. (Tr. 176:4-10).

83.    Milde felt Little did not care what the residents' needs were or what was going on at PCSR and that he viewed the residents as "non-persons". (Tr. 175:19-24).

84.    Conversely, Milde cared very much about the PCSR. (Tr. 176:11-13).

## J.    LITTLE'S DIRECTIVE THAT MILDE APOLOGIZE TO THE BOARD

85.    On June 7, 2000, Little issued a memo to Milde directing her to prepare a written apology to the Board for her actions at the May 22, 2000 Board meeting. (Tr. 180:18-24) (Milde Dep. Ex. 38).

86.    On June 21, 2000, Little issued a second memo to Milde directing her to submit a written apology to the Board. (Tr. 191:9-192:11).

87.    Milde never apologized to the Board. (Tr. 181:14-17).

88.    On June 26, 2000, Milde submitted a memo to Sue McClenachan, the other members of the Board, and Little, responding to Little's request that Milde apologize.  (Tr. 193:24-194:17) (Milde Dep. Ex. 45).

89.    In the memo, Milde provided six reasons why she could not "follow these directives". (Milde Dep. Ex. 45).

90.    In this memo, Milde accused Little of engaging in an "abuse of power by judging my performance not by an objective standard, based on my job description, but by the unfair and capricious use of his authority." (Milde Dep. Ex. 45).

91.    Milde concluded that she could not **"in good conscience, remain silent, nor will I be forced to apologize for performing my responsibilities as the administrator of PCSR to the best of my abilities and knowledge, as charged to me under our license."** (Milde Dep. Ex. 45) (emphasis in original).

92.    On June 30, 2000, Little wrote to Milde stating that he was "deeply disappointed" that she had not followed his prior directives to apologize to the Board.  (Tr. 197:3-12) (Milde Dep. Ex. 47).

**K.    MILDE'S INABILITY TO "LET THINGS GO."**

93.    On July 14, 2000, Milde wrote Leroy Franz, a member of the Fundraising Board, requesting that the "disciplinary action against me be rescinded and that an unbiased assessment be made by an impartial individual who will review my performance during the past almost four years." (Tr. 401: 3-8).

94.    Prior to sending this letter, Mr. Franz had suggested to Milde that she try to "let things go" with Little. (Tr. 410:20-25).

95.    Milde thought about that but concluded that she could not pretend that the Disciplinary Reprimand did not happen and, therefore, asked Mr. Franz if it could be rescinded. (Tr. 411:1-12).

L.    **MILDE'S FAILURE TO PROVIDE LITTLE WITH THE NURSE CONSULTANT'S CONTRACT**

96.    On July 3, 2000, Little wrote to Milde and told her to provide him a copy of the contract for Nurse Nancy Wisecup by July 6, 2000. (Tr. 197:19-24) (Milde Dep. Ex. 48).

97.    In the June 2nd "Corrective Directives" memo, Little had previously advised Milde that he would be examining all mandated services, in particular the nursing services. (Milde Dep. Ex. 33, p. 3).

98.    Milde did not submit Nurse Wisecup's contract to Little. (Tr. 199:19-20).

99.    On August 4, 2000, Little wrote Milde confirming that he had not received a copy of the Nurse Contract and stated that he assumed there was no contract.  Little then posed several questions about the charges on a time sheet for Nurse Wisecup.  (Milde Dep. Ex. 52).

100.    On August 7, 2000. Milde responded to Little 's  July 3rd and August 4th memos concerning Nurse Wisecup's contract.  (Milde Dep. Ex. 55).

101.    Milde confirmed that a contract existed but told Little that the "Nurse Consultant did not authorize me to submit the contract to you." (Milde Dep. Ex. 55).

102.    Milde proceeded to explain that she did not believe the Housing Authority had a right to the contract because her contract was initially funded by the Greenwich Department of Health and later by the PCSR Fundraising Board. (Milde Dep. Ex. 55).

103.    Milde proceeded to provide Little a counter proposal to answer his questions about the Nurse Consultant Contract. (Milde Dep. Ex. 55).

14

104.    Specifically, Milde proposed that Little attend a meeting with Milde, the Nurse Consultant, the PCSR Fund Raising Board, and the Greenwich Health Department "at a time that is mutually convenient to all." (Milde Dep. Ex. 55).

105.    Milde ended her memo by writing, "**[a]t that meeting all your concerns can be answered.**" (Milde Dep. Ex. 55 (emphasis in original)).

## M.    MILDE'S JULY 6TH MEMO REGARDING CCI SCHEDULING AND CONTRACT ISSUES

106.    On July 6, 2000, Milde wrote a memo to Little and Barbara Nolan, the Executive Director for CCI, addressing CCI scheduling and contract issues. (Milde Dep. Ex. 49).

