COPY

```
 1    UNITED STATES DISTRICT COURT
 2    DISTRICT OF CONNECTICUT
 3    ------------------------x
 4    URSULA MILDE,                :
 5                   Plaintiff,    :
 6         -versus-                : No. 3:00CV2423(AVC)
 7    THE HOUSING AUTHORITY OF
 8    THE TOWN OF GREENWICH; THE
 9    HOUSING AUTHORITY OF THE
10    TOWN OF GREENWICH BOARD OF
11    COMMISSIONERS; and           :
      BENJAMIN LITTLE, CEO,        :
12                 Defendants.     :
13    ------------------------x
14
15              Deposition of MARY ANN VLYMEN, taken
16    pursuant to Federal Rules of Civil Procedure, at the
17    law offices of Carey & Associates, Southport,
18    Connecticut, before Jacqueline McCauley, RPR/CSR, a
19    Notary Public in and for the State of Connecticut, on
20    May 20, 2003, at 2:04 p.m.
21
22
23
24
25
                    SANDERS, GALE & RUSSELL
                       (203) 624-4157
```

13

1   A.   I don't remember.
2   Q.   And with regard to Exhibit number 2 did
3   Ben tell you he had to get approval from the Board of
4   Commissioners before he could enter into that
5   contract?
6   A.   I have no recollection of that.
7   Q.   Did you ever talk to the Board of
8   Commissioners before being hired?
9   A.   Not that I recollect.
10  Q.   You never met Sue McClenachan before she,
11  before you became hired in August, 2000?
12  A.   I may have run into Sue in the office, but
13  I don't -- it wasn't officially. I didn't understand
14  the working of the board and whatever so ...
15  Q.   Okay.
16  A.   It was nothing official that I did. I may
17  have been presented at the board. I don't remember
18  that.
19  Q.   Did you ever go to board meetings of the
20  Board of Commissioners?
21  A.   Not as a general rule, no.
22  Q.   At what point in time did you become the
23  acting administrator?
24  A.   When there was no one there to
25  administrate.

20

1  Q.  September 8, 2000 sound familiar to you?
2  A.  I don't know.  I don't know when Ms. Milde
3  was fired.  When she left, it was shortly thereafter
4  that they asked me if I would step in and take it
5  temporarily.
6  Q.  How many days after her termination did
7  you recollect you were asked this?
8  A.  I don't remember.
9  Q.  Five days a week?
10 A.  I don't remember, sorry.
11 Q.  Certainly there was no one running The
12 Housing, no one running the Parsonage Cottage for some
13 time?
14 A.  Right.  I would imagine somebody moved
15 fairly quickly because ...
16 Q.  Is it fair to say that sometime in
17 September of 2000 you took over as the interim
18 administrator of the Parsonage Cottage?
19 A.  Probably not September.  I signed at the
20 end of September.  Oh sorry, that was the end of
21 August, I apologize.  Yeah, I'll say probably
22 September.
23 Q.  And what is your current age right now?
24 A.  71.
25 Q.  What was your age back in --

SANDERS, GALE & RUSSELL
(203) 624-4157

21

1  A.  Two years ago?

2  Q.  Yeah.

3  A.  I was born in '31 so I was '69.

4  Q.  You handed two documents to me. One was a

5  birth certificate and then one was citation to the

6  statute.

7  A.  I think that's the back of the birth

8  certificate.

9  Q.  Okay. We'll just include this as one

10 exhibit.

11      (Plaintiff's Exhibit 3, marked for

12      identification.)

13 Q.  This is Exhibit number 3 and this is your

14 copy of your birth certificate that you provided to us

15 today?

16 A.  Yes.

17 Q.  Date of birth July 20, 1931?

18 A.  Yes.

19 Q.  And the second page this happens to be the

20 back of the birth certificate; is that right?

21 A.  Yes. The very nice girl in the front

22 office copied it.

23 Q.  Okay. Just take a chance to review the

24 second page. That's your birth certificate; is that

25 correct?

26

1  A. That's all right. That's all right. Once
2  I start I'm okay.
3  Q. So in November this unfortunate
4  circumstance happened with your husband, November of
5  2000?
6  A. Right.
7  Q. And you told Ben Little that start looking
8  for somebody else because I don't know how long I'll
9  be here for?
10 A. Yes, exactly.
11 Q. He was unable to locate anybody?
12 A. I think then he started. He started this
13 search. He was looking. I don't know -- he had other
14 people brought in for that, too, and my husband did
15 have a little -- he went into a slight remission so
16 that took some of the pressure off from the original
17 pressure so the immediacy of doing something was kind
18 of backed off.
19 Q. So when Ben Little hired you under the
20 contract with Exhibit number 2 in this deposition, did
21 you understand the full scope of the position you were
22 being hired for?
23 A. I think so.
24 Q. Did you understand when you were hired you
25 would become the interim administrator of the

SANDERS, GALE & RUSSELL
(203) 624-4157

28

1  Q.  Was upstairs to another office?
2  A.  Office, yeah.
3  Q.  So sometime after -- from September until
4  you left in July of 2001 you performed all the
5  functions and duties of the administrator of the
6  Parsonage Cottage?
7  A.  Yes.
8  Q.  Did you engage in the budgeting process?
9  A.  Yes, paying the bills, okaying the bills.
10 Q.  Were you -- did you design your own budget
11 or was one handed to you?
12 A.  I did not design a new budget.
13 Q.  Were there any audits done, any CHFA
14 during that period of time you were there?
15 A.  I don't remember.
16 Q.  Did you discover any problems at the
17 Parsonage Cottage when you became the administrator
18 problems that allegedly were created by Ms. Milde?
19 A.  What do you mean by --
20 Q.  Well, when you were working as
21 administrator there running that facility, did you
22 discover any problems that were caused by Ms. Milde
23 when she was working there?
24 A.  Doing something awful?  No, I don't think
25 I can think of -- you are talking about an illegal