

DEFENDANT'S EXHIBIT 61 5/23/03

Ursula Milde Disciplinary Hearing Notes
September 6, 2000
11:30 a.m. – 12:50 p.m.

| Present: | Benjamin W. Little, Chief Executive Officer, HATG | BWL |
| | Louis Pittocco, Legal Counsel for HATG | LP |
| | Sim Bernstein, Consultant for Human Resources | SB |
| | Maria L. Morris, Administrative Secretary | MLM |
| | | |
| | Ursula Milde, Administrator, Parsonage Cottage | UM |
| | Mark Carey, Attorney for Ursula Milde | MC |
| | | |
| | Parsonage Cottage | PC |
| | Housing Authority of the Town of Greenwich | HATG |
| | Community Centers, Inc. | CCI |
| | Board of Commissioners | BOC |

- BWL opened the hearing by reading the letter to Ursula Milde dated August 21, 2000, and continued reading the June 2, 2000 memo of Corrective Directives.
- BWL referred to the following memos and read them aloud, June 7, 2000 memo directing Ursula Milde to write an apology; June 21, 2000 memo regarding CCI Work Schedule; June 6, 2000 regarding CCI contract and meeting; memo dated August 4, 2000 regarding justification costs for the nurse consultant.
- MC stated my client responded to all memos explaining what she feels are true factual. The purpose of her being here is to answer any other questions you have. She will not say anything, I will speak for my client. Are you unsatisfied with her responses? Is there a specific issue?
- BWL stated that she did not respond and/or comply to all – memos, i.e. letter of apology to the BOC was not done.
- MC stated that she was making a complaint to the BOC and was spoken down to.
- UM stated I am responsible for the operations of the running of Parsonage Cottage and my first responsibility is to provide whatever is needed for the residents and to the State.
- BWL – By not following directives nor responding to the memos, that is insubordination.
- LP to MC– We're on issue #1.
- BWL – Ursula Milde did respond to #2 memo any problems with CCI should be directed and discussed with me first. Ursula Milde made contact with CCI without my knowledge.
- MC – You have no lack of performance issues here today. She is providing the most for Parsonage Cottage.
- UM – CCI's schedule was not workable. Scheduling is my responsibility. I know when the residents have lunch and meds. In respect to that I know the operation better than BWL. I have always carried the best interests for Parsonage Cottage.
- BWL referred to memo of June 21. I received a phone call about a problem of CCI scheduling after other issues were resolved.

JLSK 0107

1

- MC – Why do you feel she is insubordinate? On the issue of CCI? How many times have you called CCI?
- BWL – 3 or 4 times. CCI and HATG has over a 10 year working relationship.
- MC – Wouldn't it be more effective that you allow her the flexibility to run the place? She did start Parsonage Cottage or start to run it since it opened?
- BWL – That's correct.
- MC – What reason do you have to remove duties? The CCI organization problem was caused by CCI.
- BWL – Ursula Milde had no authority to terminate the contract. The contract is between HATG and CCI.
- MC – They were not fulfilling their contract. CCI was having a problem. What was the problem?
- BWL – They were not always there.
- LP – She should have consulted with the CEO.
- MC – Why are you telling her she is not doing her job? I don't see any problems.
- BWL – I have the authority to sign the contract. HATG is responsible and is liable for Parsonage Cottage.
- MC – Her performance was not other than excellent. No basis to complain. This is the first time you are not satisfied. You are pointing the finger at Ursula Milde. You are angry there is a problem.
- BWL – That's right, there is a problem.
- MC – You will not find fault other than Ursula Milde. She did not follow the directives. What action is the HATG going to take? Charges is a negative term for someone to use. Is there anything else that she has responded to in writing that you would like to know about?
- BWL – referred to the last memo of July 3, 2000 and August 4, 2000 (read aloud). Response on August 7, 2000 (read aloud).
- UM – The nurse consultant did not authorize me to provide a copy of the contract. The not-for-profit board pays for her. The State does not reimburse us for nursing services. The Health Department said it would be good to have a nurse and they paid for the first year. The not-for-profit board pays for this. We, Ursula Milde, and the RN had proposed to have a meeting to discuss the issues with the nurse consultant.
- MC – Was she being insubordinate by not providing the contract?
- BWL – The fact that the fund raising board reimburses HATG for the nurse consultant costs the liability still rests with HATG. The nurse consultant is paid through HATG, in which I sign the checks.
- MC – Who does she receive the check from?
- UM – The State subsidizes expenses that are allowable and some are not. The nurse consultant does not get reimbursed. The Finance Director said that we are providing additional services. It shows up as an expense reimbursed by the not-for-profit board.
- MC – Why did the nurse not want to hand over her contract?
- UM – She felt that this was a way of attacking her and she wanted to be there for any questions.
- MC – Was there an issue with something?
- BWL – Yes, why am I paying $35 per hour for phone calls by the nurse consultant.
- MC – Is this part of the contract?

JLSK 0108

- LP – If the contract is there, why did she consult with the nurse consultant and not just give the contract to the CEO.
- MC – I don't see why you need to have the contract? You fault her for it, like you already know what you are going to do.
- BWL – No response.
- MC – Items 2, 3, 4 were responded to by memos. Has she not responded to these with the exception of no. 1?
- BWL – On June 21, 2000 Item #2 responded re: the new schedule. On July 6, 2000 the memo was never responded to. There was a cc: sent to the ombudsman.
- MC – She has always provided the best services possible. May be she was not getting the feedback she needed.
- UM – It was typed on my computer and had it delivered by Felix or Debby on the 8th. (Ursula Milde left the room to make a copy of the memo)
- LP – Do you have any other questions, Ben?
- BWL – There are other memos that I did not include with the August 21, 2000, letter and I don't know how much these would have added to the hearing.
- LP – Are there any questions?
- BWL – I do know Sam Romeo, I also met him at a community meeting at Parsonage Cottage. I did not know that he had any interests in the Recreational Coordinator issue. I do not see where he would have had any interest. The issue of the Recreational Coordinator was resolved and the schedule was submitted by CCI then changed by Ursula Milde.
- LP – If Ursula Milde did not have time, in her first paragraph, states she did not have time to do it was not sent on that meeting. Why didn't she consult with BWL but she did have time to cc: Sam Romeo?
- MC – Is she allowed to let the ombudsman know what is going on?
- BWL – She should not be cc: the ombudsman on an issue that has been resolved. The issue was on scheduling and not the Recreational Coordinator. The internal memos are not sent to outside agencies.
- MC – If HATG was breaking the law are you saying that HATG employees cannot inform outside agencies?
- BWL – First off, we are not talking about any laws being broken by employers. We are talking about normal business practices and internal memos do not go to outside agencies.
- LP – You are clouding the issue.
- MC – The cc: to the ombudsman, she had no alternative. Is there anything else to discuss?
- UM – Am I correct in assuming that you want to terminate me because of the EEOC charges I have brought against you?
- BWL – No, this has nothing to do with the EEOC complaint.
- MC – When will you make a decision?
- BWL – In 24 hours.

JLSK 0109