UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| URSULA MILDE, | : | |
|   Plaintiff, | : | |
| | : | |
| | : | |
| | : | |
| VS. | : | Civil No. 3:00CV2423(AVC) |
| | : | |
| THE HOUSING AUTHORITY OF THE | : | |
| TOWN OF GREENWICH; THE | : | |
| HOUSING: AUTHORITY OF THE | : | |
| TOWN OF GREENWICH BOARD OF | : | |
| COMMISSIONERS; and BENJAMIN | : | |
| LITTLE, CEO, | : | |
| | : | |
|   Defendants. | : | |

## RULING ON THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This is an action for damages and equitable relief brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq. ("Title VII"), Age Discrimination in Employment Act, 29 U.S.C. § 623 et. seq. ("ADEA"), 42 U.S.C. § 1983, and Connecticut's Fair Employment Practices Act, Con. Gen. Stat. §46(a) et. seq. ("FEPA"). The plaintiff, Ursula Milde, alleges that her former employer, Housing Authority of the Town of Greenwich ("HATG"), and the Board of Commissioners for the Housing Authority of the Town of Greenwich ("Board") subjected her to adverse employment actions based on her gender and age, and in retaliation for bringing complaints for this discrimination to the Equal Employment Opportunity Commission ("EEOC"). In addition, Milde alleges that HATG, the Board, and her former boss Benjamin Little subjected her to adverse employment actions based on her exercise of her First Amendment

rights. Finally, Milde alleges that the Media/Public Relations Policy" maintained by HATG is an unconstitutional prior restraint on her First Amendment rights.

The defendants and Milde both now move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment, arguing that there are no genuine issues of material fact, and that they are entitled to judgment as a matter of law. The issues presented are whether there is a genuine issue of material fact as to: 1) whether the defendants subjected Milde to gender discrimination; 2) whether the defendants subjected Milde to discrimination based on her age; 3) whether the defendants retaliated against Milde for bringing discrimination complaints to the EEOC; 4) whether the defendants subjected Milde to adverse employment actions based on her exercise of her First Amendment rights; 5) whether Little is entitled to qualified immunity for the First Amendment claim; 6) whether the HATG "Media/Public Relations Policy" acted as an unconstitutional prior restraint on Milde.

For the reasons set forth herein, the court concludes that no genuine issue of material fact exists as to the gender discrimination claim, the age discrimination claim, the Title VII and ADEA retaliation claims, and the claim that the HATG "Media/Public Relations" policy acted as an unconstitutional prior restraint. There is, however, a genuine issue of material

fact as to whether the defendants retaliated against Milde on account of her exercise of her First Amendment rights, and whether Little is entitled to qualified immunity.

Accordingly, the defendants' motion for summary judgment is granted in part and denied in part, and Milde's motion for summary judgment is denied.

## FACTS

Examination of the sixth amended complaint, affidavits, pleadings, Local Rule 56(a) statements, exhibits accompanying the motions for summary judgment, and the responses thereto, discloses the following undisputed, material facts.

## 1. **Background**

The defendants, Housing Authority of the Town of Greenwich ("HATG"), Board of Commissioners for HATG ("Board"), and Chief Executive Officer of HATG, Benjamin Little, oversee the Parsonage Cottage for Senior Residents ("Parsonage") in Greenwich, Connecticut. In 1937, housing legislation created public housing in Greenwich and established HATG. HATG is the only housing authority in Greenwich. HATG receives federal community block grant money directly through the town of Greenwich for public housing purposes. The town of Greenwich board of selectmen appoints the Board that oversees HATG. During the period of March, 2000 to September, 2000, Sue McClenachan, a female, was the chairperson of the Board.

Parsonage is licensed by the state of Connecticut as a residential care home.  The mission of Parsonage "is to provide a comfortable, safe home for the elderly in a residential environment within the Greenwich community."  In order to maintain their license, Parsonage must comply with Conn. Agencies Regs. § 19-13-D6 S(g), which states in relevant part that "[r]ecreational activities shall be provided in [h]omes for the [a]ged."

HATG maintains a "Media/Public Relations Policy" in order to:

> enhance the image and public perception of [HATG], its programs and residents... It is the policy of HATG that before any contact is made with the media on information, data and/or HATG policies that affect the above strategies, there must be communication with [c]ommissioners and appropriate [s]taff.

On September 30, 1996, HATG hired the plaintiff, Ursula Milde, as the administrator of Parsonage.  One Thomas Crawford, then executive director of HATG, and Little, then deputy director of HATG, made the decision to hire Milde.

Milde, a female, was 56 years of age when HATG hired her as the first administrator of Parsonage.  As administrator, Milde was in charge of the day-to-day operations of Parsonage.  She planned, developed, evaluated and updated job descriptions, admissions, and resident agreements in compliance with federal, state, and local standards, health and fire department codes and

4

regulations.  Milde also had the responsibility for hiring and

firing employees for existing positions at Parsonage. M ilde also

had the authority to write job descriptions, though it is

disputed whether she had to seek approval for these descriptions.

She was the only female senior manager at the time of her

employment.  The Board never invited Milde to participate in any

of its committee meetings, though Milde asserts that other male

managers were invited to participate in committee meetings.

On November 30, 1997, Milde wrote a memorandum to Crawford.

Milde testified that in the memorandum Milde "was complaining

about given [sic] responsibility to run the residence and being

accountable to the State under the license for the safety and the

well-being of the residents and then not given the authority to

carry it out." Specifically, the memorandum stated:

> When I was hired as the administrator of Parsonage, my
> understanding was that I would be responsible for all
> the aspects of operation at the residence. Since my
> name is on the state license, I am, naturally,
> accountable for the entire operation, a responsibility
> I do not avoid. However, there are certain consequences
> which follow from this, which I think need to be
> clearly understood by all. [Milde then proposes a
> course of action in sections marked 1) "Facility"; 2)
> "Budget"; 3) "Staffing"; 4) "Surveys and Audits"; and
> 5) "Communication"]. My modus Operandi is one of
> handling matters on my own with assistance or feedback
> from my staff, if indicated I will seek advice from my
> superiors, or colleagues, when needed, but generally
> will come prepared with a suggestion of how I plan to
> solve the problem. I work best if I am given the
> authority, but also the necessary information and if
> things are communicated to me in a timely fashion.

Crawford responded to this memorandum with his own memorandum

which stated:

> Any contract agreement, whether new or renewals, should
> also be reviewed by us prior to execution. I believe we
> are already doing this... There is no question there
> have been incidents where discussions were held
> concerning Parsonage that you should have been involved
> in or made aware of, and I believe likewise that the
> same has transpired from your end. Management needs to
> be aware in both directions of all major issues. I
> personally believe you have done an excellent job with
> the facility.

