# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| URSULA MILDE, : | |
| : | **CIV NO. 3:00CV2423 (AVC)** |
| Plaintiff : | |
| : | |
| v. : | |
| : | |
| THE TOWN OF GREENWICH; : | |
| HOUSING AUTHORITY OF THE : | |
| TOWN OF GREENWICH; : | |
| THE HOUSING AUTHORITY OF THE : | |
| TOWN OF GREENWICH BOARD OF : | |
| COMMISSIONERS; and : | **August 2, 2006** |
| BENJAMIN LITTLE, CEO, : | |
| : | |
| Defendants. : | |
| : | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR RENEWED MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S FIRST AMENDMENT CLAIM

### PRELIMINARY STATEMENT

On May 30, 2006, the Supreme Court issued its decision in Garcetti v. Ceballos,

___ U.S. ___, 126 S. Ct. 1951 (2006). Under Garcetti, a court must first determine whether the

plaintiff was actually speaking as a "citizen" before: (1) analyzing whether the speech raised an

issue of public concern; or (2) conducting the Pickering balancing test.[1] As recently noted by

other district courts analyzing First Amendment claims in light of Garcetti: "This Supreme Court

decision significantly changes the landscape of this case and the extent to which plaintiff's

speech was protected by the First Amendment." See Ryan v. Shawnee Mission Unified School

District, 2006 U.S. Dist. LEXIS 46311 (D. Kan. July 7, 2006) (holding that a school physical

therapist's complaints that the school district did not hire enough physical therapists to meet the

---

[1]    See page 4, infra.

needs of disabled students as required by law, were made as part of her official duties and were not, therefore, constitutionally protected under new Supreme Court precedent). As the Supreme Court clarified, when public employees make statements pursuant to their official duties, the employees are not speaking as "citizens" for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline. The Court reasoned that restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have otherwise enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

Defendants' respectfully renew their motion for summary judgment on Plaintiff's First Amendment claim in light of this clarification.[2] As set forth herein, Plaintiff's speech was clearly unprotected because the undisputed evidence establishes that Plaintiff spoke as Administrator of Parsonage Cottage Senior Residence (PCSR) when she engaged in her allegedly protected conduct.

## SUMMARY OF ARGUMENT

Plaintiff Ursula Milde was the Administrator of the Parsonage Cottage Senior Residence ("PCSR") in Greenwich. Milde's supervisor was Benjamin Little, the Chief Executive Officer of the Housing Authority of the Town of Greenwich ("HATG" or the "Housing Authority"). Milde refused to accept Little's authority concerning operational issues affecting the PCSR. As Milde told an employee of PCSR, she and Little disputed "who was in control."

---

[2]    The Court granted Defendants permission to file this renewed motion on July 25, 2006.

2

The power struggle between Milde and Little continued regarding the issue of recreational services provided for the residents of PCSR. Milde wanted to hire an in-house recreation coordinator. Little thought the recreation services should continue to be provided by the outside vendor who was currently performing those services.

Given their differences on the issue of hiring a recreation coordinator versus an outside vendor, Milde sought redress from the Housing Authority's Board of Commissioners through the grievance procedure. The Board rejected Milde's grievance on this issue, finding that: (1) this was an "operations matter;" (2) it did not want to become the "arbiter of turf wars" among managers; and (3) it would not usurp Little's authority over PCSR. Milde thereafter raised the subject of an in-house recreation coordinator at a public Board meeting on May 22, 2000 - - a meeting she was *required* to attend under the license for PCSR. During this meeting, Sue McClenachan, the Board Chairperson, told Milde more than once that she was "out of order". Milde did not stop speaking but insisted she wanted to be heard by the Board on this issue. McClenachan told Milde the matter should be dealt with in Executive Session. The Board then permitted Milde to speak to them in Executive Session.

After fighting a battle of memos with Milde for more than two months and concluding that Milde had attempted to deceive him regarding the hiring of an in-house recreation coordinator, Little issued Milde a formal, written disciplinary reprimand and "Corrective Directives" memorandum. Little was specific in his criticisms and directives. Little gave Milde 90 days to improve, essentially telling her she must follow his directives or face further disciplinary action. Milde took issue with each of Little's points and suggested their relationship was so damaged they needed a mediator to resolve their problems. Three months

later, and following a series of additional documented disputes and a disciplinary hearing at which Milde's counsel appeared, Little decided to terminate Milde's employment.

Milde claims she was terminated in violation of her First Amendment rights. Milde previously brought age and gender discrimination and retaliation claims against Defendants pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq., ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. § 623 et. seq., ("ADEA"), and the Connecticut Fair Employment Practices Act, Con. Gen. Stat. § 46 (1) et. seq.    On August 12, 2005, this Court granted Defendants' motion for summary judgment on Milde's Title VII, ADEA and state claims. As noted by the Court in its opinion: "the defendants' legitimate reasons for Milde's discharge *are overwhelming and there is no evidence that the reasons are false*;"[3]

The Court denied the Defendants' motion, however, with respect to Milde's First Amendment claim regarding statements she made at the Board meeting and subsequently to the press on this issue.[4]    Finding Milde's "speech" regarding recreation services for the PCSR residents "dealt with matters of public concern," the Court held that issues of fact remained as to: (1) whether this speech "was at least a substantial or motivating factor in [Milde's] discharge;" and (2) whether the potential for disruption caused by this speech outweighed the value of Milde's comments, under the "balancing test" established in Pickering v. Bd. Of Educ., 391 U.S. 563, 88 S. Ct. 1731 (1968).[5]    As recently held by the district court in Logan v. The Indiana

---

[3]     See Ruling on The Defendants' Motion for Summary Judgment and The Plaintiff's Motion for Summary Judgment at 30-31 (emphasis added).

