# EXHIBIT E-1

```
 1                UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF CONNECTICUT

 3
       * * * * * * * * * * * *
 4                                         COPY
     URSULA MILDE,                *
 5
              Plaintiff           *
 6
        VS.                       *    3:00 CV 2423 (AVC)
 7
     HOUSING AUTHORITY OF         *
 8   THE TOWN OF GREENWICH,
     ET AL                        *
 9
              Defendants          *
10
       * * * * * * * * * * * *
11
                                 Hartford, CT
12
                                 May 23, 2003
13
                                 10:00 A.M.
14
                             - - -
15
               DEPOSITION OF URSULA MILDE
16                           - - -

17
     APPEARANCES:
18
          FOR THE PLAINTIFF:
19
                  CAREY & ASSOCIATES, P.C.
20                BY:  MARK P. CAREY, ESQ.
                    71 Old Post Road
21                  Southport, CT  06490

22        FOR THE DEFENDANTS:

23                JACKSON LEWIS LLP
                  BY:  FRANCIS P. ALVAREZ, ESQ.
24                  177 Broad Street
                    P. O. Box 251
25                  Stamford, CT  06904-0251
```

                    CAMPANO & ASSOCIATES
                 COURT REPORTING SERVICES

8

1      Q.   And the other thing is that court

2  reporter has a tough job.  She has to get down

3  both my questions, your answers, if Mr. Carey has

4  something to say, to get down what he's saying as

5  well.  In fairness to the court reporter and to

6  insure we have a clear record, I would ask that

7  you let me complete what I am saying before you

8  speak.  Do you understand that?

9      A.   I understand.

10           MR. ALVAREZ:  Mr. Carey, I assume

11  that you are going to have Mrs. Milde read and

12  sign her deposition?

13           MR. CAREY:  I think that's

14  appropriate that she do that, yes.

15      Q.   With that, let me get started.

16           Mrs. Milde, when were you hired by the

17  Housing Authority?

18      A.   October 30 -- excuse me, September 30,

19  1996.

20      Q.   And were you hired as the administrator

21  of Parsonage Cottage?

22      A.   Yes.

23      Q.   You had not worked for them previously?

24      A.   No.

25      Q.   Had you provided services as a

1    Q.   At any time?

2    A.   Nobody said that to me directly.

3    Q.   And did you ever read any document,

4    whether it be a letter or a policy, that said that

5    you would be paid comp time that you had not used

6    at the time you left employment with the Housing

7    Authority or Parsonage Cottage?

8              MR. CAREY:   Objection to the form.

9    A.   No.

10             MR. ALVAREZ:   What's the basis?

11             MR. CAREY:   You are asking two

12   questions.

13   Q.   Did you ever read any document that

14   stated that you would be paid comp time at the

15   time that you left your employment?

16   A.   No.

17   Q.   When you were hired as the

18   administrator, what was your understanding as to

19   the authority that you had to run the day-to-day

20   operations of Parsonage Cottage?

21   A.   I had a job description and my

22   understanding was based on the job description and

23   what Mr. Crawford told me, that I was in complete

24   charge of the day-to-day operations of the

25   facility.

1    my letter, and then Tom corrected that by bringing

2    in the consultant.

3         Q.   So is it fair to say that the gist of

4    your memo was not that you were trying to obtain

5    more authority?

6         A.   No.

7         Q.   Was one of the purposes of this memo to

8    confirm the authority that you had over the

9    day-to-day operations of Parsonage Cottage?

10        A.    That was one purpose, and also my other

11   purpose was to make sure that people understood

12   what was needed at that operation and why

13   sometimes things had to be done differently than

14   they might have been done for other housing

15   developments.

16            (Whereupon, a memo dated 11-30-97 was

17   marked as Defendants' Exhibit 4 for

18   Identification.)

19        Q.    Ms. Milde, do you recognize the document

20   that's been marked as Defendants' Exhibit 4 as the

21   memo that you were just referring to?

