# EXHIBIT E-2

1    age or gender?

2        A.    On whatever basis he's discriminating.

3        Q.    You wouldn't say that?

4        A.    As I said, I can't read his mind.

5        Q.    Do you still believe that it's an

6    indication that you had a difficult working

7    relationship with him?

8        A.    Yes.

9        Q.    You agree that you had a very difficult

10   working relationship with him at that time?

11       A.    Yes.  At that time I sure did.

12       Q.    Did you have any hope when you wrote

13   this that it would get better?

14       A.    I was hoping that he would get a

15   mediator.  That's why I suggested that to mediate

16   between us.

17       Q.    Why did you need a mediator?

18       A.    Because he would not speak with me or

19   sit down and discuss things with me, and he made

20   false accusations, and for him to resort to this

21   and to the evaluation, and I was including in the

22   whole thing too, which was so slanderous as far as

23   I'm concerned, I felt that the only way we

24   could -- that we could get anywhere is to have a

25   third party there that would be more objective.

1        Q.    So you thought you needed a third party

2    to help facilitate communication between you and

3    him?

4        A.    Yeah.  I guess you could call it that

5    way.

6        Q.    And without that mediator, did you have

7    any hope that you would be able to improve your

8    relationship with him?

9        A.    What I felt at that time was that no

10   matter what I did, no matter how well I did my

11   job, no matter how I did things the way I had

12   always done them, no matter how dedicated I was,

13   no matter how much I had the interest of the

14   residents at heart, that Mr. Little would always

15   find something that he would hold against me, and

16   what I was afraid of -- of was that he would even

17   stoop to using my dedication to the residents and

18   to doing the best thing there, he would even use

19   that.  And when I was very worried about that, the

20   residents had no voice there and that he didn't

21   care what their needs were.  He didn't care what

22   was going on there.  That it would just be -- it

23   didn't matter.  They were like they were

24   non-persons.  You know, while they brought in some

25   revenue and it worried me a great deal.  And the

1    things that went on subsequently confirmed that.

2    And there were some things subsequently that were

3    very disturbing to me.

4        Q.    Did you not trust him at this point?

5        A.    Well, I think I answered that question.

6    The way I did just now.

7        Q.    Does that mean it is a yes or no?  Did

8    you trust him?

9        A.    I did not trust that he cared at all

10   about Parsonage Cottage.

11       Q.    You -- and you cared everything about

12   that?

13       A.    Yes, I did.  I really did.

14       Q.    Let me direct your attention to the

15   document that is Bates stamped Milde 270.  I think

16   it is attachment 5 to Defendants' Exhibit No. 35.

17       A.    Yes.

18       Q.    Can you tell me what that is?

19       A.    Those are notes I kept about a senior

20   staff meeting on February 3.

21       Q.    And when did you prepare those notes?

22       A.    When I was at the staff meeting.

23       Q.    So it was contemporaneously during the

24   meeting that you wrote this?

25       A.    Yes.

1    Q.   And were these the issues that were

2    addressed during the staff meeting?

3    A.   Yes.

4    Q.   Were these all the issues?

5    A.   As far as I remember, yes.

6    Q.   And No. 6?

7    A.   There may have been some other reports

8    that other people brought.  I don't remember, but

9    I had written that down because I wanted to make

10   sure that I would bring that up at the meeting.

11   Q.   So you wrote what down?

12   A.   The No. 6.

13   Q.   So you wrote it down before the meeting?

14   A.   No.  At the meeting.  We were sitting at

15   the meeting.  Mr. Little talked, and we have to

16   have cost control, that we talk about the union

17   negotiations that were going on, talked about the

18   developing training schedule.  While he was

19   talking about that, I said I have to bring up the

20   recreation coordinator position, and I did bring

21   that up and I wrote it down.

22   Q.   How long was your presentation on that

23   issue?

24   A.   Maybe five minutes or so.

25   Q.   And what did you tell him at that time?

1      A.    I said I wanted to go back to the

2  original plan of hiring an in-house recreation

3  coordinator.

4      Q.    What did he say?

5      A.    He didn't say anything.  And then I told

6  him about some of the facility issues and he

7  didn't say anything about that either.  That's

8  usually what -- that was his MO, if you will, that

9  staff would give him a report or they would say

10  something and he would listen and didn't respond.

11  Sometimes until much later.

12      Q.    When he didn't respond, did that mean to

13  all the staff reports that they had received his

14  approval?

