**EXHIBIT CC-1**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| URSULA MILDE,<br>　　Plaintiff,<br><br>VS.<br><br>THE HOUSING AUTHORITY OF THE<br>TOWN OF GREENWICH; THE<br>HOUSING: AUTHORITY OF THE<br>TOWN OF GREENWICH BOARD OF<br>COMMISSIONERS; and BENJAMIN<br>LITTLE, CEO,<br><br>　　Defendants. | Civil No. 3:00CV2423(AVC) |

### RULING ON THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This is an action for damages and equitable relief brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq. ("Title VII"), Age Discrimination in Employment Act, 29 U.S.C. § 623 et. seq. ("ADEA"), 42 U.S.C. § 1983, and Connecticut's Fair Employment Practices Act, Con. Gen. Stat. §46(a) et. seq. ("FEPA"). The plaintiff, Ursula Milde, alleges that her former employer, Housing Authority of the Town of Greenwich ("HATG"), and the Board of Commissioners for the Housing Authority of the Town of Greenwich ("Board") subjected her to adverse employment actions based on her gender and age, and in retaliation for bringing complaints for this discrimination to the Equal Employment Opportunity Commission ("EEOC"). In addition, Milde alleges that HATG, the Board, and her former boss Benjamin Little subjected her to adverse employment actions based on her exercise of her First Amendment

rights. Finally, Milde alleges that the Media/Public Relations Policy" maintained by HATG is an unconstitutional prior restraint on her First Amendment rights.

The defendants and Milde both now move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment, arguing that there are no genuine issues of material fact, and that they are entitled to judgment as a matter of law. The issues presented are whether there is a genuine issue of material fact as to: 1) whether the defendants subjected Milde to gender discrimination; 2) whether the defendants subjected Milde to discrimination based on her age; 3) whether the defendants retaliated against Milde for bringing discrimination complaints to the EEOC; 4) whether the defendants subjected Milde to adverse employment actions based on her exercise of her First Amendment rights; 5) whether Little is entitled to qualified immunity for the First Amendment claim; 6) whether the HATG "Media/Public Relations Policy" acted as an unconstitutional prior restraint on Milde.

For the reasons set forth herein, the court concludes that no genuine issue of material fact exists as to the gender discrimination claim, the age discrimination claim, the Title VII and ADEA retaliation claims, and the claim that the HATG "Media/Public Relations" policy acted as an unconstitutional prior restraint. There is, however, a genuine issue of material

2

fact as to whether the defendants retaliated against Milde on account of her exercise of her First Amendment rights, and whether Little is entitled to qualified immunity.

Accordingly, the defendants' motion for summary judgment is granted in part and denied in part, and Milde's motion for summary judgment is denied.

**FACTS**

Examination of the sixth amended complaint, affidavits, pleadings, Local Rule 56(a) statements, exhibits accompanying the motions for summary judgment, and the responses thereto, discloses the following undisputed, material facts.

1. **Background**

The defendants, Housing Authority of the Town of Greenwich ("HATG"), Board of Commissioners for HATG ("Board"), and Chief Executive Officer of HATG, Benjamin Little, oversee the Parsonage Cottage for Senior Residents ("Parsonage") in Greenwich, Connecticut. In 1937, housing legislation created public housing in Greenwich and established HATG. HATG is the only housing authority in Greenwich. HATG receives federal community block grant money directly through the town of Greenwich for public housing purposes. The town of Greenwich board of selectmen appoints the Board that oversees HATG. During the period of March, 2000 to September, 2000, Sue McClenachan, a female, was the chairperson of the Board.

Parsonage is licensed by the state of Connecticut as a residential care home. The mission of Parsonage "is to provide a comfortable, safe home for the elderly in a residential environment within the Greenwich community." In order to maintain their license, Parsonage must comply with Conn. Agencies Regs. § 19-13-D6 S(g), which states in relevant part that "[r]ecreational activities shall be provided in [h]omes for the [a]ged."

HATG maintains a "Media/Public Relations Policy" in order to:

> enhance the image and public perception of [HATG], its programs and residents... It is the policy of HATG that before any contact is made with the media on information, data and/or HATG policies that affect the above strategies, there must be communication with [c]ommissioners and appropriate [s]taff.

