# EXHIBIT DD-2

Service: **Get by LEXSEE®**
Citation: **2006 U.S. Dist. LEXIS 46311**

*2006 U.S. Dist. LEXIS 46311, \**

JUANITA RYAN, Plaintiff, v. SHAWNEE MISSION UNIFIED SCHOOL DISTRICT NO. 512 and DIANE HANSEN, Defendants.

Case No. 05-2213-JWL

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

2006 U.S. Dist. LEXIS 46311

July 7, 2006, Decided
July 7, 2006, Filed

**PRIOR HISTORY:** Ryan v. Shawnee Mission U.S.D. 512, 416 F. Supp. 2d 1090, 2006 U.S. Dist. LEXIS 7779 (D. Kan., 2006)

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff former employee filed an action, pursuant to 42 U.S.C.S. § 1983 and § 504 of the Rehabilitation Act of 1973, 29 U.S.C.S. § 794, alleging that defendants, a school district and her former supervisor, wrongfully terminated her employment and committed illegal retaliation. Defendants filed a motion for summary judgment on the employee's claims, and the employee filed a motion for summary judgment on her claim under 42 U.S.C.S. § 1983.

**OVERVIEW:** The employee claimed she was fired from her job as a physical therapist because she complained that the school district had not hired enough physical therapists to meet the needs of handicapped students and that some students were not receiving care which the law required. The court found that the employee's statements were not protected by the First Amendment to the U.S. Constitution because they were made as part of her official duties and did not involve matters of public concern, and it dismissed her claim under 42 U.S.C.S. § 1983. However, the court denied defendants' motion for summary judgment on the employee's claim under the Rehabilitation Act. In doing so, it found that the employee was not required to exhaust her administrative remedies before she filed suit and that the employee engaged in protected activity when she complained about circumstances she reasonably believed tended to indicate that disabled students were being subjected to discrimination. Trial was required because the issue of whether the employee was subjected to unlawful retaliation for engaging in protected activity was permeated with triable issues of fact.

**OUTCOME:** The court granted defendants' motion for summary judgment on the employee's claim that they violated her rights under the First Amendment, and denied defendants' motion for summary judgment on the employee's claim that they violated her rights under the Rehabilitation Act. The court also denied the employee's motion for partial summary judgment on her claim alleging that defendants violated her First Amendment rights.

**CORE TERMS:** Rehabilitation Act, school district, paraprofessional, duty, summary judgment, caseload, team, retaliation, doctor's, physical therapy, email, disability, disabled, special education, supervise, protected speech, staff, carrying, attend, supervisor, prima facie case, scheduled, training, matter of public concern, exhaustion requirement, protected activity, reinstatement, matters of public concern, federal funding, school year

**LexisNexis(R) Headnotes** ✦ Hide Headnotes

Civil Procedure > Summary Judgment > Supporting Materials > General Overview

Civil Procedure > Summary Judgment > Supporting Materials > Affidavits

**HN1** At the summary judgment stage, facts must be established by evidence which would be admissible at trial. Fed. R. Civ. P. 56(e). To be sure, the parties do not need to present evidence in a form that would be admissible at trial (e.g., live testimony), but the content or substance of the evidence must be admissible. Thus, factual allegations must be supported by evidence identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein. If that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, i.e., the evidence must be based on personal knowledge. Consequently, inadmissible hearsay will not defeat summary judgment.   More Like This Headnote

Civil Procedure > Summary Judgment > Standards > Appropriateness

Civil Procedure > Summary Judgment > Standards > Genuine Disputes

Civil Procedure > Summary Judgment > Standards > Materiality

**HN2** Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. A fact is material if, under the applicable substantive law, it is essential to the proper disposition of the claim. An issue of fact is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.   More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants

**HN3** A party who moves for summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. Once the movant has met this initial burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. Rather, the nonmoving party must set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant. To accomplish this, the facts must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein.   More Like This Headnote

Civil Procedure > Summary Judgment > General Overview

**HN4** Summary judgment is not a disfavored procedural shortcut; rather, it is an important procedure designed to secure the just, speedy, and inexpensive determination of every action.   More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees

Governments > Local Governments > Employees & Officials

**HN5** It is settled that a government entity cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression. At the

same time, a governmental entity has an interest as an employer in regulating the speech of its employees that differs significantly from the interest it possesses in regulating the speech of the citizenry in general. These conflicting values require courts to find a balance between the employee's interests, as a citizen, in commenting upon matters of public concern and the interest of the government entity, as an employer, in promoting the efficiency of the public services it performs through its employees. Thus, while the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance.  More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees 

Evidence > Procedural Considerations > Burdens of Proof > Preponderance of Evidence

Governments > Local Governments > Employees & Officials

HN6 In determining whether a public employer has infringed an employee's First Amendment free-speech rights, the United States District Court for the District of Kansas applies the test the United States Supreme Court articulated in Pickering v. Board of Education and Connick v. Myers. First, the court determines whether the employee spoke as a citizen on a matter of public concern. If so, then the possibility of a First Amendment claim arises and the question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. If these prerequisites are met, the employee's speech is protected and the plaintiff must show that his or her speech was a substantial motivating factor in the adverse employment action against the employee. The first two factors are questions of law for the court to decide; the third prong is a fact question for the jury. The analysis can include a fourth step: if the employee proves the first three factors, then the employee prevails unless the employer proves by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct.  More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees 

