# EXHIBIT Z

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF CONNECTICUT

3                                            ORIGINAL

4    --------------------------x

5    URSULA MILDE,                    :

6            Plaintiff,      :

7        -versus-          : No. 3:00CV2423(AVC)

8    THE HOUSING AUTHORITY OF
9    THE TOWN OF GREENWICH; THE
     HOUSING AUTHORITY OF THE
10   TOWN OF GREENWICH BOARD OF
     COMMISSIONERS; and
11   BENJAMIN LITTLE, CEO,       :

12            Defendants.  :

13   --------------------------x

14

15            Deposition of SUE McClenachan, taken

16   pursuant to Federal Rules of Civil Procedure, at the

17   law offices of Carey & Associates, Southport,

18   Connecticut, before Jacqueline McCauley, RPR/CSR, a

19   Notary Public in and for the State of Connecticut, on

20   May 16, 2003, at 10:02 a.m.

21

22

23

24

25

1    responsibilities of the Board of Commissioners with

2    regard to personnel issues?

3          A.   Yeah.

4          Q.   But the Board of Commissioners would not

5    elect to terminate any other managers?

6          A.   No.

7                     MR. ALVAREZ:   Objection.

8                     MR. CAREY:   Describe to me what

9    happens with regard to personnel issues during

10   executive session.

11                    MR. ALVAREZ:   Objection.

12         Q.   What takes place?

13         A.   The executive director does sometimes

14   discuss with us an issue, personnel issue, and if we

15   sometimes can advise that, you know, we think this is,

16   know, right or is wrong or we need to get more

17   information, we do that.

18         Q.   Has Ms. Milde ever participated during

19   executive session regarding personnel issues?

20         A.   No.

21         Q.   Is Mr. Little the only one allowed to

22   participate during the executive session of the board?

23         A.   Yes.

24         Q.   Did Mr. Russell Kemp, finance director,

25   participate in the executive session of the board?

1          A.   That was a finance committee meeting.  It
2    was not a personnel committee meeting.
3          Q.   I understand that.  I'm just asking you
4    another question.  Did Russell Kemp ever participate
5    during meetings of the executive session of the board?
6          A.   If there was need for him to be present,
7    yes, and he was invited to stay by the board.
8          Q.   Was Ms. Milde ever allowed to participate
9    in executive session of the Board of Commissioners?
10         A.   Yes.
11         Q.   And when was she allowed to participate?
12         A.   At the May meeting.  I don't remember the
13   exact date, but I think it's in the files when we were
14   at Wilbur Peck Court.
15         Q.   And what was the issue, without going into
16   detail, about what was the issue that she was allowed
17   to discuss?
18              MR. ALVAREZ:  Objection.
19         A.   Barry Nova was the chair at that time and
20   she had disrupted the board meeting and a motion was
21   made to go into executive session to let her express
22   her, make her comments and she had been told we, had
23   chosen to deny her grievance, but some of the other
24   board members felt that she should have the
25   opportunity to speak before us.

1          MR. ALVAREZ:  Objection.

2          A.   That would be brought to the Board of

3    Commissioners who would then speak to the CEO who

4    would then speak to the administrator of Parsonage

5    Cottage to make sure the problem would be rectified.

6          Q.   All right.  Here's the question.  How

7    would the public know there is such a problem like

8    that occurring at the Parsonage Cottage?

9                    MR. ALVAREZ:  Objection.

10                   MR. CAREY:  What means of

11   communication to the outside public exists regarding a

12   problem such as improper administration of medicines

13   to residents of the Parsonage Cottage?

14                   MR. ALVAREZ:  Objection.

15         A.   I guess through the people that come to

16   visit, through the doctors, through people that come

17   to visit the cottage.

18         Q.   Through Ursula Milde?

19                   MR. ALVAREZ:  Objection.

20         A.   It would seem to me that if there's a

21   problem at the Parsonage Cottage that the

22   administrator is aware of, that that should be

23   discussed with the CEO prior to going public with it.

