# EXHIBIT Z

22 regular hearing, regular meeting of the board?

        MR. ALVAREZ: Objection.

   A. Yes, yes.

   Q. Did you review the grievance and resolve the grievance issue prior to May 19, 2000?

        MR. ALVAREZ: Objection.

   A. I don't remember that date. I don't remember the exact ...

   Q. Do you know when Ms. Milde was handed the May 19 letter?

   A. Apparently she was handed that letter at our Board meeting on the 22nd.

   Q. Isn't that beyond the policy of the grievance?

        MR. ALVAREZ: Objection.

   A. I guess according to this it is, yes.

   Q. Isn't it in fact true that the Board of Commissioners violated such policy?

        MR. ALVAREZ: Objection.

   A. I guess we may have.

   Q. Do you remember May 22, the hearing of the Board of Commissioners?

   A. Yes.

   Q. How do you remember that or why do you remember it? It's a while ago, isn't it?

```
 1   meeting?
 2        A.  Yes.
 3        Q.  So there is a way to check the accuracy of
 4   what's being said?
 5        A.  Yes.
 6        Q.  Ms. Milde came to that hearing?
 7        A.  Yes.
 8        Q.  And she was present, correct?
 9        A.  To the meeting, yes.
10        Q.  You were present at the hearing, I
11   apologize, the regular meeting of the Board of
12   Commissioners May 22, which is Exhibit number 9 in
13   this deposition?
14        A.  Yes.
15        Q.  And she raised an issue about the
16   recreation coordinator position to you directly?
17        A.  Yes.
18        Q.  And she asked for some air time to express
19   her concerns, correct?
20        A.  She did.
21        Q.  And then you had informed her that this is
22   a personnel matter, correct?
23        A.  Yes.
24        Q.  That it should be taken up in executive
25   session, correct?
```

1    A.    Yes, yes.

2    Q.    And then you testified later on I believe
3 today that, correct me if I'm wrong, that you invited
4 her into executive session to air her concerns about
5 the issue?

6    A.    After I had to tell her several times that
7 she was out of order, that this was a personnel issue
8 and she continued to talk.  I told her she was out of
9 order, that it was an issue for executive, personnel
10 issue to be discussed in executive session and she
11 continued to talk and then at that point when it
12 didn't seem to be resolved, that she would not
13 continue talking, I asked for a motion on the part of
14 the board to go into executive session and the room
15 was cleared and Ms. Milde remained to express her
16 desire or her opinion on the need for a recreational,
17 I think it was for the recreation supervisor.  I don't
18 remember but ...

19    Q.    The time you gave her in executive session
20 it was in fact not a hearing as you previously
21 testified?

22    A.    No, it was not a hearing.

23    Q.    The board never granted her a hearing?

24    A.    No.

25    Q.    And when you told her that it would be

1  recreation advisor.
2      Q.  Isn't it in fact true that this was not
3  even -- withdrawn.  Isn't it a fact this was not even
4  a personnel issue, was it?
5           MR. ALVAREZ:  Objection.
6      A.  Yes, it was a personnel issue.
7      Q.  So here you have Ms. Milde, a manager of
8  the Parsonage Cottage, making a complaint about a
9  personnel issue in your opinion?
10     A.  Not about the hiring of the recreation.
11 It was a personnel issue in that she did not respect
12 the CEO and his telling her that her hiring and the
13 way she was going about to hire this person was not
14 appropriate.
15     Q.  But in fact, Ms. McClenachan, the issue is
16 that she was concerned about the safety and welfare
17 and health of those residents, was she not?
18          MR. ALVAREZ:  Objection.
19     A.  Yes.
20     Q.  Okay.  And the recreation coordinator is
21 part of the recreational coordinator services -- the
22 recreation coordinator services are a part of the core
23 services provided to the residents at the Parsonage
24 Cottage; is that not correct or correct?
25          MR. ALVAREZ:  Objection.

1   A.  No, no, not at all.

2   Q.  So it was Mr. Little's own initiative that
3   he wanted Ms. Milde to apologize to you?

4   A.  Yes.

5   Q.  You never told him that?

6   A.  No.

7   Q.  The Board of Commissioners never told
8   Mr. Little?

9   A.  Not to my knowledge, no.

10  Q.  Were you aware of that issue?

11          MR. ALVAREZ:  Objection.

12  A.  Yes.

13  Q.  How did you become aware of that issue?

14  A.  When he set down corrective procedures
15  that he wished her to follow and he sent her a letter
16  saying he wanted her to apologize to the Board of
17  Commissioners.

