**EXHIBIT Z**

Page 271

```
 1   IN THE UNITED STATES DISTRICT COURT
 2   FOR THE DISTRICT OF CONNECTICUT
 3   - - - - - - - - - - - - - - - x
 4   URSULA MILDE,                  :
 5              Plaintiff,          : Civil Action No.
 6        vs.                       :   3:00CV2423
 7   THE HOUSING AUTHORITY OF THE   :   (AVC)
 8   TOWN OF GREENWICH; THE HOUSING :
 9   AUTHORITY OF THE TOWN OF       :
10   GREENWICH BOARD OF             :
11   COMMISSIONERS; and BENJAMIN    :   VOLUME 2
12   LITTLE, CEO,                   :
13              Defendants.         :
14   - - - - - - - - - - - - - - - x
15
16            Continued deposition of SUE
17   McCLENACHAN, taken pursuant to the Federal
18   Rules of Civil Procedure at the Federal
19   Courthouse, 450 Main Street, Hartford,
20   Connecticut, before Elizabeth A. Zawacki,
21   LSR #00087, a Registered Merit Reporter
22   and Notary Public in and for the State of
23   Connecticut, on Friday, March 26, 2004, at
24   10:16 a.m.
25
```

[ORIGINAL stamp]

```
 1   A P P E A R A N C E S:

 2

 3       For the Plaintiff:

 4           CAREY & ASSOCIATES

 5           71 Old Post Road, Suite One

 6           Southport, Connecticut 06490

 7           BY:  MARK P. CAREY, ESQ.

 8

 9       For the Defendants:

10           JACKSON LEWIS

11           One North Broadway

12           White Plains, New York 10601

13           BY:  FRANCIS P. ALVAREZ, ESQ.

14

15       Also present:

16           URSULA MILDE

17

18

19

20

21

22

23

24

25
```

1   executive director. He was up here.
2       Q.    Please don't confuse me. I think I know
3   where you're going. I'm asking for the breadth of
4   your knowledge, where it's derived from regarding
5   Ms. Milde's performance. What I'm doing is making a
6   very simple analogy of drawing a circle, and maybe
7   the question is this: Put in that circle the people
8   you believe you derived personal knowledge of
9   Ms. Milde's performance from.
10      A.    Well, Mr. Little, the CEO. We had a
11  report from Dee Saccente.
12      Q.    Dorante Saccente?
13      A.    Yes.
14      Q.    The private investigator?
15      A.    Yes; and there may have been one or two
16  incidences where I personally -- a situation
17  developed between myself and Ms. Milde that I felt
18  was not appropriate for an administrator to --
19      Q.    You wouldn't be referring to the meeting,
20  the open board meeting where she allegedly disrupted
21  it with her statements regarding the recreation
22  coordinator position?
23      A.    Well, that was inappropriate.
24      Q.    But that was one?
25      A.    That was one.

```
 1   negligence to an intentional act?
 2       A.   It was, from what you're telling me, an
 3   intentional act.
 4       Q.   It would change your opinion, then,
 5   wouldn't it?
 6       A.   Yes.
 7       Q.   That would be unacceptable, would you
 8   agree?
 9       A.   Yes.
10       Q.   It would require immediate correction,
11   right?
12            MR. ALVAREZ:  Objection.
13       A.   Yes.
14       Q.   Would it call into question his overall
15   performance and integrity?
16            MR. ALVAREZ:  Objection.
17       A.   I think we would be very -- want to follow
18   and get more information on contracts and finances
19   than we had at the time.
20       Q.   Would you agree that Mr. Little's
21   performance duties of his job are primarily entering
22   into contracts with various vendors?
23       A.   That's one of his responsibilities, yes.
24       Q.   Is it a primary responsibility of his job?
25       A.   I guess it's one of the most important
```

1  parts of his job, yes.
2      Q.    I mean, if he didn't perform that function
3  of his job, what's the value to the Housing
4  Authority, when he doesn't perform that function of
5  his job?
6            MR. ALVAREZ:    Objection.
7      A.    It would be at that point in time, if we
8  had known about it at the time, we would have had to
9  have had a meeting with Mr. Little to get this whole
10 thing straightened out, to make sure that none of
11 this would occur in the future.
12     Q.    Do you remember back in 1999 Tom Crawford
13 told Mr. Little to stop his management training
14 classes at the Housing Authority?
15     A.    I don't remember that Tom Crawford told
16 him that because that was between Tom, who was I
17 guess the director, and Ben was the deputy at the
18 time.
19     Q.    You were aware he was conducting
20 management training classes at the Housing
21 Authority?
22     A.    I knew there was some kind of training
23 going on.
24     Q.    Did you know he did that in -- did he tell
25 you he was going to do management training classes

