# EXHIBIT AA

1

```
 1   UNITED STATES DISTRICT COURT
 2   DISTRICT OF CONNECTICUT
 3
 4
 5   ------------------------------x
     URSULA MILDE,                 :
 6
                  Plaintiff,       :
 7
           -versus-                : No. 3:00CV2423(AVC)
 8
     THE HOUSING AUTHORITY OF
 9   THE TOWN OF GREENWICH;
     THE HOUSING AUTHORITY OF
10   THE TOWN OF GREENWICH
     BOARD OF COMMISSIONERS;
11   and BENJAMIN LITTLE, CEO,     :

12                Defendants.      :

13   ------------------------------x

14

15            Deposition of BENJAMIN LITTLE, taken

16   pursuant to Section 243, et seq. of the Connecticut

17   Practice Book, at the law offices of Carey &

18   Associates, P.C., Southport, Connecticut, before

19   Jacqueline McCauley, RPR/CSR, a Notary Public in and

20   for the State of Connecticut, on May 9, 2003, at 10:35

21   a.m.

22

23

24

25
```

ORIGINAL

1  plaintiff complained either verbally or in writing to
2  the defendant Board of Commissioners and defendant CEO
3  Benjamin Little during an open public meeting about
4  the state licensing necessity for a recreational
5  coordinator for the Parsonage Cottage Senior
6  Residence?
7           MR. ALVAREZ:  Objection.
8       A.  I do not recall.
9       Q.  Is it a true and accurate statement that
10 The Housing Authority approved a job description for
11 recreational coordinator in October of 1986?
12      A.  State that again?
13      Q.  Sure.  Is it a true and accurate statement
14 that The Housing Authority approved a job description
15 for the recreational coordinator in October, 1986?
16      A.  True.
17      Q.  Is it a true and accurate statement that
18 during the March 24, 2000 staff meeting defendant
19 Benjamin Little was made aware that plaintiff was
20 going to hire a full-time person to provide
21 recreational services?
22      A.  That's true.
23      Q.  Did she ever notify you in any date
24 earlier than that that she was going to do that?
25      A.  No.

1  documentation explaining the case. Since the
2  executive director prevented me from presenting the
3  case to the personnel committee as I had requested, I
4  have no other choice but to ask for a formal hearing."
5  Is that what the documentation states?
6      A.  That's right.
7      Q.  So back to my original question. Is it a
8  true and accurate statement that after receiving the
9  April 17, 2000 facimile plaintiff filed a request for
10 a grievance hearing by the Board of Commissioners?
11     A.  True.
12     Q.  And just a point of fact here. She
13 arrived on the 24th for the Board of Commissioners
14 meeting and handed this out to you and the Board of
15 Commissioners?
16          MR. ALVAREZ:  Objection.
17     A.  I don't recall.
18     Q.  Is it a true and accurate statement that
19 on September 8, 2000 defendant HATG, The Housing
20 Authority of the Town of Greenwich, terminated
21 plaintiff's employment for poor performance and
22 willful insubordination?
23          MR. ALVAREZ:  Objection.
24     A.  I would like to see the letter so I can
25 know exactly what I put in there. I am not sure I

1  on September 8, 2000 defendant Housing Authority
2  terminated plaintiff's employment for poor performance
3  and wilful insubordination?
4       A.  I do not recall at this time what was in
5  the letter of termination.
6       Q.  I apologize for asking the question again.
7       A.  Thank you.
8       Q.  It's very important to ask it just in that
9  right manner.  Is it a true and accurate statement
10 that during plaintiff's tenure of employment defendant
11 Benjamin Little made false and misleading accusations
12 to defendant Board of Commissioners regarding
13 plaintiff's performance in operation of the Parsonage
14 Cottage Senior Residence facility?
15      A.  No.
16      Q.  I'm trying to locate Exhibit number 13.
17 You have the document?
18      A.  I have it.
19      Q.  Great.  In the -- number 20 of that
20 Exhibit 13 is The Housing Authority rules and personal
21 performance checklist.  Number 20 states, "Do not make
22 false or slanderous statements about The Authority,
23 its employees or residents."  That's correct, right?
24      A.  That's correct.
25      Q.  And you just testified that you did not

211

```
1    UNITED STATES DISTRICT COURT
2    DISTRICT OF CONNECTICUT
3
4
5    ---------------------------x
     URSULA MILDE,                    :
6
             Plaintiff,               :
7
         -versus-                     : No. 3:00CV2423(AVC)
8
     THE HOUSING AUTHORITY OF
9    THE TOWN OF GREENWICH; THE
     HOUSING AUTHORITY OF THE
10   TOWN OF GREENWICH BOARD OF
     COMMISSIONERS; and
11   BENJAMIN LITTLE, CEO,            :
                                        VOL. II
12           Defendants.              :
13   ---------------------------x
14
15            Continued deposition of BENJAMIN
16   LITTLE, taken pursuant to Federal Rules of Civil
17   Procedure, at the law offices of Carey & Associates,
18   P.C., Southport, Connecticut, before Jacqueline
19   McCauley, RPR/CSR, a Notary Public in and for the
20   State of Connecticut, on May 13, 2003, at 10:07 a.m.
21
22
23
24
25
```

