# EXHIBIT BB

**Page 1**

```
              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT

* * * * * * * * * * *
URSULA MILDE,              *
          Plaintiff        *
   vs.                     *   3:00 CV 2423 (AVC)
HOUSING AUTHORITY OF       *
THE TOWN OF GREENWICH,     *
ET AL                      *
          Defendants       *
* * * * * * * * * * *

                           Hartford, CT
                           May 23, 2003
                           10:00 A.M.

              DEPOSITION OF URSULA MILDE

APPEARANCES:
   FOR THE PLAINTIFF:
       CAREY & ASSOCIATES, P.C.
       BY: MARK P. CAREY, ESQ.
           71 Old Post Road
           Southport, CT 06490

   FOR THE DEFENDANTS:
       JACKSON LEWIS LLP
       BY: FRANCIS P. ALVAREZ, ESQ.
           177 Broad Street
           P.O. Box 251
           Stamford, CT 06904-0251
```

**Page 2**

```
 1     Deposition of URSULA MILDE, a Plaintiff
 2  herein, taken on behalf of the Defendants herein,
 3  for the purpose of discovery and for use as
 4  evidence in this cause, pending in the United
 5  States District Court for the District of
 6  Connecticut, pursuant to Notice, before Terri
 7  Fidanza, LSR, a Notary Public within and for the
 8  State of Connecticut, at the United States
 9  District Court, 450 Main Street, Hartford,
10  Connecticut, on May 23, 2003 at 10:00 a.m., at
11  which time counsel appeared as hereinbefore set
12  forth.

             STIPULATIONS

       IT IS HEREBY STIPULATED AND AGREED TO
   by and among counsel for the respective parties
   hereto that all technicalities as to the proof of
   the official character of the authority before
   whom the deposition is to be taken are waived.

       IT IS FURTHER STIPULATED AND AGREED TO
   by and among counsel for the respective
   parties hereto that any objections to the
   sufficiency of the Notice are waived.

       IT IS FURTHER STIPULATED AND AGREED TO
   by and among counsel for the respective
   parties hereto that all objections, except as
   to form, are reserved to the time of trial.
```

**Page 3**

 1      (Whereupon, the Renotice of Deposition
 2  was marked as Defendants' Exhibit 1 for
 3  Identification.)
 4  THEREUPON,
 5      URSULA MILDE, 257 Cherry Street, Katona,
 6  New York, 10536, having been first duly sworn,
 7  as hereinafter certified, was examined and
 8  testified as follows:
 9  DIRECT EXAMINATION BY MR. ALVAREZ:
10      Q. Good morning, Ms. Milde. Do you prefer
11  Mrs. Milde or Ms. Milde?
12      A. It doesn't matter.
13      Q. We're here this morning to take your
14  deposition. We're here at the federal courthouse
15  pursuant to a request made by your attorney. Do
16  you understand that?
17      A. Yes, I do.
18      Q. I guess before we get started, I would
19  like to confirm with your attorney what the ground
20  rules, stipulations are for the deposition.
21          MR. ALVAREZ: Mark, as far as I am
22  concerned, we'll be conducting the deposition in
23  accordance with the Federal Rules of Civil
24  Procedure, particularly the Rule 32 as to the
25  reservation or waiver of objections if they are

**Page 4**

 1  not made. Is that your understanding as well?
 2          MR. CAREY: I would clarify that
 3  objection. I will make objections to form.
 4  Everything else is reserved until trial.
 5          MR. ALVAREZ: Okay. Well --
 6          MR. CAREY: I make objections to
 7  form and attorney/client privilege if that so
 8  applies and everything else object to at trial as
 9  noted in that federal rule you just cited.
10          MR. ALVAREZ: Just note that the
11  rule does talk about things other than form. In
12  Federal Rule 32(d)(3), states that errors and
13  irregularities occurring at the oral examination
14  in the matter of taking the deposition in the form
15  of the questions or answers, in the oath or
16  affirmation, or in the conduct of parties, and
17  errors of any kind which might be obviated,
18  removed or cured if promptly presented are waived
19  unless seasonal objections are made at the taking
20  of the deposition. I assume you are not objecting
21  to taking the deposition in accordance with that
22  rule.
23          MR. CAREY: No, I do not object in
24  taking the deposition in accordance with that
25  rule.

**Page 5**

 1      Q. Let me show you what the court reporter
 2  has marked as Exhibit 1. Ms. Milde, I will note
 3  this is the renotice of your deposition and that
 4  we served yesterday. I will note that I picked up
 5  one typo here in the third line that says this
 6  will be taking the continued deposition of Ursula
 7  Milde. Mrs. Milde, I haven't deposed you before
 8  in this case, have I, correct?
 9      A. Correct.
10          MR. ALVAREZ: Mark, do you have any
11  issues with the notice of the deposition?
12          MR. CAREY: I have no problem with
13  the word continued. This is your first day of
14  depositing, Miss Milde. I will note the
15  courthouse has reserved this room in the
16  courthouse for this date and also I believe
17  May 30, 2003 pursuant to my request continued
18  examination, if that's likely in the case.
19          MR. ALVAREZ: Thank you.
20      Q. Ms. Milde, have you ever had your
21  deposition taken before?
22      A. No.
23      Q. I'm going to be asking you questions and
24  my questions and your answers to those questions
25  will be recorded by the court reporter. Do you

**Page 6**

 1  understand that?
 2      A. Yes, I do.
 3      Q. Do you understand that your answers are
 4  under oath?
 5      A. I do.
 6      Q. And to insure that you have a fair
 7  opportunity to answer those questions, I want you
 8  to make certain that you hear my question. Do you
 9  understand that?
10      A. I do.
11      Q. And you should be answering audibly so
12  that the court reporter can record your answers.
13  Do you understand that?
14      A. Yes.
15      Q. If you do not understand any question
16  that I have asked you, please let me know.
17      A. I will.
18      Q. If you answer a question that I have
19  asked, I'm going to presume that you understood
20  the question and you have given me the best answer
21  that you are able to. Do you understand that?
22      A. Yes, I do.
23      Q. If you need a break at some point in
24  time, let me know. And I will attempt to
25  accommodate your request. The only thing I ask,

Page 73

1 direct his daily work, but I don't want to lose
2 the consistency of the chain of command in the
3 maintenance department, correct?
4   A. Yes.
5   Q. He was instructing you there that there
6 was some shared responsibility with respect to
7 those maintenance personnel, correct?
8   A. Yes. Which is why I always involved
9 John Banks when there was an issue with
10 maintenance personnel.
11  Q. And on the second page under staffing,
12 you are not addressing maintenance personnel in
13 this paragraph, correct?
14  A. No.
15  Q. Withdrawn. This isn't your paragraph.
16     The staffing issue under category
17 No. 3, you were addressing staff other than
18 maintenance personnel, correct?
19  A. Yes.
20  Q. And in response to your memo,
21 Mr. Crawford wrote that it will always be our
22 responsibility to discuss with you any issues
23 pertaining to discipline or the firing of any
24 personnel, correct?
25  A. Correct.

Page 74

1   Q. And then down below in that same
2 paragraph, he wrote Ben and I do reserve the right
3 to a final review of all personnel evaluations.
4 Correct?
5   A. Yes.
6   Q. And he also wrote the reason for this is
7 to insure a continuity in the way the evaluations
8 are handled and arranged, correct?
9   A. Yes.
10  Q. He was telling you to keep them involved
11 in the review of all personnel evaluations,
12 correct?
13  A. Yes, and I did.
14  Q. Up above under budget, Mr. Crawford
15 wrote any contract agreement, whether new or
16 renewals, should also be reviewed by us prior to
17 execution, correct?
18  A. Yes.
19  Q. Do you have any problem with that
20 directive?
21     MR. CAREY: Objection.
22 Argumentative. You asked do you have any problem
23 with that directive.
24  Q. You can answer.
25  A. I understood that directive.