107.    Milde copied Sam Romeo, the State Ombudsman, on the July 6th memo. (Milde Dep. Ex. 49).

108.    Little responded to Milde by memo later that same day. (Milde Dep. Ex. 50).

109.    Little stated that Milde's memo was "inappropriate and very unprofessional" noting his view that the memo should have been provided to Ms. Nolan and him "days before the meeting" and that it was "totally inappropriate" to forward or carbon copy an internal memo to the State Ombudsman. (Milde Dep. Ex. 50).

110.    On July 7, 2000, Milde defended her actions concerning both of the issues Little had raised. (Milde Dep. Ex. 51).

111.    Concerning the CCI scheduling and contract issues, Milde wrote, among other things, that: "[i]f you had consulted me when developing the contract, and if CCI and you had accepted my previous verbal explanations why the proposed schedule did not work for us, none of this would have been necessary." (Milde Dep. Ex. 51).

112.    Concerning her copying of the State Ombudsman on the memo, Milde wrote, among other things: "[y]ou certainly understand that the state appointed ombudsman has a right

to request any pieces of documentation concerning residents' rights, and I, as the administrator, have an obligation to submit those." (Milde Dep. Ex. 51).

**N.    MILDE'S RESPONSE TO LITTLE'S REQUEST TO MEET CONCERNING THE SOCIAL WORK CONTRACT**

113.    On August 4th, Little wrote Milde informing her that a meeting had been scheduled for August 9th. (Milde Dep. Ex. 53).

114.    Little stated that it appeared much discussion had taken place without his involvement concerning the continuation of social services to PCSR. (Milde Dep. Ex. 53).

115.    Little's memo instructed Milde to provide a written assessment of several issues concerning the renewal of PCSR's social work contract and stated that he expected the information on or before August 8, 2000. (Milde Dep. Ex. 53).

116.    On August 7th, Milde responded: "[i]n regard to the proposed meeting . . . I consider it unprofessional to be notified at such short notice about this meeting. I should have been consulted whether this date and time would be available for me, since you expect me to be present. I currently have another commitment on behalf of Parsonage Cottage which conflicts with the meeting you set up which I now have to change." (Milde Dep. Ex. 56).

**O.    MILDE'S RESPONSE TO LITTLE'S NOTICE OF A PUBLIC RELATIONS VISIT**

117.    On August 4, 2000, Little wrote Milde informing her that the following day individuals would be visiting the facility to take pictures for public relations purposes. (Milde Dep. Ex. 54).

118.    On August 8, 2000, Milde responded by advising Little in a memo that she had received the memo after the visit. (Milde Dep. Ex. 57).

119.    Milde ended the August 8th memo by stating: "I would appreciate the courtesy of **timely** communication, since the PCSR staff and I would always be happy to cooperate in these matters." (Milde Dep. Ex. 57 (emphasis in original)).

## P.    LITTLE'S REQUEST THAT MILDE PARTICIPATE IN A DISCIPLINARY HEARING

120.    Shortly thereafter, in a letter to Milde dated August 21, 2000, Little stated he found Milde had made no attempt to comply with his Corrective Directives Memorandum of May 30, 2000, and since that time additional unsatisfactory performance issues had arisen. (Milde Dep. Ex. 58).

121.    Little directed Milde to attend a disciplinary hearing in his office on August 23, 2000.  (Milde Dep. Ex. 58).

122.    Little advised Milde that, as a result of this meeting, disciplinary action, up to and including termination, might result. (Milde Dep. Ex. 58).

123.    Later that day, Milde's legal counsel, Attorney Carey, wrote to Little informing him that Milde would not be attending the disciplinary meeting on August 21, 2000; that Milde would be represented by his law office at a future meeting; that he was unavailable from August 23 through 28th; and stating that: "[i]n no way shall the Housing Authority of the Town of Greenwich use my client's non-attendance to the disciplinary meeting, to be held on August 23, 2000, be deemed [sic] grounds for insubordination.  My client has a legal right to be represented by counsel, in connection with any disciplinary meeting initiated by your office."  (Milde Dep. Ex. 60).

124.    The disciplinary meeting was rescheduled to September 6, 2000. (Milde Dep. Ex. 61).

125.    Attorney Carey attended the meeting with Milde.  (Milde Dep. Ex. 61).

126.    Little, Louis Pittoco, Legal Counsel for the HATG, Sim Bernstein, Consultant for Human Resources, and Maria Morris, Administrative Secretary, attended the meeting on behalf of the Housing Authority.  (Milde Dep. Ex. 61).