When asked if during the period that these memoranda
were written there was a disagreement or a difference in
understanding as to how much communication with Crawford was
necessary, Milde testified that there was.  Milde also admits
that she did not believe that the memorandum was motivated by age
or gender animus, or animus towards Milde expressing her
concerns.  Overall, Milde and Crawford had an effective working
relationship, and Crawford thought she did an outstanding job
while he was her supervisor.  Neither Crawford or Little ever
disciplined Milde while Crawford was executive director.

In April, 1999, Crawford retired as executive director
and HATG hired Little, the deputy director at the time, to
replace Crawford.  Little changed his title to that of chief
executive officer.  Little has described his style of management
as "militaristic."  In addition, he rarely visited Parsonage and
was not generally involved with residents there.

Before March 2000, Little was friendly towards Milde
and did not complain about her job performance.  Little and the

chairwoman of board of HATG, Sue McClenachan, both thought at the time that Milde did a good job for the residents of Parsonage. At a meeting during 1998, Little stated that "I wish I had ten Ursulas." Little was 60 years of age when he discharged Milde.

## 1. **In-house Recreation Director**

On February 3, 2000, Milde alleges she first told Little that she wanted to hire an in-house recreation coordinator. Milde had written a job description in 1996 for an in-house coordinator, but instead HATG and Milde agreed to contract with a private company, C.C.I., for recreation services. Milde had developed the contract with C.C.I. with the approval of Crawford.

By February 3rd Milde thought C.C.I. was not doing an adequate job and hence sought to hire an in-house recreation coordinator. Milde alleges that Little responded to the request for an in-house recreation coordinator with silence. Milde stated:

> That's his MO. Sometimes when you kept insisting on it, sometimes he didn't respond at all. And then the person would take an action and then he would either – if the action went well, then he would say, you know, he wouldn't necessarily say something. but it seemed like all was good and it was done. If it didn't go well, then the person was being blamed.

During February 2000, Milde posted a notice for a job opening for the position of in-house recreation coordinator in several places. Milde decided on one Agata Willinski as the most

7

suitable for the job, even though Willinski did not have the
degree required by the job description.  Little asserted that
this amounted to changing the original job description.

On March 24, 2000, Little wrote Milde a memorandum
expressing concerns he had with hiring an in-house recreational
coordinator.  On March 25, 2000, Milde responded with a
memorandum addressing the concerns Little had raised in his memo.
Milde stated:

> During the past three years this arrangement [the
> contract with C.C.I.] has not worked out consistently
> to the best for Parsonage Cottage (i.e. frequent staff
> turnover, leaving us without a working program for
> months, lack of recreation experience/background on the
> part of some of their staff, unavailability of C.C.I.
> staff for holidays and weekends, not enough in-house
> time to develop programs for all residents, not only
> those who are able to go on trips etc.) We did not
> renew the contract in 1999 and at this point it is very
> clear that we need an in-house recreation/activities
> therapist.

On April 13, 2000, Milde wrote Little a memorandum as a
follow up to Milde's March 25 memorandum informing him that Milde
had found a candidate, Agata Willinski.  In that letter, Milde
stated,"[s]ince we have not had a recreation coordinator through
CCI for the past two months, I will have to move ahead as soon as
possible.  Please call me if you have any question or concern or
want to meet with Ms. Willinksi."

On April 17, 2000, Little responded to Milde by writing
a memorandum.  In this memorandum, Little stated that "the
procedure you (Milde) have followed in hiring a recreational

coordinator causes a few problems." Little then proceeded to list five concerns, which included instructions that "until the personnel committee makes its recommendations and approval, no further action can be taken... All new staff is required to be interviewed by the chief executive officer." On April 18, 2000, Little wrote a memorandum to the personnel committee of the Board of HATG in order to express his concerns about hiring an in-house recreation coordinator.

On April 24, 2000, Milde responded with a memorandum to Little. She stated that:

> Since we are not creating a new position... I am suprised that suddenly the board has to approve this one again... You have so far not interviewed any of the Parsonage staff... Furthermore I would think that as the CEO you are too busy to interview all of the candidates... Of course you are welcome to interview this or any other candidate... Let me assure you that I have proceeded with this not because I want to usurp your authority but because I know you are very busy and it is my responsibility to do what needs to be done and what is best for the residents.

On April 24, 2000, Milde wanted to explain to the Board's personnel committee why she was planning on hiring an in-house recreation coordinator so they could make an informed decision on what action to take. On April 24, 2000, before the meeting Little telephoned Milde and explained to her that she was not welcome. Milde asserts that the Board never invited her to one of its committee meetings, though other male managers were invited. Later on April 24, 2000, Milde filed a grievance with

9

the Board claiming that she was denied the opportunity to explain
the reasons behind her plan to hire an in-house recreation
coordinator.  In this grievance, she asked for a formal hearing
in front of the Board.

On April 26, 2000, Milde wrote another memorandum and
sent it to Little, with copies for the members of the Board.  In
this memo, she stated that:

> I can only conclude that the way in which you and the
> Board proceeded regarding this matter and the way the
> decision was "un-communicated" to me (I learned it
> first through the newspaper) showed a high disregard
> for me and for my staff.  But more importantly it
> demonstrated a lack of concern for the needs of the
> residents... I like to remind you, therefore, that what
> matters is not your, or my, authority nor "who is in
> charge here" but what best serves the residents of
> Parsonage.

About 15 days later, Milde received a memo stating that there
would be a grievance hearing on May 18, 2000.  Shortly before the
scheduled hearing on May 18, 2000, Milde received a fax stating
that the hearing was cancelled, without an explanation.

On May 22, 2000, Milde attended a public meeting of the
Board in order to express her view of the importance of hiring an
in-house recreation coordinator.  When she arrived at the
meeting, Milde received a letter from one Barry Nova, the vice-
chairperson of the Board, stating that her grievance had been
denied and she was not going to have a hearing.  Specifically,
the letter stated in part that:

The subject of your request, i.e., the hiring of a
Recreation Director, we believe, is an operations
matter that should be discussed and resolved between
you and the CEO of the HATG to whom you report. The
Board should not, and will not, become the arbiter in
"turf wars" among managers; nor will it usurp the
responsibilities and accountabilities of Benjamin
Little.

During the meeting, Milde stood up and started talking
about the issue.  McClenachan told her that she was out of order
pursuant to rules governing the hearing because nobody had
recognized Milde and Milde was not on the agenda.  McClenachan
then told Milde that she could bring up the issue after the
public meeting in the non-public executive session.  Milde,
Wisecup and McClenachan dispute whether Milde's behavior was
disruptive and whether the Board should have recognized Milde.
Milde then attended the executive session and expressed her
concern that her right to be heard by the Board was being taken
away, and that she was being treated unprofessionally.
McClenchan testified that Milde's grievance regarding the
recreation coordinator "was perhaps one of the reasons for her
termination.  It was not the only reason."

On May 23 and May 26, 2000, articles in the Greenwich
Times appeared about the May 22, 2000 Board meetings and the
recreation services at Parsonage.  The May 23, 2000 article
quoted Milde as saying "[i]f you don't provide [recreation
services], that's a form of abuse... I don't know what their
hang-up is."  The May 26, 2000 article quoted Milde as saying

"[m]y concern is that some of these people can't get out... What
we really should do here is have an individualized program for
each person."