[4]     Defendant Little subsequently appealed the Court's denial of his defense of qualified immunity.  The Second Circuit dismissed the appeal on April 26, 2006, for lack of jurisdiction.

[5]     See Ruling on The Defendants' Motion for Summary Judgment and The Plaintiff's Motion for Summary Judgment at 39-43.

Department of Corrections, 2006 U.S. Dist. LEXIS 43631 (S.D. Ind. June 26, 2006), however, "before asking that question, Garcetti requires that the court must decide whether the plaintiff was speaking as a citizen or as part of her public job." Id. at *3 (internal quotations omitted) (holding that Garcetti has "changed the analysis in § 1983 First Amendment speech cases, requiring a new question to be asked and answered as part of the Connick/Pickering test.").

Because Milde's "speech" was admittedly made in her capacity as the Administrator for PCSR and pursuant to her job responsibilities, such speech is not entitled to constitutional protection as a matter of law. Therefore, the issues of fact previously identified by the Court relating to the "motivating factor" for Milde's termination and the Pickering balancing test are not even reached as a matter of law. There is no material issue of fact to be tried. This Court should grant summary judgment for Defendants on the remaining count in Plaintiff's Revised Sixth Amended Complaint as a matter of law.[6]

## STATEMENT OF FACTS[7]

The undisputed facts relevant to the instant motion are set forth in Defendants' Local Rule 56(a)1 Statement of Facts. For the Court's convenience, the following summarizes the undisputed facts.

### I.    Milde's Employment History

The Housing Authority hired Ursula Milde on September 30, 1996 as the Administrator of Parsonage Cottage Senior Residence ("PCSR"). (Tr. 8:18-22). When hired,

---

[6]    The operative Complaint in this case is currently Plaintiff's *Revised Sixth* Amended Complaint ("6th Amend. Compl.") dated January 16, 2003. A copy of Plaintiff's Sixth Amended Complaint is annexed to the Affirmation of Susanne Kantor, submitted in support of Defendants' Renewed Motion for Summary Judgment ("Kantor Aff.") as Exhibit A.

[7]    These facts are assumed true for the purposes of the instant motion only. Throughout this Memorandum, "Tr. __" refers to pages of the transcript of Plaintiff Milde's deposition. Copies of all relevant deposition transcript pages and exhibits cited herein are annexed to the Kantor Aff. Copies of all unreported decisions cited herein also are attached to the Kantor Aff.

Milde believed she was in complete charge of the day-to-day operations of PCSR. (Tr. 18:21-25). Milde believed she would report what she did to the Executive Director and the Deputy Director of the Housing Authority but she would make the decisions on everything that pertained to the operations of PCSR as long as they were within the guidelines of the law and PCSR's operating certificate. In April 1999, Tom Crawford retired as Executive Director and Ben Little replaced Crawford. (Tr. 229:2-7). Little later changed the title of his position to Chief Executive Officer. (Tr. 229:8-10).

## II.     Milde's Relationship With HATG Management and Her "Control" Issue

Milde told Debra Littlejohn, an employee of PCSR, that the problem between Little and her was "who is in control." (Tr. 279:16-24). Milde's six month battle with Little over the authority to control PCSR, however, was not the first one she waged. On November 30, 1997, Milde wrote a memo to Tom Crawford stating that she was accountable and responsible under the PCSR's license.    (Tr. 57:19-58:2, 64:8-13; Milde Dep. Ex. 4). In the memo, Milde stated that: "[w]hen I was hired as the administrator of Parsonage Cottage Senior Residence, my understanding was that I would be responsible for all the aspects of operations at the residence." (Milde Dep. Ex. 4). Milde further wrote that: "[s]ince my name is on the state license, I am, naturally accountable for the entire operation, a responsibility I do not avoid." (Milde Dep. Ex. 4).

## III.     The Initial Dispute Over Hiring an In-House Recreation Coordinator

Milde first raised the issue of hiring an in-house recreation coordinator for Parsonage Cottage at a senior staff meeting on February 3, 2000. (Tr. 94:8-23; 176:14-178:8). When Milde raised the issue, Little did not say anything. (Tr. 178:4-5). Milde understood that it

was Little's "modus operandi" to listen to a staff member's report and not respond or sometimes respond "much later". (Tr. 178:7-11).

On March 24, 2000, Little responded to Milde. Little wrote Milde a memo referencing a number of concerns Little had about Milde's conversation regarding the recreation coordinator position. (Tr. 92:17-93:17) (Milde Dep. Ex. 6). Of the concerns listed by Little were: (1) how the individual would be paid; (2) the development of a proper job description for the position; and (3) if the position was allowable under the State. (Milde Dep. Ex. 6). On March 25, 2000, Milde responded to Little's March 24th memo, citing Connecticut State Code regulations and an earlier job description she previously developed. (Tr. 95:25-96:25) (Milde Dep. Ex. 7). Milde addressed this memo to Little from: "Ursula Milde, Administrator, PCSR." (Id.).

On April 13, 2000, Milde again wrote Little concerning the recreation coordinator position, claiming to have found a "suitable candidate" for the position, and stating that she was going to "move ahead with this plan as soon as possible." (Tr. 97:3-21) (Milde Dep. Ex. 8). This memo to Little was addressed from: "Ursula Milde, Administrator, PCSR." (Id.).