22        A.    Yes.

23        Q.    And it's dated November 30, 1997?

24        A.    Yes.

25        Q.    It is to Tom Crawford, executive

```
 1     director?
 2          A.   Yes.
 3          Q.   And this memo identifies or lists five
 4     different subject areas, correct?
 5          A.   That's correct.
 6          Q.   Addresses issues to the facility, yes or
 7     no?
 8          A.   Yes.
 9          Q.   How about budget?
10          A.   Right.
11          Q.   Staffing?
12          A.   Yes.
13          Q.   Surveys and audits?
14          A.   Yes.
15          Q.   And communication, correct?
16          A.   Correct.
17          Q.   And has -- has an introduction paragraph
18     or two?
19          A.   Yes.
20          Q.   And before you list those five areas,
21     you propose a course of action, correct?
22          A.   What do you mean?
23          Q.   It says in the third paragraph therefore
24     I propose the following course of action?
25          A.   Yes.
```

1          Q.    That's what it says?

2          A.    Yes.

3          Q.    And then you list the five different

4     areas where you are posing a cause of action,

5     correct?

6          A.    Yes.

7          Q.    In the first paragraph, you say that

8     when I was hired as the administrator for

9     Parsonage Cottage Senior Residence, my

10    understanding was that I would be responsible for

11    all the aspects of the operation at the

12    residence.  Correct?

13         A.    Yes.

14         Q.    The next sentence states since my name

15    is on the state license, I am naturally

16    accountable for the entire operation.  A

17    responsibility I do not avoid.

18         A.    Yes.

19         Q.    Then you say in that same paragraph in

20    the next sentence, however, there are certain

21    consequences which follow from this which I think

22    need to be clearly understood by all, correct?

23         A.    Correct.

24         Q.    Is it fair to say that you were using

25    this memo at least in part to clarify the areas of

1    yes or no.

2              MR. CAREY:  Objection.  Asked and

3    answered.  Argumentative.

4         A.   Yeah, I wouldn't say yes or no.

5         Q.   Are you saying that you were not

6    complaining about an absence of authority?

7              MR. CAREY:  Objection, vague.

8         A.   I was complaining about given

9    responsibility to run the residence and being

10   accountable to the State under the license for the

11   safety and well-being of the residents and then

12   not given the authority to carry out the

13   responsibility.

14        Q.   That was one of the complaints you were

15   making?

16        A.   Yes.

17        Q.   And you made that complaint to Tom

18   Crawford?

19        A.   Yes.  I informed Ben about that too.

20        Q.   You made that complaint in November of

21   1997?

22        A.   That's correct.

23        Q.   Who was not giving you the authority

24   that you just referenced?

25        A.   I believe the management, Tom, the

1    Q.   Did he do or say something during that
2    conversation to suggest to you that you were being
3    denied the opportunity to go to that meeting
4    because of your age or gender?
5    A.   He just said those two sentences.
6    That's all he said.
7    Q.   So the answer is no?
8    A.   I don't know what he was thinking.  He
9    only said those two things.
10    Q.   How else were you treated differently in
11    your last year of employment to the extent that
12    you haven't already told us?
13    A.   Following this denial of attending the
14    personnel committee, I submitted a grievance.  And
15    I submitted that in writing to the commissioners
16    that very same evening because the personnel
17    committee was three hours before the general
18    commissioners' meeting.  And my grievance, the
19    substance of my grievance was that I was not
20    allowed to present the reason or the rationale for
21    my plan even though I was told that that body was
22    supposed to make the decision for that.  So I
23    presented the grievance.  I didn't hear anything
24    about it.  I just presented it in writing.  I
25    didn't hear anything about the grievance, any

```
1    response until 15 days or so later when I got a
2    memo saying that there was going to be a grievance
3    hearing on the 18th of May.  So I prepared some
4    material for this grievance hearing.  And then
5    shortly before the grievance hearing, I
6    received -- I either received a fax from
7    Mr. Little or from a phone call.  It was a fax.
8    Saying that the hearing was cancelled.  And
9    nothing, you know, why it was cancelled.  It was
10   just cancelled.  That was May 18.  On May 22, I
11   went to an open board meeting, so I get this memo
12   that the grievance hearing is cancelled.  So I
13   realize that the board and/or Mr. Little or both,
14   whatever, that do not want to hear me on this
15   matter.  And I was very upset about that because
16   it was advocating for the residents at the
17   cottage.  And it not only was my responsibility,
18   but I felt it was very, very important that we
19   hire an in-house coordinator for all the reasons
20   that I outlined in all the previous memos, and the
21   fact that I wasn't even being heard by the body
22   who was supposed to make the decision about that
23   was upsetting to me.  Because it indicated to me a
24   lack of caring for the residents.  So I went to
25   the open board meeting, and our nurse consultant
```