15      A.    Generally, yes.

16      Q.    But then why would he need to respond

17  later if his lack of a response during the meeting

18  was approval?

19      A.    I don't know why he responded later.

20  That's what I said earlier in my testimony that I

21  was stunned when I got his response on in the end

22  of March.

23      Q.    But you said that his MO, which is modus

24  operandi, right?

25      A.    Right.

1       Q.    Was not to say anything in these staff

2    meetings, correct?

3       A.    Yes.

4       Q.    And he would then only respond much

5    later, correct?

6       A.    That's his MO.  Sometimes when you kept

7    insisting on it, sometimes he didn't respond at

8    all.  And then the person would take an action and

9    then he would either -- if the action went well,

10   then he would say, you know, he wouldn't

11   necessarily say something, but it seemed like all

12   was good and it was done.  If it didn't go well,

13   then the person was being blamed.

14      Q.    This was the process he followed with

15   the other senior managers?

16      A.    Yes.

17      Q.    All those other senior managers are men,

18   aren't they?

19      A.    Yes.

20      Q.    Let me show you what's been marked as

21   Defendants' Exhibit No. 36.  Do you recognize this

22   document?

23      A.    Yes.

24      Q.    What is it?

25      A.    It is a memo from Mr. Little to me

1   dated June 7 regarding direct contact with the

2   Board of Commissioners.

3          Q.    He had previously issued a memo to you

4   and others about direct contact with the board,

5   correct?

6          A.    Yes.

7          Q.    And was this memo that's Defendants'

8   Exhibit No. 37 prompted by any particular thing

9   that you did?

10         A.    I don't remember.

11         Q.    You don't remember?

12         A.    No.

13         Q.    Do you remember whether you had

14  delivered the document that's been marked as

15  Defendants' Exhibit 35 directly to the board?

16         A.    I really don't remember.  I really,

17  truly don't.

18         Q.    Let me show you what's been marked

19  Defendants' Exhibit 38.   Do you recognize this

20  document?

21         A.    Yes.

22         Q.    What is it?

23         A.    It's from Mr. Little to me dated June 7

24  regarding a written apology.

25         Q.    And he had previously told you to

1    apologize to Sue McClenachan, correct?

2        A.    No.  That's the first time when he says.

3        Q.    He said in the first paragraph from our

4    discussion of Friday June 2 of your behavior and

5    actions at the board meeting, you are hereby

6    directed to write a written apology.  Did he tell

7    you to apologize before this memo?

8        A.    He may have.  I really don't remember

9    that.

10        Q.    But it is pretty clear in this memo he

11    was directing you to have a written apology to the

12    Board of Commissioners and Sue McClenachan?

13        A.    Correct.

14        Q.    Did you ever apologize?

15        A.    No.  I sent a memo in June about that I

16    really didn't feel -- I didn't know what to

17    apologize for.

18        Q.    Let me show you what's been marked

19    Defendants' Exhibit No. 39.  Do you recognize this

20    document?

21        A.    Yes.

22        Q.    What is it?

23        A.    It's a memo from Mr. Little to me dated

24    June 8.  Response to my memo.

25        Q.    The June 6 memo that's Defendants'

1             MR. CAREY:  Objection.

2    Argumentative.

3             MR. ALVAREZ:  It's

4    cross-examination, Counsel.

5             MR. CAREY:  I know it is, but it is

6    also argumentative.

7        A.   That's not true.  When I got this memo,

8    I asked for another meeting.

9        Q.   Let me show you what's been marked

10   Defendants' Exhibit 42.  Do you see that,

11   Ms. Milde?

12       A.   Yes.

13       Q.   Do you recognize that document?

14       A.   Yes.

15       Q.   What is it?

16       A.   It's another memo telling me to write a

17   written apology.

18       Q.   And Mr. Little gave this memo to you?

19       A.   A memo from Mr. Little to me.  He faxed

20   it to me.

21       Q.   He faxed this to you?

22       A.   All the memos he sent me with the

23   exception of the disciplinary action, which he

24   presented to me in person, every single memo was

25   faxed to the residence to a room where our fax

1    machine is, and it was faxed without me knowing

2    ahead of time when a memo was going to be faxed.

3    This was the room in which all the staff signs in

4    when they come to work in which the chef has his

5    office.  So none of these memos are in any way

6    confidential.  They are all faxed to me in that

7    manner.  Every single one of them.