On September 30, 1996, HATG hired the plaintiff, Ursula Milde, as the administrator of Parsonage. One Thomas Crawford, then executive director of HATG, and Little, then deputy director of HATG, made the decision to hire Milde.

Milde, a female, was 56 years of age when HATG hired her as the first administrator of Parsonage. As administrator, Milde was in charge of the day-to-day operations of Parsonage. She planned, developed, evaluated and updated job descriptions, admissions, and resident agreements in compliance with federal, state, and local standards, health and fire department codes and

4

regulations. Milde also had the responsibility for hiring and firing employees for existing positions at Parsonage. Milde also had the authority to write job descriptions, though it is disputed whether she had to seek approval for these descriptions. She was the only female senior manager at the time of her employment. The Board never invited Milde to participate in any of its committee meetings, though Milde asserts that other male managers were invited to participate in committee meetings.

On November 30, 1997, Milde wrote a memorandum to Crawford. Milde testified that in the memorandum Milde "was complaining about given [sic] responsibility to run the residence and being accountable to the State under the license for the safety and the well-being of the residents and then not given the authority to carry it out." Specifically, the memorandum stated:

> When I was hired as the administrator of Parsonage, my understanding was that I would be responsible for all the aspects of operation at the residence. Since my name is on the state license, I am, naturally, accountable for the entire operation, a responsibility I do not avoid. However, there are certain consequences which follow from this, which I think need to be clearly understood by all. [Milde then proposes a course of action in sections marked 1) "Facility"; 2) "Budget"; 3) "Staffing"; 4) "Surveys and Audits"; and 5) "Communication"]. My modus Operandi is one of handling matters on my own with assistance or feedback from my staff, if indicated I will seek advice from my superiors, or colleagues, when needed, but generally will come prepared with a suggestion of how I plan to solve the problem. I work best if I am given the authority, but also the necessary information and if things are communicated to me in a timely fashion.

Crawford responded to this memorandum with his own memorandum

5

which stated:

> Any contract agreement, whether new or renewals, should also be reviewed by us prior to execution. I believe we are already doing this... There is no question there have been incidents where discussions were held concerning Parsonage that you should have been involved in or made aware of, and I believe likewise that the same has transpired from your end. Management needs to be aware in both directions of all major issues. I personally believe you have done an excellent job with the facility.

When asked if during the period that these memoranda were written there was a disagreement or a difference in understanding as to how much communication with Crawford was necessary, Milde testified that there was. Milde also admits that she did not believe that the memorandum was motivated by age or gender animus, or animus towards Milde expressing her concerns. Overall, Milde and Crawford had an effective working relationship, and Crawford thought she did an outstanding job while he was her supervisor. Neither Crawford or Little ever disciplined Milde while Crawford was executive director.

In April, 1999, Crawford retired as executive director and HATG hired Little, the deputy director at the time, to replace Crawford. Little changed his title to that of chief executive officer. Little has described his style of management as "militaristic." In addition, he rarely visited Parsonage and was not generally involved with residents there.

Before March 2000, Little was friendly towards Milde and did not complain about her job performance. Little and the

6

chairwoman of board of HATG, Sue McClenachan, both thought at the time that Milde did a good job for the residents of Parsonage. At a meeting during 1998, Little stated that "I wish I had ten Ursulas." Little was 60 years of age when he discharged Milde.

1. **In-house Recreation Director**

On February 3, 2000, Milde alleges she first told Little that she wanted to hire an in-house recreation coordinator. Milde had written a job description in 1996 for an in-house coordinator, but instead HATG and Milde agreed to contract with a private company, C.C.I., for recreation services. Milde had developed the contract with C.C.I. with the approval of Crawford.

By February 3rd Milde thought C.C.I. was not doing an adequate job and hence sought to hire an in-house recreation coordinator. Milde alleges that Little responded to the request for an in-house recreation coordinator with silence. Milde stated:

> That's his MO. Sometimes when you kept insisting on it, sometimes he didn't respond at all. And then the person would take an action and then he would either - if the action went well, then he would say, you know, he wouldn't necessarily say something. but it seemed like all was good and it was done. If it didn't go well, then the person was being blamed.