HN7 In Garcetti v. Ceballos, the United States Supreme Court instructed lower courts to ask and answer another question as part of the test which the Court articulated in Pickering v. Board of Education and Connick v. Myers: whether the employee made the statement as a citizen or pursuant to his or her official duties.  More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees 

Governments > Local Governments > Employees & Officials 

HN8 In Garcetti v. Ceballos, the United States Supreme Court held that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline. The Court reasoned that restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created. According to the Court, its precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job.  More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees 

Governments > Local Governments > Employees & Officials 

HN9 Whether an employee's speech addresses a matter of public concern must be determined by

the content, form, and context of a given statement, as revealed by the whole record. In determining whether the speech touches on a matter of public concern, the United States District Court for the District of Kansas looks to whether it can be fairly considered as relating to any matter of political, social, or other concern to the community. The court focuses on the speaker's motive and attempts to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose. The speech cannot relate generally to subject matter that is of public interest, but must sufficiently inform the issue as to be helpful to the public in evaluating the government's conduct. Ordinarily, for an employee's work-related speech to be on a matter of public concern, the speech must be uttered with an eye to action, to improve the public welfare, not just to remedy a personal grievance. Thus, the court looks beyond the general topic of the speech to evaluate more specifically what was said on the topic. More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees

Education Law > Faculty & Staff > Freedom of Speech > Individual & Public Speech

HN10 ⊕ The broad issue of the treatment of individuals with disabilities generally may be a matter of political, social, or other concern to the community. But, as the United States Court of Appeals for the Tenth Circuit noted in Tytor v. Board of Trustees, communications concerning the particular educational needs of individual students are not themselves matters of public interest. More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees

Governments > Local Governments > Employees & Officials

HN11 ⊕ Speech pertaining to internal personnel disputes and working conditions ordinarily is not a matter of public concern. More Like This Headnote

Civil Rights Law > Protection of Disabled Persons > Rehabilitation Act > Scope

Governments > Federal Government > Claims By & Against

Labor & Employment Law > Discrimination > Disability Discrimination > Rehabilitation Act

HN12 ⊕ Section 505 of the Rehabilitation Act, 29 U.S.C.S. § 794a, sets forth essentially two different remedial schemes. 29 U.S.C.S. § 974a(a)(1) provides that the remedies, procedures, and rights of Title VII of the Civil Rights Act of 1964 are available with respect to any complaint under 29 U.S.C.S. § 791, and a Title VII plaintiff must exhaust his or her administrative remedies before filing suit. Section 501 of the Rehabilitation Act, 29 U.S.C.S. § 791, is directed specifically at employment of individuals with disabilities by federal employers. Consequently, exhaustion of administrative remedies under the Rehabilitation Act generally is required if the employee is asserting a § 501 claim against a federal employer. More Like This Headnote

Civil Rights Law > Protection of Disabled Persons > Rehabilitation Act > Enforcement

HN13 ⊕ In contrast to the incorporation of rights and remedies under Title VII of the Civil Rights Act of 1964 into § 501 of the Rehabilitation Act, 29 U.S.C.S. § 791, § 505(a)(2) of the Rehabilitation Act, 29 U.S.C.S. § 794a(a)(2), sets forth a separate remedial scheme. It provides that the remedies, procedures, and rights set forth in Title VI of the Civil Rights Act are available to any person aggrieved by a violation of 29 U.S.C.S. § 794. Section 794 bars discrimination on the basis of an individual's disability in all federally funded programs. 29 U.S.C.S. § 794(a). Any person aggrieved by a violation of 29 U.S.C.S. § 794 may seek relief under 29 U.S.C.S. § 794a(a)(2), which permits plaintiffs to invoke the remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964. 29

U.S.C.S. § 794a(a)(2). Because exhaustion of administrative remedies is not a prerequisite to a Title VI claim, it is well settled that it is not a prerequisite to a private cause of action under 29 U.S.C.S. § 794a(a)(2). More Like This Headnote

Civil Rights Law > Protection of Disabled Persons > Rehabilitation Act > Enforcement

HN14 The United States Court of Appeals for the Tenth Circuit has held that a private plaintiff is not required to pursue a remedy under regulations issued by a U.S. Government agency which are irrelevant to his or her particular need. Accordingly, exhaustion of administrative remedies is not required before a plaintiff files suit under § 504 of the Rehabilitation Act, 29 U.S.C.S. § 794. More Like This Headnote

Civil Rights Law > Protection of Disabled Persons > Rehabilitation Act > Enforcement

Education Law > Discrimination > Individuals With Disabilities Education Act > Enforcement

HN15 The Individuals with Disabilities Act (IDEA) states that it should not be construed to limit the rights, procedures, and remedies available under the Rehabilitation Act, except that administrative remedies must be exhausted to the same extent as would be required had the action been brought under the IDEA. 20 U.S.C.S. § 1415(l). The United States Court of Appeals for the Tenth Circuit has interpreted the IDEA's exhaustion provision to mean that a plaintiff asserting another type of claim (e.g., a claim under § 504 of the Rehabilitation Act, 29 U.S.C.S. § 794) must abide by the IDEA's exhaustion requirement to the extent the plaintiff is seeking relief that is also available under the IDEA. Consequently, a plaintiff may not circumvent the IDEA's exhaustion requirement simply by recasting the claim as one under the Rehabilitation Act. More Like This Headnote