24         Q.   The list that you are describing is, of

25   how the public would become aware, number one is

1    sentence continues on  -- actually I'll read the whole

2    sentence again.  Paragraph one sentence two it reads,

3    "The Board of Commissioners sets policy and is

4    responsible for the overall operation of the

5    authority."  Is it a true and accurate statement that

6    that's what it says?

7                    MR. ALVAREZ:  Objection.

8         A.   That's what it says here and that is the

9    Board of Commissioners sets the policy and is

10   responsible and the CEO administers that, those

11   policies.

12        Q.   Well, it doesn't say the CEO in that

13   sentence administers the policy.  It just says that

14   the Board of Commissioners sets the policy; is that

15   correct?

16        A.   That's what it says.

17        Q.   Okay.  And it also says that the Board of

18   Commissioners are responsible for the overall

19   operation of the authority.  That's what it says as

20   well?

21        A.   That's what it says.

22        Q.   And overall operation of the Authority is

23   inclusive of the following items, finance, correct?

24                    MR. ALVAREZ:  Objection.

25        A.   We want to keep The Housing Authority and

1    you testified earlier, doesn't it?

2         A.   Yes.

3         Q.   Thank you.  I'm going to do this the

4    following way.  Before I do, Ms. Milde has

5    communicated to you about issues involving the

6    Parsonage Cottage during her tenure of employment?

7         A.   Not to me personally, no.

8         Q.   Isn't it true that Ms. Milde actually

9    reported to the Board of Commissioners during open

10   hearings regarding Parsonage Cottage issues?

11        A.   She did to the Board of Commissioners, but

12   not to me personally, as I said.

13        Q.   Okay.  Sorry.  In your professional

14   capacity serving as a chair of the Board of

15   Commissioners did Ms. Milde report to you regarding

16   the issues arising or the daily developments of the

17   Housing, of the Parsonage Cottage?

18        A.   To the Board of Commissioners.

19        Q.   And you were also present at the Board of

20   Commissioners?

21        A.   Yes.

22        Q.   And was she allowed to participate in

23   committee meetings?

24        A.   No.

25        Q.   And why wasn't she, as a part of the

1    management of The Housing Authority and the

2    administrator of the Parsonage Cottage, allowed to

3    participate in the committee meetings?

4         A.   The two member committee meetings, you are

5    referring to the subcommittees?

6         Q.   I just said committee meetings, committee

7    meetings of the Board of Commissioners.

8         A.   She is allowed to participate in board,

9    open board meetings.

10        Q.   Sure.  The public is, too, isn't it?

11        A.   Yes.

12        Q.   And my question to you is is she allowed

13   to participate in committee meetings on the board?

14        A.   Give me your definition of the committee

15   meetings please.

16        Q.   Personnel finance, those kind.

17        A.   No, she was not, unless she was invited.

18        Q.   Okay.  But isn't it true that other

19   members of the management were in fact allowed,

20   without being invited, to participate in those

21   committee meetings?

22        A.   They were invited to participate.

23        Q.   So your testimony is that everybody,

24   whoever went to a committee meeting, was invited?

25              MR. ALVAREZ:   Objection.

1      Q.   Is that your testimony?

2      A.   Yes.

3      Q.   Invited by who, the Board of

4  Commissioners?

5      A.   By the committee members.

6      Q.   Well, isn't it in fact true that the

7  committee members are in fact the male managers of The

8  Housing Authority?

9      A.   The who?

10              MR. ALVAREZ:  Objection.

11      Q.   The male managers on the same peer level

12  as Ms. Milde.

13      A.   If they were invited to come to the

14  committee meetings to answer questions, yes.

15      Q.   Okay.  Who is Todd Cozolino?

16      A.   Todd Cozolino?

17      Q.   Uh-huh.

18      A.   He at the time was  -- I don't know -- his

19  exact title was head of maintenance and construction

20  for The Housing Authority, yes.

21      Q.   Was he a managerial employee?

22      A.   He was a consultant for a while and then

23  he was an employee, yes.

24      Q.   Was he a managerial employee?

25      A.   Yes.

1    Q.  Okay.

2    A.  I think so.  I don't really remember what

3    his title was.

4    Q.  Terry Mardula, who is he?

5    A.  He is The Housing manager.

6    Q.  Is he part of some committee?  Is he part

7    of the maintenance committee?