18  Q.  Yet another example of corrective
19  directives that you just testified to of how you
20  derive your knowledge about Ms. Milde's failure to,
21  alleged failure to follow procedures and guidelines;
22  is that correct?

23  A.  He is the CEO and he can, you know -- it's
24  his job to work with the staff and to, you know, to
25  have them work within the guidelines of his, as the,

```
 1                   MR. ALVAREZ:  It's a long day.
 2                   MR. CAREY:  With respect to Ms.
 3   Milde's actions to protect the interests of the
 4   residents wouldn't you agree that the recreation
 5   services issue that she presented was a very valid
 6   concern?
 7                   MR. ALVAREZ:  Objection.
 8        A.   I would agree that there was need for
 9   recreation services at Parsonage Cottage and they were
10   being provided by Community Centers.
11        Q.   Okay.  But my question wasn't -- doesn't
12   her efforts to bring this issue through Mr. Little all
13   the way to the Board of Commissioners, even risking
14   her own employment, evidence that she was deeply
15   concerned about this issue?
16                   MR. ALVAREZ:  Objection.
17        A.   She personally was deeply concerned about
18   the issue.
19        Q.   And Ms. Milde's running a facility for
20   elderly folks, correct?  Correct?
21        A.   She is the administrator.
22        Q.   She was for this matter and she is not --
23   she's basically bringing something to your attention
24   about in essence the safety and welfare of the
25   residents, is she not?  Isn't she doing that?
```

1    A.  Yes.

2    Q.  Okay. And you testified earlier that if she had a problem regarding the recreation coordinator issue or the services, she should bring that to your immediate attention? The word is immediate in a phrase immediate attention.

    MR. ALVAREZ:  Objection.

    A.  To the board's immediate attention?

    Q.  Yeah.

    A.  That should be -- perhaps I said that. I don't recall, but that should be taken -- her concern should be taken to her immediate boss who would then bring it to the Board of Commissioners because we don't get involved with hiring personnel. That's the job of the CEO.

    Q.  But you do get involved with Ms. Milde's right to engage in free speech regarding a matter of public concern on the issue of the recreation coordinator issue; is that correct?

    MR. ALVAREZ:  Objection.

    MR. CAREY:  Yes or no?

    MR. ALVAREZ:  Objection.

    A.  I don't feel that we denied her the right of free speech.

    Q.  You sat there in open session before the

1  public and told Ms. Milde we are going to deal with
2  this issue in executive session. You cannot raise the
3  issue in front of the public regarding this matter of
4  vital public concern. Isn't that what you did?
5      A.  She was out of order. She was not on the
6  agenda. She was not speaking. She had not been
7  called on to speak. She started to talk and in order
8  to regain some level of the proper running of a
9  meeting we had to ask her, we had to somehow allow her
10 to speak, but it had to be done -- because it was a
11 personnel issue and still is a personnel issue it had
12 to be done in executive session. We don't discuss
13 personnel issues in public, in the public session.
14     Q.  How would the public find out about this
15 issue if she didn't do that in the regular meeting on
16 May 22, 2000?
17         MR. ALVAREZ: Objection.
18     A.  I don't know if -- we felt that the
19 recreation services were being provided at Parsonage
20 Cottage.
21     Q.  How would the public find out about the
22 recreation services issue if Ms. Milde didn't complain
23 about it on May 22, 2000 during the regular meeting of
24 The Housing Authority Board of Commissioners?
25         MR. ALVAREZ: Objection.

```
 1        A.   I don't know.
 2        Q.   How about going through the press, is that
 3   an alternative we have here?
 4        A.   As an employee of The Housing Authority,
 5   we have a public relations policy that has been
 6   approved by our attorney and the attorney that
 7   reviewed the policies and procedures of The Housing
 8   Authority and that was never told -- we were never
 9   told it was in violation of any freedom of speech
10   rights of freedom of speech.
11        Q.   So you're telling me that I have to go and
12   speak to some attorney to find out what he did on some
13   project regarding the media relations policy; is that
14   correct?
15             MR. ALVAREZ:  Objection.
16        Q.   Somebody not present in this room today;
17   is that correct?
18        A.   I guess so.
19        Q.   Okay.  You testified earlier that the
20   different ways that the public would find out about
21   prescriptions, problem in the administration of
22   prescriptions, you know, by the residents themselves
23   you testified that the newspaper is one source for the
24   public to find out; is that correct?
25             MR. ALVAREZ:  Objection to this line
```

```
 1   of questions and characterization of prior testimony.
 2        A.   I guess I did.
 3        Q.   And in fact, Ms. Milde went to the press
 4   regarding the recreation services issue, did she not?
 5   Let me rephrase before you answer, sorry.  It is more
 6   appropriate to say it this way.  In fact, Ms. Milde
 7   went to the press prior to the May 22 meeting about
 8   the recreation services issue, did she not?
 9        A.   She may well have.  I don't really
10   remember.
11        Q.   And then when you -- when she raised the
12   issue on May 22, the grievance was already denied,
13   correct?
14        A.   Yes.
15        Q.   And you sat there in open session in front
16   of the public, in front of the newspaper and told her
17   that she couldn't express her free speech on the
18   recreation services issue; is that correct?
19             MR. ALVAREZ:  Objection.
20        A.   I told her that she had not been
21   recognized to speak before the board at that time and
22   that she was not on the agenda at that time and she
23   was out of order.
24        Q.   Right.  Because in your opinion Roberts
25   rules of order are an example of a method of keeping
```