1   Q.   Because she didn't do it?
2        MR. ALVAREZ:  Objection.
3   Q.   Right?  She didn't terminate the contract?
4        MR. ALVAREZ:  Objection.
5   A.   I don't know.  Maybe the contract, the
6   time period ran out and it was just going on a
7   month-to-month basis.  Services were continued to
8   the best of the ability and the bills were paid to
9   the best of the ability of the Housing Authority.
10  That's all I know, that's all I remember.
11  Q.   Because the contract was not renewed,
12  correct?
13  A.   At that time.
14       MR. ALVAREZ:  Objection.
15  Q.   So she couldn't terminate a contract that
16  was not renewed, right?
17       MR. ALVAREZ:  Objection.
18  A.   I guess she couldn't.  I guess she
19  couldn't terminate a contract if it wasn't in
20  existence, if the time had run out.
21  Q.   Line 23, 266 page of your deposition.
22       MR. ALVAREZ:  Say it again.
23  Q.   Line 21, 266, line 21 through 25.
24       "Question: And you believed Mr. Milde" --
25  rephrase.

```
 1   the person that worked very hard to get the town to
 2   lease Parsonage Cottage to the Housing Authority.
 3        Q.    Before it opened?
 4        A.    Before it opened.
 5        Q.    But not after?
 6        A.    Being there when she started working.
 7   Everybody was very pleased, and then she got more to
 8   the point where she wanted things done her way, and
 9   if they weren't done her way, she made it very
10   difficult for people and made it very unpleasant.
11        Q.    You told me in your last deposition that
12   you have a bias against her, don't you?
13        A.    Since my last deposition?
14        Q.    You told me in your last deposition that
15   you have a bias against Ms. Milde?
16        A.    I don't have a bias against Ms. Milde. I
17   don't like the woman, but is that a bias?
18        Q.    What's your definition of "bias"?
19        A.    Bias is something when you disparage the
20   race, religion, creed, color. To me, bias is -- I
21   mean, that had nothing to do with my dislike for
22   Ms. Milde. I liked and respected her at the
23   beginning, and I learned, I guess, as I got more
24   involved out there and got to know her better and
25   some of the things that had happened, I got to like
```