SANDERS, GALE & RUSSELL

1   review of the nursing activities at Parsonage Cottage.
2         Q.   Didn't -- wasn't Ms. Milde terminated on
3   September 8, 2000?
4         A.   That's true.
5         Q.   When did Ms. Vlyman get hired as a
6   consultant after that?
7         A.   It had to be --
8              MR. ALVAREZ:   Objection.
9         A.   It has to be close to a month before.
10        Q.   You hired Ms. Vlyman a month before her,
11  Ms. Milde's termination?
12        A.   Yes.
13        Q.   And the purpose of that hiring is for
14  what?
15        A.   To review the activities of the nursing
16  programs at Parsonage Cottage.
17        Q.   So your hiring her as a nursing consultant
18  had nothing to do with the administrative position
19  that Ms. Milde occupied?
20        A.   True.
21        Q.   But eventually she did take over the
22  activities and the responsibility of the administrator
23  for the Parsonage Cottage; is that correct?
24        A.   That is correct.
25        Q.   When did she take over the activities as

1    decision about her employment?
2            MR. ALVAREZ:  Objection.
3        A.   No.
4        Q.   Were you aware that Ms. Milde engaged in
5    protected activity regarding her free speech?
6            MR. ALVAREZ:  Objection.
7        A.   No.
8        Q.   Did she in fact tell you she was informing
9    you about her right to talk to the Board of
10   Commissioners about the CCI contract and the
11   recreation coordinator position?
12       A.   Say that again?
13       Q.   Did she in fact tell you that she was
14   asserting her rights to free speech regarding the
15   recreation coordinator position to the Board of
16   Commissioners?
17       A.   The free speech word wasn't in there. If
18   she was exercising her right to talk, grievance, bring
19   a grievance in front of the Board of Commissioners,
20   then the answer is yes.
21       Q.   That grievance had to do with the CCI
22   recreation coordinator issue, correct?
23       A.   Yes.
24       Q.   Do you feel, Mr. Little, intimidated by
25   older more competent females?

1       Q.  I'm sorry?

2       A.  When I get a weekly report, yes.

3       Q.  So your knowledge is only derived from
4   weekly reports?

5       A.  Right.

6       Q.  And Ms. Milde sent you those weekly
7   reports, didn't she?

8       A.  Yes.

9       Q.  So isn't it true that the residents, in
10  the absence of the recreation coordinator services,
11  are left to remain in their rooms with nothing to do?

12      A.  Not that I was aware of.

13      Q.  Not that you are aware of?

14      A.  Right.

15      Q.  Were you ever aware at a prior time before
16  this deposition?

17      A.  Yes.

18      Q.  What were you aware of?

19      A.  That what was told to me that there was
20  other staff doing different recreational activities
21  with the residents when there wasn't someone from CCI
22  doing it.

23      Q.  So Ms. Milde's staff was performing the
24  services of CCI; is that correct?

25      A.  That's what I heard.

1  Q. That's what you heard. Did you actually
2  call CCI and find out?
3  A. No, I did not.
4  Q. Did you call Ms. Milde to find that out?
5  A. Ms. Milde is the one who told me.
6  Q. She told you, okay. She tell you anything
7  else about the CCI or the -- did she tell you anything
8  else about her own employees performing these services
9  in the absence of CCI?
10 A. Yes.
11         MR. ALVAREZ: Objection.
12 Q. What did she tell you?
13 A. That Tammy would be doing some of the
14 things with the residents and some of her own staff
15 and I believe she did some things herself.
16 Q. Did she tell you that -- did she tell you
17 that providing those services to which CCI was
18 supposed to perform was impairing the medications that
19 they give to the residents and other activities?
20 A. No.
21 Q. In your opinion recreation services
22 provided to the residents is a valid public concern
23 issue?
24         MR. ALVAREZ: Objection.
25 A. A valid public concern issue? No.

1   Q.  It's not?  So what is it if it's not a
2   valid public concern -- withdrawn.  Wouldn't the
3   public Town of Greenwich be concerned that recreation
4   services weren't being provided in an adequate manner
5   to the residents?
6           MR. ALVAREZ:  Objection.
7   A.  I don't know.  I can't answer that.
8   Q.  Did you ever receive complaints from the
9   public?
10  A.  No.
11  Q.  Did you ever receive statements from any
12  residents that -- withdrawn.  Did you or did you not
13  say to Ms. Milde on May 30 in a letter entitled
14  corrective directives, "I share your concerns
15  regarding any abuse or neglect regarding any of the
16  services provided to the residents of Parsonage"?
17  A.  It sounds like a true statement, yes.
18  Q.  So what abuse and neglect were you
19  referring to, sir?
20  A.  It was already previously stated by Ms.
21  Milde that there was abuse and neglect.
22  Q.  With regard to what issue, sir?
23  A.  I don't recall what issue at that time.  I
24  know I responded to something that was written.
25  Q.  But isn't it in fact true that you were