Page 75

1   Q. Did you intend to follow it when it was
2 given to you?
3   A. Yeah.
4   Q. And do you believe that you followed it
5 throughout the rest of your employment with the
6 Parsonage Cottage?
7   A. As I said, I didn't follow it with the
8 linen contract, but it was brought to their
9 attention the linen contract and they said just
10 handle it.
11  Q. In the document that's been marked as
12 Defendants' Exhibit 4, your memo to Mr. Crawford
13 dated November 30, 1997, were you describing in
14 any way treatment that you believed was age
15 discrimination?
16  A. In that memo, I was trying to clarify my
17 responsibilities and also reminding them they
18 needed -- they had to involve me in things about
19 Parsonage because they made some decisions that
20 were actually detrimental.
21  Q. Those things that were done by
22 management and were addressed in your memo, was
23 that in your opinion age discrimination?
24  A. I don't understand.
25  Q. You are complaining about certain things

Page 76

1 that management was doing or was not doing,
2 correct?
3   A. Correct.
4   Q. Were those things age discrimination?
5     MR. CAREY: Objection to the form.
6   A. I didn't see those as discrimination at
7 that time.
8   Q. Today as you sit here, do you believe
9 that those actions which prompted those memos were
10 discriminatory on the basis of your age?
11  A. Those actions that I was talking about,
12 no.
13  Q. Do you believe that the actions that you
14 were talking about were discriminatory based on
15 your gender?
16  A. Those actions I'm talking about in here?
17  Q. Yes.
18  A. No.
19  Q. And do you think that any of the
20 directives that Mr. Crawford made in his
21 responsive memo, which is Defendants' Exhibit 5,
22 were retaliatory for you expressing opinions about
23 matters of public concern?
24  A. No.
25  Q. At any point in time during your

Page 77

1 employment, have members of management at the
2 Housing Authority made any comments to you that
3 were derogatory in your opinion on the basis of
4 your age?
5   A. Direct comments, no.
6   Q. Any indirect comments?
7   A. There were a lot of things that happened
8 in my last year that were indirect, but I believe
9 that were discriminatory, many things.
10  Q. Just focusing on comments right now.
11 What statements were made by management
12 representatives during your employment that you
13 believe were derogatory of your age?
14  A. My age, I don't remember any statement.
15  Q. What statements were made during your
16 employment that you believe were derogatory of
17 your gender?
18  A. Direct statements, I don't remember
19 any.
20  Q. You don't remember any or you do not
21 believe any were made?
22  A. I believe none were made.
23  Q. But you do believe that there were
24 certain actions that were taken that were
25 derogatory of your age?

Page 78

1     MR. CAREY: Objection to the form.
2   A. I don't know whether it was age or
3 gender. Not clear, but there were certain
4 actions, yes.
5   Q. And I want you to list for me as
6 succinctly as you can what those actions were.
7   A. I was the only female senior staff and I
8 was not -- I was never invited to committee
9 meetings to discuss my area of operation. I was
10 never invited at a board meeting to discuss or to
11 record initially verbally about my area of
12 operation. I wasn't at any board meeting about my
13 area of operation. When there was a question
14 about Parsonage and was the finances or
15 maintenance or whatever, it was always asked of
16 the other senior staff, so finance might be
17 Russell Kemp or maintenance might be John Banks.
18 Eventually after the first -- I was occasionally
19 asked to submit reports, written reports, about
20 certain issues mostly having to do with the
21 occupancy and I submitted those reports.
22 Eventually one board member said to me how come
23 there is no official report in the board package
24 from Parsonage Cottage. I said that's a very
25 good question. I would really like to give a

### Page 79

1 report, so I started to submit reports from then
2 on, but my reports or input on my area of
3 operation was not sought like with the other male
4 managers.
5    Q. Were there any other actions that were
6 taken by management of the Housing Authority that
7 you believe were derogatory of your age or gender?
8    A. Later on, yes.
9    Q. What were they?
10    A. It wasn't so much my age and gender but
11 generally discriminatory. As I said, the last
12 year there were a lot of actions.
13    Q. You are making claims of age
14 discrimination and gender discrimination in the
15 lawsuit, correct?
16    A. Yes.
17    Q. I just want to understand from you what
18 actions you are claiming were derogatory or
19 discriminatory on the base of your age or gender.
20    A. I just mentioned those. I just
21 mentioned.
22    Q. Are there any others?
23    A. Not that I can think of now other than
24 general inference.
25    Q. What do you mean by general inference?

### Page 80

1    A. All later, in the last year.
2    Q. Are you saying there are other actions
3 which you believe indicated age or gender
4 discrimination?
5    A. I indicated discrimination.
6    Q. Of what type?
7    A. I don't know. I can't -- you know, I
8 don't know when people treat me differently what
9 specifically they are thinking or the individual
10 is thinking. I don't know, but there were -- I
11 was treated differently.
12    Q. How else were you treated differently
13 during your employment?
14    A. In the last year of my employment when I
15 had a legitimate issue to bring up. As I said
16 before, I was never invited to committee
17 meetings. But when I had an issue that I was told
18 was to be decided by the personnel committee and
19 the commissioners and I wanted to bring up that
20 issue, I was not allowed to present that issue.
21    Q. Are you talking about the May 22 board
22 meeting?
23    A. No, I'm talking about the April 24
24 personnel committee meeting.
25    Q. So this is the April 24 personnel

### Page 81

1 committee meeting which you -- withdrawn.
2    What did you do or attempt to do at the
3 April 24 meeting?
4    A. I attempted to explain why I was
5 planning to go back to hire an in-house recreation
6 coordinator, which was the first plan, and I
7 wanted to explain the history and the rationale
8 for that, and the reason why I requested to be at
9 that committee meeting was because I was told by
10 the CEO that it was up to the committee and the
11 commissioners to decide that. And I wanted to
12 give them an opportunity to explain so they had
13 some basis for decision or recommendation or
14 whatever they do at the committee.
15    Q. They did not permit you to offer that
16 explanation at that meeting?
17    A. That's correct.
18    Q. Who denied you that opportunity?
19    A. I don't know, but it was communicated to
20 me by Mr. Little.
21    Q. Did he explain to you the reason why?
22    A. No. He called me up and said -- I was
23 ready to go and he called me up and said you are
24 not permitted to come. You are not welcome
25 there.

### Page 82

1    Q. Did he do or say something during that
2 conversation to suggest to you that you were being
3 denied the opportunity to go to that meeting
4 because of your age or gender?
5    A. He just said those two sentences.
6 That's all he said.
7    Q. So the answer is no?
8    A. I don't know what he was thinking. He
9 only said those two things.
10    Q. How else were you treated differently in
11 your last year of employment to the extent that
12 you haven't already told us?
13    A. Following this denial of attending the
14 personnel committee, I submitted a grievance. And
15 I submitted that in writing to the commissioners
16 that very same evening because the personnel
17 committee was three hours before the general
18 commissioners' meeting. And my grievance, the
19 substance of my grievance was that I was not
20 allowed to present the reason or the rationale for
21 my plan even though I was told that that body was
22 supposed to make the decision for that. So I
23 presented the grievance. I didn't hear anything
24 about it. I just presented it in writing. I
25 didn't hear anything about the grievance, any

### Page 83

1 response until 15 days or so later when I got a
2 memo saying that there was going to be a grievance
3 hearing on the 18th of May. So I prepared some
4 material for this grievance hearing. And then
5 shortly before the grievance hearing, I
6 received -- I either received a fax from
7 Mr. Little or from a phone call. It was a fax.
8 Saying that the hearing was cancelled. And
9 nothing, you know, why it was cancelled. It was
10 just cancelled. That was May 18. On May 22, I
11 went to an open board meeting, so I get this memo
12 that the grievance hearing is cancelled. So I
13 realize that the board and/or Mr. Little or both,
14 whatever, that do not want to hear me on this
15 matter. And I was very upset about that because
16 it was advocating for the residents at the
17 cottage. And it not only was my responsibility,
18 but I felt it was very, very important that we
19 hire an in-house coordinator for all the reasons
20 that I outlined in all the previous memos, and the
21 fact that I wasn't even being heard by the body
22 who was supposed to make the decision about that
23 was upsetting to me. Because it indicated to me a
24 lack of caring for the residents. So I went to
25 the open board meeting, and our nurse consultant

### Page 84

1 was there and also Tammy, my assistant, the
2 resident services coordinator, and at the end of
3 the open part of the board meeting, I brought up
4 that I wanted to be heard and I brought it up in
5 the voice like I'm speaking today. I'm not
6 accustomed to raising my voice, and I was shouted
7 down and I was literally shouted down. And I
8 brought it up again and I was shouted down. And
9 then the commissioner said that it had to be taken
10 up in executive session. So I asked to be allowed
11 to speak in executive session. But I forgot one
12 important thing. When I came into the room for
13 the open meeting and I was at all the open
14 meetings of the commissioners because under my
15 license I had to actually produce evidence that I
16 was there as the administrator of Parsonage
17 Cottage, and it had to show in the minutes that
18 the managing agent, namely, the Housing Authority,
19 that the administrator was there at the meetings.
20 So I was at all the open board meetings. When I
21 came into the room where the board was held, I was
22 handed a letter by Mr. Nova, who is the vice
23 chair, which was dated May 19, and there was a
24 copy of the letter which he stated was mailed to
25 me, but I hadn't gotten it yet. I was handed a

Page 85

1 copy of the letter saying that my grievance was
2 denied. That I wasn't going to have a hearing
3 again. I wasn't going to have a hearing, period.
4 So that was at the very beginning of the open
5 commissioners' meeting, so the meeting goes on
6 and, you know, they discuss all the different
7 whatever, and that at the end of that open
8 session, I asked -- I spoke up and said I wanted
9 to be heard about that. And so already -- so the
10 discrimination was that I couldn't even -- my
11 grievance wasn't even heard.
12     Q. What does discrimination mean to you as
13 you used it then?
14     A. Discrimination means to me that a person
15 is, for whatever reason, is treated differently
16 from the other people, the peers, the other
17 equivalent staff and also is not treated according
18 to the policies that the organization or employer
19 has.
20     Q. So you don't believe you were treated
21 the same way as your peers?
22     A. That's correct.
23     Q. And you don't think you were treated
24 according to policy?
25     A. That's correct.