127.    Maria Morris prepared notes of the disciplinary meeting.  (Milde Dep. Ex. 61).

128.    Among other things, the notes reflected the following:

a.    Little told Attorney Carey and Milde that it was "insubordination" for Milde to fail to follow his directives and to respond to his memos;

b.    Little told Attorney Carey and Milde that Milde made contact with CCI without his knowledge;

c.    Attorney Pittoco told Attorney Carey that Milde should have consulted with Little;

d.    Milde stated that scheduling was her responsibility, that she knew when the residents have lunch and meds, and that she knew the operation better than Little;

e.    Little stated that Milde had no authority to terminate the contract, the contract was between the Housing Authority and CCI; Little has the authority to sign the contract, and the Housing Authority is responsible and liable for PCSR;

f.    Attorney Carey told Little he was angry there was a problem;

g.    Little told Attorney Carey that he was correct, there was a problem;

h.    Little referred to memos dated July 3rd, August 4th, and August 7th;

i.    Milde reiterated her position that the Nurse Consultant had not authorized her disclosure of the Nurse Consultant Contract and that the not-for-profit Board pays for her services;

j.    Milde and Little disputed who pays for the Nurse Consultant;

k.    Little asked why the Housing Authority was paying $35 an hour for the Nurse Consultant to answer telephone calls;

l.    Attorney Pittoco asked why Milde had not just provided the contract to Little;

18

m.    Attorney Carey questioned why the Housing Authority needed to have the contract;

n.    Little reiterated his view that Milde should not have copied the State Ombudsman on her memo;

o.    Attorney Carey stated that Milde had no alternative but to copy the Ombudsman;

p.    Milde asked Little whether he wanted to terminate her because of the EEOC charges she had filed and Little responded that this had nothing to do with the EEOC complaint.

(Milde Dep. Ex. 61).

## Q.    LITTLE'S TERMINATION OF MILDE'S EMPLOYMENT

129.    On September 8, 2000, Little wrote Milde informing her that her employment was being terminated effective that same day.  (Milde Dep. Ex. 62).

130.    Little wrote: "This action is based on inadequate and poor work performance and failure to comply with the policies, procedures, and regulations of the Housing Authority of the Town of Greenwich.  These issues have been presented to you in writing and you have been given the opportunity to respond and comply with these policies, procedures, and regulations. You have failed to respond and actively resolve these issues and as a result of these actions have interfered with the efficient and effective operation of Parsonage Cottage." (Milde Dep. Ex. 62).

## R.    THE REPLACEMENT OF PLAINTIFF AS ADMINISTRATOR OF PCSR.

131.    Mary Ann Vlymen succeeded Milde as Administrator.  (Vlymen Tr. 19:22-20:5).

132.    Vlymen, a female, was born on July 20, 1931 and is 9 years older than Milde. (Vlymen Tr. 21:17-18).

133.    Vlymen voluntarily informed the HATG that she could not continue on as Administrator for PCSR due to her husband's illness.  (Vlymen Tr. 26:3-10).

134.    Vlymen was succeeded by Penny Lore, also a female.  (Lore Tr. 8:15-22).

135.   Lore continues to hold the position of Administrator.  (Lore Tr. 8:15-22).

Respectfully submitted,

DEFENDANT HOUSING AUTHORITY OF THE
TOWN OF GREENWICH; THE HOUSING
AUTHORITY OF THE TOWN OF GREENWICH
BOARD OF COMMISSIONERS; AND BENJAMIN
LITTLE, CEO

By: _Francis P. Alvarez_____
    Francis P. Alvarez (CT 10350)
    alvarezf@jacksonlewis.com
    JACKSON LEWIS LLP
    One North Broadway
    White Plains, NY 10601
    Phone: (914) 514-6149
    Fax:  (914) 328-1882
    Their Attorneys

20

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| URSULA MILDE, | : | |
| | : | CIV NO. 3:00CV2423 (AVC) |
| **Plaintiff** | : | |
| | : | |
| v. | : | |
| | : | |
| THE TOWN OF GREENWICH; | : | |
| HOUSING AUTHORITY OF THE | : | |
| TOWN OF GREENWICH; | : | |
| THE HOUSING AUTHORITY OF THE | : | |
| TOWN OF GREENWICH BOARD OF | : | |
| COMMISSIONERS; and | : | |
| BENJAMIN LITTLE, CEO, | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of Defendants'

Local Rule 56(a)(1) Statement In Support Of Motion For Summary Judgment was served via

Federal Express, this 13th day of May 2004, on counsel for Plaintiff at the address listed below:

Mark P. Carey, Esq.
Carey & Associates P.C.
71 Old Post Rd.
Southport, CT 06490

_Francis P. Alvarez_
Francis P. Alvarez