On June 2, 2000, Little sent Milde a performance review
along with two memoranda entitled "Corrective Directives" and
"Disciplinary Reprimand and 90 Day Opportunity to Improve."  This
was the first written performance review Little had ever provided
Milde, though Milde asserts that Little provided male managers
with performance reviews.  On the performance review, Little gave
Milde an overall rating of 3.81 out of 7.  For this performance
review, Little adopted the findings of a written report made by a
private investigator he had hired.  There is a dispute as to
whether Little hired the private investigator for the purpose of
conducting a personnel review of Milde.  McClenachan approved of
using a private investigator because she felt that there were so
many interpersonal problems between Little and Milde that it
"seemed like the right thing to do."  In addition, the private
investigator investigated dealings with Russell Kemp.  Kemp
alleges this investigation led to his suspension and termination
when he was 57 years old.  HATG replaced Kemp with somebody
younger.  McClenchan, Kemp and Crawford do not remember another
time when HATG hired a private investigator except during the
period before HATG terminated Milde and Kemp.

In the Corrective Directives memorandum Little sent to

12

Milde, he wrote:

> Pursuant to your concerns regarding the recreational
> services that are "mandated" by state statute, I
> reviewed the activities of CCI and the services they
> have provided.  I believe that CCI has attempted in
> good faith to provide the services as set for in their
> contract with the Housing Authority... Therefore I have
> decided to renew our contract with CCI... Your actions
> regarding the issue of Recreation Coordinator are
> serious.  You have failed to keep the lines of
> communications open between you and me and therefore I
> have been unaware of your activities.  You have
> evidenced a wilful and intentional position of not
> recognizing that I am your supervisor... These combined
> with your reluctance not to change, have caused me to
> consider disciplinary actions ranging from a written
> reprimand to a possible termination. However, because
> of your dedication to the elderly residing at
> Parsonage, I have decided to only give a written
> reprimand which will be placed in your personnel file.
> In addition, I have decided to give you 90 days to take
> the following corrective actions... All press releases
> are reviewed by me and issued through the Housing
> Authority of the Town of Greenwich.

In the disciplinary reprimand, Little listed seven

reasons for the reprimand.  These reasons were:

> 1) Deceptive actions; 2) Acts of insubordination; 3)
> Failure to follow the policies and procedures of HATG;
> 4) Failure to communicate issues and problems relating
> to Parsonage in a timely manner to the CEO, Benjamin
> Little; 5) Failure to follow the recognized and
> mandated hiring procedures of HATG; 6) Short-circuiting
> the administrative chain of authority; 7) Improper
> influence of the hiring procedures (possible coercive
> activities and alteration of public document).

Little went on to cite specific events as support for the seven

reasons that he listed, including asserting that Milde's

statements to the Greenwich Times were not truthful.  Little also

supported his reasoning by expressing his view that Milde had not

properly communicated with him about her actions regarding hiring
an in-house recreation coordinator, and that she exceeded her
authority in trying to hire an in-house recreation coordinator
and pressing this issue after she was told to take no further
action on the issue.

On June 6, 2000, Milde sent a response to Little.  In
this memo she justified her actions regarding the hiring of an
in-house recreation coordinator.  She also wrote that she
believed the disciplinary reprimand, among other things, to be
"[a]n attempt to undermine her authority as the administrator,
[i]n direct conflict with past messages of the Housing Authority
and verbal statements by Little that Milde's work was very good
and [i]ndication of a difficult working relationship between us."
In her response, Milde requested a mediator be used to work out
the issues between her and Little, because Milde stated that
Little would not discuss things with her and was making false
accusations.

On June 7, 2000, Little sent a memo to Milde directing
her to write an apology to the Board for her actions at the May
22, 2000 board meeting.  On June 21, 2000, Little sent Milde a
second memorandum to Milde directing her to write an apology to
the Board.  Neither McClenchan nor any other Board members
directed Little to do this, but McClenchan has since stated that
she supported this disciplinary action.

14

On June 26, 2000, Milde responded by sending a memorandum to Little, McClenachan, and the other Board members in which she listed six reasons why she could not follow the directives to apologize to the Board. These reasons included accusing Little of engaging in an "abuse of power by judging my performance not by an objective standard based on my job description, but by the unfair and capricious use of his authority." On June 30, 2000, Little responded in a memorandum to Milde saying "I am deeply disappointed that you have not followed the directions" by not apologizing to the Board.

### 3. Nancy Wisecup

On July 3, 2000, Little asked Milde to provide him, by July 6, 2000, with a copy of the contract for one Nancy Wisecup, a nurse who did work for Parsonage. On August 4, 2000, Little wrote Milde a memorandum confirming that Milde did not submit Wisecup's contract to Little. On August 7, 2000, Milde responded in a memorandum that she did not submit Wisecup's contract because Wisecup had not authorized her to submit it, and that HATG did not have a right to the contract because it was initially funded by the Greenwich Department of Health. Milde instead suggested that Little attend a meeting with Milde, Wisecup, and the Greenwich Department of Health.

### 4. C.C.I. Contract Issues

On July 6, 2000, Milde wrote a memorandum to Little and

15

one Barbara Nolan, the executive director of C.C.I., expressing
concerns about C.C.I. scheduling and contract issues.  Milde also
sent a copy of the memorandum to one Sam Romeo, the state of
Connecticut Ombudsman who oversaw the services provided to
Parsonage residences.

Later on July 6, 2000, Little responded with a
memorandum to Milde stating that Milde's previous memorandum was
"inappropriate and very unprofessional" because the memorandum
should have been submitted days before the meeting with Nolan
that took place on July 6, 2000.  He also stated that "an
internal memorandum being forwarded or carbon copied to the State
Ombudsman is totally inappropriate."

On July 7, 2000, Milde responded with a memorandum
defending her actions. She stated that:

> If you had consulted me when developing the contract...
> none of this would have been necessary... [y]ou
> certainly understand that the state appointed ombudsman
> has a right to request any pieces of documentation
> concerning residents' rights, and I, as the
> administrator have an obligation to submit those.

## 5. Request to Rescind Disciplinary Action

On July 14, 2000, Milde wrote a letter to one Leroy
Franz, a member of the fundraising committee of the Board
requesting that "the disciplinary action against me be rescinded
and that an unbiased assessment be made by an impartial
individual."  Prior to sending this letter, Franz had suggested
to Milde that she try to "let things go" with Little.

16

6. **EEOC Charge**

On July 25, 2000 Milde filed a charge of discrimination against the defendants with the United States Equal Employment Opportunity Commission ("EEOC").  On a letter dated July 26, 2000, Milde's attorney sent Little a letter explaining that Milde had filed discrimination charges with the EEOC and had retained counsel.