On April 17, 2000, Little responded to Milde's April 13th memo stating that: "[t]he procedure that you have followed in hiring a Recreational Coordinator causes a few problems" and proceeded to list five specific concerns, including the fact that the position had not yet been approved by the Personnel Committee or recommended to the Board. (Tr. 97:22-98:10) (Milde Dep. Ex. 9). The following day, Little presented the Board's Personnel Committee with a memo identifying Milde's desire to hire an in-house recreation coordinator. In his memo to the Personnel Committee, Little outlined his concerns about the hiring of a full-time

individual for this position, including but not limited to the fact that hiring someone for that position would cause an additional $24,593.82 annually to PCSR's budget. (Milde Dep. Ex. 11).

On April 24, 2000, Milde responded to Little's April 17th memo. (Milde Dep. Ex. 12). In this memo, Milde explained how she had already developed a job description for a recreation coordinator, posted the position, and interviewed a candidate for the position. Milde ended the memo by writing: "Let me assure you that I have proceeded with this not because I want to usurp your authority but because I know you are very busy *and it is my responsibility to do what needs to be done and what is best for the residents at PCSR and the total operation.*" (Milde Dep. Ex. 12) (emphasis added). Again, Milde wrote this memo to Little from: "Ursula Milde, Administrator, PCSR." (Id.).

## IV.    Milde's Attempts to Present her Case to the Board

On April 24, 2000, after her request to present her recommendation to the Board's personnel committee was denied, Milde wrote a memo to Little in which she requested a grievance hearing with the Board. (Tr. 82:13-18) (Milde Dep. Ex. 13). In that memo, addressed from: "Ursula Milde, Administrator, PCSR," Milde wrote: "Since the Executive Director prevented me from presenting the case to the Personnel Committee as I had requested, I have no other choice but to ask for a formal hearing." (Milde Dep. Ex. 13). The substance of Milde's grievance was that she was not allowed to present her reason or the rationale for her plan to hire an in-house recreation coordinator. (Tr. 82:18-23).

On April 26, 2000, Milde wrote another memo to Little regarding the hiring of the recreation coordinator and copied all the members of the Board. (Milde Dep. Ex. 20). In that memo, on PCSR stationary and addressed from: "Ursula Milde, Administrator, PCSR," Milde wrote:

8

It is *my responsibility* both legally and ethically *as administrator of this licensed home* to safeguard the rights and well being of the residents who entrust themselves to our care. This is expressed in the code for licensed homes: "Section (C) Administration (1)" . . . . "The proprietor or licensee of the institution shall be responsible for operation of the institution in compliance with these regulations." . . .

Parsonage Cottage Senior Residence has been so successful in these first three years, and is so well regarded by residents' families, the professional community, as well as our licensor (i.e. the CT State Health Department), *because I have taken this responsibility seriously* and have found trained staff who are like minded and dedicated to the same principles. . . .*The decision to hire an in-house recreation coordinator . . . was arrived at through careful deliberation and observation by our staff and myself,* because we realize how much it would benefit the residents and meet their needs. . . . I can only conclude that the way in which you and the Board proceeded regarding this matter, and the way the decision was "un-communicated" to me (I learned it first through the newspaper) showed a high disregard for me and my staff. But, more importantly, it demonstrated a lack of concern for the needs of the residents whom we have, after all, pledged to serve. I like (sic) to remind you, therefore, that what matters is not your, or my, authority nor, "who is in charge here" but what best serves the residents of Parsonage Cottage Senior Residence. All of us, including you as the CEO of the managing agent, as well the Board of Commissioners, the Parsonage Cottage staff, and I, must always be cognizant of this responsibility.

(Milde Dep. Ex. 20) (emphasis added).

About 15 days later, Milde received a memo stating that there would be a grievance hearing on May 15, 2000. (Tr. 82:23-83:3). Shortly before the hearing, however, Milde received a fax from Mr. Little stating that the grievance hearing was cancelled but no explanation for the cancellation was provided. (Tr. 83:4-10).

When Milde arrived at the Board meeting on May 22, 2000, she was given a letter dated May 19, 2000 and signed by Barry Nova, the Board's Vice Chair, stating that her

grievance had been denied and she was not going to have a hearing on this issue. (Tr. 83:10-12;

84:20-85:11). The Board's letter, in part, stated:

> The subject of your request, i.e., the hiring of a Recreation
> Director at Parsonage Cottage, we believe, is an operations
> matter that should be discussed and resolved between you
> and the CEO of the Housing Authority of the Town of
> Greenwich to whom you report.    The Board of
> Commissioners should not, and will not, become the arbiter
> in "turf wars" among Managers; nor will it usurp the
> responsibilities and accountabilities of Benjamin Little.

(Milde Dep. Ex. 30).

## V.    The May 22, 2000 Board Meeting

The HATG Board meetings follow Robert's Rule of Parliamentary Procedure.

(Tr. 163:10-12).    If someone wanted to speak during the meeting, the Chairperson had to

recognize them. (Tr. 163:13-16).  Under the license for PCSR, Milde was required to attend all

open Board meetings.  (Tr.84:12-20).

When Milde began to speak at the Board meeting on May 22, 2000 about the

recreation coordinator position, Sue McClenachan, the Board Chairperson, told Milde more than

once that she was "out of order". (Tr. 161:16-22; 163:20-21). Milde did not stop speaking but

insisted she wanted to be heard on this issue. (Tr. 161:23-25).  McClenachan told Milde the

matter should be dealt with in Executive Session and that the issue Milde was raising was a

personnel matter. (Tr. 164:4-9). Milde continued to speak and insisted she be permitted to come

to an Executive Session. (Tr. 164:10-13).  The Board then permitted Milde to speak in Executive

Session. (Tr. 164:14-16).