1    was there and also Tammy, my assistant, the

2    resident services coordinator, and at the end of

3    the open part of the board meeting, I brought up

4    that I wanted to be heard and I brought it up in

5    the voice like I'm speaking today.  I'm not

6    accustomed to raising my voice, and I was shouted

7    down and I was literally shouted down.  And I

8    brought it up again and I was shouted down.  And

9    then the commissioner said that it had to be taken

10   up in executive session.  So I asked to be allowed

11   to speak in executive session.  But I forgot one

12   important thing.  When I came into the room for

13   the open meeting and I was at all the open

14   meetings of the commissioners because under my

15   license I had to actually produce evidence that I

16   was there as the administrator of Parsonage

17   Cottage, and it had to show in the minutes that

18   the managing agent, namely, the Housing Authority,

19   that the administrator was there at the meetings.

20   So I was at all the open board meetings.  When I

21   came into the room where the board was held, I was

22   handed a letter by Mr. Nova, who is the vice

23   chair, which was dated May 19, and there was a

24   copy of the letter which he stated was mailed to

25   me, but I hadn't gotten it yet.  I was handed a

1    copy of the letter saying that my grievance was

2    denied.  That I wasn't going to have a hearing

3    again.  I wasn't going to have a hearing, period.

4    So that was at the very beginning of the open

5    commissioners' meeting, so the meeting goes on

6    and, you know, they discuss all the different

7    whatever, and that at the end of that open

8    session, I asked -- I spoke up and said I wanted

9    to be heard about that.  And so already -- so the

10   discrimination was that I couldn't even -- my

11   grievance wasn't even heard.

12        Q.   What does discrimination mean to you as

13   you used it then?

14        A.   Discrimination means to me that a person

15   is, for whatever reason, is treated differently

16   from the other people, the peers, the other

17   equivalent staff and also is not treated according

18   to the policies that the organization or employer

19   has.

20        Q.   So you don't believe you were treated

21   the same way as your peers?

22        A.   That's correct.

23        Q.   And you don't think you were treated

24   according to policy?

25        A.   That's correct.

1    and 90-Day Opportunity to Improve was marked as

2    Defendants' Exhibit 34 for Identification; the

3    response to the disciplinary reprimand was marked

4    as Defendants' Exhibit 35 for Identification;

5    a memo dated 6-7-00 was marked as Defendants'

6    Exhibit 36 for Identification.)

7    BY MR. ALVAREZ:

8        Q.    Ms. Milde, what I want to do now is show

9    you some documents.  And I really just want to at

10   least preliminary ask you to look at them and tell

11   me whether you have received them.  We'll go

12   through, I will ask you more questions about them

13   later on.  We'll go through them at least

14   initially.  Let me show you what's been marked as

15   Defendants' Exhibit 6.  If the questions I ask you

16   require that you have any more reading of it, tell

17   me.  The document that's been marked as

18   Defendants' Exhibit 6, this document is a memo

19   that was given to you from Mr. Little and it is

20   dated March 24, 2000, correct?

21       A.    Yes.

22       Q.    And do you remember receiving this?

23       A.    Yes.

24       Q.    And is it fair to say that this memo

25   raised concerns that Mr. Little had about several

1    issues, including the recreation care services

2    contract with CCI?

3                        MR. CAREY:  Objection to the form.

4    She can't testify to what he knows.

5                        MR. ALVAREZ:  I believe I asked her

6    whether it addresses those issues.

7                        MR. CAREY:  Rephrase the question.

8        Q.    Mrs. Milde, this memo raised questions

9    that Mr. Little had about the contract with CCI

10    being ended by you, correct?

11                        MR. CAREY:  Same objection.

12        A.    It raised that it made a mention about

13    that.  He said something about it, yes.

14        Q.    He told you a number of things that he

15    had concerns about concerning your discussions

16    with him about that contract, correct?

17        A.    Correct.

18        Q.    And prior to receiving this memo, you

19    had some discussions with him about the CCI

20    contract, correct?