8         Q.    And is this memo accurate in stating

9    that you had not provided the written apology that

10   he had directed you to provide?

11        A.    Yes, that's correct.

12        Q.    I show you what's been marked

13   Defendants' Exhibit 43.  Do you recognize this

14   document?

15        A.    Yes.

16        Q.    What is it?

17        A.    It's my response to document No. 41.

18        Q.    I show you what's been marked as

19   Defendants' Exhibit 44.  Do you recognize this

20   document?

21        A.    Yes.

22        Q.    What is it?

23        A.    It's a memo from me to Barbara Nolan and

24   Benjamin Little requesting a meeting.

25        Q.    About what?

1        A.    About the CCI schedule.

2        Q.    Had you requested a meeting to discuss

3    the schedule before this date?

4        A.    No.  That's the request of the meeting.

5        Q.    I show you another document that's

6    marked as Defendants' Exhibit 45.  Do you

7    recognize this document?

8        A.    Yes, I do.

9        Q.    What is it?

10        A.    It's a memo to Sue McClenachan,

11    chairman of the Board of Commissioners, to

12    Benjamin Little from me dated June 26.

13        Q.    At the bottom of this memo you copy

14    Mr. Carey, correct?

15        A.    Yes.

16        Q.    When did you retain Mr. Carey?

17        A.    Somewhere around that time.

18        Q.    Was it in May or June?

19        A.    I don't remember exactly.

20        Q.    Was it before or after the board meeting

21    on May 22?

22        A.    It was after the May 22 board meeting, I

23    believe.

24        Q.    Is it fair to say in this memo, you

25    informed Sue McClenachan, members of the board and

1    Mr. Little that you would not apologize for your

2    actions at the board meeting?

3        A.    I said I cannot follow these directives

4    because it's hard for me to understand for what I

5    am directed to apologize since I have not

6    committed any act or engaged in any behavior which

7    warrants an apology.  I neither used abusive

8    language or never raised my voice when I brought

9    up a vital concern for Parsonage.

10        Q.    You are reading from the document?

11        A.    Yes.

12        Q.    Again, my question, is it fair to say

13    that this document represented your communication

14    to Miss McClenachan, the board members and

15    Mr. Little that you would not apologize for your

16    actions at the board meeting?

17        A.    Yes.

18        Q.    Was this also noticed to Mr. Little that

19    you would not comply with one of the directives

20    that he issued to you on May 30?

21                MR. CAREY:    Objection to the form.

22        A.    No.    I'm addressing that specifically to

23    the directives to apologize, to write a written

24    apology to those two in response to those two

25    memos.

1    penalized concerning this incident?

2         A.    He didn't respond to this letter.

3         Q.    I show you what's been marked

4    Defendants' Exhibit 47.  Do you recognize that

5    document?

6         A.    Yes.

7         Q.    What is it?

8         A.    It is a document in which he said he's

9    disappointed that I have not followed his

10   directions of June 7 and June 21.

11        Q.    Do you remember receiving those?

12        A.    Yes.

13        Q.    Did you call him on or after June 30 to

14   further address this issue?

15        A.    It think I let it go because I thought

16   that maybe he had not seen that memo or hadn't

17   read it yet.  I don't know.  I don't remember.

18   But I was puzzled by this.

19        Q.    Let me show I Defendants' Exhibit

20   No. 48.  Do you recognize that document?

21        A.    Yes.

22        Q.    What is it?

23        A.    It's a memo asking for Nancy Wisecup's

24   contract.

25        Q.    This is a memo from Mr. Little to you?

1        Q.    Dated August 7, right?

2        A.    Yes.

3        Q.    And 57 is what?

4        A.    My memo to him in response to the

5   photographer coming.

6        Q.    And at the bottom of Defendants'

7   Exhibit No. 57, you wrote I would appreciate the

8   courtesy of timely communication since the PCSR

9   staff would always be happy to accommodate in

10  these matters?

11       A.    Yes.

12       Q.    And you bolded the word timely, correct?

13       A.    Yes.

14       Q.    Let me show you a document that's been

15  marked Defendants' Exhibit No. 58.  Do you

16  recognize that document?

17       A.    Yes.

18       Q.    What is it?

19       A.    A letter from Mr. Little to me.  Dated

20  August 21.

21       Q.    And in this memo, isn't he notifying you

22  that he's directing you to attend the disciplinary

23  hearing?

24       A.    Yes.

25       Q.    And he informs you that the disciplinary

1    hearing will give you an opportunity to answer

2    charges against you concerning your work

3    performance, correct?