During February 2000, Milde posted a notice for a job opening for the position of in-house recreation coordinator in several places. Milde decided on one Agata Willinski as the most

7

suitable for the job, even though Willinski did not have the degree required by the job description. Little asserted that this amounted to changing the original job description.

On March 24, 2000, Little wrote Milde a memorandum expressing concerns he had with hiring an in-house recreational coordinator. On March 25, 2000, Milde responded with a memorandum addressing the concerns Little had raised in his memo. Milde stated:

> During the past three years this arrangement [the contract with C.C.I.] has not worked out consistently to the best for Parsonage Cottage (i.e. frequent staff turnover, leaving us without a working program for months, lack of recreation experience/background on the part of some of their staff, unavailability of C.C.I. staff for holidays and weekends, not enough in-house time to develop programs for all residents, not only those who are able to go on trips etc.) We did not renew the contract in 1999 and at this point it is very clear that we need an in-house recreation/activities therapist.

On April 13, 2000, Milde wrote Little a memorandum as a follow up to Milde's March 25 memorandum informing him that Milde had found a candidate, Agata Willinski. In that letter, Milde stated,"[s]ince we have not had a recreation coordinator through CCI for the past two months, I will have to move ahead as soon as possible. Please call me if you have any question or concern or want to meet with Ms. Willinksi."

On April 17, 2000, Little responded to Milde by writing a memorandum. In this memorandum, Little stated that "the procedure you (Milde) have followed in hiring a recreational

8

coordinator causes a few problems." Little then proceeded to list five concerns, which included instructions that "until the personnel committee makes its recommendations and approval, no further action can be taken... All new staff is required to be interviewed by the chief executive officer." On April 18, 2000, Little wrote a memorandum to the personnel committee of the Board of HATG in order to express his concerns about hiring an in-house recreation coordinator.

On April 24, 2000, Milde responded with a memorandum to Little. She stated that:

> Since we are not creating a new position... I am suprised that suddenly the board has to approve this one again... You have so far not interviewed any of the Parsonage staff... Furthermore I would think that as the CEO you are too busy to interview all of the candidates... Of course you are welcome to interview this or any other candidate... Let me assure you that I have proceeded with this not because I want to usurp your authority but because I know you are very busy and it is my responsibility to do what needs to be done and what is best for the residents.

On April 24, 2000, Milde wanted to explain to the Board's personnel committee why she was planning on hiring an in-house recreation coordinator so they could make an informed decision on what action to take. On April 24, 2000, before the meeting Little telephoned Milde and explained to her that she was not welcome. Milde asserts that the Board never invited her to one of its committee meetings, though other male managers were invited. Later on April 24, 2000, Milde filed a grievance with

9

the Board claiming that she was denied the opportunity to explain the reasons behind her plan to hire an in-house recreation coordinator. In this grievance, she asked for a formal hearing in front of the Board.

On April 26, 2000, Milde wrote another memorandum and sent it to Little, with copies for the members of the Board. In this memo, she stated that:

> I can only conclude that the way in which you and the Board proceeded regarding this matter and the way the decision was "un-communicated" to me (I learned it first through the newspaper) showed a high disregard for me and for my staff. But more importantly it demonstrated a lack of concern for the needs of the residents... I like to remind you, therefore, that what matters is not your, or my, authority nor "who is in charge here" but what best serves the residents of Parsonage.

About 15 days later, Milde received a memo stating that there would be a grievance hearing on May 18, 2000. Shortly before the scheduled hearing on May 18, 2000, Milde received a fax stating that the hearing was cancelled, without an explanation.

On May 22, 2000, Milde attended a public meeting of the Board in order to express her view of the importance of hiring an in-house recreation coordinator. When she arrived at the meeting, Milde received a letter from one Barry Nova, the vice-chairperson of the Board, stating that her grievance had been denied and she was not going to have a hearing. Specifically, the letter stated in part that:

10

>The subject of your request, i.e., the hiring of a Recreation Director, we believe, is an operations matter that should be discussed and resolved between you and the CEO of the HATG to whom you report. The Board should not, and will not, become the arbiter in "turf wars" among managers; nor will it usurp the responsibilities and accountabilities of Benjamin Little.