Education Law > Discrimination > Individuals With Disabilities Education Act > Enforcement

HN16 Case law does not extend the right to bring a cause of action under the Individuals with Disabilities Act beyond a disabled child or the child's parents. More Like This Headnote

Civil Rights Law > Protection of Disabled Persons > Rehabilitation Act > Enforcement

Evidence > Procedural Considerations > Burdens of Proof > Burden Shifting

Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof

Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Rehabilitation Act

HN17 Section 504 of the Rehabilitation Act, 29 U.S.C.S. § 794, provides that no individual with a disability shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity that receives federal funding. 29 U.S.C.S. § 794(a). In the absence of direct evidence, claims of retaliation are subject to the United States Supreme Court's burden-shifting framework established in McDonnell Douglas Corp. v. Green. Under that framework, a plaintiff must begin by putting on a prima facie case of retaliation. If the plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking the adverse employment action. If the defendant meets its burden, summary judgment is warranted unless the plaintiff shows that there is a genuine issue of fact as to whether the defendant's reason is a pretext for discrimination. More Like This Headnote

Civil Rights Law > Protection of Disabled Persons > Americans With Disabilities Act > Scope 

Civil Rights Law > Protection of Disabled Persons > Rehabilitation Act > Enforcement

Labor & Employment Law > Discrimination > Disability Discrimination > Proof > Burdens of Proof > Burden Shifting

Labor & Employment Law > Discrimination > Disability Discrimination > Rehabilitation Act

HN18 As to the first prong of the burden-shifting framework which the United States Supreme Court established in McDonnell Douglas Corp. v. Green, a plaintiff must demonstrate a prima facie case. In employment discrimination cases alleging violations of the Rehabilitation Act, the court generally applies the standards of the Americans with Disabilities Act (ADA), 42 U.S.C.S. § 12101 et seq. 29 U.S.C.S. § 794(d). Under the ADA, an employee must prove the following elements in order to establish a prima facie case of retaliation: (1) that the plaintiff was engaged in activity protected by the statute; (2) that the employee was subjected to adverse employment action contemporaneous with or subsequent to the protected activity; and (3) that there was a causal connection between the protected activity and the adverse action. More Like This Headnote

Civil Rights Law > Protection of Disabled Persons > Rehabilitation Act > Scope

Education Law > Discrimination > Gender & Sex Discrimination > Title IX > General Overview

Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Rehabilitation Act

HN19 The Rehabilitation Act prohibits disability discrimination by recipients of federal funding. The Act provides that no individual with a disability shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity that receives federal funding. 29 U.S.C.S. § 794(a). The United States Supreme Court's holding in Jackson v. Birmingham Board of Education, which was a case under Title IX of the Civil Rights Act of 1964, extends to provide a plaintiff with a claim under the Rehabilitation Act based on an allegation that a school district retaliated against her for complaining about disability discrimination in the school's programs. More Like This Headnote

Civil Rights Law > Protection of Disabled Persons > Rehabilitation Act > Scope

Education Law > Discrimination > Gender & Sex Discrimination > Title IX > General Overview

Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Rehabilitation Act

HN20 The arguably more limited nature of the Rehabilitation Act prohibition is enlarged by the remedial provision which provides that any person aggrieved by a violation is entitled to relief. 29 U.S.C.S. § 794a(a)(2). Given this broad language and the synonymous purposes of the Rehabilitation Act and Title IX of the Civil Rights Act of 1964 (Title IX prohibits sex discrimination in federally funded programs whereas the Rehabilitation Act prohibits disability discrimination in federally funded programs), the United States District Court for the District of Kansas can find no principled distinction between § 504 of the Rehabilitation Act, 29 U.S.C.S. § 794, and the Title IX statute at issue in Jackson v. Birmingham Board of Education. More Like This Headnote

Civil Rights Law > Protection of Disabled Persons > Americans With Disabilities Act > Scope

Civil Rights Law > Protection of Disabled Persons > Rehabilitation Act > Scope

Education Law > Discrimination > Gender & Sex Discrimination > Title IX > General Overview

HN21 The standards used to determine whether a violation of the Rehabilitation Act has occurred are to be determined under Americans with Disability Act standards. 29 U.S.C.S. § 794(d). But, the scope of that statute is unclear, particularly in light of the clarity of the statutory language in the Rehabilitation Act that "any party aggrieved" by a violation may seek relief

as well as the United States Supreme Court's holding in Jackson v. Birmingham Board of Education construing the analogous Title IX statute to recognize a third-party retaliation claim.  More Like This Headnote

Civil Rights Law > Protection of Disabled Persons > Rehabilitation Act > Scope

Education Law > Discrimination > Individuals With Disabilities Education Act > Coverage