8    A.  No.

9    Q.  What committee is he a part of?

10   A.  He is not a part -- he is staff.  He is

11   not part of any committee.

12   Q.  Well, let me put it this way.  Who are the

13   two-member committee meetings for committees of The

14   Housing Authority?  Who are the individual persons on

15   each committee?

16          MR. ALVAREZ:  Objection.

17   A.  At the time to my best recollection

18   finance was Alan Bernard and myself.  Maintenance

19   committee was, for a while was Barry Nova and then Tom

20   Barr when Tom Barr became a commissioner so that's

21   ... Did I say personnel?  Personnel was Barry Nova and

22   myself.  Public relations was Barry Nova and myself

23   and tenant selection was Darlene Gerald and myself and

24   site development was Barry Nova and Alan Bernard.

25   Q.  Okay.  Isn't it in fact true that the

1   Board of Commissioners and The Housing Authority

2   prevented or, to use your words, did not invite Ms.

3   Milde to attend regular meetings of the committees?

4           A.   No, she was not invited.

5           Q.   Now, you've known Ms. Milde for some time

6   because she was the administrator of the Parsonage

7   Cottage, correct?

8           A.   Yes.

9           Q.   She reported to you, correct?

10          A.   She reported to the CEO.

11          Q.   And she also reported to the Board of

12  Commissioners?

13          A.   At open meetings.

14          Q.   Okay.  And she submitted reports to the

15  Board of Commissioners as well?

16          A.   Yes.

17          Q.   That would be the status reports that she

18  would submit?

19          A.   Yes.

20          Q.   Either they go through Mr. Little and then

21  they eventually get submitted to the board?

22          A.   Yes.

23          Q.   So with that understanding on a scale of 1

24  to 10 can you rate Ms. Milde's performance one being

25  extremely poor, 10 being -- withdrawn.  We'll do it or

1              MR. ALVAREZ:  Objection.

2         A.   I guess at the time any contract over

3    $10,000 would need board approval.

4         Q.   Okay.  Now that's a rule established in

5    that procurement policy, is it not?

6         A.   Yes.

7         Q.   And you follow that rule for what purpose?

8         A.   So that the commissioners can have some, I

9    guess, oversight and some approval of contracts that

10   are signed.

11        Q.   It's much more than that because we know

12   that Exhibit number 2 says something very, very

13   important.  Let me find it first.  Page three of

14   Exhibit 2 and it states, "The Board of Commissioners

15   sets policy and is responsible for the overall

16   operation of the Authority."  Is that still correct?

17        A.   Yes.

18        Q.   And policy or procurements worth over

19   $10,000 are obviously under the control and authority

20   of the you used the word oversight of the Board of

21   Commissioners; is that correct?

22        A.   Yes.

23        Q.   In particular at the time in question

24   commissioner, I think is it, Alan Bernard --

25        A.   Yes.

1          identification.)

2          Q.   I'll show you what's been marked Exhibit

3   number 12.  It is a letter from Ms. Milde to

4   Mr. Little dated April 24, 2000 and it is -- it states

5   first line, it states first line, "This is a formal

6   request to present a grievance to the commissioners of

7   the HATG."  Do you see that?

8          A.   Yes.

9          Q.   Do you remember seeing this document?

10         A.   I -- yes, I did see it, yes.

11         Q.   Is it in fact true that Ms. Milde handed

12  this document during a Board of Commissioners meeting

13  on April 24, 2000?

14         A.   The policy said it should be submitted in

15  a letter setting forth.  This was not a letter.  This

16  was a memorandum. It was not a direct letter to the

17  Board of Commissioners.  It was handed to me.  It was

18  not a letter.

19         Q.   Well, let's refer back to the grievance,

20  okay?  It says -- does it say there  -- point me to

21  the direction where it says that, ma'am.

22         A.   That was for the executive director, I'm

23  sorry.  I was just reading that part.

24         Q.   I can try to help you if you want.  It

25  says -- see the second sentence?  It says, "Such

1   request shall be submitted in a letter setting forth

2   the specific grievance."