1   Q. Reading the letter does it refresh your
2   recollection?
3   A. No.
4   Q. Would you agree that this letter can be
5   categorized as a continued protest by Ms. Milde
6   regarding her actions on the recreation services
7   issue?
8              MR. ALVAREZ: Objection.
9   A. She -- by this letter she does not feel
10  that she can follow directives of her immediate
11  supervisor.
12  Q. Isn't it a true and accurate statement
13  that this letter sent to you and the Board of
14  Commissioners June 26, 2000 is an example of her
15  continued protest about the recreation services issue,
16  yes or no?
17             MR. ALVAREZ: Objection.
18  A. I guess she is continuing to protest, yes.
19  Q. Did you ever step outside the issue
20  between Mr. Little and Ms. Milde and look at this
21  objectively to determine what the proper course of
22  action should be done with regard to Ms. Milde's
23  employment?
24  A. Our feeling was that there was a contract
25  with CCI, Community Centers, Inc, to provide

```
 1   guess ...
 2          Q.   Are you -- isn't it true that you don't
 3   have any knowledge about the proper allocation of time
 4   for recreation services to the residents at the
 5   Parsonage Cottage?
 6          A.   No.  I wouldn't know the number of hours
 7   of the week or the day.
 8          Q.   I'm sorry.  Isn't it true that Mr. Little
 9   told you that Ms. Milde had represented to him that
10   she had terminated the CCI contract?
11          A.   She had no right to do that.  The contract
12   was not with Ms. Milde.  The administrator it was with
13   The Housing Authority.
14          Q.   I understand that, thank you, but I'm
15   asking you this.  Did he tell you and the board that
16   she had terminated the CCI contract?
17          A.   He may have mentioned it I -- maybe not to
18   the board.  He maybe told me and I said, well, how can
19   she do that if she isn't the one that has the contract
20   with CCI.
21          Q.   And you believed Mr. Little over Ms.
22   Milde, correct?
23          A.   Of course I believe my CEO.
24          Q.   Right.  What if he was wrong?  Would you
25   still believe him?
```

```
 1                MR. ALVAREZ:  Objection.
 2        Q.   What if he was wrong that the contract had
 3   not been terminated by Ms. Milde at all?
 4        A.   I had faith in Mr. Little's honor and his
 5   credibility and his ethics and I felt that what he was
 6   telling me and was telling the board and the board
 7   seemed to not question what he was, how he was acting
 8   and what he was doing he was doing in an honest and
 9   honorable manner.
10        Q.   In fact, Ms. McClenachan, the contract
11   with CCI lapsed by its operation of its terms.  Are
12   you aware of that?
13        A.   Yes.
14                MR. ALVAREZ:  Objection.
15                MR. CAREY:  How can Ms. Milde
16   terminate a contract that had lapsed?
17                MR. ALVAREZ:  Objection.
18        A.   You find this funny?
19        Q.   I don't find anything funny, ma'am.
20        A.   She can't terminate the contract and the
21   services for what I understand had continued on a
22   month-to-month basis.
23        Q.   Right, because the contract was not
24   renewed, correct?
25        A.   It may not have been renewed for a period
```