1  her less and less.
2  Q.   But sitting here today, you cannot cite
3  more than two examples, if not one example, of a
4  reason of her poor performance for your own opinion,
5  can you?
6  A.   I thought her poor performance when we
7  told her we would not hear her grievance to the
8  board --
9       MR. ALVAREZ:  Let her finish.
10 A.   -- and she came to the board and started
11 speaking out of turn, and would not respect the
12 board, would not respect my asking her to please sit
13 down, that she was not part of the meeting and she
14 was not to be recognized.
15 Q.   To clarify, that's one example?
16 A.   That's one example.
17 Q.   You have another example?
18 A.   I think the example that she -- that I
19 expressed earlier with the planting of the two
20 bushes, where it had supposedly been approved, the
21 location, and -- I cannot remember his name -- went
22 out, the man we bought -- Kennedy Nursery went out
23 and took men off of other jobs to put those trees
24 in, and she objected vehemently that day, so they
25 had to come back another day.

```
 1   That was another source of information?
 2       A.   Yes.
 3       Q.   Then thirdly, I believe, was the
 4   fundraising board you cited as a source of
 5   information, correct?
 6       A.   Yes.
 7            MR. ALVAREZ:  Objection.
 8       Q.   Fourth, you cite your own just personal
 9   belief?
10       A.   Yes.
11       Q.   On the day that she came into the board
12   meeting to have her grievance be heard, did you feel
13   challenged by her that day?
14       A.   No.
15       Q.   You didn't?
16       A.   No.
17       Q.   Did you feel that you could usurp the
18   rules of procedure to quiet her free speech?
19       A.   What do you mean by "usurp"?
20       Q.   What do you think the word "usurp" means?
21       A.   I think you're inferring that in a meeting
22   that's run under Roberts Rules that if somebody
23   stands up to talk, the chair and the commissioners
24   at the table have no right to require that person to
25   sit down and be recognized.  In a meeting you can't
```

```
1      A.     What, the Roberts Rules?
2      Q.     Which you followed.  Are they set in stone
3   or flexible?
4      A.     I think that as far as keeping order in a
5   meeting, they are fairly set in stone, that you ask
6   to be recognized by the chair, and the chair
7   recognizes you, and when you're recognized, then you
8   make your presentation.  You don't just get up and
9   start talking.  I think you see that if you watch
10  anything on C-SPAN and watch how the House and
11  Senate work.  If you watch the procedures here in
12  Hartford with the state legislature and the
13  committees, the people have to be recognized by the
14  chair.
15     Q.     Well, so they are set in stone?  They are
16  rigid?
17              MR. ALVAREZ:  Objection.
18     A.     My feeling is yes, they are fairly rigid,
19  yes.
20     Q.     So when she came in there and said, "I
21  want to talk about the recreation coordinator
22  issue," you felt that she was -- that was an example
23  of poor performance on her part?
24     A.     She was out of order.  She had not been
25  recognized and she was not on the agenda.
```

```
 1    Q.   Isn't it true that the part of the meeting
 2  to which she was speaking in was an open session,
 3  open to the public?
 4    A.   When the public comes to speak at the
 5  Board of Commissioners, they raise their hands and
 6  they are recognized by the chair, and then they
 7  speak.  They don't just stand up and start talking.
 8    Q.   Well, did she, Ms. Milde raise her hand?
 9    A.   Not to my knowledge.  If she did, she was
10  not recognized.
11    Q.   You did not recognize her because you had
12  denied her grievance already?
13    A.   She had been denied the grievance and I
14  don't really recall if she asked to be recognized,
15  but I do remember saying that she was not on the
16  agenda, it was not the appropriate time for her to
17  speak, and to please be seated.
18    Q.   So in a session of your meeting open to
19  the public she stood up as a member of the public
20  and said, I want to be recognized, and you refused
21  to do so?
22    A.   She didn't ask to be recognized.
23    Q.   She stood up and began to talk about the
24  recreation coordinator position, right?
25    A.   Yes.
```

1   Q.   You said, Sit down, be quiet?  Et cetera?
2   A.   I said, "You are not on the agenda at this
3   time.  This is not your opportunity to speak, and
4   you will have to sit down."
5   Q.   But the public didn't come in and say, We
6   have to get on the agenda to give our speech about
7   what our concerns are?  Do they?
8   A.   They have to -- no, but we ask them if
9   they have any comments that they would like to make.
10  They stand up and they are recognized, and they do
11  it in a manner that we can listen to.
12       We had one other situation a number of
13  years ago where we had a resident come to a meeting
14  at McKinney Terrace, and he stood up and started to
15  talk, and I asked him to sit down.  He did not stop
16  talking.  He continued to talk.  I told him, as I
17  told Ms. Milde, we follow Roberts Rules of Order,
18  and that she has to be recognized, and he had to be
19  recognized to speak.  Fortunately, his wife was
20  there and she got him to sit down.
21       That did not occur with Ms. Milde.  She
22  finally did --
23  Q.   So she gets up as a member of the public
24  and said, "I want to be recognized," and you said,
25  "I'm not going to recognize you"?  Is that what

```
 1   happened?
 2              MR. ALVAREZ:  Objection.
 3       A.     You should refer to my other testimony.
 4   My recollection is that she came in at the beginning
 5   of the meeting and started, stood up and started
 6   talking about the need for a recreation supervisor
 7   at Parsonage Cottage, and I told her she was not
 8   being recognized, this was not on the agenda at this
 9   time, and to please sit down.
10       Q.     Was that action on her part a basis for
11   her termination?
12              MR. ALVAREZ:  Objection.
13       A.     It was not the basis.  It was one, one of
14   a number of reasons that she was --
15       Q.     I'll rephrase.  I'm sorry.
16              Did it form one of the bases for the
17   reason why she was fired?
18              MR. ALVAREZ:  Objection.
19       A.     Well, it didn't help for the commissioners
20   to see her act like that.
21       Q.     Your opinion of her probably only got
22   worse, rather than better, with respect to that
23   action she took?
24       A.     Well, it certainly didn't help my opinion
25   of her.
```