1      MR. ALVAREZ: Objection.
2     A. I have to know what I was responding to
3  when I wrote that one phrase in there. There's
4  probably a lot more to the memorandum.
5     Q. Do you know what the corrective directives
6  is?
7     A. Yes, I do.
8     Q. What was it?
9     A. It was exactly what it stated. It was
10 directives to be corrected by Ms. Milde.
11    Q. In fact, that was actually a disciplinary
12 corrective directive, wasn't it?
13    A. Yes, it was.
14    Q. Because you were supervisor of her,
15 correct?
16    A. That's correct.
17    Q. And she wasn't doing allegedly something
18 you had told her to do?
19    A. That's correct.
20    Q. But yet you stated to her in that letter
21 that you share her concerns over the abuse and
22 neglect; is that correct?
23         MR. ALVAREZ: Objection.
24    A. I do share her concerns of that, that's
25 true.

1        MR. ALVAREZ: Objection.
2        A. There was verbal discussions but no. This
3   is the first written warning, yes.
4        Q. Do you consider, your personal position, a
5   disciplinary warning to be an adverse employment
6   action?
7        A. Disciplinary warnings, my opinion, is not
8   for adverse -- it's not an adverse thing. It's giving
9   the employee an opportunity to make changes.
10           MR. ALVAREZ: Note an objection.
11       A. It's guidance.
12           MR. ALVAREZ: Are you finished?
13       A. Yes.
14           MR. ALVAREZ: Note an objection to
15  that question.
16       Q. Okay. Well, certainly the corrective
17  directives and the 90-day notice to improve were not
18  positive. They didn't cite positive aspects of her
19  employment, did they?
20       A. The performance -- no.
21       Q. Let's take a break for lunch. We'll be
22  back at 1 o'clock and then we'll go for one hour. Be
23  back at 1 o'clock.
24           (Whereupon, there was a luncheon
25           recess from 12:14 to 1:03.)

1  still a truthful and accurate answer?

2      A.  Yes.

3          MR. ALVAREZ:  Objection.

4      Q.  Turn to page 73 of Exhibit 29.

5      A.  Page 79?

6      Q.  Correct.  I'm sorry, 73.  I want to refer your attention to line 20, okay?  The question being asked of you was "And you described your style of management as being militaristic?"  The next question was "Correct?"  The answer was "Correct."  Do you see that, sir?

12     A.  Yes.

13         MR. ALVAREZ:  Objection.

14         MR. CAREY:  Is that still truthful and accurate testimony under oath?

16         MR. ALVAREZ:  Objection.

17     Q.  Sir?

18     A.  Yes.

19     Q.  Turn to page 82 of Exhibit 29.  Turn to line 11.  It reads -- the question reads, "The survey that she created did, she have authority to do that?"  Answer line 13, "I would assume so."  Is that a correct statement, sir?

24     A.  Yes.

25         MR. ALVAREZ:  Objection.

```
 1  program."  Do you see that, sir?
 2       A.   Yes.
 3       Q.   Did I read that correctly?
 4       A.   Yes.
 5       Q.   Isn't it true that this is the first time
 6  on February 11, 2000 that you were notified about the
 7  recreation coordinator issue at Parsonage Cottage, yes
 8  or no?
 9       A.   According to this document I was notified
10  February 11 of that issue.
11       Q.   I'm sorry, notified of the issue?
12       A.   On February 11 this memorandum states I
13  was notified.
14       Q.   Okay.
15                  (Plaintiff's Exhibit 31, marked for
16                   identification.)
17       Q.   This is a letter to Ms. Milde from you
18  dated March 24, 2000.  Do you see that?
19       A.   Yes.
20       Q.   Are you familiar with this letter?
21       A.   Yes.
22       Q.   And it's got your initials BWL?
23       A.   Yes.
24       Q.   And who is the secondary initials?
25       A.   Maria Morris.
```

1   state that those questions are of a neutral nature in
2   your opinion?"
3           A.   Yes.
4                   (Plaintiff's Exhibit 32, marked for
5                   identification.)
6           Q.   Show you what's been marked as Plaintiff's
7   Exhibit 32.  It's a memorandum from Ms. Milde to you,
8   a March 25, 2000 response to your memo dated 3/24
9   which was Exhibit number 31.  Do you remember
10  receiving that memo, sir?
11          A.   Not offhand, but is most likely I probably
12  did.
13          Q.   Is most likely you probably did?
14          A.   Most likely, yes.
15          Q.   Let me show you the next exhibit.
16                  (Plaintiff's Exhibit 33, marked for
17                  identification.)
18          Q.   Exhibit 33 is a letter from Ms. Milde to
19  you dated April 13, 2000.  Do you see that?
20          A.   Yes.
21          Q.   Do you remember receiving this letter,
22  sir?
23          A.   I don't remember.  I don't recall.
24          Q.   Do you remember who Agata Wilinski is?
25          A.   Yes.