Page 86

1     Q. But why do you believe or do you believe
2 that being treated differently than your peers was
3 because of your age?
4     A. That is an assumption.
5     Q. And is it an assumption based on
6 specific facts that you know about?
7     A. It is an assumption because it's a
8 general assumption, and as I said before, I can't
9 look into the mind of another person. There has
10 to be some reason.
11     Q. What makes you think that the reason is
12 age discrimination?
13     A. Because I was the oldest manager there.
14 I was much older than the rest of them.
15     Q. Is there any other reason?
16     A. I believed that, I assume, and I have
17 seen it sometimes that some managers feel
18 intimidated by older, more experienced workers.
19     Q. Is there any other reason that you felt
20 that you were being treated differently because of
21 your peers, because of your age?
22     A. No. That's it essentially.
23     Q. What are the reasons you believe that
24 you were being treated differently than your peers
25 because of your gender?

Page 87

1     A. Well, because as I said before, I was
2 the only female manager. I mean among my peers, I
3 was the only female.
4     Q. Any other reasons?
5     A. Yeah. I want to add one more. Both
6 when my -- I never received a performance review
7 until June 2, a performance review which was
8 written on May 30 of 2000, and I believed other
9 managers received performance reviews.
10     Q. What managers received performance
11 reviews?
12     A. John Banks, Russ Kemp, Terry Mardula
13 Todd Cozolino. I also -- my performance review
14 and disciplinary action, I didn't know at the
15 time, but I learned later because I saw the bill
16 from, that was not written by my supervisor. And
17 I think I probably was the only employee when that
18 was the case. And also there's another thing.
19 When I received that disciplinary action in that
20 performance review, Mr. Little had present another
21 senior staff member, Terry Mardula, who was a peer
22 to me and not my supervisor, and I thought that
23 was highly irregular, and I don't think that any
24 other employee this was done with other managers.
25     Q. Assuming it wasn't done with other

Page 88

1 managers, assuming it was highly irregular, why do
2 you think or do you think that it was done to you
3 because of your age?
4     A. I thought it was discriminatory. I
5 don't know why, whether it was age or gender or
6 whatever, but believe it was a discriminatory
7 practice, and as I said before, I don't know what
8 this individual goes on in his head.
9     Q. What nationality are you?
10     A. German.
11     Q. Were you born in Germany?
12     A. Yes. I'm an American citizen but --
13     Q. Do you believe that this happened
14 perhaps because of your German ancestry?
15         MR. CAREY: Objection. Vague.
16     A. No. I don't know.
17         MR. CAREY: Relevance.
18     A. I never experienced that.
19     Q. You have never experienced it. I'm
20 trying to understand why you believe or if you
21 believe that this different treatment was because
22 of age, gender or some other reasons.
23     A. I can't answer that. I really don't
24 know what the reasons were. I don't know.
25     Q. And you said the reason you believe it

Page 89

1 would have been because of gender, because you are
2 the only female manager, correct?
3     A. That's correct.
4     Q. But there's no other facts that you can
5 tell me that suggest that the reason this was
6 happening to you was because of your gender?
7         MR. CAREY: Objection.
8 Argumentative.
9     A. I don't have any other facts. As I said
10 before, I don't know what went on in this
11 individual's thinking or mind.
12         MR. CAREY: Just for the record, it
13 is 12:20. We have been going two and a half hours
14 straight. When do you want to take a break?
15         MR. ALVAREZ: I think this is a
16 perfect time to take a break. Why don't we
17 attempt to start at 1:00. Does that sound
18 reasonable? Is that enough time?
19         THE WITNESS: I only eat a yogurt
20 at lunch.
21         MR. ALVAREZ: Do you want to try to
22 start in 30 minutes?
23         MR. CAREY: No, I need to eat
24 something. Let's say 1:00. That's 40 minutes
25 from now.

Page 90

1         (Whereupon, a recess was taken from
2 12:20 p.m. to 1:05 p.m.)
3         (Whereupon, a memo dated 3-24-00 was
4 marked as Defendants' Exhibit 6 for
5 Identification; a memo was marked as Defendants'
6 Exhibit 7 for Identification; a memo was marked as
7 Defendants' Exhibit 8 for Identification; a memo
8 dated 4-17-00 was marked as Defendants' Exhibit 9
9 for Identification; a fax dated 4-17-00 was marked
10 as Defendants' Exhibit 10 for Identification; a
11 memo was marked as Defendants' Exhibit 11 for
12 Identification; a memo was marked as Defendants'
13 Exhibit 12 for Identification; the request for
14 grievance hearing was marked as Defendants'
15 Exhibit 13 for Identification; the outline for
16 grieving dated 5-15-00 was marked as Defendants'
17 Exhibit 14 for Identification; the posting notice
18 was marked as Defendants' Exhibit 15 for
19 Identification; a memo was marked as Defendants'
20 Exhibit 16 for Identification; the status reports
21 were marked as Defendants' Exhibit 17 for
22 Identification; the 4-24-00 meeting minutes were
23 marked as Defendants' Exhibit 18 for
24 Identification; a memo dated 4-24-00 was marked as
25 Defendants' Exhibit 19 for Identification; a memo

### Page 109

1  Q. In your mind, what else was there to be
2  done before you could hire her?
3  A. Well, in that period too, although it
4  may have been after March, I also did a posting at
5  town hall.
6  Q. Is that before or after March 24,
7  because I'm asking you right now just what
8  happened before you received the memo from
9  Mr. Little?
10  A. I think it was after March 24.
11  Q. So what else did you do, if anything,
12  before March 24? Is that it?
13  A. Yeah, that's pretty much it. As I said,
14  I talked with Mr. Little about these things so --
15  Q. You said the first time you heard back
16  from him on it was March 24?
17  A. I heard in writing from him, yes. I
18  told him on February 3 -- I sent him a memo on the
19  11th. I remember one time I went over there and I
20  told him after the memo of February 11, I told him
21  that I had the candidate, and then I get this
22  March 24 memo, which was a surprise to me.
23  Q. So you just mentioned three things. You
24  said you told him on February 3 at a staff
25  meeting?

### Page 110

1  A. Yes, senior staff meeting.
2  Q. You sent him a memo on February 11?
3  A. Right.
4  Q. And then you told him at another meeting
5  or was it --
6  A. I saw him. I brought something over --
7  over to the Housing Authority and I saw him.
8  Q. In Defendants' Exhibit 6, the first line
9  says -- you made mention that you would be ending
10  the contract with CCI for the recreation services?
11  A. That's not correct. I didn't say that.
12  Q. Do you know what conversation Mr. Little
13  is referring to in that sentence?
14  A. No. I think he's making a statement
15  that is not true. I never said that I would end
16  the CCI contract because there was nothing to
17  end.
18  Q. But you did mention to him that you
19  would be no longer using the services of CCI?
20  MR. CAREY: Objection.
21  A. No. I did not say that either. I said
22  to him that I wanted to hire an in-house
23  recreation person.
24  Q. To perform recreation services?
25  A. Yes. Actually said I wanted to go back

### Page 111

1  to the original plan and hire an in-house
2  recreation person.
3  Q. That meant that CCI was not providing
4  the recreation services?
5  MR. CAREY: Objection.
6  A. No, not exactly. That meant that I
7  wanted to hire that person -- person as being the
8  coordinator. I would use some CCI services, but
9  we would have to still discuss that, and the idea
10  was that I would be possibly using the shopping
11  trip and, you know, also putting residents on
12  other trips, things like that.
13  Q. When you received Defendants' Exhibit
14  No. 9, Mr. Little's memo to you dated April 17,
15  what was your reaction to that memo?
16  A. That puzzled me even more.
17  Q. Why did it puzzle you even more?
18  A. Because I already had told him that the
19  position had been approved.
20  Q. Approved by whom?
21  A. By the commissioners.
22  Q. You are talking about the original plan?
23  A. Yeah.
24  Q. You consider that an approval for hiring
25  Miss Wilinski and somebody else at that time?