7. **Deteriorating Relationship**

On August 4, 2000, Little wrote Milde a memorandum informing her that a meeting was scheduled for August 9, 2000, and instructed Milde to provide a written assessment of issues concerning Parsonage's social work contract by August 8, 2000. On August 7, 2000, Milde responded in a memorandum by writing "I consider it unprofessional to be notified at such short notice about this meeting. I should have been consulted whether this date and time would be available for me."

On August 21, 2000, Little sent Milde a letter stating that:

> I find no attempts have been made by you to comply with my Corrective Directives Memorandum of May 30, 2000. Since that time additional unsatisfactory performance issues have arisen. You are directed to attend a disciplinary hearing... At this hearing you will be given an opportunity to answer the charges brought against you. As a result of this hearing, disciplinary action, up to and including termination, may result.

On September 6, 2000 Little held a disciplinary meeting concerning Milde.  On September 8, 2000, Little wrote Milde

informing her that he had determined to terminate her employment,

effective at the end of that business day.  Little also wrote:

> This action is based on inadequate and poor work
> performance and failure to comply with the policies,
> procedures, and regulations of [HATG].  These issues
> have been presented to you in writing and you have been
> given the opportunity to respond and comply with these
> policies, procedures and regulations.  You have failed
> to respond and actively resolve these issues and as a
> result of these actions have interfered with the
> efficient and effective operation of Parsonage.

Though Little made the decision, McClenchan supported this

decision and the way it was handled.  Though Milde admits that

she did not hear direct discriminatory comments, she believes

that her discharge, along with the written reprimands were

motivated by age and gender animus.  On September 11, 2000 Milde

sent Little a written request for reinstatement, which Little

later denied.  On November 8, 2000, Little again rejected Milde's

request for reinstatement.

## 8. **After Milde's Discharge**

During September 2000, one MaryAnn Vlymen became the

acting administrator of Parsonage.  At the time, Vlymen was 69

years old.  In November of 2000, Vlymen suggested to Little that

he should start looking for a permanent administrator because

Vlymen's husband was ill.  On April 9, 2001, Little hired one

Penny Lore as administrator of Parsonage.  Lore is a female who

was 35 years of age at the time.  In August, 2002, Little gave

Lore a positive performance review, and overall Little never

18

reprimanded Lore.  Little also never warned Lore that he would reprimand her if she violated HATG's media policy.

On May 12, 2003, the Board provided Little with a separation agreement, along with a $145,000 severance payment, even though his employment contract did not mandate such a payment.

## 9. Russell Kemp

Another manager employed by HATG at the time, one Russell Kemp, who was 57 years of age at the time, had problems with Little.  Kemp thought that Little promised him $40,000 in severance pay and never paid it, and Little owed him compensation time. Kemp thus thinks Little was a poor manager.  Kemp, 57 years of age, also believes that the same private investigator who helped in Milde's performance review investigated Kemp, which he believes led to his suspension and termination from HATG.  He also believes that Little replaced him with a younger employee. When asked if these actions were due to animus against his age, Kemp stated "I am not sure of this."

### STANDARD

Summary judgement is appropriately granted when the evidentiary record shows that there are no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether the record presents genuine issues for trial, the court must view

all inferences and ambiguities in a light most favorable to the non-moving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) cert. denied, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). A plaintiff raises a genuine issue of material fact if "the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56 "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgement; the requirement is that there is not a genuine issue of material fact." Anderson, at 247-8, 106 S.Ct. 2505.

        In opposing a motion for summary judgment, the "adverse party may not rest upon the mere allegations or denials of [its] pleading," but must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; see D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(d). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to avoid the entry of summary judgment against the non-moving party]; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 248, 106 S.Ct. 2505.

**DISCUSSION**

**I. <u>Gender Discrimination</u>**

Milde first argues that HATG and the Board terminated her employment based on gender in violation of Title VII, 42 U.S.C. § 2000e.[1]  The analysis for a gender discrimination claim is governed by the well known <u>McDonnell Douglas</u> framework. <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, the plaintiff:

> has the initial burden of establishing a prima facie case of discrimination... If [she] establishes a prima facie case, the burden shifts to [the defendant] to articulate a legitimate, non-discriminatory reason for the adverse employment decision. If [the defendant] offers a legitimate, non-discriminatory reason for its actions, the burden reverts to [the plaintiff] to show [the] proffered reason was a pretext for discrimination.

<u>Burlington v. United Airlines, Inc.</u>, 186 F.3d 1301, 1315 (10th Cir. 1999)(citations omitted).

A.        The Plaintiff's Prima Facie Case

In order to defeat a motion for summary judgment, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  <u>See e.g.</u>, <u>Texas Dep't of Community</u>

---

[1] Milde also argues that the defendants' actions violated FEPA Con.Gen.Stat. § 46(a). "Claims of sex discrimination, age discrimination and retaliation in employment under FEPA are adjudicated using the same standards as are applied to cases arising under Title VII and the ADEA." <u>Pascal v. Storage Technology Corp.</u>, 152 F.Supp. 2d. 191 (D.Conn. 2001) (citing <u>Miko v. CHRO</u>, 220 Conn. 192, 204, 596 A.2d 396 (1991) and <u>Levy v. CHRO</u>, 236 Conn. 96, 107-8, 671 A.2d 349 (1996). Therefore the court's reasoning for the Title VII and ADEA claims apply equally to the FEPA claims.

Affairs v. Burdine, 450 U.S. 248, 253-54, 101 S.Ct. 1089, 1093-94
(1981).  The nature of the plaintiff's burden of proof is de
minimus.  Dister v. Continental Group, Inc., 859 F.2d 1108, 1114
(2d Cir. 1988).  To make out a prima facie case, the plaintiff
must prove that: 1) she is a woman; 2) she was qualified for her
position; 3) she was discharged; and 4) her firing occurred under
circumstances giving rise to an inference of discrimination."
Shumway v. United Parcel Serv. Inc., 118 F.3d 60, 63 (2d Cir.
1997)(citation omitted).

          For purposes of discussion, the court assumes that
Milde has established a prima facie case of gender
discrimination, in that she is a female, she was qualified for
her position, and she was discharged.  Further, the court will
assume that the plaintiff has established an inference of gender
discrimination by offering evidence that she was discharged from
her employment as the only female manager in a group of otherwise
male managers. see Padob v. Entex Info. Servs., 960 F.Supp. 806,
812 (S.D.N.Y. 1997)(where the court assumed that a prima facie
case of gender discrimination had been established based on the
fact that the plaintiff was the only female manager in her
department). The assumption is further supported in that: 1) she
was never invited to participate in committee meetings or
executive sessions held by the Board, unlike other male managers;
2)she was never provided with a performance review until June 2,

2000, while other male managers were provided with written performance reviews; 3)Little hired a private investigator to investigate Milde's performance, while not doing the same for other male managers; and 4) Little denied her compensation time Milde had earned while awarding it to other male managers.