During Executive Session, Milde told the Board that she had opened the PCSR,

"had a track record with this," and was "treated very unprofessionally" throughout the whole

process. (Tr. 165:5-9). The day after the meeting, Milde sent a letter on PCSR letterhead to

Barry Nova, the Board's Vice Chair. (Milde Dep. Ex. 31). In her letter, Milde wrote:

> In response to your letter dated May 19, 2000, which you
> handed me last night, I want to clear up some inaccuracies.
> **My grievance is a grievance against the CEO, who**
> **prevented me from presenting the reason for my desire**
> **to hire an in-house Recreation Coordinator to the**
> **Personnel Committee, after he had informed me via a**
> **memo dated 4/17/00 that it was up to the Personnel**
> **Committee of the Board of Commissioners to make the**
> **decision**. . . . Through out my tenure as the administrator of
> PCSR, I have provided strong and consistent leadership and
> have made decisions which have benefited the residence,
> the individuals, and ultimately the HATG. I have a proven
> track record and have been trusted by the CT State Health
> Department which licenses us, by residents, their families
> and my staff and colleagues. It is therefore important that
> my and the PCSR staff's input is sought regarding
> decisions which affect PCSR. On another note, I do want
> to thank you personally, for listening to me at last night's
> executive session."

(Milde Dep. Ex. 31) (emphasis in original). Milde then signed the letter: "Ursula Milde,

Administrator." (Id.).

## VI.    Little's May 30, 2000 Disciplinary Reprimand and Corrective Directives to Milde

On June 2, 2000, Little provided Milde with a performance evaluation and two

memos entitled, "Corrective Directives" and "Disciplinary Reprimand and 90 Day Opportunity

to Improve". (Tr. 414:17-415:11; 166:2-15; 168:9-23) (Pl's Dep. Ex. 16; Milde Dep Exs. 33 and

34). On the review, Little provided Milde with an overall rating of 3.81 out of 7 on her

performance. (Tr. 419:9-22).

In the Corrective Directives memo, Little wrote:

> Your actions regarding the issue of Recreational
> Coordinator are serious. You have failed to keep lines of
> communications open between you and me and therefore I
> have been unaware of your activities. You have evidenced

> a willful and intentional position of not recognizing that I
> am your supervisor. You have acted without the authority
> of myself or the Board of Commissioners. These,
> combined with your reluctance not to change, have caused
> me to consider disciplinary actions ranging from a written
> reprimand to possible termination. However, because of
> your dedication to the elderly residing at Parsonage, I have
> decided to only give a written reprimand which will be
> placed in your personnel file. In addition, I have decided to
> give you 90 days to take the following corrective actions ....

(Milde Dep. Ex. 33, p. 2). Milde understood that if she did not do as directed by Little in the

memo, she would be subject to further disciplinary action. (Tr. 168:4-8).

In the Disciplinary Reprimand, Little listed seven reasons for the reprimand,

including insubordination. (Tr. 169:10-14). On page three of the Reprimand, Little stated that

Milde gave the impression in her March 25th memo that the position of "recreational activities

therapist" was merely in the "planning" stages because the memo made no mention of the fact

that Milde had already posted for the position, nor any mention that Agata Wilinkski had already

interviewed for the position by March 25, 2000.   (Tr. 604:3-10; 15-20; Milde Dep. Ex. 34).

Milde also unilaterally changed the degree requirement on the job posting from "associate degree

required" to one where a degree was "not necessary but advisable." (Tr. 606:5-22). Milde made

this change without discussing it with Little. (Tr. 605:25-607:2).

## VII.  Milde's Response to Little's May 30, 2000 Disciplinary Reprimand and Corrective Directives

Milde responded to the Disciplinary Reprimand with a five page memo that

included eleven attachments. (Tr. 171:12-172:14) (Milde Dep. Ex. 35). With respect to the

insubordination issue, Milde wrote:

> **You appear to interpret my carrying out my**
> **responsibilities, as delineated in my job description,**
> **with the independence and competence I have shown in**
> **the past three years and eight months as**

12

> **insubordination and lack of communication. I believe that I have carried out my responsibilities within my job description conscientiously and competently.**

(Milde Dep. Ex. 35). On the final page of this memo, Milde stated that she believed the Disciplinary Reprimand to be: (1) A violation of her contractual agreement as delineated in her job description . . .; (3) An attempt to undermine her authority as the administrator, who is responsible to the CT State Health Department, under our license, for all the operations at PCSR . . .; (5) In direct conflict with past messages of the Housing Authority and verbal statements by Little that Milde's work was very good; and (6) An indication of a difficult working relationship between Milde and Little. (Tr. 173:2-15) (Milde Dep. Ex. 35, p. 5). At the time she wrote her response to the Disciplinary Reprimand, Milde's relationship with Little was so poor that she suggested they use a mediator to work through their problems. (Tr. 174:12-25) (Milde Dep. Ex. 35, p. 5).

## VIII.    Little's Directive That Milde Apologize to the Board

On June 7, 2000, Little issued a memo to Milde directing her to prepare a written apology to the Board for her actions at the May 22, 2000 Board meeting. (Tr. 180:18-24) (Milde Dep. Ex. 38). On June 21, 2000, Little issued a second memo to Milde directing her to submit a written apology to the Board. (Tr. 191:9-192:11). Milde never apologized to the Board. (Tr. 181:14-17).