21        A.    I had discussions with him about the

22    issue with the recreation coordinator.

23        Q.    You told him before receiving this memo

24    that you wanted to end the contract with CCI for

25    recreation services?

1              MR. CAREY:  Objection.

2       Argumentative.

3              A.    I did not.

4              Q.    You did not tell him that you wanted to

5       end the contract with CCI for recreation services?

6              A.    No.  Because there was no contract with

7       CCI anymore.  The contract had already ended.

8              Q.    Did you tell him that you no longer

9       wanted to use the services of CCI for recreation?

10             A.    I told him that I wanted to go back to

11      the original plan of hiring an in-house recreation

12      coordinator.

13             Q.    You told him that before you received

14      this document, correct?

15             A.    Yes, I told him that two months before.

16             Q.    Do you remember the date when you told

17      him?

18             A.    Yes, February 3.

19             Q.    And where were you when you told him

20      that?

21             A.    We were in the senior staff meeting.

22             Q.    That's February 3, 2000, correct?

23             A.    Yes.

24             Q.    Between February 3, 2000 and March 24,

25      2000, did you have any other conversations with

1    him in which you told him you no longer wanted to

2    use CCI to provide the recreation care services

3    for Parsonage Cottage?

4        A.    Yes.   I sent him a memo on February 11,

5    which was used in one of the depositions.

6        Q.    It is your testimony here under oath

7    that you provided notice to him in that memo dated

8    February 11 that you did not want to use CCI to

9    provide the recreational care services?

10            MR. CAREY:   Objection.

11   Argumentative.

12       A.    In the memo, I told him that I had a

13   candidate for an in-house recreation -- for

14   in-house recreation coordinator who had applied.

15       Q.    You are absolutely certain you told him

16   that in a memo on February 11, 2000?

17       A.    Yes, I told him I had a candidate.   I'm

18   pretty sure it was the February 11 memo that I

19   mentioned that already, but if you have that here,

20   we can look at it.

21       Q.    You responded to the memo that's in

22   front of you right now, Defendants' Exhibit No. 6,

23   correct?

24       A.    Yes.

25       Q.    I show you a document that's been marked

```
 1      as Defendants' Exhibit 7.   Is that your response
 2      to the memo that's Defendants' Exhibit No. 6?
 3           A.    That's correct.
 4                      MR. CAREY:  Just note for the
 5      record this is marked in the right-hand corner
 6      Plaintiff's Exhibit 32.  I assume this is from Ben
 7      Little's deposition.
 8                      MR. ALVAREZ:  Yes, it is.
 9                      MR. CAREY:  Exhibit 6 is 31 from
10      Ben Little's deposition.
11                      MR. ALVAREZ:  I will note for the
12      record many of these documents have handwritten
13      notations at the top which are my notations
14      representing the exhibit numbers from Mr. Little's
15      deposition.
16                      MR. CAREY:  For efficiency, just
17      mention it so I don't continue interrupting you.
18      Sorry.
19           A.    Yes, I recognize this.
20           Q.    And thereafter you also sent Mr. Little
21      a follow-up memo concerning the recreation care
22      services, correct?  Do you remember that?
23           A.    Well, for up to this.
24           Q.    Yes.  In response to his March 25 -- in
25      response to his March 24 memo.
```

1                    MR. CAREY:  Exhibit 6.

2          A.    I have to see it.

3          Q.    (Handing.)  I show you a document that's

4    been marked as Defendants' Exhibit No. 8.  This is

5    a memo that you sent to Mr. Little concerning the

6    recreation care coordinator position, correct?

7          A.    Correct.

8                    MR. ALVAREZ:  And just for the

9    record, Mark, I will note it says Plaintiff's

10   Exhibit 33 at the top, which is from Mr. Little's

11   deposition.  Do I need to say that every time?

12                    MR. CAREY:  Just say Defendant

13   Exhibit -- just say for efficiency Little No. 33.

14                    MR. ALVAREZ:  Previously marked as

15   Little No. 33.  Is that okay?

16         A.    That's fine.

17         Q.    And, again, Defendants' Exhibit No. 8 is

18   in further response to Mr. Little's memo to you

19   dated March 24, which is Defendants' Exhibit

20   No. 6, correct?

21         A.    Correct.

22         Q.    Let me show you a document that's been

23   marked as Defendants' Exhibit No. 9, previously

24   marked as Little Exhibit No. 19.  Do you recognize

25   this document?