4         A.   That's what he's saying.

5         Q.   You later had that hearing, correct?

6         A.   Yes.

7         Q.   And Mr. Carey attended that hearing with

8    you, correct?

9         A.   Yes.

10        Q.   At that hearing you discussed what

11   Mr. Little viewed as your poor work performance,

12   correct?

13        A.   In a manner of speaking, yes.

14        Q.   And who else was present at that meeting?

15        A.   A gentleman who was a consultant.  I

16   don't remember his name offhand.  The personnel

17   consultant.

18        Q.   Sim Bernstein?

19        A.   Right.  And Louis Pittocco.  And

20   Mr. Little and Mr. Carey.

21        Q.   Was Maria Morris present?

22        A.   Yes.  She was the secretary.

23        Q.   Was she taking notes?

24        A.   Yes.

25        Q.   Is she Mr. Little's secretary?

225

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF CONNECTICUT

3
   * * * * * * * * * * * * * *
4
   URSULA MILDE,                    *        COPY
5
                 Plaintiff          *
6
   VS.                              *  CIV NO. 3:00CV2423(AVC)
7
   HOUSING AUTHORITY OF THE         *
8  TOWN OF GREENWICH; THE
   HOUSING AUTHORITY OF THE         *
9  TOWN OF GREENWICH BOARD
   OF COMMISSIONERS; and            *
10 BENJAMIN LITTLE, CEO,

11               Defendants         *

12 * * * * * * * * * * * * * *
                                    Hartford, CT
13
                                    May 30, 2003
14
                                    10:17 A.M.
15
                        - - -
16           DEPOSITION OF URSULA MILDE

17                  VOLUME II
                        - - -
18
   APPEARANCES:
19
        FOR THE PLAINTIFF:
20
                   CAREY & ASSOCIATES, P.C.
21                 BY:  MARK P. CAREY, ESQUIRE
                        71 Old Post Road, Suite One
22                      Southport, CT    06490

23      FOR THE DEFENDANTS:

24                 JACKSON LEWIS, LLP
                   BY:  FRANCIS P. ALVAREZ, ESQUIRE
25                      One North Broadway
                        White Plains, NY   10601

229

1        A.      That's correct.

2        Q.      Mr. Crawford, Thomas Crawford retired as

3    the executive director in April of 1999, correct?

4        A.      As far as I remember, yes.

5        Q.      And Mr. Little replaced him as the

6    executive director, correct?

7        A.      That's correct.

8        Q.      And Mr. Little later changed his title to

9    chief executive officer, correct?

10       A.      That's correct.

11       Q.      I'd like to talk to you about the damages

12   you're seeking in this case.  Your salary at the

13   time that you left the Parsonage Cottage --

14   Withdrawn.  What was your salary at the time that

15   you left the Parsonage Cottage?

16       A.      Approximately 65 or so.

17       Q.      Sixty-five?

18       A.      Sixty-five thousand a year.  It could

19   have been 68.  I don't remember exactly.

20       Q.      You have to keep your voice up.

21       A.      Oh, I'm sorry, either 65 or 68 annually.

22   I'm not a hundred percent sure anymore.

23       Q.      Is that wages plus benefits or just

24   wages?

25       A.      Those are wages.

1   don't know because, you know, all of these things,

2   you know, it's a process.  You know, the process

3   started in February and it went on to the -- until I

4   was terminated.

5                    MR. ALVAREZ:  Mark this exhibit.

6                    (Whereupon, newspaper article was marked

7   as Defendants' Exhibit 66 for Identification.)

8        Q.    I'm going to show you a document that's

9   been marked as Defendants' Exhibit Number 66.  Do

10  you recognize this as an article from The Greenwich

11  Time on May 23, 2000?

12       A.    Yes.

13       Q.    Okay.  In the first paragraph it states,

14  quote, "And according to Parsonage Cottage

15  Administrator Ursula Milde, residents at the home

16  are experiencing levels of neglect that are in

17  violation of state standards for senior citizen

18  homes as a result of the vacancy," closed quote.

19  And I'm quoting the -- what it's written here, not a

20  quote that is attributed to you.  Do you see that?

21       A.    Yes, I do.

22       Q.    This is a simple "Yes" or "No" question:

23  Did you say that Parsonage Cottage was in violation

24  of state standards as a result of not filling the

25  position of recreational care coordinator?