During the meeting, Milde stood up and started talking about the issue. McClenachan told her that she was out of order pursuant to rules governing the hearing because nobody had recognized Milde and Milde was not on the agenda. McClenachan then told Milde that she could bring up the issue after the public meeting in the non-public executive session. Milde, Wisecup and McClenachan dispute whether Milde's behavior was disruptive and whether the Board should have recognized Milde. Milde then attended the executive session and expressed her concern that her right to be heard by the Board was being taken away, and that she was being treated unprofessionally. McClenchan testified that Milde's grievance regarding the recreation coordinator "was perhaps one of the reasons for her termination. It was not the only reason."

On May 23 and May 26, 2000, articles in the Greenwich Times appeared about the May 22, 2000 Board meetings and the recreation services at Parsonage. The May 23, 2000 article quoted Milde as saying "[i]f you don't provide [recreation services], that's a form of abuse... I don't know what their hang-up is." The May 26, 2000 article quoted Milde as saying

11

"[m]y concern is that some of these people can't get out... What we really should do here is have an individualized program for each person."

On June 2, 2000, Little sent Milde a performance review along with two memoranda entitled "Corrective Directives" and "Disciplinary Reprimand and 90 Day Opportunity to Improve." This was the first written performance review Little had ever provided Milde, though Milde asserts that Little provided male managers with performance reviews. On the performance review, Little gave Milde an overall rating of 3.81 out of 7. For this performance review, Little adopted the findings of a written report made by a private investigator he had hired. There is a dispute as to whether Little hired the private investigator for the purpose of conducting a personnel review of Milde. McClenachan approved of using a private investigator because she felt that there were so many interpersonal problems between Little and Milde that it "seemed like the right thing to do." In addition, the private investigator investigated dealings with Russell Kemp. Kemp alleges this investigation led to his suspension and termination when he was 57 years old. HATG replaced Kemp with somebody younger. McClenchan, Kemp and Crawford do not remember another time when HATG hired a private investigator except during the period before HATG terminated Milde and Kemp.

In the Corrective Directives memorandum Little sent to

12

Milde, he wrote:

> Pursuant to your concerns regarding the recreational services that are "mandated" by state statute, I reviewed the activities of CCI and the services they have provided. I believe that CCI has attempted in good faith to provide the services as set for in their contract with the Housing Authority... Therefore I have decided to renew our contract with CCI... Your actions regarding the issue of Recreation Coordinator are serious. You have failed to keep the lines of communications open between you and me and therefore I have been unaware of your activities. You have evidenced a wilful and intentional position of not recognizing that I am your supervisor... These combined with your reluctance not to change, have caused me to consider disciplinary actions ranging from a written reprimand to a possible termination. However, because of your dedication to the elderly residing at Parsonage, I have decided to only give a written reprimand which will be placed in your personnel file. In addition, I have decided to give you 90 days to take the following corrective actions... All press releases are reviewed by me and issued through the Housing Authority of the Town of Greenwich.

In the disciplinary reprimand, Little listed seven reasons for the reprimand. These reasons were:

> 1) Deceptive actions; 2) Acts of insubordination; 3) Failure to follow the policies and procedures of HATG; 4) Failure to communicate issues and problems relating to Parsonage in a timely manner to the CEO, Benjamin Little; 5) Failure to follow the recognized and mandated hiring procedures of HATG; 6) Short-circuiting the administrative chain of authority; 7) Improper influence of the hiring procedures (possible coercive activities and alteration of public document).

Little went on to cite specific events as support for the seven reasons that he listed, including asserting that Milde's statements to the Greenwich Times were not truthful. Little also supported his reasoning by expressing his view that Milde had not

13

properly communicated with him about her actions regarding hiring an in-house recreation coordinator, and that she exceeded her authority in trying to hire an in-house recreation coordinator and pressing this issue after she was told to take no further action on the issue.

On June 6, 2000, Milde sent a response to Little. In this memo she justified her actions regarding the hiring of an in-house recreation coordinator. She also wrote that she believed the disciplinary reprimand, among other things, to be "[a]n attempt to undermine her authority as the administrator, [i]n direct conflict with past messages of the Housing Authority and verbal statements by Little that Milde's work was very good and [i]ndication of a difficult working relationship between us." In her response, Milde requested a mediator be used to work out the issues between her and Little, because Milde stated that Little would not discuss things with her and was making false accusations.