HN22± The Rehabilitation Act prohibits federal funding recipients from excluding individuals from participating in, denying individuals the benefit of, or discriminating against individuals solely by reason of their disabilities. 29 U.S.C.S. § 794(a). Notwithstanding that the right to a free and public education (FAPE) arises under the Individuals with Disabilities in Education Act (IDEA), rather than the Rehabilitation Act, a school district's denial of a FAPE can constitute disability discrimination in violation of the Rehabilitation Act. Moreover, protected activity can range from filing formal charges to complaining informally to supervisors.  More Like This Headnote

Civil Procedure > Appeals > Briefs

HN23± An argument raised for the first time in a reply brief is waived, and issues not raised in an opening brief are deemed abandoned or waived.  More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation > Elements > Causal Link

HN24± A causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.  More Like This Headnote

Evidence > Procedural Considerations > Burdens of Proof > Burden Shifting

Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burdens of Proof

HN25± Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in an employer's proferred legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons. When assessing whether a plaintiff has made an appropriate showing of pretext, the United States District Court for the District of Kansas considers the evidence as a whole.  More Like This Headnote

Evidence > Procedural Considerations > Weight & Sufficiency

Labor & Employment Law > Discrimination > Disparate Treatment > Proof > General Overview

HN26± Evidence of pretext may, together with the elements of the prima facie case, suffice to show intentional discrimination.  More Like This Headnote

Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview

HN27± An attempt to add a new claim or a request for another type of relief is evaluated under the standards set forth in Fed. R. Civ. P. 15(a), which provides that leave to amend shall be freely given when justice so requires. The most important factor in deciding a motion to amend pleadings is prejudice. Prejudice generally refers to an amendment which unfairly affects the defendants in terms of preparing their defense to the amendment.  More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees

HN28 In Garcetti v. Ceballos, the United States Supreme Court rejected the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties, but pointed out that other statutes exist to protect employees and provide checks on supervisors who would order unlawful or otherwise inappropriate actions. More Like This Headnote

**COUNSEL:** **[*1]** For Juanita Ryan, Plaintiff: Kelly L. Jackson, Kelly L. Jackson, Leawood, KS.

For Shawnee Mission Unified School District No. 512, Marjorie P. Kaplan, in her official capacity as supervisor at Shawnee Mission School District, Shawnee Mission School Board, by and through their president, Donna Bysfield, Diane Hansen, individually and in her official capacity as East Area Coordinator, Occupational and Physical Therapy, USD 512, Defendants: Curtis L. Tideman, Tammy M. Somogye, Lathrop & Gage, LC -- OP, Overland Park, KS.

**JUDGES:** John W. Lungstrum, United States District Judge.

**OPINIONBY:** John W. Lungstrum

**OPINION: MEMORANDUM AND ORDER**

Plaintiff Juanita Ryan was formerly a physical therapist with the defendant Shawnee Mission Unified School District No. 512. She asserts claims against the school district and her former supervisor, Diane Hansen, for retaliation and wrongful termination for violations of her First Amendment free speech rights, pursuant to 42 U.S.C. § 1983, and § 504 of the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. § 794(a). This matter is currently before the court on Plaintiff's Motion for **[*2]** Partial Summary Judgment and Defendants' Motion for Summary Judgment (docs. # 66 & # 69). For the reasons explained below, the court will grant defendants' motion with respect to plaintiff's First Amendment retaliation claim and will deny it as to plaintiff's Rehabilitation Act claim. Having granted summary judgment in favor of defendants on plaintiff's First Amendment retaliation claim, the court will deny plaintiff's motion for partial summary judgment as moot because it pertains to one of defendants' asserted defenses on that claim.

**STATEMENT OF MATERIAL FACTS**

The court's analysis of the facts of this case is complicated significantly by two considerations. First and foremost, plaintiff has largely failed to support any of her factual allegations with admissible evidence. HN1 At the summary judgment stage, facts must be established by evidence which would be admissible at trial. Fed. R. Civ. P. 56(e); Pastran v. K-Mart Corp., 210 F.3d 1201, 1203 n.1 (10th Cir. 2000). To be sure, the parties do not need to present evidence in a form that would be admissible at trial (e.g., live testimony), but the content or substance of **[*3]** the evidence must be admissible. Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1122 (10th Cir. 2005); Pastran, 210 F.3d at 1203 n.1. Thus, factual allegations must be supported by evidence "identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." Diaz v. Paul J. Kennedy Law Firm, 289 F.3d 671, 675 (10th Cir. 2002) (quotation omitted). In this case, plaintiff's factual allegations are largely supported by references to notes, emails, and other documents that are not authenticated or part of a sworn affidavit or other testimony. Thus, the majority of exhibits plaintiff filed in support of her response are not proper Rule 56 evidence. See, e.g., Hayes v. Marriott, 70 F.3d 1144, 1148 (10th Cir. 1995) (unsworn statements do not raise factual issues precluding summary judgment); Fed. R. Civ. P. 56(c) & (e); D. Kan. Rule 56.1 (d). In addition to plaintiff's failure to establish the admissibility of most of her exhibits, many of her numbered fact paragraphs rely on inadmissible hearsay. "[I]f that evidence is presented in the form **[*4]** of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, i.e., the evidence must be based on personal knowledge." Bryant, 432 F.3d at 1122. Consequently, inadmissible hearsay will not defeat summary judgment. Lozano v. Ashcroft, 258 F.3d 1160, 1166 (10th Cir. 2001); Hardy v. S.F. Phosphates Ltd. Co., 185 F.3d 1076, 1082 n.5 (10th Cir. 1999); Treff v. Galetka, 74 F.3d 191, 195 (10th Cir. 1996).