3        A.   Uh-huh.

4        Q.   Does it say any type of letter?

5        A.   It does not say a letter, but that to me

6   is not a letter.  That's a memorandum.

7        Q.   That's your opinion.  That's your

8   interpretation of the policy; is that right?

9        A.   That's my interpretation of the policy.

10       Q.   But in fact how many grievances did Ms.

11  Milde submit to the CEO?

12       A.   One, I guess.  That's the only one I heard

13  of.

14       Q.   What was the grievance about?

15       A.   Tell me what you -- go ahead.

16       Q.   Wasn't the grievance about an issue that

17  actually ended Ms. Milde's employment?

18            MR. ALVAREZ:  Objection.

19       A.   That -- no, that was not the reason she

20  was, her employment was ended.

21       Q.   Isn't it in fact true that the grievance

22  was, Exhibit number 12, was in regard to the

23  recreation coordinator issue?  Is that not correct?

24       A.   The grievance was in regard to the

25  recreation coordinator, yes.

1      Q.   And that was in no way connected to her

2    termination?

3                  MR. ALVAREZ:   Objection.

4      Q.   No?   I'm sorry, she is shaking her head.

5    I have to put it on the record.

6      A.   Restate your question, please?

7      Q.   I'll have it read back.

8                  (Whereupon, the question was

9                   read back.)

10                 MR. ALVAREZ:   I had an objection to

11   that question, right?

12                 COURT REPORTER:   Yes.

13     A.   It was perhaps one of the reasons for her

14   termination.  It was not the only reason.

15     Q.   Thank you for clarifying.

16     A.   You're very welcome.

17     Q.   Okay.   Now, did Ms. Milde ever get a

18   hearing on the grievance?

19     A.   No.

20     Q.   Why not?

21     A.   Because the board chose not to hear her

22   grievance.

23     Q.   Do you remember talking to Barry Nova

24   about this issue?

25                 MR. ALVAREZ:   Objection.

219

1          A.   Mrs. Milde's grievance.  It was probably

2   about her wanting to hire a recreation coordinator.

3   We could have discussed that she did not have the

4   right to do that because that was a decision that

5   should have been made by the CEO.  She could not do

6   that on her own.  The other things that were discussed

7   was, and again this is conjecture because I don't

8   remember exactly what I talked about April 24, 2000

9   with the Board of Commissioners, that we wondered how,

10  you know, how she posed this, why she felt she had the

11  right to do this and, you know, and then we had the

12  executive session that was held and we, you know, had

13  a discussion.  This was not the date of the executive

14  session from what I understand that she requested that

15  she have, be able to bring the case and we did discuss

16  what had happened and we felt as a board that we would

17  not hear her case, that we upheld the decision of

18  Mr. Little, the CEO.

19          Q.   What if the CEO was wrong?

20          A.   We didn't feel he was wrong.

21               MR. ALVAREZ:  Objection.

22          Q.   Why didn't you feel he was wrong?

23          A.   Because she had not worked within the

24  administrative procedures of the, and the structure of

25  The Housing Authority.  She worked as if her position

1   of time and effort and money and I don't see the need

2   for it.

3            Q.   Isn't it true in fact you have a bias, an

4   animosity against Ms. Milde sitting here today?

5                 MR. ALVAREZ:   Objection.

6            A.   I do today.   At the time earlier on before

7   all this occurred that did not, was not the situation.

8            Q.   Okay.   Back to the Exhibit 19, okay?   This

9   is a?

10           A.   19?   13.

11           Q.   I'm sorry.   It's May 19, 2000.   It's

12  Exhibit number 13.   It is a letter from Mr. Nova to

13  Ms. Milde stating that the commissioners, first

14  paragraph, "The commissioners of The Housing Authority

15  of the Town of Greenwich have decided that your

16  request for a grievance hearing before us is denied at

17  this time."   Do you see that?

18           A.   Yes.

19           Q.   And you're familiar with this document,

20  ma'am?

21           A.   Yes.

22           Q.   Let's take you back a little bit in

23  history here to the grievance policy Exhibit number 11

24  and mark this as Exhibit number 14.

25                 (Plaintiff's Exhibit 14, marked for