### Page 112

1  A. I consider that as an approved
2  position. When I didn't fill that position at the
3  time, it was only because I didn't have any
4  candidates, any viable candidates. I had two of
5  them, candidates. One of them withdrew, and the
6  other one wanted too much money, and I went to --
7  I looked around for some other plan, and I had
8  several other plans, and I won't go into that
9  because it takes too long, but we resorted to CCI
10  merely as kind of the last resort at the time
11  because I had to do something since the residence
12  was about to be opened, so there was always an
13  approved position, and my understanding was that
14  if I saw that the contractual arrangement was not
15  satisfactory because the contract's quality
16  control was poor and the residents weren't getting
17  what there was supposed to get, and believe me it
18  was bad, it really was, that it's my
19  responsibility as a manager to evaluate that and
20  then come up with a solution, and since I was
21  reverting back to the original solution to the
22  original plan, and I was letting Mr. Little know
23  that, I didn't understand why there was an
24  objection to that.
25  Q. But you did understand that Mr. Little

### Page 113

1  was objecting to it?
2  A. No. I didn't.
3  Q. My question, just so it is clear, did
4  you understand that Mr. Little was saying that
5  there was no approval?
6  A. I see that he was saying that. But I
7  thought that that was in error, that he forgot.
8  Because there clearly was an approval, and I sent
9  him a copy of the initial job description. The
10  approved job description.
11  Q. Isn't it possible that Mr. Little just
12  disagreed with whether the initial approval was
13  sufficient to constitute approval at that time?
14  MR. CAREY: Objection to the form.
15  She can't testify to what he knows.
16  A. No. I really can't and actually what I
17  want to say is that that's a very strange
18  communication. If you communicate with a manager,
19  and the manager gives you direct answers to your
20  questions, and I gave him a direct answer, and I
21  said your position was approved, that it was
22  mandated under our code that we provide
23  recreational services, I give him answers to all
24  these questions, and then he says the position has
25  not been approved, he's either calling me a liar

### Page 114

1  or I don't really understand what he meant by
2  that. What I would do, I would say well, you
3  know, this is what I understand. This is the
4  situation here and this is what we have to work
5  with. But all I had to go by was this memo. And
6  I had explained to him, you know, I had gone
7  through the whole process with him. I had brought
8  him up to speed on the process, so I felt that he
9  had an agenda that had nothing to do with this.
10  Q. What do you think that agenda was?
11  A. In retrospect, I think the agenda was
12  that he wanted to -- he had some bias against me.
13  And he wanted to make a case so that he could
14  exercise that bias.
15  Q. What type of bias are you referring to?
16  A. I didn't know exactly what bias, but I
17  felt really. I felt when these memos came, I was
18  stunned. I really was. I couldn't understand
19  what was going on. I knew that I was doing things
20  in the best interest of the residents. I had
21  researched this matter for a long time. I had
22  talked with my staff about it. I had talked with
23  the nurse consultant, the resident care
24  coordinator. I mean the social worker, and I
25  couldn't understand what was going on here.

### Page 115

1    Q. I want to show a document that's been
2 marked Defendants' Exhibit No. 12. Do you
3 recognize that document?
4    A. Yes.
5    Q. What is it?
6    A. That's a memo I wrote to Mr. Little.
7    Q. Did you write that memo in response to
8 Mr. Little's April 17 memo, which is Defendants'
9 Exhibit No. 9?
10    A. Yes.
11    Q. I'm going to show you what's been marked
12 Defendants' Exhibit No. 13. Do you recognize that
13 document?
14    A. Yes.
15    Q. What is it?
16    A. That's my request for a grievance
17 hearing.
18    Q. And you wrote this document the same day
19 you wrote the memo to Mr. Little that's
20 Defendants' Exhibit No. 12, correct?
21    A. Yes. And can I tell you what else I did
22 on that day? Because let me tell you then. I
23 brought the memo that I -- that -- that's dated
24 April 24 personally to Mr. Little. I handed it to
25 him personally. I asked him whether I could go to

### Page 116

1 the personnel committee meeting on that same day.
2 The personnel committee meeting -- I brought this
3 over in the morning. The personnel committee
4 meeting was, I believe, at 4:00 in the afternoon.
5 Either 2 or 4. And he said okay. Okay. So I
6 went back to the cottage, and I, you know,
7 gathered some material I wanted to bring to the
8 personnel committee meeting just so I can go.
9    Q. Can I stop you there. You said you went
10 to him and asked him if you can go to the
11 personnel committee meeting and he said okay?
12    A. He first said okay.
13    Q. Then you gathered some things?
14    A. So I went back to the cottage. I
15 gathered some material. Half an hour before the
16 personnel committee meeting I get a call from this
17 Mr. Little saying you are not allowed to come to
18 the committee meeting. You are not welcome
19 there. I was speechless. I said why not. He
20 said you are not allowed. You are not welcome
21 there. He repeated it and hung up.
22    Q. Did he tell you anything else about that?
23    A. No. So I said to myself okay, so I felt
24 there's really something going on. He's really --
25 you know, I mean I really felt that he was

### Page 117

1 deliberately giving me not only a hard time, but
2 really blocking my work because that's my work to
3 do things for the residents and to do things that
4 I'm supposed to do, so I sat down and I drafted
5 this, the request for a grievance.
6    Q. Defendants' Exhibit No. 13?
7    A. Right. And I brought it to the board
8 meeting that evening. The open portion and I
9 handed it to the commissioners.
10    Q. Did you hand a copy to each of the
11 commissioners?
12    A. Yes. And, of course, to Mr. Little
13 because this is addressed to Mr. Little.
14    Q. And did you discuss it with them at that
15 meeting?
16    A. No. I didn't say a word.
17    Q. I show you what's been marked
18 Defendants' Exhibit No. 14. Tell me if you
19 recognize that document.
20    A. Yes.
21    Q. Your signature is on the bottom of that
22 document, correct?
23    A. Yes.
24    Q. This is dated May 15, 2000, correct?
25    A. Yes.

### Page 118

1    Q. What is this?
2    A. This is -- I outlined the rationale for
3 hiring an in-house recreation coordinator that I
4 wanted to bring with me to the grievance hearing
5 that in the meantime I was informed had been
6 scheduled for May 18.
7    Q. So this was in anticipation of that
8 grievance hearing?
9    A. Right. Together with this document I
10 had letters of support.
11    Q. From whom?
12    A. From Carol Cherry, Nancy Wisecup, Tamara
13 Smith.
14    Q. And did you think this fairly described
15 your rationale for hiring an in-house recreation
16 coordinator?
17    A. In very abbreviated form, yes.
18    Q. In the second paragraph, you say not
19 providing this is a form of neglect/abuse?
20    A. That's correct.
21    Q. At what point does a lack of
22 recreational care become negligent and abuse in
23 your opinion?
24    A. There's a good reason why the code says
25 that reasonable, rational services are to be

### Page 119

1 provided. There's a good reason why people in
2 nursing homes have recreational programs and why
3 they are so important. When we all have things to
4 keep our mind occupied, to stretch our mind, to
5 stretch our body, to stimulate us, to make us feel
6 good about ourselves, we do that for ourselves
7 because we are able to do that. When a person is
8 in some way disabled either physically, or, you
9 know, their memory isn't good, or they are in a
10 situation where they can't do things for
11 themselves anymore because they don't drive
12 anymore and all of that, they are a captive to
13 that environment, and when they are in that kind
14 of a situation and they put themselves in a
15 situation to be taken care of, whether it's
16 getting help with their bath, or having their
17 meals prepared, or having this medication
18 supervised, or having recreation services
19 provided, it's because they can't do that
20 themselves anymore, and when a person doesn't get
21 those needs met, and emotional and physical
22 needs are just as important as food, it is food
23 for the mind, and then I consider that neglect.
24    Q. How much has to be provided to prevent
25 it in your mind from being neglect?