B. The Defendants' Non-Discriminatory Reason

To rebut an inference of discrimination established by the plaintiff's prima facie case, the defendant must articulate a legitimate, non-discriminatory reason for the adverse employment action. Texas Dept. of Comty. Affairs v. Burdine, 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The defendant must state a "clear and specific" reason. Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir. 1985). Here, the defendants state that they took the action condemned because she usurped Little's authority and failed to follow Little's directions.

The defendants maintain that the documentary evidence demonstrates that Milde usurped Little's authority by 1) terminating the contract with C.C.I.; 2) attempting to hire a recreation coordinator at Parsonage without communicating with Little or getting his approval; and 3) changing the degree required to be a recreation coordinator in the job description. The defendants further claim that the documentary evidence demonstrates that Milde failed to follow the 90-day opportunity to improve that Little gave her on June 6, 2000, in that Milde:

1) communicating directly with C.C.I. regarding contract issues;
2) refused to turn over an employment contract that Little asked
for; 3) continuing in her efforts to hire an in-house recreation
coordinator even though Little told her not to; 4) refused to
attend a meeting at the time directed by Little; and 5) refused
to apologize to the Board for her actions at their May 22, 2000
meeting.  With this articulation, the court concludes that the
defendants have sufficiently rebutted the inference of
discrimination raised by Milde's prima facie case.

C.          Pretext/Discrimination

          Finally, the plaintiff must show that the reason given
by the defendant for the adverse action was false, and that the
real reason for the action was illegal discrimination.  St.
Mary's Honor Center v. Hicks, 509 U.S. 502, 507-08, 113 S.Ct.
2742, 125 L.Ed.2d 407 (1993). The plaintiff my satisfy this
burden by persuading the court that... the employer's proffered
reason is unworthy of credence." McDaniel v. Temple Inep. School
Dist., 770 F.2d 1340 (5th Cir. 1985).

> The factfinder's disbelief of the reasons put forward
> by the defendant (particularly if disbelief is
> accompanied by a suspicion of mendacity) may, together
> with the elements of a prima facie case, suffice to
> show intentional discrimination. Thus, rejection of the
> defendant's proffered reasons, will permit [but does
> not compel] the trier of fact to infer the ultimate
> fact of intentional discrimination... [and] no
> additional proof of discrimination is required.

St. Mary's Honor Center, 509 U.S. at 511, 113 S.Ct. 2742.

1.    <u>Usurpation of Authority</u>

Milde asserts that contrary to the defendants' assertions, she did not usurp Little's authority. Specifically, she argues that: 1) she did not "terminate the contract" but instead simply failed to "renew the contract"; 2) that she did report her efforts to hire an in-house recreation coordinator as Little accused her of not doing; and 3) she did not rewrite the job description for the in-house coordinator as Little accused her of doing.

Milde's arguments are without basis.  The record reflects a series of memoranda, many written by Milde, which show that Milde disregarded Little's authority.  In particular, documents reveal that Milde posted a job opening for an in-house recreation coordinator and then interviewed and found a person to hire.  That person did not have a degree as required in the original job description which the Board approved in 1996. None of these memoranda reflect that she communicated these steps to Little or asked for his permission until after she had already done them.

Further, Milde's assertion that she did have the authority to hire an in-house recreation coordinator and terminate the contract with C.C.I. are also without merit.  There is no dispute that Little was Milde's boss and that the ultimate authority over Parsonage is the Board, which sided with Little in

25

his decision not to hire an in-house recreation coordinator and to maintain the contract with C.C.I., as witnessed by McClenachan's testimony that she supported Little's actions dealing with Milde.

      2. <u>Failure to follow 90-Day Opportunity to Improve</u>

      Milde also argues that, contrary to the defendants' assertions, she did follow the 90 day opportunity to improve. However, the record discloses Milde took actions that show she did not follow that 90-day opportunity, in that 1) Milde communicated directly with C.C.I. about contract issues instead of working through Little as instructed, as shown with the July 6, 2000 memorandum she wrote to C.C.I.; 2) Milde failed to turn over the employment contract of Nancy Wisecup that Little asked for; 3) Milde continued to go around Little in trying to hire an in-house recreation coordinator as shown with her carbon copying an internal memorandum to the state ombudsman; 4) Milde refused to attend a meeting at the time directed by Little as shown in Milde's August 7, 2000 memorandum; and 5) Milde admittedly refused to apologize to the Board for her actions at their May 22, 2000 meeting.

      In sum, Milde has failed to produce any evidence beyond her own conclusory statements that the defendants' articulated reason for terminating her employment is unworthy of belief. In light of the substantial evidence produced to support the

defendants' articulated reason, the court concludes that an issue of fact does not exist with respect to the claim of pretext, and accordingly, the defendants are entitled to judgment as a matter of law.  See e.g., Getschmann v. James River Paper Co., Inc., 822 F. Supp. 75, 78 (D. Conn. 1993) (favorable prior work performance and two discriminatory statements by a supervisor were "too slender a reed to carry the weight of the charge" at summary judgment where there was overwhelming evidence of legitimate business reason).[2]  For the same reasons, Milde's motion for summary judgment on her Title VII claim is denied.

## II. Age Discrimination

Milde next argues that HATG and the Board subjected her to adverse employment actions due to her age, in violation of the ADEA. The ADEA states in relevant part, "[i]t shall be unlawful for an employer to... discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms conditions or privileges of his employment

---

[2] Other factors in this case strongly rule out a finding of illegal discrimination.  Firstly, it was Little who made the original decision to hire the plaintiff. See Schnabel v. Abramson, 232 F.3d 83, 91 (2d Cir. 2000) ("Some factors strongly suggest that invidious discrimination was unlikely. For example where the person who made the decision to fire was the same person who made the decision to hire.") Further, after Milde's discharge, the defendants replaced her with another woman.  See Montana v. First Fed. Sav. & Loan Assoc. of Rochester, 869 F.2d 100, 107 (2d Cir. 1989) (where the court observes that, where the plaintiff's responsibilities were given to a woman after her termination, the plaintiff could not even establish a prima facie case of gender discrimination).

because of such individual's age." 29 U.S.C. § 623(a)(1). "The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age." 29 U.S.C. § 631(a). "[W]e analyze ADEA claims under the same framework as claims brought pursuant to Title VII" <u>Schnabel v. Abramson</u>, 232 F.3d 83, 87 (2d Cir. 2000). Therefore, the court first turns to Milde's prima facie case.

## 1. <u>The Plaintiff's Prima Facie Case</u>

"[A] plaintiff establishes a prima facie case of discrimination by showing that: (i) at the relevant time the plaintiff was a member of the protective class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination, such as the fact that the plaintiff was replaced by someone 'substantially younger.'" <u>Roge v. NYP Holdings, Inc.</u>, 257 F.3d 164, 168 (2d Cir. 2001)(quoting <u>O'Connor v. Consol. Coin Carriers Corp.</u>, 517 U.S. 308, 313, 116 S.Ct. 1307, 134 L.Ed. 433 (1996)); <u>see</u> <u>Schnabel</u>, 232 F.3d at 87 (holding "the fact that [the plaintiff] was replaced by a 31 year old is sufficient to give rise to the inference that [the plaintiff] was the victim of discrimination" in establishing a prima facie case).