On June 26, 2000, Milde submitted a memo to Sue McClenachan, the other members of the Board, and Little, responding to Little's request that Milde apologize for her actions at the Board meeting. (Tr. 193:24-194:17) (Milde Dep. Ex. 45). In the memo, Milde provided six reasons why she could not "follow these directives". (Milde Dep. Ex. 45). Milde specifically stated:

13

> It is hard for me to understand for what I am being directed
> to apologize since I have not committed any act or engaged
> in any behavior which warrants an apology. I have neither
> used abusive language nor even raised my voice when I
> brought up a matter of vital concern for PCSR, *which is my*
> *responsibility as the administrator.*

(Milde Dep. Ex. 45) (emphasis added). In addition, Milde concluded that she could not

> **in good conscience, remain silent, nor will I be forced to**
> **apologize for performing my responsibilities as the**
> **administrator of PCSR to the best of my abilities and**
> **knowledge, as charged to me under our license.**

(Milde Dep. Ex. 45) (emphasis in original). On June 30, 2000, Little wrote to Milde stating that

he was "deeply disappointed" that she had not followed his prior directives to apologize to the

Board. (Tr. 197:3-12) (Milde Dep. Ex. 47).

## IX.    Little's Request that Milde Participate in a Disciplinary Hearing

In a letter to Milde dated August 21, 2000, Little stated he found Milde had made

no attempt to comply with his Corrective Directives Memorandum of May 30, 2000, and since

that time additional unsatisfactory performance issues had arisen. (Milde Dep. Ex. 58). Little

directed Milde to attend a disciplinary hearing in his office on August 23, 2000. (Milde Dep. Ex.

58). Little advised Milde that, as a result of this meeting, disciplinary action, up to and including

termination, might result. (Milde Dep. Ex. 58). The disciplinary meeting was later rescheduled

to September 6, 2000 so that Attorney Carey could attend the meeting with Milde. (Tr. 207-08).

## X.    Little's Termination of Milde's Employment

On September 8, 2000, Little wrote Milde informing her that her employment was

being terminated effective that same day. (Milde Dep. Ex. 62). Little wrote:

> This action is based on inadequate and poor work
> performance and failure to comply with the policies,
> procedures, and regulations of the Housing Authority of the
> Town of Greenwich. These issues have been presented to

> you in writing and you have been given the opportunity to
> respond and comply with these policies, procedures, and
> regulations.   You have failed to respond and actively
> resolve these issues and as a result of these actions have
> interfered with the efficient and effective operation of
> Parsonage Cottage.

(Milde Dep. Ex. 62).   Milde's employment as Administrator for PCSR was terminated

accordingly.

## ARGUMENT

## POINT I

### RENEWAL OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IS APPROPRIATE WHERE RECENT SUPREME COURT PRECEDENT ESTABLISHES THAT PLAINTIFF DOES NOT HAVE A CLAIM AS A MATTER OF LAW

Renewing a previously denied motion for summary judgment is proper where

new controlling case law establishes that plaintiffs cannot, as a matter of law, sustain their

claims.  See Ruotolo v. City of New York, 2006 U.S. Dist. LEXIS 49903 (S.D.N.Y. July 19,

2006) (granting the defendants' motion to renew their motion to dismiss the plaintiff's First

Amendment claim *two weeks before trial* - - after previously denying motions to dismiss and for

summary judgment - - in light of the Supreme Court's decision in Garcetti v. Ceballos).  See

also  Epstein v. Kalvin-Miller International, Inc., 100 F. Supp. 2d 222 (S.D.N.Y. 2000);

Remington Products, Inc. v. North American Philips, Corp., 755 F. Supp. 52 (D. Conn. 1991).

Defendants are entitled to summary judgment unless Milde can set forth facts,

supported by admissible evidence, which establish a genuine issue for trial.  See Fed. R. Civ. P.

56(e).  Based on this standard and the controlling Supreme Court precedent, Plaintiff cannot

establish a genuine issue of fact for trial on her remaining constitutional claim.  As set forth

herein, summary judgment is warranted for Defendants as a matter of law.

## POINT II

### *GARCETTI V. CEBALLOS* FORECLOSES PLAINTIFF'S "FREE SPEECH" CLAIM AS A MATTER OF LAW

Milde's remaining fourth cause of action is brought under 42 U.S.C. § 1983 for alleged violation of her First Amendment rights for speaking about the hiring of an in-house recreation coordinator. As set forth below, based on the undisputed record in this case - - including the clear and assertive statements by Milde in her capacity as Administrator for PCSR - - Milde cannot establish a constitutional claim against Defendants in light of the Supreme Court's decision in Garcetti v. Ceballos, ___ U.S. ___, 126 S. Ct. 1951 (2006).

In Garcetti, plaintiff-Ceballos was a calendar deputy in a district attorney's office. A defense attorney contacted Ceballos about a pending case claiming there were inaccuracies in an affidavit used to obtain a critical search warrant. Garcetti, __ U.S. __, 126 S. Ct. at 1955. Ceballos investigated the allegations, spoke to the warrant affiant, a deputy sheriff, but was not satisfied concerning the perceived inaccuracies in the warrant. Id. Ceballos relayed his concerns to his supervisors, and followed up by sending a memorandum recommending dismissal of the case. Garcetti, __ U.S. __, 126 S. Ct. at 1955-56. A meeting was later held with Ceballos' supervisors, the warrant affiant and other employees from the sheriff's department. Garcetti, __ U.S. __, 126 S. Ct. at 1956. The meeting allegedly became heated, with one lieutenant sharply criticizing Ceballos. Id. Despite Ceballos' concerns, the prosecution proceeded and defense counsel filed a motion to challenge the warrant. Id. At a hearing on the motion, defense counsel called Ceballos to testify, and Ceballos recounted his concerns about the warrant. Id. The trial court rejected the challenge to the warrant but following these events, Ceballos was reassigned from his calendar deputy position, transferred to another courthouse, and denied a promotion. Id. Ceballos claimed these actions were in retaliation for the aforementioned speech.