1        A.    Yes.  I do.

2        Q.    What is it?

3        A.    It's a memo from Mr. Little to me.

4        Q.    And it is responding to your memo of

5    April 13 that's been marked as Defendants'

6    Exhibit No. 8, right?

7        A.    Correct.

8        Q.    And, again, that deals with the

9    recreation coordinator position?

10        A.    Yes.

11        Q.    I show you the document that's been

12    marked as Defendants' Exhibit No. 10.  Do you

13    recognize this document?

14        A.    Yes, I do.

15        Q.    What is it?

16        A.    That's the same document we had before.

17    It's a fax to Mr. Little from me.

18        Q.    It's a two-page document?

19        A.    Yes.

20        Q.    It's the same as Defendants'

21    Exhibit No. 2 except the second page is different,

22    correct?

23        A.    Right.

24        Q.    Is the second page the correct

25    attachment?

1    to third page of this document?

2         A.    Yes.

3         Q.    And under staff reports, there's a

4    section said reports of the residence council

5    meeting?

6         A.    Yes.

7         Q.    Can you read that section and tell me if

8    it's accurate, if it accurately describes what

9    happened at that meeting?

10        A.    Not entirely.

11        Q.    Can you tell me what's not accurate?

12        A.    I was not very loud.  I was vocal

13   obviously because I spoke.  I didn't use sign

14   language.  And I was insistent, but I was not

15   loud.

16        Q.    Did Ms. McClenachan, the chairperson,

17   repeatedly tell you that you were out of order?

18        A.    She didn't tell me.  She shouted me that

19   I was out of order.

20        Q.    Did the words that you were out of order

21   come out of her mouth more than once?

22        A.    Yes.  I believe.

23        Q.    And when she said that, did you stop

24   speaking?

25        A.    I insisted that I wanted to be heard.

1      Q.    Were you on the agenda that night?

2      A.    No.

3      Q.    And when she asked you to speak --

4      A.    Excuse me.  The meetings don't have an

5   agenda in the sense that there's a printed agenda

6   ahead of time.  The meetings have a certain format

7   with reports and listening to residents if the

8   meeting is held at one of the housing complexes,

9   and even if there are issues that people want to

10  bring up, they bring them up at the meeting.

11     Q.    Do you have to be recognized by the

12  chairperson before you speak at the meeting?

13     A.    Generally when somebody comes to a

14  meeting, and the person is not supposed to be at

15  the meeting, and the person wants to bring

16  something up that pertains to that business,

17  generally you get heard at meetings.  I have never

18  been at a meeting where -- and I have had a lot of

19  jobs where certain, you know, where the people who

20  are regular participants at the meeting, where

21  they want to bring up an issue that is important

22  where they are not going to be heard.

23     Q.    You say you attend --

24     A.    Being shouted down specifically.

25     Q.    You said previously that you attend the

1    open board meetings?

2         A.   Yes.

3         Q.   When you were administrator, correct?

4         A.   Yes.

5         Q.   And isn't it true that the way those

6    meetings were run is that the chair would

7    recognize people before they spoke?

8         A.   I don't know what you mean by

9    recognize.

10        Q.   They follow Robert's Rules of

11   Parliamentary Procedure, correct?

12        A.   Supposedly.

13        Q.   Therefore if somebody wanted to speak,

14   they had to ask permission to speak and the

15   chairperson would say okay, speak, correct?

16        A.   Yes.

17        Q.   And in your instance, did you ask at

18   this meeting on May 22, did you ask for permission

19   to speak?

20        A.   Yes, I said I wanted to bring up the

21   issue of the recreation coordinator.

22        Q.   Did the chair say that was permissible?

23        A.   The chair shouted me down.  She was

24   almost like saying shut up.

25        Q.   So the chair said you shouldn't speak at

1    that time, correct?

2         A.    The chair said, you know, this is --

3    yeah.

4         Q.    The chair said that this should be dealt

5    with in executive session, correct?

6         A.    Yes.

7         Q.    The chair said this is a personnel

8    matter, correct?