278

1  there's just two other quotes on the last page that

2  I'd just like to ask you very specifically whether

3  you said it.

4                    MR. CAREY:   Page 6, Frank?

5                    MR. ALVAREZ:   Yes.

6        Q.    The second paragraph --

7        A.    That's the last page?

8        Q.    Yes, on the last page.

9        A.    Yeah.

10       Q.    It says, "There was a time when the Board

11  of Commissioners had a meeting and she was not

12  allowed to address them.   Ursula stated to me that,"

13  quote, "'If they don't like the way she ran

14  Parsonage Cottage,'" comma, "'they could just fire

15  me,'" closed quote.   Did you say that?

16       A.    At that 5/22 meeting I was very

17  frustrated because I was being shouted down and I

18  couldn't explain.   And I did say something to the

19  effect that, you know, when you hire a person to

20  do -- to be an administrator and to run something

21  and then you don't allow that person -- you give the

22  person a responsibility but don't allow the person

23  the authority, then what's the use of having that

24  person?

25       Q.    I'm just asking you if you said it.

1    A.    Yeah, and I don't remember whether I said

2  that they should fire me.  I don't think I said it

3  that way.  I said, you know, what's the use of

4  having a person who has the responsibility and not

5  the authority or something like that.

6    Q.    Okay.  And the last question I have is in

7  the next paragraph.  It says, "She constantly

8  complained that the problems between Ben and her was

9  a," quote unquote, "power struggle and," quote, "who

10  is in control," closed quote.  Did you ever say to

11  Deborah Littlejohn that the problem between

12  Mr. Little and you was a power struggle?

13    A.    No.

14    Q.    So that's an untrue statement?

15    A.    Yeah.

16    Q.    And did you ever say to Miss Littlejohn

17  that the problem between Ben and you was, quote,

18  "who is in control," closed quote?

19    A.    I think I may have said that because I

20  had the feeling that Ben had generated that kind of

21  a dynamics between us through his discriminatory

22  actions.

23    Q.    So you did say that --

24    A.    I probably did.

25    Q.    So that it's clear for the record, you

324

1   not sure anymore where, but it came out in one of

2   the depositions.   It was presented.

3        Q.    How many other documents in this case

4   refer to a statute?

5        A.    That's the only one.   That's the only one

6   where I quote a statute.

7        Q.    Okay.   Now, my question was what's the

8   purpose of this letter to Mr. Little on April 26,

9   2000?

10       A.    Well, the purpose is to explain to him

11  why the recreation issue was such a vital issue.

12       Q.    How about, read the first paragraph for

13  me.

14       A.    "It is my responsibility both legally and

15  ethically as administrator of this licensed home to

16  safeguard the rights and well-being of the residents

17  who entrust themselves to our care.   This is

18  expressed in the Code for Licensed Homes, Section C,

19  Administration."

20       Q.    Okay.   Why don't you read Section C for

21  us?

22       A.    "Administration:   Number 1, the

23  proprietor or licensee of the institution shall be

24  responsible for operation of the institution in

25  compliance with these regulations."

 1              MR. ALVAREZ: Objection as to the

 2    form of the question.

 3         A.    Because first of all, I wanted to --

 4              MR. CAREY: Let me just stop for a

 5    second. You know what an objection to the form of

 6    the question on this particular thing would be,

 7    Frank? If I said to the witness, "Weren't you

 8    trying to tell him that this is the proper standard

 9    to follow?" That would be an appropriate objection

10    or an objectional statement. So let's continue.

11         Q.    The -- Okay. Go ahead to the original

12    question before I commented to Mr. Alvarez.

13         A.    Can you read that again?

14         Q.    I'm just curious, what is the purpose of

15    telling Mr. Little this language you just read?

16         A.    Well, I wanted him to -- I wanted to

17    remind him that we had to follow a code under our

18    license. And these were excerpts from the code, and

19    the code is a very lengthy code. And a lot of it

20    has to do with the way the building has to be and,

21    you know, the size of the rooms and whatnot. But

22    there are certain sections in the code that pertain

23    to the administration of the home, and I wanted to

24    point out to him that these are -- this is what was

25    required of us under the -- under our license.

334

1  form of the question.

2      A.    Yeah, that's what it is.

3              MR. CAREY:  I assume that, Frank,

4  that's a leading objection?