On June 7, 2000, Little sent a memo to Milde directing her to write an apology to the Board for her actions at the May 22, 2000 board meeting. On June 21, 2000, Little sent Milde a second memorandum to Milde directing her to write an apology to the Board. Neither McClenchan nor any other Board members directed Little to do this, but McClenchan has since stated that she supported this disciplinary action.

14

On June 26, 2000, Milde responded by sending a memorandum to Little, McClenachan, and the other Board members in which she listed six reasons why she could not follow the directives to apologize to the Board. These reasons included accusing Little of engaging in an "abuse of power by judging my performance not by an objective standard based on my job description, but by the unfair and capricious use of his authority." On June 30, 2000, Little responded in a memorandum to Milde saying "I am deeply disappointed that you have not followed the directions" by not apologizing to the Board.

3. <u>Nancy Wisecup</u>

On July 3, 2000, Little asked Milde to provide him, by July 6, 2000, with a copy of the contract for one Nancy Wisecup, a nurse who did work for Parsonage. On August 4, 2000, Little wrote Milde a memorandum confirming that Milde did not submit Wisecup's contract to Little. On August 7, 2000, Milde responded in a memorandum that she did not submit Wisecup's contract because Wisecup had not authorized her to submit it, and that HATG did not have a right to the contract because it was initially funded by the Greenwich Department of Health. Milde instead suggested that Little attend a meeting with Milde, Wisecup, and the Greenwich Department of Health.

4. <u>C.C.I. Contract Issues</u>

On July 6, 2000, Milde wrote a memorandum to Little and

one Barbara Nolan, the executive director of C.C.I., expressing concerns about C.C.I. scheduling and contract issues. Milde also sent a copy of the memorandum to one Sam Romeo, the state of Connecticut Ombudsman who oversaw the services provided to Parsonage residences.

Later on July 6, 2000, Little responded with a memorandum to Milde stating that Milde's previous memorandum was "inappropriate and very unprofessional" because the memorandum should have been submitted days before the meeting with Nolan that took place on July 6, 2000. He also stated that "an internal memorandum being forwarded or carbon copied to the State Ombudsman is totally inappropriate."

On July 7, 2000, Milde responded with a memorandum defending her actions. She stated that:

> If you had consulted me when developing the contract... none of this would have been necessary... [y]ou certainly understand that the state appointed ombudsman has a right to request any pieces of documentation concerning residents' rights, and I, as the administrator have an obligation to submit those.

5. **Request to Rescind Disciplinary Action**

On July 14, 2000, Milde wrote a letter to one Leroy Franz, a member of the fundraising committee of the Board requesting that "the disciplinary action against me be rescinded and that an unbiased assessment be made by an impartial individual." Prior to sending this letter, Franz had suggested to Milde that she try to "let things go" with Little.

16

6. **EEOC Charge**

On July 25, 2000 Milde filed a charge of discrimination against the defendants with the United States Equal Employment Opportunity Commission ("EEOC"). On a letter dated July 26, 2000, Milde's attorney sent Little a letter explaining that Milde had filed discrimination charges with the EEOC and had retained counsel.

7. **Deteriorating Relationship**

On August 4, 2000, Little wrote Milde a memorandum informing her that a meeting was scheduled for August 9, 2000, and instructed Milde to provide a written assessment of issues concerning Parsonage's social work contract by August 8, 2000. On August 7, 2000, Milde responded in a memorandum by writing "I consider it unprofessional to be notified at such short notice about this meeting. I should have been consulted whether this date and time would be available for me."

On August 21, 2000, Little sent Milde a letter stating that:

> I find no attempts have been made by you to comply with
> my Corrective Directives Memorandum of May 30, 2000.
> Since that time additional unsatisfactory performance
> issues have arisen. You are directed to attend a
> disciplinary hearing... At this hearing you will be
> given an opportunity to answer the charges brought
> against you. As a result of this hearing, disciplinary
> action, up to and including termination, may result.

On September 6, 2000 Little held a disciplinary meeting concerning Milde. On September 8, 2000, Little wrote Milde