Defendants raised these evidentiary objections for the first time in their reply brief. The court granted plaintiff leave to file a surreply brief, explaining that plaintiff could use her surreply to respond to issues which defendants had raised anew for the first time in their reply brief. Thus, in allowing plaintiff to file a surreply the court gave plaintiff the opportunity to respond to the defendants' evidentiary objections. Notwithstanding the opportunity to respond (perhaps by authenticating documents or pointing to a hearsay exception), plaintiff did not respond to those objections. Instead, she filed a motion to amend her response to defendants' motion for summary judgment [*5] (doc. # 100). In that motion, she seeks to correct references to the evidence in twenty-one numbered fact paragraphs by changing references to deposition testimony and by submitting a few different exhibits. Plaintiff contends that her previous errors in failing to refer to and attach the appropriate evidence were inadvertent. The court will deny plaintiff's motion to amend her response because, first, plaintiff had the opportunity to marshal her evidence in response to defendants' motion for summary judgment when she filed her response to the motion and again when she filed her surreply. Moreover, even if the court were to permit her to amend her response, most of the prior evidentiary deficiencies would not be cured. Far most importantly, the court denies the motion because the court would reach the same result with or without the proposed changed evidentiary citations in any event.

In addition to plaintiff's failure to properly support her factual allegations with admissible evidence, the second and related consideration which further complicates the court's analysis of the facts of this case is that the parties submitted voluminous statements of fact. The statement of facts contained [*6] in defendants' motion consists of 249 fact paragraphs spanning fifty-four pages. In response, plaintiff really did not controvert defendants' factual allegations in any significant respect. Instead, she asserted factual allegations which essentially added to fifty-five of defendants' fact paragraphs. Additionally, the statement of facts contained in her response to defendants' motion consists of 190 fact paragraphs spanning thirty-three pages. A significant portion of both of the parties' factual allegations are immaterial to the court's resolution of defendants' motion for summary judgment in the sense that, although they are helpful to the court's understanding of the background of the case, they do not impact the court's determination of whether summary judgment is warranted on either of plaintiff's claims.

Because of the parties' unnecessarily voluminous statements of fact, then, the court will not resolve each and every one of defendants' evidentiary objections. Instead, in an abundance of caution, the court has thoroughly reviewed the record in an effort to ensure that plaintiff is not deprived of her day in court simply because her counsel has not marshaled the evidence in [*7] the manner required by summary judgment practice and applicable rules. In doing so, the court has attempted to anticipate potential hearsay exceptions and exclusions which might apply despite the fact that plaintiff's counsel did not raise those arguments. Ultimately, the court finds that plaintiff's failure to support her factual allegations is immaterial to the court's resolution of defendants' motion for summary judgment. With or without those factual allegations, plaintiff has failed to establish that a genuine issue of material fact exists to withstand summary judgment on her First Amendment retaliation claim and, conversely, the school district has failed to establish that it is entitled to summary judgment on her Rehabilitation Act claim. Accordingly, consistent with the well established summary judgment standard, the court accepts the facts which are uncontroverted or relates them in the light most favorable to plaintiff, the nonmoving party.

**A. The School District's Special Education Department** n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Consistent with the well established standard for evaluating a motion for summary judgment, then, the following facts are either uncontroverted or stated in the light most favorable to plaintiff, the nonmoving party.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*8]

The school district has fifty-one schools. Each school building is managed by a principal who

supervises the staff assigned to work exclusively in that building. Nearly five thousand students in the school district have individualized education plans (IEPs). Of those, 3,481 students have identified educational disabilities that impact their ability to receive a free and appropriate education (FAPE). Students with IEPs are commonly called "special education students." Some have health impairments which impact their ability to make educational progress and are the ones with whom physical therapists (PTs) work. Plaintiff was formerly employed by the school district as one of the PTs and, as such, she worked with those students.

The school district's hierarchy relating to plaintiff's employment with the school district is as follows. n2 The school district's Director of Special Education is Deborah Haltom. The school district is divided into five areas for purposes of managing special education resources: the East area, the South area, the North area, the Northwest area, and the West area. The school district assigns coordinators to manage the special education resources in each of those [*9] five areas. Ms. Haltom supervises these area coordinators. The area coordinators, in addition to managing their respective areas, have specialized areas of responsibility. Defendant Diane Hansen is the coordinator for the East area and also supervises the PTs and a physical therapy assistant (PTA). Pona Piekarski is the coordinator for the South area to which plaintiff was assigned. Several types of specialists work with special education students such as PTs, occupational therapists (OTs), autism specialists, school psychologists, speech pathologists, social workers, and vision specialists. These specialists, including PTs, are assigned to several schools within the district.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 To clarify, this was the hierarchy during the relevant time period.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

When the school district suspects that a student needs special education services, or at a parent's request, a diagnostic team meets with the student's parent(s) to develop an evaluation plan and determine the appropriate way to collect data to determine whether the [*10] student qualifies for such services. The student is then evaluated by different specialists who compile an evaluation report and provide it to the parents. If a student is found to be in need of special education services, an IEP meeting is scheduled to develop an IEP for the student. IEP meetings can involve as many as ten or more service providers, all of whom are invited to attend. IEP meetings must be attended by a local educational agency representative (i.e., a school principal or other person licensed to provide or supervise special education services), a special education teacher, and a parent. The purpose of an IEP meeting is to discuss the evaluation, consider the recommendations of all team members, and reach consensus about the program that should be provided to the student.