### Page 120

1    A. Enough so the person doesn't sit around
2 and become depressed.
3    Q. Does that require a different level of
4 services for each person or is everything the
5 same?
6    A. No. That requires individualized
7 services.
8    Q. An individual assessment as to what each
9 person might need?
10    A. Individualized assessment first, then
11 addressing those individualized needs.
12    Q. Is it fair to say that some residents
13 might need more recreational care services than
14 others?
15    A. Some residents might need different
16 kinds. Not necessarily more. But different.
17    Q. Does everybody need the same number of
18 hours of recreation care attention?
19    A. Actually I think everybody needs as much
20 as can possibly be given. Ideally as much
21 stimulation as you can do during their waking
22 hours.
23    Q. Are you saying that if you don't reach
24 that ideal level of services, it's neglect?
25    A. No. I'm saying that there's an ideal

Page 121
1  and then there's a below standard and the below
2  standards neglect.
3    Q. And, again, how would you describe that
4  standard below which you consider to be neglect?
5    A. By the observation you make of what the
6  individual does, and how the individual acts
7  during the day, and their behavior, and their
8  mood, and so on and so forth. Their physical
9  abilities and things like that.
10   Q. Does the code identify the standard?
11   A. No. The code says they have to be
12 provided and the code expects the staff, the
13 administrator is the responsible agent to make
14 that determination.
15   Q. Does the code say that?
16   A. Not under recreational services to be
17 provided, but the code says that the
18 administrator -- I forget the way it says the
19 person in charge is responsible for the
20 well-being, comfort, well-being and health of the
21 residents.
22   Q. Is it possible that two people could
23 come to a different opinion about the level of
24 recreation care that would be needed to
25 appropriately stimulate a resident?

Page 122
1    A. If those two people both have an
2  intimate knowledge of the people for whom the
3  recreation services are to be provided, and what
4  they do all day, and see them on a regular basis,
5  and understand what recreation is all about and
6  what the purpose of it is and all of that, there
7  could be some small variation. That's why I had
8  these letters of support. Because I wanted to
9  show the commissioners that it wasn't just my own
10 determination but that there were other people at
11 the cottage who knew the residents very well who
12 were there on a regular basis, who had knowledge
13 about that and who also had that conclusion.
14   Q. You were at the deposition of Penny Lore
15 the other day, correct?
16   A. Yes.
17   Q. You heard her say that the recreation
18 services they were currently receiving amounted to
19 15 hours a week, correct?
20   A. I believe that's what she said, yes.
21   Q. That CCI was providing 15 hours of
22 recreation services a week, correct?
23   A. That's what she said, I believe, yes.
24   Q. And in your experience as administrator
25 of that home, do you believe that 15 hours a week

Page 123
1  from CCI is sufficient level of recreation care to
2  avoid neglect?
3    A. When I started with the contract with
4  CCI, the contract stipulates that it is 18 hours
5  they are providing to us, 15 of which are contact
6  hours. It included two people doing this work.
7  The first coordinator they provided us was able to
8  work within that hourly framework and add all the
9  other things that we had discussed shall be added;
10 namely, bringing in entertainment groups, being in
11 charge of developing a volunteer program, those
12 augmented working with our staff. The part that I
13 was never entirely happy about was that they were
14 never available on weekends, but that's what they
15 told me right off the bat. At the time I had no
16 other choice because I had to put something in
17 place. So the hours at that time were not ideal,
18 but the type of work they did and the quality of
19 work made up for the lack of sufficient hours.
20 Unfortunately when you are a contractor, it is
21 your responsibility to maintain some quality
22 control. And unfortunately those contractor's
23 quality control was really poor, and they had not
24 only the turnover that happens, but when they had
25 turnover, that made our residents suffer because

Page 124
1  they had gotten used and attached to somebody and
2  trusted somebody and then that person was gone.
3  So -- and there was nobody to take their place for
4  months on end. Secondly, they had some people
5  that eventually would take their place that
6  were -- whose performance was completely
7  inadequate, and Barbara Nolan knew that and
8  admitted that to me. We talked about this all the
9  time throughout the time the contract was in
10 force.
11   Q. Did you tell the level of services was
12 so bad that there was neglect?
13   A. I told her that with the two people who
14 was bad, I did say that that was -- I could not
15 tolerate that.
16   Q. Tell me you use -- were using CCI from
17 the time that Parsonage Cottage opened, right?
18   A. Yes.
19   Q. From 1996 to May 15, 2000 when you wrote
20 this, you were using CCI, correct?
21   A. Yes.
22   Q. And when did the lack of recreation care
23 services become neglect and/or abuse?
24   A. I didn't say they became neglect. I
25 said, first of all, that not providing enough can

Page 125
1  be seen as neglect. But let me finish this. In
2  the fall of 1999, I learned that CCI, as I said,
3  the ideal was to have two people and one the
4  coordinator and the other worker. The program
5  worker always was available throughout the whole
6  time. In the fall of 1999, I learned that that
7  program worker, that individual, was going to be
8  relocating and was going to be leaving the
9  following year. I also learned that we had one
10 volunteer, Alice Rapasky, who was at the cottage a
11 lot. She had been a former IBM employee, manager,
12 and she had a stroke and she did a lot of
13 volunteer work. She did wonderful things at the
14 time. I learned that Alice was moving out of
15 state. Was going to move out of state in the year
16 2000. The contract with CCI, as I said, it had
17 already lapsed in February of 1999. I became very
18 concerned and I started to discuss issues with my
19 staff and those people here.
20   Q. So when you say you became concerned,
21 did you form an opinion that in the fall of 1999,
22 the residents were being neglected or abused at
23 that time?
24   A. No.
25   Q. Let me ask you my next question.

Page 126
1  January 2000, were the residents being neglected
2  or abused during that month because of a lack of
3  recreation care services?
4    A. Yes. In January, they were being
5  neglected.
6    Q. How about December 1999? These are
7  simple yeses or nos.
8    A. I think in December already. I have to
9  look at the chronology again. Because that was
10 the time when Devin Dirksen was there.
11   Q. You believe in December 1999, there was
12 neglect and abuse of residents?
13   A. I believe that the residents'
14 recreational needs were neglected, yes.
15   Q. Were they being abused? These are your
16 words, neglect and
17 abuse.
18   A. I said if you don't provide recreational
19 services, that's a form of abuse.
20   Q. I'm trying to figure out whether you are
21 saying in the future, if we don't change things,
22 it is going to become neglect and abuse or are you
23 saying it was neglect and abuse at that time?
24   A. In December, I don't remember, but in
25 January, I began to feel that it was happening.

Page 127

1  That the abuse was in the form of neglect. That
2  they didn't get enough recreation service.
3      Q. In February 2000, did that continue?
4      A. Yes.
5      Q. Do you still believe there was neglect
6  and abuse?
7      A. Yes.
8      Q. March of 2000, did you believe there was
9  neglect and abuse?
10     A. Yeah. I told Barbara in March, I
11 believe, that this individual in February, I
12 forgot that she had that, could not continue. We
13 couldn't work with her because she was just
14 sitting around and not doing anything.
15     Q. In April 2000, was there still neglect
16 and abuse?
17     A. No. She was no longer there. The
18 person was no longer there.
19     Q. On the day that you wrote this document
20 in May, is it your testimony that there was
21 neglect and abuse of residents?
22         MR. CAREY: What's the exhibit?
23         MR. ALVAREZ: Defendants' Exhibit
24 14, May 15, 2000.
25     A. I believe that from I guess the

Page 128

1  beginning of 2000 when the residents did not get
2  the kind of recreational services that they should
3  get, and while I tried to plug in my staff and
4  also do things myself, it was not sufficient. And
5  I didn't have any reasonable expectation that
6  CCI's track record would change in the future.
7  And I also had the reasonable -- I knew that they
8  were losing the one person who had a good track
9  record, and I knew that we were losing a volunteer
10 who was supplementing as much as she could and she
11 was already cutting back because she was getting
12 ready to sell her house and whatnot.
13     Q. Isn't it true after you submitted
14 fendants' Exhibit No. 14 to the board, the State
15 came in and examined the recreation care services
16 that were being provided?
17     A. No.
18     Q. The State never came in?
19     A. No. The State came in and licensed us
20 in 1998. They didn't come in and examine the
21 services.
22     Q. Isn't it true that the State was asked
23 whether Parsonage Cottage was violating the laws
24 by not providing sufficient recreational programs?
25         MR. CAREY: Objection to form,

Page 129

1  vague.
2      A. I didn't say -- ask anything to the
3  State. The State didn't tell me anything. I
4  didn't contact the State.
5      Q. Do you know who Wendy Furniss is?
6      A. No.
7      Q. F-U-R-N-I-S-S.
8      A. No.
9      Q. Do you ever remember reading an article
10 in the Greenwich Times?
11     A. Yeah, I read that document, which I
12 presume the article is.
13     Q. What do you remember it saying?
14     A. What you just read.
15     Q. That Parsonage Cottage was not violating
16 state law by providing insufficient recreation
17 services?
18     A. That's what that article says.
19     Q. So if the State Department of Health
20 said that there was no violation of law, is it
21 your contention that the law permits neglect and
22 abuse?
23     A. I don't know who contacted the state
24 department, number one. Number two, I don't know
25 what that person, whoever contacted them, said to