For the purposes of discussion, the court will assume that Milde has established a prima facie case of age

28

discrimination, in that she was 60 years old when she was terminated, she is a member of a protected class, she was qualified for her position, and she suffered and adverse employment action through her job termination. Further, the court will assume that she has established an inference of age discrimination in that she was replaced by Penny Lore, a 35 year old female.

### 2. **The Defendants' Non-Discriminatory Reason**

The defendants articulate the same non-discriminatory reason for Milde's discharge they furnished with respect to the gender discrimination claim. Accordingly, the court concludes that the defendants have sufficiently rebutted the inference of age  discrimination raised by Milde's prima facie case.

### 3. **Pretext/Discrimination**

As with Title VII claims, when looking at whether there is sufficient evidence of pretext, "courts must refrain from second guessing the decision-making process, but must allow the employees to show that the employer acted in an illegitimate or arbitrary manner." Montana v. First Fed. Sav. & Loan Assoc. of Rochester, 869 F.2d 100, 106 (2d Cir. 1989)(quoting Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985); see Viola v. Philips Med. Sys. of N. Am., 42 F.3d 712, 718 (2d Cir. 1994) (where the plaintiff's first adverse performance review was shortly before being fired, the court held "[d]ismissals are often preceded by

29

adverse performance reviews. Were we to view this pattern as suspect, without more, many employees would be able to appeal their personnel evaluations to a jury"; see also Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001) ("our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employer's business judgments") (quoting Sims v. Oklahoma ex. rel. Dept. of Mental Health and Substance Abuse, 165 F.3d 1321, 1330 (10th Cir. 1999))).  In assessing the final phase of the ADEA framework, "the plaintiff need not prove that age was the only or even the principal factor... but only that age was at least one of the motivating factors."  Carlton v. Mystic Transp. Inc., 202 F.3d 129, 135 (2d Cir. 2000).

    Both Milde and the defendants repeat the same arguments here that they made when discussing the gender discrimination claim.  Milde argues that along with the evidence presenting a prima facie case of discrimination, that the defendants' explanation of a legitimate reason for its action is false.  The defendants argue that there is no evidence that the their reason is false, and that there is also no evidence that age was the real reason for Milde's discharge.

    As with Milde's claim of gender discrimination, even if a reasonable jury could find an inference of age discrimination, the defendants' legitimate reasons for Milde's discharge are

overwhelming and there is no evidence that the reasons are false.[3]   Therefore, the evidence put forward by Milde of age discrimination, as with the evidence put forward of gender discrimination, is once again too slender of reed to carry the weight of the charge in light of the overwhelming evidence of a legitimate reason for discharging Milde.

        Therefore, the court concludes that an issue of fact does not exist with respect to the claim of pretext, and accordingly, the defendants are entitled to judgment as a matter of law.   For the same reasons stated, Milde's motion for summary judgment on her ADEA and FEPA age discrimination claims are denied.

## III. <u>Title VII, ADEA and FEPA Retaliation Claims</u>

        Milde next argues that the defendants retaliated against her in violation of Title VII and ADEA on account of a complaint she filed with the EEOC.   Title VII and the ADEA makes it unlawful for an employer to discriminate against an employee for opposing any unlawful employment practice or for charging, testifying, assisting, or participating in a investigation

---

[3]As mentioned footnote 2, there are factors in this case that strongly rule out a finding of gender discrimination. Likewise, there are factors that strongly rule out a finding of age discrimination, in that Little was the same age as Milde, 60, when he made the decision to terminate her, Little helped to make the decision to hire Milde in 1996 and had an admittedly good relationship with Milde until March, 2000, and hence this evidence indicates that he did not express any discriminatory animus towards Milde when she was ages 56 through 59.

proceeding or hearing authorized under Title VII or the ADEA.  42
U.S.C. § 2000e-3(a); 29 U.S.C. § 623.  "We analyze a claim of
retaliatory discharge under the familiar three-part burden
shifting analysis that was set forth in McDonnell Douglas v.
Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."
Slattery v. Swiss Reins. N. Am., 248 F.3d 87, 94 (2d Cir. 2001).

## 1. **The Plaintiff's Prima Facie Case**

"In order to make out a prima facie case of
retaliation, a plaintiff must show by a preponderance of the
evidence '1) participation in a protected activity known to the
defendant; 2) an employment action disadvantaging the plaintiff;
3) a causal connection between the protected activity and the
adverse employment action.'"  Slattery, 248 F.3d at 94(quoting
Holt v. KMI-Cont'l Inc., 95 F.3d 123, 130 (2d Cir. 1996)).
"[T]he burden that must be met by an employment discrimination
plaintiff to survive a summary judgment motion at the prima facie
stage is de minim[i]s."  Chambers v. TRM Copy Centers Corp., 43
F.3d 29, 37 (2d Cir. 1994)(alterations in original)(internal
quotation marks omitted).  While proof of causal connection can
be established by showing that the protected activity was
followed closely by discriminatory treatment, Davis v. State
University of New York, 802 F.2d 638, 642 (2d Cir. 1986), "when
timing is the only basis for a claim of retaliation, and gradual,
adverse job actions began well before the plaintiff had ever

engaged in a protected activity, an inference of retaliation does not arise." <u>Slattery</u>, 248 F.3d at 95.

A. <u>Participation in Protected Activity/Known to Management/Adverse Employment Action</u>

        The court assumes that Milde has established the first three parts of the prima facie case. Milde engaged in a protected activity by filing her complaint of discrimination with the EEOC. Second, Little knew about Milde's participation in a protected activity through a July 26, 2000 letter from Milde's attorney to Little.  Finally, Milde suffered an adverse employment action when she was discharged.

B. <u>Causal Nexus</u>

        In arguing that a causal nexus exists between the filing of her complaint and her termination, Milde points to the fact that she engaged in protected activity on July 26, 2000 when she filed her complaint with the EEOC.  Shortly thereafter, on August 21, 2000, Little sent Milde a letter informing her that she would be subject to a disciplinary hearing.  The hearing went forward on September 6, 2000, and HATG discharged Milde on September 8, 2000.  Hence, Milde has provided evidence of temporal proximity.

        However, Little subjected Milde to a series of reprimands months before she filed her complaint with the EEOC. Beginning with a memorandum Little wrote on March 24, 2000, Little increasingly expressed his disapproval of hiring an in-

33

house recreation coordinator and the way Milde was handling the situation. These concerns led to the "Corrective Directives" and "Disciplinary Reprimand" that Little sent to Milde on June 2, 2000, far in advance of Milde's EEOC charge.  Furthermore, Little's basic complaints in his June 2, 2000 letters to Milde are consistent with the reasons that the defendants articulated to discharge Milde.