Similar to the instant case, the Ninth Circuit found that Ceballos' speech was a matter of public concern and the Pickering[8] balancing test could not be resolved on a motion for summary judgment. Reversing the Ninth Circuit's decision, however, the Supreme Court found that the appellate court erred because it did not address an initial critical issue. The Court stated the controlling factor was that Ceballos' expressions were made pursuant to *his duties as a prosecutor*. Garcetti, __ U.S. __, 126 S. Ct. at 1959-60. "That consideration - - the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case - - distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline." Garcetti, __ U.S. __, 126 S. Ct. at 1960. Therefore, even if the subject matter of the speech related to a matter of public concern, the Supreme Court held:

> when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline. Ceballos wrote [the memorandum] because that is part of what he, as a calendar deputy, was employed to do. . . . The significant point is that the memo was written pursuant to Ceballos' official duties. Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioner or created.

Garcetti, __ U.S. __, 126 S. Ct. at 1960. In reversing the decision of the Ninth Circuit, the Supreme Court specifically rejected "the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties." Id. at __ U.S. __, 126 S. Ct. at 1962. The Court further concluded: "Our precedents do not support the existence of a

---

[8]    Pickering v. Board of Educ., 391 U.S. 563 (1968).

constitutional cause of action behind every statement a public employee makes in the course of doing his or her job." Id.

In this case, the evidence that Milde was speaking as the Administrator of PCSR when she was advocating for the hiring of an in-house recreation coordinator is overwhelming. As set forth in detail above, under the license for PCSR, Milde was *required* to attend all open Board meetings. (Tr.84:12-20). As Milde explained:

> I was at all the open meetings of the commissioners because under my license I had to actually produce evidence that I was there as the administrator of Parsonage Cottage, and it had to show in the minutes that the managing agent, namely, the Housing Authority, that the administrator was there at the meetings. So I was at all the open board meetings.

(Tr. 84: 13-20). Therefore, when Milde spoke at these meetings, she was speaking as the Administrator and not as a private citizen.

Moreover, Milde was interviewed by a representative of the Greenwich Time immediately after the May 22, 2000 Board meeting in her capacity as Administrator for PCSR. In a May 23, 2000 newspaper article entitled: "Official decries lack of recreation planner," Milde is referenced as "Parsonage Cottage Administrator." (See Kantor Aff. Ex. F). In the article, Milde describes her responsibilities regarding the hiring of staff at the PCSR. In fact, Milde is quoted: "Whether we hire somebody or contract out to another person, that should be left to me because I'm the administrator." (See Kantor Aff. Ex. F).

Therefore, it cannot be seriously debated that Milde viewed her statements and memos on this issue as anything other than her *responsibility* as the Administrator. For example,

- When first hired, Milde believed she was in complete charge of the day-to-day operations of PCSR. (Tr. 18:21-25).

18

- As far back as November 30, 1997, Milde wrote: "[w]hen I was hired as the administrator of Parsonage Cottage Senior Residence, my understanding was that I would be responsible for all the aspects of operations at the residence;." and "[s]ince my name is on the state license, I am, naturally accountable for the entire operation, a responsibility I do not avoid." (Milde Dep. Ex. 4).

- Milde first raised the issue of hiring an in-house recreation coordinator for Parsonage Cottage during the regular course of her duties at a senior staff meeting on February 3, 2000. (Tr. 94:8-23; 176:14-178:8).

- Milde wrote numerous inter-office memos (some on PCSR stationary) on this subject, addressed from "Ursula Milde, Administrator, PCSR." (See, e.g., Milde Dep. Exs. 8, 12, 13, 20).

- Milde's memos repeatedly referenced her "responsibility" on the issue of a recreation coordinator. For example, in her April 24, 2000 memo to Little, Milde stated: "*it is my responsibility to do what needs to be done and what is best for the residents at PCSR and the total operation.*" (Milde Dep. Ex. 12) (emphasis added).

- Milde's April 26, 2000 memo to Little, copied to all the members of the Board, specifically stated, among other things, that: "It is *my responsibility both legally and ethically as administrator of this licensed home* to safeguard the rights and well being of the residents who entrust themselves to our care. This is expressed in the code for licensed homes: "Section (C) Administration (1)" . . . . *The decision to hire an in-house recreation coordinator . . . was arrived at through careful deliberation and observation by our staff and myself,* because we realize how much it would benefit the residents and meet their needs. (Milde Dep. Ex. 20) (emphasis added).

- Unlike a private citizen, Milde was permitted to speak with the Board in Executive Session at the Board meeting. (Tr. 164: 4-19).

- In the letter Milde sent to Mr. Nova the day after the Board meeting, Milde wrote regarding her opinion to hire an in-house recreation coordinator: "Through out my tenure as the administrator of PCSR, I have provided strong and consistent leadership and have made decisions which have benefited the residence, the individuals, and ultimately the HATG. I have a proven track record and have been trusted by the CT State Health Department which licenses us, by residents, their families and my staff and colleagues. It is therefore important that my and the PCSR staff's input is sought regarding decisions which affect PCSR." (Milde Dep. Ex. 31).

- Milde was interviewed by the Greenwich Time in her capacity as the Administrator of Parsonage Cottage Senior Residence. The newspaper article

quotes Milde as the Administrator and even contains the headline, "Official decries lack of recreation planner". (See Tr. 261; Def.'s Ex. 66).