9         A.    Yes.

10        Q.    And despite those statements by the

11   chair, you continued to speak, correct?

12        A.    That's correct.  I then said then I want

13   to be allowed to come to the executive session.

14        Q.    And ultimately there was an agreement to

15   permit you to do that, correct?

16        A.    Yes.

17        Q.    During that executive session, you were

18   able to explain your position on the recreation

19   care position?

20        A.    At that executive session, I couldn't --

21   I didn't go into all of that anymore because I had

22   just been given that letter that essentially said

23   we don't want to hear about anything that you have

24   to say in essence.  So at the executive session, I

25   just -- I don't even remember all I said, but I

1    basically said that I felt that, you know, that I

2    had a right to be heard by the commissioners and

3    that systematically that that being -- that right

4    was taken away from me and I was really protesting

5    about that.  And that I, you know, I had opened

6    the cottage, I had track record with this, and

7    that I was treated very unprofessionally

8    throughout this, in this whole process.  Something

9    to that effect.

10        Q.    You had an opportunity to say all that

11   at the executive session?

12        A.    Yes.

13        Q.    Did you -- go back to Defendants'

14   Exhibit 31, your letter to Mr. Nova.  Do you see

15   that?  No. 4 says on another note I do want to

16   thank you -- you personally for listening to me at

17   last night's executive session.  You wrote that,

18   correct?

19        A.    I wrote that because he was the only one

20   who -- in executive session, Mrs. McClenachan kept

21   interrupting me also, and Mr. Nova was the one who

22   said let's hear her, and I felt that he was the

23   only one who was making an attempt to let me speak

24   at all.

25        Q.    You appreciated that?

1          A.    Yes.

2          Q.    Let me show you Defendants' Exhibit

3     No. 33.  Do you recognize that document?

4          A.    Yes.

5          Q.    What is it?

6          A.    The corrective directives.

7          Q.    This is the memo that Mr. Little gave

8     to you on May 30, 2000?

9          A.    Yes.

10          Q.    If you refer to the last page of this,

11     it's signed by you and Mr. Little on June 2, 2000,

12     correct?

13          A.    Right.

14          Q.    When did you receive this?

15          A.    On June 2.

16          Q.    So it is dated May 30, but you received

17     it on June 2?

18          A.    Yes.

19          Q.    Did he give it to you in a meeting?

20          A.    Yes.

21          Q.    Did you discuss it with him during the

22     meeting?

23          A.    I only -- no.  Not really.  We didn't go

24     into the detail.

25          Q.    Did you read it at the meeting?

1          Q.    What did you understand this memo to

2     mean?

3          A.    Extremely adverse action.

4          Q.    Did you understand it to mean that if

5     you did not do what it said, that you would be

6     subject to further disciplinary action?

7                    MR. CAREY:   Objection.

8          A.    I guess so.

9          Q.    I show you what's been marked as

10    Defendants' Exhibit 34.   Note for the record this

11    document has been previously marked as Little

12    Exhibit No. 42.   Do you recognize this document?

13         A.    Yes.

14         Q.    What is it?

15         A.    Disciplinary reprimand and 90-day

16    opportunity to improve.

17         Q.    And the last page of this again is

18    signed by you and Mr. Little on June 2, correct?

19         A.    That's correct.

20         Q.    So did you receive this document and the

21    document that's been marked as Defendants'

22    Exhibit No. 33 at the same time?

23         A.    Yes.

24         Q.    And this is a written -- entitled

25    Written Disciplinary Reprimand and 90-Day

1      Opportunity to Improve, correct?

2          A.    Right.

3          Q.    On the first page, Mr. Little identifies

4      a number of actions which he believed you were

5      guilty of, correct?

6                    MR. CAREY:    Objection to form.

7      Argumentative.    Guilty.

8          A.    It fits the whole tone of the

9      guiltiness.

10         Q.    Let me rephrase.    On the first page of

11     this memo, isn't it true that Mr. Little

12     identifies a list of seven causes for this written

13     disciplinary reprimand?

14         A.    That's correct.

15         Q.    And it's fair to say that you disagreed

16     with his assessment of those seven items, correct?

17         A.    Yes.

18         Q.    You then later responded explaining why

19     you disagreed, correct?