5              MR. ALVAREZ:  Yes, it is.

6              MR. CAREY:  Okay.  Frank, your

7  attempt is not to trap me and cause me frustration

8  and think about every little question I have to

9  answer -- or ask this witness, is it?

10             MR. ALVAREZ:  I'm not responding to

11 that question.

12             MR. CAREY:  I thought so,

13 Mr. Alvarez.

14     Q.    Okay.  Let's continue.  Can you read the

15 next paragraph, please, starting with the word "I"?

16     A.    "I can only conclude that the way in

17 which you and the board proceeded regarding this

18 matter and the way the decision was 'uncommunicated'

19 to me" -- "uncommunicated" in quotation marks -- in

20 parentheses, "(I learned it first through the

21 newspaper) showed a high disregard for me and for my

22 staff, but more importantly it demonstrated a lack

23 of concern for the needs of the residents whom we

24 have, after all, pledged to serve."

25     Q.    Okay.  My question to you, Miss Milde,

1    this letter about this issue?

2        A.    Yes.

3        Q.    Okay.  Are you protesting about this

4    recreation issue to Mr. Little in this letter?

5                MR. ALVAREZ:  Objection.

6        A.    Yeah.

7        Q.    What did you think his reaction would be

8    when you wrote this?

9                MR. ALVAREZ:  Objection.

10       A.    I was hoping that he would -- he would

11   realize that, you know, he as my manager and as the

12   CEO, that he would remember his responsibility

13   towards the clients and the staff.

14       Q.    Okay.  And --

15       A.    And I wanted to speak for them, so I --

16   and I really felt that somebody has to speak for the

17   residents.  Throughout that whole time I always felt

18   that there has to be somebody who has to stand up

19   for the residents and say, "This is the right thing

20   to do."  And I really felt I was the person because

21   I was the administrator and the residents couldn't

22   do that on their own.

23       Q.    Why couldn't the residents do that on

24   their own?

25       A.    First of all, because they never saw

414

1          Q.      Okay.  During your employment were you --
2     did you ever make false -- this is number 20 on the
3     list.  Did you ever make false or slanderous
4     statements about the authority, its employees or
5     residents?
6          A.      No.
7          Q.      Did you ever make false or slanderous
8     statements about Mr. Little?
9          A.      No.
10         Q.      Number 33, did you ever commit any act of
11     dishonesty against the Housing Authority?
12         A.      No.
13         Q.      Okay.
14                 (Whereupon, Performance Evaluation dated
15     6/2/00 was marked as Plaintiff's Exhibit 16 for
16     Identification.)
17         Q.      I show you what's been marked Plaintiff's
18     Exhibit Number 16.
19         A.      Yes.
20         Q.      And -- for Identification.  Can you tell
21     me what that document is?
22         A.      That's a performance evaluation.
23         Q.      And -- Go ahead.
24         A.      My performance evaluation.
25                     MR. ALVAREZ:  Keep your voice up.

415

1       A.     I'm sorry, my performance evaluation.

2       Q.     The date of that document is -- or let me

3   rephrase it.  And for what period is that

4   performance review for?

5       A.     Looks like 7/3/99 to 6/30/2000, could be

6   8/3.  It's kind of smudged.  It's hard to see.

7       Q.     Okay.  And turn to the last page.  And

8   who is it signed by?

9       A.     By Mr. Little.

10      Q.     And what date did he sign it?

11      A.     6/2.

12      Q.     Did you sign that?

13      A.     No.

14      Q.     Okay.  And was this the first performance

15  review you received -- rephrase -- first written

16  performance review you received while working as the

17  Parsonage Cottage administrator?

18      A.     Yes.

19      Q.     Did you ever receive any verbal

20  performance reviews from Mr. Little during your

21  tenure of employment?

22      A.     He once said in -- at a meeting with some

23  staff that he wished he had 10 Ursulas.

24      Q.     Okay.  When did he say this?

25      A.     In 1998 or so.

419

1      A.    I did take it as a compliment.

2      Q.    Did you take it as sarcastic?

3              MR. ALVAREZ:   Objection as to the

4  form.

5      A.    No, I didn't.

6      Q.    Now to Exhibit Number 16, Mrs. Milde.

7  You do recall seeing this document, don't you?

8      A.    Yes, I certainly do.

9      Q.    What was your overall rating on this

10 performance review?

11     A.    2.75.

12     Q.    And --

13     A.    Oh, the final overall rating was 3.81.

14     Q.    Out of a scale of what?

15     A.    Seven.

16     Q.    What's the highest?

17     A.    Seven.

18     Q.    What's the lowest?

19     A.    One.

20     Q.    And your rating was, again, I'm sorry,

21 final?