The IEP identifies, among other things, the goals for a student, how the student's progress toward the goals will be measured, the type of related services the school district agrees to provide a student, how often a student is to receive certain specified services, and if any assistive technology is required for the student. "Related services" is a term of art in the field of special education. It [*11] means development, corrective, and supportive services required to assist a child who has been identified as qualified to receive special education. Some examples include physical therapy, occupational therapy, social work services, assistive technology, speech therapy, and transportation. "Assistive technology" is another special education term of art and means items, pieces of equipment or product system, whether acquired commercially off the shelf, modified, or customized, that is used to increase, maintain, or improve the functional capabilities of a child with a disability. Some examples include things as simple as a velcro strap to assist a student in holding a pencil, crayon, cup, or spoon; a ramp built out of wood for a student to roll a bowling ball down a bowling alley; or a paper towel holder attached to a wheelchair for a student who needs easy access to it; and more complicated items such as a word processor; an eye signal (light beam) button; an auditory output device; an electric wheelchair; or a switch that is noise or light sensitive and activates a radio or other electronic device.

A student with an IEP may receive several different related services such as physical [*12]

therapy, occupational therapy, and speech therapy. If the service is not consultative in nature, the therapists providing these services must schedule regular times to see the student within the school. In addition to providing services to students on their caseload, therapists are called on to attend meetings to discuss students' cases (sometimes referred to as team meetings) or report students' progress, evaluate students suspected of being in need of special education, evaluate new students coming to the school district, and train the paraprofessionals serving the students on their case loads. According to plaintiff, PTs are also required to perform equipment adjustments, locate equipment, obtain equipment, provide re-evaluations for students, supervise the PTA, supervise the paraprofessionals, and plan PT services. Plaintiff also points out that PTs often contact the parents directly for signed permission for evaluations or returning doctor's notes, or to discuss matters such as physical therapy, "in-home" activities, equipment needs, positioning and handling of a child, and the results of doctor's visits.

Each student with an IEP has a case manager who coordinates meetings, serves **[*13]** as a point person for contact with the parents, and checks that services are being provided as required on the student's IEP. It is often difficult to schedule meetings because there are so many individuals' calendars to coordinate. Also, some service providers work less than full time schedules, as did plaintiff in this case, and are not working on days when meetings are scheduled. Persons who coordinate meetings try to schedule meetings when the most service providers can attend. Some part-time service providers will attend a meeting scheduled on a regular work day off and later adjust their schedules by taking off a scheduled work day when students are out of school or coming in later or leaving early on regularly scheduled work days. Plaintiff's schedule did not allow her to take time out of a regular day without missing necessary duties. Sometimes, a meeting is scheduled for one student when a service provider is scheduled to serve another student. In order to attend the meeting, the service provider has to cancel his or her regular student visit.

When Ms. Hansen was the supervisor for the PTs, the PTs met without her and determined their caseloads and then Ms. Hansen reviewed **[*14]** what the PTs proposed. Caseloads were divided by number of students. Plaintiff did not agree with this method of dividing the caseloads, believing that it should be divided by the number of visits instead. On average, a full time PT has approximately forty students on his or her caseload. PTs working three days a week have twenty to twenty-five students on their caseloads. Ms. Hansen met with the PTs and OTs, on average, once per month. The PTs also met on occasion without Ms. Hansen to address issues they were having as a group and to try to help each other out. PTs had concerns about talking to administration for various reasons.

The school district's PTA, Ann LaHue, visits students and provides the physical therapy services called for on IEPs, obtains equipment, and prepares equipment requests. Often, if a student's IEP calls for more than one visit in a week, Ms. LaHue will see the student one time per week and the PT will see the student the other time. Ms. LaHue worked with some of the students on plaintiff's caseload.

Paraprofessionals working in the school buildings receive training from various disciplines to be able to work with students throughout the school day when the **[*15]** service providers are visiting other students. PTs may only delegate certain duties to paraprofessionals. PTs are responsible for training the paraprofessionals who work with the students on their caseload who receive physical therapy services. Ideally, the student is present during the PT's training of the paraprofessional. Training is particularly difficult at the beginning of the school year because it takes new paraprofessionals working with students awhile to learn students' problems. Scheduling this training is also difficult when there are many paraprofessionals to train. During the relevant time period, the Kansas Department of Education (KSDE) required PTs to supervise paraprofessionals working with students on physical therapy two times per month. PTs are responsible for keeping track of when they supervise paraprofessionals.

## B. Plaintiff's Employment with the School District

The school district hired plaintiff as a physical therapist in 1999. Plaintiff accepted a contract with the school district for the 2003-2004 school year working 0.6 of a full time schedule. The events that are the subject of this lawsuit occurred during the 2003-2004 school year.