Page 130

1  the state department about what was happening at
2  Parsonage Cottage. How many hours or what was
3  going on there. I have no knowledge of that
4  whatsoever.
5          MR. ALVAREZ: Can you read her
6  back my question and see if she'll answer it this
7  time.
8          MR. CAREY: Objection. The
9  witness did answer the question.
10         (Record Read by the Court
11 Reporter.)
12     Q. Yes or no?
13         MR. CAREY: Objection to form.
14 She's answered it. It is not a yes or no answer.
15     A. I don't know what whoever talked with
16 the State told the State. I know what the code
17 says. I know that in the view of those of us who
18 were intimately familiar with Parsonage Cottage,
19 they did not get the kinds of recreational
20 services that were sufficient and in my view, that
21 amounted to neglect.
22         (Whereupon, a newspaper article was
23 marked as Defendants' Exhibit 37 for
24 Identification.)
25     Q. Take a look at the document that's been

Page 131

1  marked as Defendants' Exhibit No. 37.
2          MR. CAREY: Just note for the
3  record that we're jumping ahead to Exhibit 37.
4  The last exhibit is 14.
5      A. Yeah, I recognize this.
6      Q. You have previously read that article?
7      A. Yeah, when it came out.
8      Q. At the end of this article I direct your
9  attention to the last three paragraphs. It states
10 especially if there's no immediate risk of
11 violating state laws, Milde said she wants to be
12 able to hire a recreation director who would work
13 directly under the home administration as soon as
14 possible. Do you remember saying that to Kurt
15 Gottschalk, the author of this article?
16     A. Yes.
17     Q. "My concern is some of these people
18 can't get out," she said. Do you remember saying
19 that?
20     A. Yes.
21     Q. Is that accurate?
22     A. Yes.
23     Q. She says what we really should do is
24 have an individualized program for each person and
25 when you have a limited number of hours under a

Page 132

1  contract, you can't do that?
2      A. Yes.
3      Q. Do you remember saying that?
4      A. Yes.
5      Q. Is that an accurate quote from you?
6      A. That's an accurate quote, right.
7      Q. Then it says we don't have a violation
8  at the moment, closed quote, she added. Did you
9  say that?
10     A. Yes, I guess so.
11     Q. It says if we don't get a recreation
12 person here, there's going to be a violation. Is
13 that your quote?
14     A. I guess so.
15     Q. So on May 26 when this article came out,
16 isn't it fair to say that you understood there was
17 no violation of law at that time?
18     A. Yes.
19     Q. And is it your testimony that even
20 though there was no violation of law, that there
21 was neglect and abuse?
22     A. I didn't say that. I said that if you
23 don't provide enough, that is a form of neglect
24 and abuse. It is not a matter of -- excuse me.
25         MR. CAREY: Let her finish.

Page 151

1　Q. I show you what's been marked
2　Defendants' Exhibit No. 25. Have you ever seen
3　this document before?
4　A. Yes. No, I didn't. I'm sorry, I didn't
5　see that before. This one I did not see.
6　Q. Does it appear to be a letter from Ben
7　Little to Agata Wilinski dated May 10, 2000
8　informing him there was presently no opening for
9　the position of recreational coordinator?
10　A. Yes.
11　Q. Do you have any reason to believe that
12　Mr. Little did not send this letter?
13　　　MR. CAREY: Objection. She can't
14　testify to what he knows.
15　Q. You can answer if you can.
16　A. I don't know that. Presumably he did
17　send it.
18　Q. I show you a document marked as
19　Defendants' Exhibit No. 26. Do you recognize this
20　document?
21　A. Yes.
22　Q. What is it?
23　A. It's a memo to all the above mentioned,
24　including myself, from Mr. Little regarding
25　communication to the board and dated May 10.

Page 152

1　Q. Is Pat Kelly a female?
2　A. Yeah.
3　Q. You received this document?
4　A. Yes.
5　Q. To your knowledge, did the others who
6　are addressed here also receive it?
7　　　MR. CAREY: She can't testify to
8　that.
9　A. I don't know.
10　Q. Excuse me?
11　A. I said presumably, but I don't know.
12　Q. Did you ever discuss this document with
13　any of the other people who are addressed here?
14　A. No.
15　Q. You never discussed it with Russ Kemp?
16　A. No.
17　Q. You never discuss it with Terry Mardula?
18　A. No.
19　Q. Is it your claim that this document also
20　is a form of harassment?
21　A. My claim is that in the period from
22　February on, things changed, and I was trying to
23　do things exactly the way I had been doing before,
24　and I was trying to do something for the residents
25　at Parsonage Cottage that in my professional

Page 153

1　opinion and based on my background of knowledge
2　and what was going on there was in the best
3　interest of these residents, and I was trying very
4　hard to get that across to Mr. Little, to the
5　commissioners and Mr. Little stonewalled. He kept
6　saying it is a decision of the commissioners.
7　When I tried to explain to the commissioners why I
8　wanted to go this route, I was prevented to do
9　that. I received a great deal of documents that I
10　had to respond to in addition to running a
11　residence. Now, I know people haven't done this
12　job that I done, don't really know what that
13　means, and I was -- I felt that this documentation
14　back and forth without somebody actually sitting
15　down with me and saying, Ursula, not more than
16　sitting down, coming over to Parsonage Cottage,
17　seeing what was going on, meeting with the
18　residents and the staff and the people who were
19　working there, and talking with them, including,
20　you know, the consultants too, and trying to
21　understand why I was embarked on this course of
22　action, instead of that I got documents that I had
23　to respond that were getting more and more
24　harassing in nature and I felt -- I really felt
25　being harassed and discriminated. I couldn't

Page 154

1　understand what was happening. I was trying to do
2　something for the residence. I wasn't asking for
3　a raise, I wasn't asking for anything for myself,
4　I was doing something to the best interest of the
5　residents at Parsonage Cottage, whom I knew very
6　well. Whom every one of whom I had interviewed
7　personally and who depended on me to advocate for
8　them. And I was trying to do that to the best of
9　my ability, and all I got were these pieces of
10　paper, and I responded to every one of them, and
11　the pieces of paper got more and more abusive in
12　nature, and nobody on the part of management, not
13　Mr. Little, not any of the commissioners, said to
14　me why do you want to do this, sat down with me.
15　Even listened to me. And I am a persistent
16　person, but I have a record, and if you look at
17　all my previous evaluations from other jobs, and
18　you have all of that stuff, I have a record to be
19　very strong advocate for the people I serve, and
20　that's what I was doing. It was outrageous. What
21　I was doing and the way I was responded to when I
22　was trying something for these residents was
23　outrageous in my mind. That's why, and I went to
24　the Nth degree. I spoke up at a board meeting on
25　the 22nd because I was very concerned and I knew I

Page 155

1　was risking my position. I knew that there was a
2　deliberate attempt to find something to
3　discriminate against me. I knew that, and I did
4　it because I believe that was the right thing to,
5　do and to this very day, I believe that, and to
6　this very day I stand on this principle that --
7　and I am in -- excuse me. I'm involved in this
8　lawsuit and it's a very stressful thing to me.
9　But you have to do what's right, and I believe
10　that to the core of my being and that's what I was
11　doing.
12　　　MR. CAREY: Do you want to take a
13　break?
14　A. No. What was done to these residents
15　was so outrageous.
16　Q. Are you finished?
17　A. Yes. For now.
18　　　MR. CAREY: Did you ask if she was
19　finished?
20　　　MR. ALVAREZ: Because I didn't
21　want to cut off her answer.
22　　　MR. CAREY: Normally you would ask
23　a witness if she was in tears if she needs a
24　break.
25　　　MR. ALVAREZ: You asked her if she

Page 156

1　needed a break. She said no.
2　　　MR. CAREY: You asked her if she
3　was finished crying.
4　　　MR. ALVAREZ: No, I asked if she
5　was finished with her answer.
6　　　THE WITNESS: I'm okay.
7　Q. So is it fair to say, Ms. Milde, that
8　the process that Mr. Little and the board followed
9　in communicating by written memo you found to be
10　discriminatory and harassing?
11　A. I found the tone of them at most. I
12　found the fact that when I gave an answer, it was
13　either not taken into account as if I hadn't given
14　an answer and I was prevented from going into more
15　detail and explaining what was behind this.
16　Because it's not just hiring an in-house person.
17　There are reasons behind it, and I wanted to
18　explain these reasons to the people who made those
19　decisions, and the memos, they were like a barrier
20　to hearing my reasons. They were thrown at me as
21　we don't want to hear your reasons, just answer
22　this memo. That's what these memos are.
23　Q. Mr. Little's style of doing everything
24　in the memo format was objectionable to you?
25　A. No. That's not what I said. I said