Accordingly, although there temporal proximity between the filing of Milde's EEOC complaint and her discharge this evidence does not create a causal connection because there were a series of gradual reprimands before the plaintiff engaged in a protected activity.  Milde has therefore failed to establish a prima facie case of retaliation.  For the same reasons stated, Milde's motion for summary judgment on these claims is denied.

## IV.  Claim Pursuant to 42 U.S.C. § 1983

Milde next argues that the defendants terminated her employment in retaliation for her exercise of speech as protected by the First Amendment to the United States Constitution.  The defendants seek judgment as a matter of law on the claim, arguing that Milde has failed to raise a genuine issue of material fact that any state action is involved and that, even if there is state action, Milde has failed to establish a prima facie case of retaliation.

1.    <u>State Action/Color of State Law</u>

The defendants argue that there is no evidence that they were acting under color of state law and, hence, they are entitled to judgment as a matter of law.  Further, the defendants point out that, while the they receive state funding, that alone is insufficient to establish that personnel decisions of the institution are state actions.

In response, Milde argues that, to the contrary, the activity of HATG is infused with state action because it is performing a function that is public and governmental in nature and that, moreover, it was established under legislation that was approved by the state of Connecticut with the Board appointed by the town of Greenwich board of selectmen with the defendants receiving local, state and federal funding.  Further, Milde maintains that each defendant is clothed with the authority of state law because they operate the only housing authority in Greenwich.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  <u>West v. Adkins</u>, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)(citation omitted).  For an entity to be liable as a state actor, "the State need not have coerced or even encouraged events

35

at issue. . . if 'the relevant facts show pervasive entwinement
to the point of largely overlapping identity' between the State
and the entity that the plaintiff contends is a state actor."
Horvath v. Westport Library Ass'n, 362 F.3d 147, 154 (2d Cir.
2004)(quoting Brentwood Academy v. Tennessee Secondary School
Athletic Ass'n, 531 U.S. 288, 303, 121 S.Ct. 924, 148 L.Ed.2d 807
(2001)); see id. (where the court held that a library was a state
actor because the town appointed half of the board, the library
was created by statute, and it served a governmental function).
In Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 400, 115
S.Ct. 961, 130 L.Ed.2d 902 (1995), the Court stated that, "where
the Government creates a corporation by special law, for the
furtherance of governmental objectives, and retains for itself
permanent authority to appoint a majority of the directors of
that corporation, the corporation is part of the government for
purposes of the First Amendment." Id. Further, an individual
who conducts himself as a supervisor for a public employer is, as
a matter of law, acting under color of state law. Annis v.
County of Westchester, 36 F.3d 251, 254 (2d cir. 1994). "The
question of state involvement is always a factual inquiry."
Ginsburg, 189 F.3d 268, 271 (2d Cir. 1999)(quoting Dahlberg v.
Beck, 748 F.2d 85, 92 (2d Cir. 1984)).

      In this case there is enough evidence for a fact-finder
to conclude that each of the defendants, i.e., HATG, the Board

and Little, were acting under color of state law as state actors.
As with Lebron, the state created HATG by statute in order to
perform a public function – in this case to provide public
housing.  With respect to the Board, the board of selectmen of
the town of Greenwich appointed the members of the Board, and
gave the Board authority from which it could decide how to
provide recreational services to the residents at Parsonage.
Further, Little, as a supervisor of a public employer, is a state
actor as a matter of law.  Viewing all facts in light most
favorable to the plaintiff, the court concludes that this case
does not fail for want of state action.

      2.   Retaliation

      A.  Matters of Public Concern

      The defendants next argues that they are entitled to
judgment as a matter of law because the speech at issue does not
touch on a matter of public concern.  Specifically, they assert
that the speech at issue, Milde's complaints, dealt solely with
internal operational matters, i.e., her day-to-day employment
situation resulting from her dissatisfaction with Little.

      In response, Milde argues that her complaints to Little
and the Board centered around what she thought was C.C.I.'s
inadequate recreation services.  She argues that the absence of
such services would have a negative impact on the residences, and
do not involve merely internal personnel matters.

37

To establish a claim of retaliation in violation of the
First Amendment, the plaintiff must initially demonstrate that:
"(1) the speech at issue was made as a citizen on matters of
public concern; (2) he or she suffered an adverse employment
action; [and] (3) the speech was at least a substantial
motivating factor in the [adverse employment action]" Johnson v.
Ganim, 342 F.3d 105 (2d Cir. 2003)(internal citations and
quotations omitted).

"Whether speech involves a public concern is a question
of law to be determined on the basis of the 'content, form, and
context of a given statement, as revealed by the whole record.'"
Sheppard v. Beerman, 18 F.3d 147, 151 (2d Cir. 1994)(quoting
Connick v. Myers, 461 U.S. 138, 147-8 & n. 7, 103 S.Ct. 1684, 75
L.Ed.2d 708 (1983)).  First Amendment protection applies not only
when the view is expressed publicly, but also "when a public
employee arranges to communicate privately with his employer
rather than to express his views publicly." Connick, 461 U.S. at
146, 103 S.Ct. 1684. See White Plains Towing Corp. v. Patterson,
991 F.2d 1049, 1058 (2d Cir. 1993)(where the court gives examples
of speech that are "less likely" to be matter of public concern,
such as "speech that merely proposes commercial transactions...
desire for a particular assignment... medical resident's
complaints regarding her treatment in residency program."
(internal citations omitted)).

38

In this case Milde did express complaints that dealt with matters of public concern.  It is undisputed that Parsonage was required by statute to provide for recreation for its residents. Under state law, "[r]ecreational activities shall be provided in [h]omes for the [a]ged." Conn. Agencies Regs. § 19-13-D6 S(g). This law is a strong indication that the public has a genuine concern that the elderly in their community, who are often more vulnerable than younger people, receive adequate recreation.

The record indicates that two incidents of Milde's speech in which she alleges led to adverse employment actions dealt with inadequate recreation services. On May 22, 2000, Milde tried to speak at a Board meeting about her grievance.  The subject of the speech involved the inadequacy of the recreation services at Parsonage.  On May 22 and May 26, 2000, Milde spoke about the adverse effects of not having an adequate recreation coordinator to the Greenwich Times.  These incidents involve issues of public concern to the community and as a matter of law are not merely internal personnel matters.

B.   <u>Casual Nexus</u>

The defendants argue that there is no evidence of a causal nexus between Milde's protected speech and her job termination.  Specifically, they argue that Little decided to terminate Milde's ewmployment because of an internal power

struggle with Milde, not because of any protected speech.

Milde argues that she can establish a causal nexus between her speech and the adverse employment actions. Specifically, Milde points to the short period of time that elapsed between her speaking out about recreation services at Parsonage and her discharge.  In addition, Milde points to McClenchan's testimony that Milde's grievance regarding the recreation coordinator "was perhaps one of the reasons for her termination. It was not the only reason."