Perhaps most telling, however, are Milde's responses to Little's Disciplinary Reprimand and her letter to the Board regarding Little's request that she apologize for her actions at the Board meeting. In response to Little's claim that she was insubordinate, Milde wrote:

> You appear to interpret my *carrying out my responsibilities,* as delineated in my job description, with the independence and competence I have shown in the past three years and eight months as insubordination and lack of communication. I believe that I have carried out my responsibilities within my job description conscientiously and competently.

(Milde Dep. Ex. 35 (emphasis added)). Moreover, in her letter to the Board explaining the reasons why she would not apologize for her actions at the Board meeting, Milde wrote:

> It is hard for me to understand for what I am being directed to apologize since I have not committed any act or engaged in any behavior which warrants an apology. I have neither used abusive language nor even raised my voice when I brought up a matter of vital concern for PCSR, *which is my responsibility as the administrator*.

(Milde Dep. Ex. 45) (emphasis added). In addition, Milde concluded that she could not

> **in good conscience, remain silent, nor will I be forced to apologize for performing my responsibilities as the administrator of PCSR to the best of my abilities and knowledge, as charged to me under our license.**

(Milde Dep. Ex. 45) (emphasis in original).

Based on this undisputed evidence of Milde's actions, it is clear that Milde was *never* speaking as a "citizen" regarding her view that PCSR should hire an in-house coordinator to perform the recreational services for the facility's residents rather than continue to have those services provided by an outside vendor. Milde admittedly voiced these concerns as part of her

*responsibilities* as Administrator for PCSR. Therefore, under Garcetti, the Court must reject

Milde's notion that "the First Amendment shields from discipline the expressions [she made]

pursuant to [her] professional duties." See Garcetti, __ U.S. __, 126 S. Ct. at 1962. Milde's First

Amendment claim must be dismissed as a matter of law.

## POINT II

### RECENT CASE LAW APPLYING *GARCETTI* TO "FREE SPEECH" CLAIMS SUPPORTS DISMISSAL OF MILDE'S CLAIM AS A MATTER OF LAW

As discussed above, the Supreme Court's decision "significantly changes the

landscape of this case and the extent to which plaintiff's speech was protected by the First

Amendment." See Ryan v. Shawnee Mission Unified School District, 2006 U.S. Dist. LEXIS

46311 (D. Kan. July 7, 2006). Courts recently applying Garcetti to First Amendment cases have

held that, "[a]fter Garcetti, *the analysis is different*." See Ruotolo v. City of New York, 2006

U.S. Dist. LEXIS 49903 (S.D.N.Y. July 19, 2006) at * 15 (emphasis added).

Under the new standard set forth by the Supreme Court, it must first be

determined whether the plaintiff was actually speaking as a "citizen" before: (1) analyzing

whether the speech raised an issue of public concern; or (2) conducting the Pickering balancing

test. In fact, the District Court for the Southern District of New York recently granted the

defendants' motion to renew their motion to dismiss the plaintiff's First Amendment claim just

*two weeks before trial* - - after previously denying motions to dismiss and for summary

judgment - - in light of the recent Supreme Court's decision in Garcetti. See Ruotolo v. City of

New York, 2006 U.S. Dist. LEXIS 49903 (S.D.N.Y. July 19, 2006).

In Ruotolo, the plaintiff was the Training and Safety Officer at the 50th Precinct in

the Bronx. Id. at *4. In his capacity as Safety Officer, Ruotolo wrote a report, which he

delivered to his commanding officer, identifying several possible environmental risks, including

air and water contamination issues and potential health problems associated with those risks. Id. at **4-5. The precinct's environmental issues thereafter received publicity in several newspapers. Id. Ruotolo claimed that after he submitted this report, he was subjected to a number of retaliatory actions, including reassignment, discipline, and constructive discharge. Id. at *5. In granting the defendants' renewed motion to dismiss, the Southern District held:

> It is clear beyond peradventure that the Report was prepared as part of the plaintiff's official duties. Since Ruotolo prepared his report in the course of his employment duties, his speech is exactly the type addressed in Garcetti; i.e., employer commissioned work over which the employer is entitled to exercise control. Because Ruotolo spoke as a public employee when he prepared this report, he was not speaking as a citizen for First Amendment purposes and has no First Amendment claim for adverse employment actions he may have suffered as a consequence of this work.

Id. at **10-11 (internal citations omitted).

As similarly stated by the District Court in Logan v. The Indian Department of Corrections, 2006 U.S. Dist. LEXIS 43631 (S.D. Ind. June 26, 2006): "The effect of the holding in Garcetti is to add a new test in analyzing the employee's speech in determining whether it is protected under the First Amendment. In applying that test here, we find that plaintiff's speech was not protected and summary judgment must be entered in favor of defendants." Id. at **2-3. In Logan, the plaintiff was the Healthcare Administrator at the New Castle correctional facility. The plaintiff brought a § 1983 claim alleging she was terminated in violation of her First Amendment rights. Id. at *5. The speech in question involved the plaintiff's statements to state correction officials regarding her recommendation for removing the Director of Nursing at the facility. Id. Citing Garcetti, the District Court found the plaintiff's statements were not constitutionally protected because they "arose out of her job responsibilities." Id. The Court

found it persuasive that the plaintiff was the healthcare administrator at the facility and had "broad responsibilities includ[ing] acting 'as a liaison between correctional personnel, public agencies and Prison Health Services.'" Id. at *6.