20         A.    Yes.

21         Q.    On a scale of 1 to 10, with 1 being

22     complete agreement and 10 being complete

23     disagreement, how would you rate your disagreement

24     with Mr. Little on the points raised in the memo?

25                    MR. CAREY:    Objection to the form.

1    Multiple questions.  Counsel, rephrase.

2        A.    Ten.

3        Q.    Isn't it fair to say that you were

4    completely at odds with Mr. Little on the issues

5    he raised in this memo?

6        A.    No.  That's actually not fair to say.

7    What is fair to say is he accuses me of things

8    that, number one, were not true.  Number two, they

9    were things that he practiced all the time.  He

10   even at times did not follow the policies and

11   procedures of the Housing Authority.  He

12   oftentimes did not follow the recognized mandated

13   hiring procedures.  He oftentimes used improper

14   influence of the hiring procedure.  And I didn't

15   actually.  And he oftentimes used deceptive

16   actions.  And some of that actually came out in

17   some of the depositions that have been conducted.

18   And I was kind of stunned at the dishonesty that

19   this kind of thing portrayed.  If you are a

20   manager, and you have standards within an

21   organization, and you expect your employees to

22   adhere to these standards, you don't have to

23   adhere to these standards yourself.

24       Q.    If you don't, is that discrimination?

25       A.    If you don't adhere to standards, and

1    then accuse your subordinates not to adhere to

2    these standards, and you harass the subordinate

3    not to do the job for which they were hired to do

4    and make it harder for the person to do the job

5    and accuse them of lying to you, that to me is

6    discrimination.

7         Q.    Is it age discrimination?

8         A.    It's discrimination of whatever form you

9    call it, and whatever it originates from in his

10   mind, I don't know, but it's highly

11   discriminatory.

12        Q.    Let me show you what's been marked as

13   Defendants' Exhibit No. 35, previously marked as

14   Little Exhibit No. 43.   It's previously been

15   marked as Little Exhibit No. 43.   Ms. Milde, do

16   you recognize the document?

17        A.    Yes.

18        Q.    It has multiple pages?

19        A.    Yes.

20        Q.    What is this document?

21        A.    This is my response to the disciplinary

22   action and 90-day opportunity to improve.

23        Q.    How many attachments did you include in

24   this response?

25        A.    I guess 11.

```
 1              Q.   You had a lot to say in response to

 2    Mr. Little's memo?

 3              A.   I did.

 4                   MR. ALVAREZ:  And if I represent

 5    that the Bates stamp on this starts with Milde 256

 6    and goes to Milde 281, Mark, would you agree?

 7                   MR. CAREY:  Yeah, I would agree to

 8    that, the last page being attachment No. 11 dated

 9    October 1996.

10              Q.   This is a 25-page document?

11              A.   Yeah.

12              Q.   That you submitted in response to

13    Mr. Little's 90-day opportunity to improve?

14              A.   Yes.

15                   MR. CAREY:  Frank, I don't know

16    what you are going to do.  Does anybody need a

17    break?

18              Q.   Mrs. Milde, when you issued this

19    response, is it fair to say that you intended to

20    communicate to Mr. Little that you thought he was

21    absolutely wrong in his accusations against you?

22                   MR. CAREY:  Objection.

23    Argumentative.

24              A.   I intended to rebut specifically the

25    accusations he accused me of.  And really tell him
```

1    the truth of what I did.

2         Q.    I would like to direct your attention to

3    the last page of your written memo before you go

4    to attachments.  And I would like you to read

5    again to yourself the last part of the memo that

6    starts with I believe the, quote, Written

7    Disciplinary Reprimand and 90-Day Opportunity to

8    Improve to be, then you list six things.

9         A.    Yes.

10        Q.    Read that again and tell me if there's

11   anything in there that you would change about

12   that.

13        A.    In light of everything that went on

14   after this, I would say on No. 6, indication of

15   your discrimination against me.

16        Q.    Are you saying --

17        A.    You said if there's anything that I

18   would change.  I said in light of everything that

19   went on after this and what I know now, I would

20   say instead of saying this is an indication of

21   difficult working relationship between us, I would

22   say it is an indication of your discriminating

23   against me.

24        Q.    Would you say an indication of

25   discrimination against you on the basis of your