22     A.    3.81.

23              MR. ALVAREZ:   Objection.

24     Q.    Okay.  And this is the first time this

25 document was used to evaluate your performance?

434

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF CONNECTICUT

3

4    * * * * * * * * * * * * *

     URSULA MILDE,                    *      COPY
5
                    Plaintiff         *
6
     VS.                              *   CIV NO. 3:00CV2423(AVC)
7
     HOUSING AUTHORITY OF THE         *
8    TOWN OF GREENWICH; THE
     HOUSING AUTHORITY OF THE         *
9    TOWN OF GREENWICH BOARD
     OF COMMISSIONERS; and            *
10   BENJAMIN LITTLE, CEO,

11                  Defendants        *

12   * * * * * * * * * * * * *
                                  Hartford, CT
13
                                  June 5, 2003
14
                                  10:22 A.M.
15
                         - - -
16         DEPOSITION OF URSULA MILDE

17                 VOLUME III
                         - - -
18
     APPEARANCES:
19
             FOR THE PLAINTIFF:
20
                     CAREY & ASSOCIATES, P.C.
21                   BY:  MARK P. CAREY, ESQUIRE
                         71 Old Post Road, Suite One
22                       Southport, CT    06490

23           FOR THE DEFENDANTS:

24                   JACKSON LEWIS, LLP
                     BY:  FRANCIS P. ALVAREZ, ESQUIRE
25                       One North Broadway
                         White Plains, NY    10601

604

1  time to justify what you did or didn't do.  I'm just

2  trying to confirm what you did or did not do.  So

3  I'm going to ask you again:  In this March 25th memo

4  that's Defendants' Exhibit Number 7, you did not

5  tell Mr. Little that you had already posted the

6  position --

7                 MR. CAREY:  Objection; asked and

8  answered

9      Q.    -- correct?

10     A.    I did not say that in this memo.  I

11  assumed that he already knew that because I had

12  already gone for almost two months with -- you know,

13  doing -- taking all the steps that one normally

14  takes in hiring a new person.

15     Q.    And prior to March 25, 2000, when you

16  sent the Defendants' Exhibit Number 7, you had not

17  told Mr. Little that you had posted the position,

18  correct?

19     A.    No, because I didn't see that it was

20  necessary.

21     Q.    And in your March 25th memo, you did not

22  mention Agata Wilinski, did you?

23     A.    In this memo here?

24     Q.    Yes, Defendants' Exhibit Number 7.

25     A.    No, because I thought I might have some

605

1   other candidates, too.

2        Q.    And prior to March 25, 2000, you never

3   mentioned to Mr. Little that you had interviewed

4   Agata Wilinski, did you?

5        A.    No.  But that was standard procedure,

6   too.  I -- When I interviewed for other positions

7   that had to be filled, I didn't tell Mr. Little or

8   Mr. Crawford what was going on.  I didn't tell him

9   step by step.

10        Q.    On the next page of Defendants' Exhibit

11   Number 34, under "Finding" -- and this is part of

12   finding number -- finding F, continued from --

13   Excuse me.  Withdrawn.  On the next page which is

14   page 4 of Defendants' Exhibit Number 34, under

15   Section F of Deceptive Acts, under "Finding" in the

16   first sentence, Mr. Little references a comparison

17   of the approved job description dated October 1996

18   with the job description that you later posted in

19   2000, correct?

20        A.    Yes.

21        Q.    And he states that that comparison

22   revealed that you had altered the description of the

23   job to meet the qualifications and experience of

24   your candidate Agata Wilinski.  That's what he

25   states, right?

606

1      A.    That's what he states.

2      Q.    And I'm assuming you disagree with that

3  statement, correct?

4      A.    Yes.

5      Q.    The next sentence states, "The 1996 job

6  description states the qualifications to be an

7  associate's degree in recreation therapy or leisure

8  studies plus one year of related experience working

9  with elderly people or equivalent."  That's a true

10 statement, isn't it?

11     A.    Yeah.

12     Q.    And it's also true that the job

13 description that you posted in 2000 stated

14 qualifications to be different than that which was

15 in the October 1996 job description, correct?

16            MR. CAREY:  Objection to form.

17     A.    The only degree in the posting -- The

18 only difference in the posting between the original

19 posting which outlines -- the posting outlines the

20 job description, if you will, and the 2000 posting

21 was that I said, "Degree not necessary but

22 advisable."