[*16] *1. Handling of M.J. at Rosehill Elementary*

The record reflects that one of the students on plaintiff's caseload, M.J. at Rosehill Elementary School, was a source of significant friction between plaintiff and the staff at Rosehill. **(1) On August 21, 2003, plaintiff made a recommendation to Karen Kittell, the resource room teacher at Rosehill, that M.J. needed to have a wheelchair and that M.J. needed the wheelchair regardless of what the IEP team recommended. n3 (2) On September 17, 2003, plaintiff told Ms. Kittell that M.J. should be allowed to walk in the hallway, that plaintiff only had time to provide services to M.J. for thirty minutes per week as reflected in M.J.'s IEP, that plaintiff did not have time to provide supervision to several different paraprofessionals serving M.J., and that plaintiff therefore needed to train and supervise one primary paraprofessional.**

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 The boldface statements are those which plaintiff contends constituted protected speech under the First Amendment. The court has numbered these statements for purposes of providing a clear record of the court's ruling on plaintiff's First Amendment retaliation claim.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*17]

The Rosehill team convened a meeting on October 16, 2003, concerning M.J. The principal at Rosehill, Brenda Boyd, was present at this meeting. During the meeting, **(3) plaintiff stated that she was assessing the equipment needs and activities to be implemented during M.J.'s therapies. Plaintiff requested that M.J. be allowed to walk in the hallway and be evaluated by a vision specialist who worked on mobility needs for visually impaired students. Plaintiff also stated that she needed to train one primary paraprofessional so that she could limit the time necessary to supervise paraprofessionals and she stated that she did not have sufficient time in her schedule to attend monthly team meetings for M.J. Plaintiff discussed other activities and other related equipment for M.J. She recommended removing the toys from the floor and requiring M.J. to sit at a chair and table instead of crawling and sitting on the floor. Plaintiff also stated that she had spoken to M.J.'s parents and they did not object to M.J. walking in the hallway or interacting with other children.**

On October 20, 2003, plaintiff requested direction from Ms. Hansen as to whether she was required to attend all of [*18] the team meetings being scheduled for M.J. Ms. Hansen responded, in essence, that plaintiff "can't do everything. Ask them what they want you to do the most." Plaintiff requested that Ms. Hansen speak with Ms. Boyd about the matter and Ms. Hansen indicated that she would do so. On November 5, 2003, Ms. Piekarski emailed plaintiff and stated that she had been told that plaintiff was not providing services at Rosehill. Plaintiff emailed Ms. Hansen, copying Ms. Haltom and Ms. Piekarski, and stated that Ms. Hansen told her that "direct services" included in-service training to paraprofessionals and team meetings. Plaintiff explained all of the activities she had performed and meetings she had attended on behalf of M.J. Her email stated: "Yet, I have recently obtained an email from Pona Piekarski indicating that I have not provided PT services for this student in several weeks. Are not the activities as referenced in this paragraph considered PT services? If not, what exactly does constitute PT services?" Ms. Piekarski had told Ms. Boyd that "direct services" were only "hands-on activities with the student and staff training with the student present."

**(4) At the November 6, 2003, Rosehill [*19] team meeting, plaintiff stated that she had received an email from Ms. Piekarski indicating that someone from Rosehill had indicated to plaintiff that she had not been providing PT services for over three weeks. Plaintiff indicated to the team that she was disappointed that someone would say this and wanted to reassure the parent and team that plaintiff, in fact, had been delivering PT services and did not want them or the team members to be misled by someone who was sending**

unsubstantiated emails. Plaintiff further stated that M.J. was spending too much time on the floor which decreased mobility and increased the risk for decreased joint range and contractors, that student and staff safety were impaired during ambulation into and out of the school building and within the building, and that M.J. had too little interaction with her peers.

After the meeting, Ms. Boyd met with plaintiff to discuss her comments. Ms. Boyd explained to plaintiff that she thought her behavior was unprofessional because it had nothing to do with talking about M.J. **(5) Plaintiff defended her discussion of the email, claiming that her intent in bringing up the email at the meeting was "integrity." She [*20] stated: "[A]pparently whoever sent this email did not have sufficient integrity/self-esteem to have contacted me personally at which time I could have answer[ed] any questions which they might have had in regards to the type/extent of PT services which I was providing. . . . [P]erhaps an email to Piekarski should not have been sent when [you] could have spoken directly to me regarding [your] service concerns." Plaintiff also told Ms. Boyd that she was concerned with M.J.'s isolation from her peers, her unduly restrictive placement, and the fact that M.J. was not being allowed to walk in the hallway.** Ms. Piekarski believed that the Rosehill team "was not communicating well with each other" and "there were a lot of mixed communications between the team [] about service and when service would be provided."

On November 11, 2003, plaintiff called Ms. Hansen to inform her that she needed to miss M.J.'s direct service time to attend an IEP meeting. Plaintiff asked Ms. Hansen what she should do. Plaintiff did not receive an answer from Ms. Hansen.

In a meeting on November 19, 2003, Ms. Piekarski ordered plaintiff to schedule a meeting with Ms. Boyd so that plaintiff could [*21] apologize to Ms. Boyd.