Page 157

1 that his style of using the memos only and the
2 tone of the memo and preventing me from speaking
3 to the people who in some of his memos he said
4 were making the decisions, that was -- I felt that
5 amounted close to abuse. Yes, discriminatory.
6   Q. Abuse based on your age and gender?
7   A. I don't know what he based it on, but it
8 was very discriminatory to me.
9   Q. Let me show you what's been marked
10 Defendants' Exhibit No. 27. Do you remember
11 receiving this document?
12  A. Yes.
13  Q. And what is this?
14  A. This is a memo from Little to me
15 May 10. Saying that a grievance hearing had been
16 scheduled for May 18.
17  Q. I show you what's been marked
18 Defendants' Exhibit No. 28. Do you recognize this
19 document?
20  A. Yes, I do.
21  Q. What is it?
22  A. That was a letter of support Tammy
23 wrote. It was to be furnished to the
24 commissioners together with the cover memo about
25 the rationale for hiring.

Page 158

1   Q. Did you see this letter before
2 Miss Smith sent it to the commissioners?
3   A. She actually gave it to me to include in
4 that packet.
5   Q. Did you assist her in any way in
6 drafting this letter?
7   A. No, I didn't.
8   Q. Did anybody else assist her in drafting
9 this letter to your knowledge?
10  A. I don't know.
11  Q. And this is dated May 17, 2000?
12  A. Yes.
13  Q. Do you know from Ms. Smith or anyone
14 else as to when the commissioners received this?
15  A. No, I don't.
16  Q. You said this was included in the
17 package though. You were referring to the package
18 that was attached to the document that's
19 Defendants' Exhibit No. 14?
20  A. Yes.
21      MR. CAREY: Note for the record
22 Exhibit No. 14 is the rationale for hiring an
23 in-house recreation coordinator.
24  Q. I show you a document that's been marked
25 as Defendants' Exhibit No. 29.

Page 159

1   A. Yes, I recognize that. That was a
2 letter Barry Nova handed me at the beginning of
3 the commissioners' meeting, the open board meeting
4 on the May 22.
5   Q. This document has handwriting at the
6 top. Is that your handwriting?
7   A. Yes.
8   Q. Does it say this copy was handed to me
9 at the commissioners' open HATG board meeting on
10 5-22-00? The original arrived in mail on 5-25-00?
11  A. That's right.
12  Q. And this letter denied your request for
13 a grievance, correct?
14  A. That's correct.
15  Q. I show you Defendants' Exhibit No. 30.
16 Just tell me if that's the same letter without
17 your handwriting.
18  A. That's correct.
19  Q. Let me show you Defendants' Exhibit
20 No. 31. Is this your response to Defendants'
21 Exhibit No. 29 and 30.
22  A. Yes.
23  Q. In the first numbered paragraph in this
24 letter, it states my grievance is a grievance
25 against the CEO. Correct?

Page 160

1   A. That's correct.
2   Q. That whole entire paragraph is in bold?
3   A. Yes.
4   Q. What did you mean when you said my
5 grievance is against the CEO?
6   A. Exactly what it says there.
7   Q. Was your grievance against the board?
8   A. The grievance was addressed to the
9 board. And it was about the CEO. Because the CEO
10 told me the board -- the CEO prevented me from
11 talking to the board directly. After he told me
12 it wasn't his decision. And the CEO's conduct in
13 this whole -- throughout that whole period to me
14 was -- I felt that he was in some way persecuting
15 me and I wanted to be heard by the board.
16  Q. I show you what's been marked as
17 Defendants' Exhibit No. 32. Have you seen this
18 document before?
19  A. No.
20  Q. I will note for the record it's
21 previously been marked as Little Exhibit No. 16
22 and it's titled Housing Authority, the Town of
23 Greenwich Regular Meeting of May 22, 2000
24 Minutes.
25      Ms. Milde, can I direct your attention

Page 161

1 to third page of this document?
2   A. Yes.
3   Q. And under staff reports, there's a
4 section said reports of the residence council
5 meeting?
6   A. Yes.
7   Q. Can you read that section and tell me if
8 it's accurate, if it accurately describes what
9 happened at that meeting?
10  A. Not entirely.
11  Q. Can you tell me what's not accurate?
12  A. I was not very loud. I was vocal
13 obviously because I spoke. I didn't use sign
14 language. And I was insistent, but I was not
15 loud.
16  Q. Did Ms. McClenachan, the chairperson,
17 repeatedly tell you that you were out of order?
18  A. She didn't tell me. She shouted me that
19 I was out of order.
20  Q. Did the words that you were out of order
21 come out of her mouth more than once?
22  A. Yes. I believe.
23  Q. And when she said that, did you stop
24 speaking?
25  A. I insisted that I wanted to be heard.

Page 162

1   Q. Were you on the agenda that night?
2   A. No.
3   Q. And when she asked you to speak --
4   A. Excuse me. The meetings don't have an
5 agenda in the sense that there's a printed agenda
6 ahead of time. The meetings have a certain format
7 with reports and listening to residents if the
8 meeting is held at one of the housing complexes,
9 and even if there are issues that people want to
10 bring up, they bring them up at the meeting.
11  Q. Do you have to be recognized by the
12 chairperson before you speak at the meeting?
13  A. Generally when somebody comes to a
14 meeting, and the person is not supposed to be at
15 the meeting, and the person wants to bring
16 something up that pertains to that business,
17 generally you get heard at meetings. I have never
18 been at a meeting where -- and I have had a lot of
19 jobs where certain, you know, where the people who
20 are regular participants at the meeting, where
21 they want to bring up an issue that is important
22 where they are not going to be heard.
23  Q. You say you attend --
24  A. Being shouted down specifically.
25  Q. You said previously that you attend the

Page 163

1 open board meetings?
2   A. Yes.
3   Q. When you were administrator, correct?
4   A. Yes.
5   Q. And isn't it true that the way those
6 meetings were run is that the chair would
7 recognize people before they spoke?
8   A. I don't know what you mean by
9 recognize.
10  Q. They follow Robert's Rules of
11 Parliamentary Procedure, correct?
12  A. Supposedly.
13  Q. Therefore if somebody wanted to speak,
14 they had to ask permission to speak and the
15 chairperson would say okay, speak, correct?
16  A. Yes.
17  Q. And in your instance, did you ask at
18 this meeting on May 22, did you ask for permission
19 to speak?
20  A. Yes, I said I wanted to bring up the
21 issue of the recreation coordinator.
22  Q. Did the chair say that was permissible?
23  A. The chair shouted me down. She was
24 almost like saying shut up.
25  Q. So the chair said you shouldn't speak at

Page 164

1 that time, correct?
2   A. The chair said, you know, this is --
3 yeah.
4   Q. The chair said that this should be dealt
5 with in executive session, correct?
6   A. Yes.
7   Q. The chair said this is a personnel
8 matter, correct?
9   A. Yes.
10  Q. And despite those statements by the
11 chair, you continued to speak, correct?
12  A. That's correct. I then said then I want
13 to be allowed to come to the executive session.
14  Q. And ultimately there was an agreement to
15 permit you to do that, correct?
16  A. Yes.
17  Q. During that executive session, you were
18 able to explain your position on the recreation
19 care position?
20  A. At that executive session, I couldn't --
21 I didn't go into all of that anymore because I had
22 just been given that letter that essentially said
23 we don't want to hear about anything that you have
24 to say in essence. So at the executive session, I
25 just -- I don't even remember all I said, but I

Page 165

1 basically said that I felt that, you know, that I
2 had a right to be heard by the commissioners and
3 that systematically that was being -- that right
4 was taken away from me and I was really protesting
5 about that. And that I, you know, I had opened
6 the cottage, I had track record with this, and
7 that I was treated very unprofessionally
8 throughout this, in this whole process. Something
9 to that effect.
10  Q. You had an opportunity to say all that
11 at the executive session?
12  A. Yes.
13  Q. Did you -- go back to Defendants'
14 Exhibit 31, your letter to Mr. Nova. Do you see
15 that? No. 4 says on another note I do want to
16 thank you -- you personally for listening to me at
17 last night's executive session. You wrote that,
18 correct?
19  A. I wrote that because he was the only one
20 who -- in executive session, Mrs. McClenachan kept
21 interrupting me also, and Mr. Nova was the one who
22 said let's hear her, and I felt that he was the
23 only one who was making an attempt to let me speak
24 at all.
25  Q. You appreciated that?