"Once the employee establishes that he has spoken as a citizen on a matter of public concern, he must also establish that the speech was at least a 'substantial' or 'motivating' factor in the discharge." White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1058-59 (quoting Mt. Healthy City City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). "The motive behind [the plaintiff's] firing in his retaliation claim is clearly one of fact." Sheppard, 18 F.3d at 151.

In this case there is evidence from which a jury could find that Milde's protected speech, i.e., her speech at the Board meeting and her comments to the Greenwich Times, was a substantial or motivating factor behind her discharge.  Along with McClenachan's testimony that Milde's actions at the May 22, 2000 Board meeting was perhaps one of the reasons for Milde's job

termination, Little himself told Milde in the May 30, 2000
"Written Disciplinary Reprimand" that once of the reasons for
reprimanding her was her statements to the Greenwich Times about
the failure of C.C.I. to provide adequate recreational services.
While there is evidence that Little discharged Milde based on
conflict over internal procedural matters, there is enough
evidence that Milde's protected speech was at least a substantial
or motivating factor in her discharge.

    C. Pickering Balancing Test

        The defendants next argue that Milde's outburst at the
May 22, 2000 meeting was disruptive to the operations of the
Board and hence, they are entitled to judgment as a matter of law
under Pickering v. Bd. of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20
L.Ed.2d 811 (1968).  Milde responds that her First Amendment
claim is not foreclosed by Pickering because the public interest
of adequate recreation services for the residents at Parsonage
outweighs the potential disruption caused by her speech.
Specifically, Milde argues that poor recreation services for the
elderly can have serious consequences, including stunted life
spans.  In addition, Milde argues that as opposed to disrupting
the functioning of HATG, her speech could have helped the
administration of Parsonage, so it could run more efficiently and
better serve the residents.  Milde also argues that the meeting
was open to the public and there was no reason for the Board to

41

refuse to recognized her.  Finally, Milde points out that the

testimony of nurse Wisecup, that Milde's speech at Board meeting

on May 22, 2000 was not disruptive, supports her claim.

Under Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88

S.Ct. 1731, 20 L.Ed.2d 811 (1968), the court must balance "the

interests of the [plaintiff], as a citizen, to comment upon

matters of public concern and the interest of the [state actor],

as an employer, in promoting the efficiency of the public

services it performs through its employees."  Id.  In Johnson v.

Ganim, 342 F.3d 105, 114 (2d Cir. 2003), the Second Circuit

stated:

> While as a general rule the [Pickering] test is a
> matter of law for the district court to apply, where
> there are questions of fact relevant to that
> application, this court has made known that 'we can
> envision cases in which the question of the degree to
> which the employee's speech could reasonably have been
> deemed to impede the employer's efficient operation
> would properly be regarded as a question of fact, to be
> answered by the jury prior the [district] court's
> application of the Pickering balancing test.'

Johnson v. Ganim, 342 F.3d 105, 114 (2d Cir. 2003) (quoting

Gorman-Bako v. Cornell Coop. Extension, 252 F.3d 545, 557 (2d

Cir. 2001)).

Because there are unresolved factual disputes that must

be resolved before the court can properly apply the Pickering

balancing test, neither party is entitled to judgment as a matter

of law.  Specifically, there is conflicting testimony as to

whether Milde caused a disruption at the May 22, 2000 board

42

meeting.  Milde and Wisecup both testified that McClenchan
shouted Milde down while Milde was being polite.  McClenachan
however characterized Milde's speech as more disruptive.  The
record is also unclear as to why McClenachan testified that Milde
was out of order at the meeting, when she also admitted that it
was a public meeting and anybody could speak.  In addition, it is
also not clear whether or not Milde's statement to the Greenwich
Times could reasonably be seen to cause a disruption.  Finally,
there is evidence on the record, mostly from Milde's testimony
and memoranda that there were deficiencies in the recreational
services at Parsonage, which could weigh against any potential
disruption.  Without the resolution of these issues, the court
can not apply the Pickering balancing test.

## 5. Qualified Immunity

Little next seeks judgment as a matter of law on the
First Amendment claim, arguing that the doctrine of qualified
immunity shields him from liability.  Milde responds that Little
is not protected by the doctrine of qualified immunity.
Specifically, Milde argues that the right not to be discharged
for exercising First Amendment rights are clearly established so
that Little knew or should have known he violated Milde's rights.

"A government official is protected by qualified
immunity insofar as the official's conduct does not violate
clearly established Constitutional or statutory rights."  "Our

43

cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).  The "relevant inquiry is not whether the defendant's should have known that there was a federal right, in the abstract, 'to freedom of speech,' but whether the defendants should have known that the specific actions complained of violated the plaintiff's freedom of speech." <u>Lewis v. Cowen</u>. 165 F.3d 154, 166 (2d Cir. 1999).  "Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful." <u>Lennon v. Miller</u>, 66 F.3d 416, 420 (2d Cir. 1995)(citation omitted).

Under the circumstances presented here, the court concludes that there is a genuine issue of material fact as to whether Little is entitled to qualified immunity.  If Little is not entitled to relief under <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and there is a finding that he terminated Milde's employment on account of her statements either at the May 22, 2000 Board meeting or on account of her report to the Greenwich Times, the court would be hardpressed to conclude that Little believed that his actions

44

were lawful and not in violation of Milde's First Amendment
rights.  Accordingly, Little is not entitled to qualified
immunity at this juncture.

## V. <u>Unconstitutional Prior Restraint Claim</u>

The defendants next seek judgment as a matter of law on
Milde's claim that their media and public relations policy
constituted an unconstitutional prior restraint.  In response,
Milde argues that these policies do constitute unconstitutional
prior restraints because their purpose was to prevent negative
press while mandating that all issues were to be discussed with
the Board or Little.

An unconstitutional prior restrain may be found where
"the government imposes a requirement of advance approval or
seeks to enjoin speech." <u>Dial Info. Servs. Corp. v. Thornburgh</u>,
938 F.2d 1535, 1543 (2d Cir. 1991). <u>See</u> <u>Morris v. Lindau</u>, 196
F.3d 102, 112-113 (2d Cir. 1999)(where the court held that
"because the policy clearly states that it simply requires
notification of the subject matter of the speech, it is not a
prior restraint and does not violate the First Amendment").

In this case, the media policy does not seek to enjoin
speech or require advance approval.  Rather, it simply requires
notification before an employee speaks to the press.  In this
regard, the policy states "before any contact is made with the
media on information, data and/or HATG policies that affect the

45

above strategies, there must be communication with [c]ommissioners and appropriate [s]taff." Therefore, as written it is not a prior restraint. The defendants motion for summary judgment on the prior restraint claim is granted. For the same reasons stated, Milde's motion for summary judgment on her prior restraint claim is denied.

### CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment (document no. 128) is GRANTED IN PART AND DENIED IN PART, and Milde's motion for summary judgment (document no. 132) is DENIED.

It is so ordered, this _____ day of August, 2005, at Hartford, Connecticut.

_____
Alfred V. Covello
United States District Judge

46