Likewise, in Ryan v. Shawnee Mission Unified School District, 2006 U.S. Dist. LEXIS 46311 (D. Kan. July 7, 2006), the plaintiff was hired as a physical therapist ("PT") with the defendant-school district. Id. at *15. During the course of her employment, the plaintiff made several statements regarding the quantity and quality of services provided to disabled students and her concerns about inadequate staffing. The plaintiff was subsequently asked to resign her position at the end of the school year because none of the schools to which she was assigned wanted her back the following year due to her interpersonal issues with a variety of staff members. Id. at *31. *Of the issues identified by the employer were the plaintiff's unprofessional behavior and comments at a school team meeting, and her refusal to apologize for her behavior at the meeting.* Id. at *21 and *54. The District Court found that given the "parameters of plaintiff's official job duties as PT for the school district," which included providing services to students, attending team meetings to discuss cases, and evaluating students suspected of being in need of special education, "there is not room for serious debate that the overwhelming bulk of her statements were made pursuant to those duties rather than in her capacity as a citizen. As such, these statements are not protected First Amendment speech." Id. at *44. The District Court further held that: "Like the employee Ceballos in Garcetti, plaintiff made these statements as she went about conducting her daily professional activities, the scope of which is uncontroverted. As such, Garcetti forecloses the possibility that these statements can be considered protected speech." Id. at 49.

See also:

- Gilder-Lucas v. Elmore County Board of Education, 2006 U.S. App. LEXIS 16167 (11th Cir. June 26, 2006) (affirming summary judgment to defendants in light of Garcetti, holding that the plaintiff-school teacher's statements regarding alleged unfairness in the school's cheerleader tryouts were not made as a "citizen" and thus were not protected by the First Amendment).

- Bailey v. Dept. of Elementary and Secondary Education, 451 F.3d 514 (8th Cir. June 23, 2006) (affirming summary judgment to defendants and finding "most importantly," under Garcetti, that the plaintiff's statements in his letter were admittedly made pursuant to his services as a consultant for the state and, therefore, were not constitutionally protected).

- Mills v. City of Evansville, 2006 U.S. App. LEXIS 15082 (7th Cir. June 20, 2006) (affirming summary dismissal of the plaintiff's First Amendment claim under Garcetti, finding the plaintiff's statements were made "in her capacity as a public employee contributing to the formation and execution of official policy," and holding that where the employer believed the plaintiff would attempt to undermine the department's policy, "it was free to act accordingly.").

- Duran v. City of Corpus Christi, 2006 U.S. Dist. LEXIS 46917 (S.D. Tex. July 11, 2006) (granting the defendants' motion for summary judgment on the plaintiff's First Amendment claim where his "own evidence demonstrates that his speech on the [insurance claim] was pursuant to his duties as 'coordinator' under the [City contract].").

- Holbrook v. State of Nevada, 2006 U.S. Dist. LEXIS 47835 (D. Nev. July 13, 2006) (finding the plaintiff-correction officer's refusal to engage in a breach of prison procedure consisted of his performing his duties as required by departmental regulations and institutional procedures;" thus he was not speaking as a "citizen" under Garcetti.)

Based on the foregoing, dismissing Milde's First Amendment claim in light of

Garcetti is in complete agreement with other courts applying this new standard.

## CONCLUSION

Garcetti v. Ceballos significantly changed the standard courts must use to evaluate

whether speech is protected under 42 U.S.C. § 1983. The Supreme Court noted in Garcetti that

"[e]mployers have heightened interests in controlling speech made by an employee in his or her

professional capacity."  __ U.S. __, 126 S. Ct. at 1960-61.  In its August 12, 2005, ruling, this Court did not apply the new <u>Garcetti</u> standard in its analysis of Milde's First Amendment claim, and never addressed whether Milde actually spoke as a "citizen" for First Amendment protection.  The overwhelming undisputed evidence clearly establishes that she did not.  As noted previously by the Court, the undisputed evidence also established that "the defendants' legitimate reasons for Milde's discharge *are overwhelming and there is no evidence that the reasons are false.*"[9]  Based on the foregoing, there is no issue to be tried.  Milde's remaining First Amendment claim must be dismissed as a matter of law.

> Respectfully submitted,
>
> DEFENDANTS HOUSING AUTHORITY OF THE TOWN OF GREENWICH; THE HOUSING AUTHORITY OF THE TOWN OF GREENWICH BOARD OF COMMISSIONERS; AND BENJAMIN LITTLE, CEO
>
> By: _____
> Francis P. Alvarez (CT 10350)
> alvarezf@jacksonlewis.com
>
> Susanne Kantor (CT 19556)
> kantors@jacksonlewis.com
>
> JACKSON LEWIS LLP
> One North Broadway
> White Plains, NY 10601
> Phone: (914) 328-0404
> Fax: (914) 328-1882
> Their Attorneys

---

[9]  <u>See</u> Ruling on The Defendants' Motion for Summary Judgment and The Plaintiff's Motion for Summary Judgment at 30-31 (emphasis added).

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| URSULA MILDE, | : | |
| | : | CIV NO. 3:00CV2423 (AVC) |
| **Plaintiff** | : | |
| | : | |
| v. | : | |
| | : | |
| THE TOWN OF GREENWICH; | : | |
| HOUSING AUTHORITY OF THE | : | |
| TOWN OF GREENWICH; | : | |
| THE HOUSING AUTHORITY OF THE | : | |
| TOWN OF GREENWICH BOARD OF | : | |
| COMMISSIONERS; and | : | |
| BENJAMIN LITTLE, CEO, | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

### CERTIFICATE OF SERVICE

A copy of the foregoing Memorandum of Law in Support of Defendants'
Renewed Motion for Summary Judgment was served via Federal Express, this 2nd day of August
2006, on counsel for Plaintiff at the address listed below:

Mark P. Carey, Esq.
Carey & Associates P.C.
71 Old Post Rd.
Southport, CT 06490

Susanne Kantor