23     Q.    Okay.  So you made that change?

24     A.    Yes.

25     Q.    And you made that change without

607

1    discussing it with Mr. Little, correct?

2         A.    That's correct.

3         Q.    So Mr. Little states in the last sentence

4    of that finding "No review or approval was given to

5    alter the recreation coordinator job description."

6    Would you agree that no review was given to alter

7    the recreation coordinator job description?

8         A.    Yeah.

9         Q.    Okay.  Now, is it your claim that

10   approval was given to change it?

11        A.    Yes, because when we hired -- we

12   developed the contract with CCI and we contracted

13   with CCI, the CCI staff didn't have a degree in this

14   at all.  So we had already made -- accepted the fact

15   that a degree was not necessary.  So the fact that I

16   say a degree is not necessary but desirable was

17   basically just stating something that was, in fact,

18   practiced already.

19        Q.    But isn't it fair to say that when

20   services are provided by CCI they are technically

21   under the supervision and responsibility of CCI?

22             MR. CAREY:  I'm sorry.  Reread the

23   question.

24             (Whereupon, the requested portion of

25               the record was read by the reporter.)

1  somebody for a month when the person needs a shower

2  once a week, that to me is abuse and neglect. There

3  is a minimum level of what -- what a person needs;

4  and if you don't give that to the person, then that

5  to me is a form of neglect.

6      Q.    And I believe you testified that in your

7  opinion the code of the State of Connecticut made it

8  the responsibility of the licensee, the person whose

9  name is on the license, to make that determination

10  as to whether adequate services -- recreational care

11  services were being provided, correct?

12      A.    Not just recreational care, but all

13  services, yes.

14      Q.    And on the license which was introduced

15  as Plaintiff's Exhibits 5 and 6 which I show you,

16  you're identified as the person in charge, correct?

17      A.    That's correct.

18      Q.    And it was your understanding that as the

19  person in charge, you needed to make that

20  determination as to whether adequate recreational

21  care services were being provided, correct?

22      A.    Yes, that was my responsibility.

23      Q.    It wasn't the CEO's responsibility. It

24  was your responsibility; that's your testimony,

25  correct?

638

1      A.    Yes.  I saw that as my responsibility.  I

2  would hope the CEO saw it as his responsibility,

3  too, because --

4      Q.    But the ultimate judgment --

5                MR. CAREY:  Let her finish, Frank.

6      A.    Because the -- Because the -- you know,

7  when you are a managing agent for something for an

8  organization that takes care of people, you need to

9  be responsible about the care of the people and --

10     Q.    But my question, again, is this, just to

11  be clear:  It's your testimony that the ultimate

12  decision, the ultimate judgment for whether adequate

13  recreation care services were being provided in your

14  opinion rested with you, not the CEO, correct?

15                MR. CAREY:  Objection; asked and

16  answered.

17     A.    I saw it as my responsibility and my duty

18  to make sure that all the services were provided at

19  Parsonage were adequate.  And I assumed that

20  responsibility, and I did not feel that it would be

21  right on my part to say oh, it doesn't matter

22  because I don't care about that, somebody else's

23  response.

24                So in my view, I had the responsibility;

25  and I would be -- and I would be accountable and

1  that to me, that was my ethical stance in this.  So

2  yes, I guess that would answer the question:  Yes, I

3  saw that was my responsibility.

4      Q.    So when there was a disagreement as to

5  whether to hire an in-house recreation coordinator,

6  you believed that your judgment should prevail over

7  Mr. Little's judgment, correct?

8                MR. CAREY:  Objection to form;

9  argumentative.

10     A.    I believed that I -- that there was a

11 problem, and I believed it was my responsibility to

12 come up with a solution for this problem.  And I

13 explained that to Mr. Little.  And Mr. Little

14 essentially indicated to me that it wasn't his

15 decision, it was the board's decision.  And he

16 prevented me to explain it to the board.  And I -- I

17 began to see that the welfare of Parsonage Cottage

18 was not an overall important issue for Mr. Little

19 and the board.  And I felt very strongly that I had

20 the responsibility to advocate for these residents.

21               And I wanted to make the case for that

22 and for explaining why and why I had come to that

23 decision, and I was not allowed to do that.  So in a

24 way, I was -- the residents' welfare was used to

25 discriminate against me.  That's what I ultimately