**(6) In an email dated December 3, 2003, plaintiff told Ms. Kittell, with a copy to Ms. Boyd, that the wheelchair provided for M.J.'s needs was not safe and that another wheelchair needed to be provided.** This email was also provided to Ms. Piekarski. Ms. LaHue spoke with the nurse at Rosehill about providing the wheelchair which was stored in the nurse's office for M.J.'s use. Shortly thereafter, someone at the school told the nurse: "Don't give them anything."

On December 12, 2003, plaintiff met with Ms. Boyd, Ms. Piekarski, and Lisa Elliott, an NEA representative who attended at plaintiff's request. According to Ms. Piekarski, the intent of the meeting was to discuss how the team could communicate better: **(7) At that meeting, plaintiff stated that she would not apologize to Ms. Boyd for the comments she made during the November 6, 2003, team meeting at Rosehill Elementary School.**

**(8) On January 15, 2004, plaintiff continued to advocate for additional services for M.J. at a staff meeting to prepare for M.J.'s upcoming IEP meeting. She advocated that M.J. be allowed to interact with other students, that services be increased, and that the paraprofessionals [*22] provide services as per her matrix of activities she had provided to Ms. Kittell and Ms. Boyd.**

Shortly thereafter, Ms. Boyd sent a letter to plaintiff removing her from the Rosehill team. The second paragraph of the letter stated: "You are not to contact the parents of [M.J.], or any member of that team." Ms. Piekarski dictated the language ordering plaintiff not to speak to anyone. Ms. Hansen approved the letter. On January 29, 2004, an IEP meeting took place which reduced services to M.J.

*2. Problems with Paraprofessionals at South High School*

During the 2003-2004 school year, plaintiff also had problems at South High School with not being able to find students when she arrived at the building to provide their services. For example, plaintiff arrived at South High School on November 13, 2003, to provide services to students with IEPs. The paraprofessionals did not meet her with the students. Plaintiff located the case manager and Ms. Piekarski and informed them that she was unable to provide the students with services because the paraprofessionals did not meet her with the students as planned. In December of 2003, Ms.

Piekarski contacted Lisa Ross regarding this issue **[*23]** and requested that they meet to resolve the problem. Ms. Ross and plaintiff met. Ms. Ross reported the results of the meeting to Ms. Piekarski.

At a November 19, 2003, meeting with plaintiff, Ms. Piekarski, Ms. Haltom, and Ms. Hansen, one of the topics of discussion was the issue at South High School in which the paraprofessionals were not bringing the students to plaintiff in time for their physical therapy appointments. Ms. Piekarski chided plaintiff for not providing services at South High School. **(9) Plaintiff stated that Ms. Piekarski knew the problem was that the paraprofessionals were not bringing the students for their therapy sessions because Ms. Piekarski was there on November 13th when it happened and she refused to do anything about it.**

*3. Provision of Services Without Doctor's Orders*

On October 9, 2003, plaintiff learned of a student at South High School having been assigned to her caseload. Plaintiff questioned whether this student was supposed to be receiving physical therapy because she had not evaluated him for these services. She sent a request for doctor's orders to the student's parents.

**(10) On October 13, 2003, plaintiff contacted Larry Buening [*24] with the Kansas State Board of Healing Arts regarding whether a physical therapist was required to have doctor's orders prior to seeing a "consult" student.**

**(11) During an OT/PT meeting on October 15, 2003, plaintiff had a conversation with Ms. Hansen in which she raised the question of delivery of PT service without doctor's orders.** Ms. Hansen indicated that PT services should not be provided without doctor's orders.

On November 5, 2003, Ms. Piekarski sent plaintiff an email that stated: "I spoke with Diane [Hansen], and you do not need doctor's orders regarding [student name]. His IEP says 30 minutes 1x a quarter consult -- that would be talking to Mr. Lucas. n4 Should he ask about positioning or request you to provide, then you would need doctors orders. Please see that you make contact with him this week."

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 It appears to the court that Mr. Lucas must have been the student's teacher.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**(12) In an email of November 14, 2003, plaintiff asked Ms. Piekarski how it was determined whether or not [*25] physical therapy services could be provided to a child without doctor's orders. She asked Ms. Piekarski where she found the information stated in the November 5 email so that she "might refer/review this information also in the event this situation should arise again."**

On November 19, 2003, plaintiff met with Ms. Haltom, Ms. Hansen, and Ms. Piekarski. Plaintiff claims that during this meeting, Ms. Piekarski directed her to provide physical therapy services to two students at South High School assigned to her caseload who did not have doctor's orders. **(13) Plaintiff replied that to provide physical therapy without doctor's orders would be a violation of Kansas law.** Ms. Piekarski replied: "If I say it's so, then it is." Ms. Piekarski indicated to plaintiff that if she did not comply with the directive to see this student at South High School without doctor's orders, plaintiff would be in breach of her contract and Ms. Piekarski would contact the school district's legal personnel and take action against plaintiff. **(14) Plaintiff attempted to inform Ms. Piekarski that the student without doctor's order also apparently had an error in his IEP: where it said he was to receive [*26] physical therapy services it really meant that he was to receive occupational therapy services.** Ms. Piekarski ended the conversation and required plaintiff to provide her with a detailed schedule of plaintiff's activities.