Page 166

1   A. Yes.
2   Q. Let me show you Defendants' Exhibit
3 No. 33. Do you recognize that document?
4   A. Yes.
5   Q. What is it?
6   A. The corrective directives.
7   Q. This is the memo that Mr. Little gave
8 to you on May 30, 2000?
9   A. Yes.
10  Q. If you refer to the last page of this,
11 it's signed by you and Mr. Little on June 2, 2000,
12 correct?
13  A. Right.
14  Q. When did you receive this?
15  A. On June 2.
16  Q. So it is dated May 30, but you received
17 it on June 2?
18  A. Yes.
19  Q. Did he give it to you in a meeting?
20  A. Yes.
21  Q. Did you discuss it with him during the
22 meeting?
23  A. I only -- no. Not really. We didn't go
24 into the detail.
25  Q. Did you read it at the meeting?

Page 167

1   A. Yes, I did.
2   Q. On the fourth page, the last page, you
3 wrote several of the above statements are
4 untruthful. I will respond to this in writing?
5   A. That's correct.
6   Q. That's your handwriting, correct?
7   A. Yes.
8   Q. So is it fair to say that you disagreed
9 with a number of things in this memo, correct?
10  A. That's correct.
11  Q. Was it pretty clear that Mr. Little felt
12 strongly about the things he said in this memo?
13       MR. CAREY: She can't testify as to
14 what he knows.
15       MR. ALVAREZ: She can testify to
16 what was apparent to her.
17  Q. Was it apparent to you that Mr. Little
18 felt strongly about what he wrote in this memo?
19  A. I don't know what felt strongly means.
20       MR. CAREY: Objection. Vague.
21  A. Let me think about it.
22  Q. Can you answer the question or do you
23 need it rephrased?
24  A. Let me give you an analogy. This memo
25 to me was like being hit over the head.

Page 168

1   Q. What did you understand this memo to
2 mean?
3   A. Extremely adverse action.
4   Q. Did you understand it to mean that if
5 you did not do what it said, that you would be
6 subject to further disciplinary action?
7       MR. CAREY: Objection.
8   A. I guess so.
9   Q. I show you what's been marked as
10 Defendants' Exhibit 34. Note for the record this
11 document has been previously marked as Little
12 Exhibit No. 42. Do you recognize this document?
13  A. Yes.
14  Q. What is it?
15  A. Disciplinary reprimand and 90-day
16 opportunity to improve.
17  Q. And the last page of this again is
18 signed by you and Mr. Little on June 2, correct?
19  A. That's correct.
20  Q. So did you receive this document and the
21 document that's been marked as Defendants'
22 Exhibit No. 33 at the same time?
23  A. Yes.
24  Q. And this is a written -- entitled
25 Written Disciplinary Reprimand and 90-Day

Page 181

1 apologize to Sue McClenachan, correct?
2  A. No. That's the first time when he says.
3  Q. He said in the first paragraph from our
4 discussion of Friday June 2 of your behavior and
5 actions at the board meeting, you are hereby
6 directed to write a written apology. Did he tell
7 you to apologize before this memo?
8  A. He may have. I really don't remember
9 that.
10  Q. But it is pretty clear in this memo he
11 was directing you to have a written apology to the
12 Board of Commissioners and Sue McClenachan?
13  A. Correct.
14  Q. Did you ever apologize?
15  A. No. I sent a memo in June about that I
16 really didn't feel -- I didn't know what to
17 apologize for.
18  Q. Let me show you what's been marked
19 Defendants' Exhibit No. 39. Do you recognize this
20 document?
21  A. Yes.
22  Q. What is it?
23  A. It's a memo from Mr. Little to me dated
24 June 8. Response to my memo.
25  Q. The June 6 memo that's Defendants'

Page 182

1 Exhibit No. 35?
2  A. Right.
3  Q. In it -- the end, he says I expect that
4 the directives that were cited be fully carried
5 out by you, correct?
6  A. Correct.
7  Q. Despite receiving your June 6 memo, you
8 reiterated his expectation that you follow the
9 directives in his memo, correct?
10  A. That's what he's saying there, yes.
11  Q. So is it fair to say you didn't make
12 much progress in trying to resolve the dispute
13 that existed at that time?
14  A. No. As a matter of fact, when I wrote
15 this, I thought that he didn't read this at all.
16 That was my impression.
17  Q. It does say he received it?
18  A. Correct. That's right. But that
19 doesn't necessarily mean that he's reading it.
20  Q. He said I'm in receipt of your
21 memorandum and view of the same. What did you
22 understand that to mean?
23  A. It didn't review all. If he did, it
24 didn't matter that no matter what I did.
25  Q. Excuse me.

Page 183

1  A. No matter what I did or what I said, it
2 was irrelevant to him.
3  Q. So at that point in time --
4  A. Because that was not the real agenda on
5 his mind.
6  Q. So at that point in time, you thought
7 the relationship was doomed to failure?
8  A. No. What I thought was that --
9   MR. CAREY: Objection to the last
10 question.
11  A. What I thought was that he had a closed
12 mind about me. He had a preconceived notion of
13 bias and that what I showed him or what I proved
14 or what I brought to him were completely
15 irrelevant to him. Even if it had to do with the
16 well-being of the people there, whatever. That he
17 had made up his mind. That he -- and that is what
18 came through in these memos and these memos were
19 just there to, you know, they were further
20 harassment in a way.
21  Q. You think that these memos in and of
22 itself illustrate discrimination and harassment?
23  A. Yes.
24  (Whereupon, a recess was taken.)
25  Q. Let me show you what's been marked

Page 184

1 Defendants' Exhibit No. 40. Ms. Milde, do you
2 recognize this document?
3  A. Yes.
4  Q. What is it?
5  A. It's a document to Barbara Nolan and
6 Benjamin Little about the confirmation about the
7 agreements that were arrived at the meeting on the
8 day before.
9  Q. So you had a meeting on June 12 with
10 Barbara Nolan and Ben Little?
11  A. Right.
12  Q. And the subject of that meeting was the
13 recreation care services?
14  A. Yes.
15  Q. And is it fair to say that you tried to
16 summarize the agreements that were reached during
17 that meeting through this memo?
18  A. That's correct.
19  Q. Who arranged this meeting?
20  A. I did.
21  Q. Do you feel this meeting was helpful?
22  A. Yeah. Actually I arranged that
23 meeting. The meeting originally was supposed to
24 be between Barbara Nolan and myself because she
25 had requested to go over some issues and

Page 185

1 apparently -- forget it. Strike it. I don't
2 think Ina was there. It don't know whether Alice
3 Rapasky was there either. They may have been
4 there also. I just don't remember.
5  Q. I show you what's been marked
6 Defendants' Exhibit 41. Do you recognize this
7 document?
8  A. Yes.
9  Q. What is it?
10  A. It is a memo from Mr. Little to me.
11  Q. You previously received this, right?
12  A. Yes.
13  Q. And this memorandum concerns the CCI
14 work schedule, correct?
15  A. Yes.
16  Q. Why don't you read this memo and tell me
17 if Mr. Little states anything in this memo that's
18 not accurate.
19  A. What's accurate is that he states that
20 and apparently that's how he perceives I'm
21 supposed to operate. So the CCI person gives me a
22 schedule, a handwritten schedule, which is
23 somewhere in all the myriads of paper, and I can
24 tell the person when I get the schedule that the
25 schedule is not workable. I have to first call

Page 186

1 Mr. Little and tell him that the schedule this
2 individual handed to me directly is not workable
3 and that then he has to call that individual and
4 tell the person the schedule is not workable but
5 can't explain to the individual why the schedule
6 is not workable because he don't know what the
7 Parsonage -- what's going on at Parsonage.
8  Q. So -- and you were doing this because --
9 as part of the directives that he had issued to
10 you?
11  A. I was doing what?
12  Q. I will rephrase. You are saying
13 Mr. Little had a certain expectation about how you
14 would communicate about CCI, correct?
15  A. Evidently.
16  Q. And let me refer you back to Defendants'
17 Exhibit No. 33, which is the corrective directives
18 memo. You referred to the second page of that
19 memo. The first bullet.
20  A. Yeah.
21  Q. It says I expect you to fully
22 cooperate with CCI staff.
23  A. Yes.
24  Q. You will communicate with me regarding
25 services provided by this company. It says that,