# EXHIBIT BB

225

```
UNITED STATES DISTRICT COURT
    DISTRICT OF CONNECTICUT

* * * * * * * * * * * * *
URSULA MILDE,              *
         Plaintiff         *
VS.                        * CIV NO. 3:00CV2423(AVC)
HOUSING AUTHORITY OF THE   *
TOWN OF GREENWICH; THE
HOUSING AUTHORITY OF THE   *
TOWN OF GREENWICH BOARD
OF COMMISSIONERS; and      *
BENJAMIN LITTLE, CEO,
                           *
         Defendants
* * * * * * * * * * * * *
                          Hartford, CT
                          May 30, 2003
                          10:17 A.M.

        DEPOSITION OF URSULA MILDE
               VOLUME II

APPEARANCES:
    FOR THE PLAINTIFF:
        CAREY & ASSOCIATES, P.C.
        BY:  MARK P. CAREY, ESQUIRE
             71 Old Post Road, Suite One
             Southport, CT  06490
    FOR THE DEFENDANTS:
        JACKSON LEWIS, LLP
        BY:  FRANCIS P. ALVAREZ, ESQUIRE
             One North Broadway
             White Plains, NY  10601
```

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

---

226

Continuation of the Deposition of URSULA MILDE, the plaintiff herein, taken on behalf of the defendants herein, for the purpose of discovery and for use as evidence in this cause, pending in the United States District Court for the District of Connecticut pursuant to Notice, before Aimee M. Suhie, Registered Professional Reporter, Licensed Shorthand Reporter No. 00022 and Notary Public within and for the State of Connecticut, at the United States District Court, 450 Main Street, Hartford, Connecticut, on the 30th day of May, 2003, at 10:17 a.m., at which time counsel appeared as hereinbefore set forth . . .

S T I P U L A T I O N S
Federal Rules of Civil Procedure

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

---

227

MR. ALVAREZ: Okay. This is the continued deposition of Mrs. Milde in this case. Before we go and begin asking questions, I'll just note for the record that Mr. Carey and I just had a discussion about the amount of time that might be remaining. According to Mr. Carey's records, there is an hour and 15 minutes left of the seven-hour allotment that I've been given to depose the plaintiff under the Federal Rules of Civil Procedure.

The court reporter has noted that their records indicate that there's an additional two hours left, so what we've proposed to do to potentially avoid the need to involve the Court is to see how far I get in the next hour. And if necessary, we need more time, we will contact the Court. We're at the courthouse right now, so it's easy enough to do.

As far as stipulations go, Mr. Carey agreed to the same stipulations we had last time which, as far as I understand, is that you'll have to object in accordance with the Federal Rules of Civil Procedure which includes objections -- all objections as to the form of the question.

MR. CAREY: I'll just note for the

---

228

record that the statements I made on day 1 of the deposition applies to today's deposition.

Thereupon:
    URSULA MILDE, residing at 257 Cherry Street, Katonah, New York, 10536, being first duly sworn, as hereinafter certified, was examined and testified as follows:

DIRECT EXAMINATION BY MR. ALVAREZ (Cont'd):
    Q.  Good morning, Ms. Milde.
    A.  Good morning.
    Q.  What's your date of birth?
    A.  July 12, 1940.
    Q.  And at the time you were hired by the Housing Authority, how old were you?
    A.  Let's see. It was in '96. I was 56.
    Q.  And in the fall of 1999, that would make you 59, correct?
    A.  That's correct.
    Q.  And as of March of 2000, you were still 59, correct?
    A.  That's correct.
    Q.  In May of 2000 you were 59, correct?
    A.  That's correct.
    Q.  And in September of 2000 you were 60?

245

1   A.   Isn't that an attorney/client privilege?
2        MR. CAREY:  She can assert it
3   herself, Counsel.  She just did.
4        MR. ALVAREZ:  Well, are you
5   instructing her not to answer?
6        MR. CAREY:  I didn't instruct her
7   anything, sir.  She did it herself.  And under the
8   Federal Rules, you understand that when she does
9   that, you can't ask any further questions.
10       MR. ALVAREZ:  Well, I can -- Is
11  there any --
12  Q.   Why do you claim that that's
13  attorney/client privilege?
14  A.   Well, it is.  It's an arrangement between
15  my attorney and myself and a discussion between my
16  attorney and myself.
17       MR. ALVAREZ:  Mark, do you believe
18  that that's attorney/client privilege?
19       MR. CAREY:  I'm sorry.  Am I under
20  oath today?
21       MR. ALVAREZ:  No, but we can call
22  the Court and ask them to direct her to answer the
23  question.  But as her counsel, I think it's
24  appropriate for me to discern before I call the
25  Court what your position is on this issue.

246

1        MR. CAREY:  I'm not going to comment
2   because she herself, after your question, did it on
3   her own right.  And if she's going to hold that
4   privilege which she's entitled to, then I think the
5   judge will ask the question, not me.  And I'm not
6   going to comment, I'm not going to make an objection
7   and I'm not instructing the client not to answer.
8   That's her right.
9   Q.   Ms. Milde, is anybody assisting you in
10  paying -- Withdrawn.  Have you paid Mr. Carey any
11  fees in compensation for the services that he's
12  provided?
13  A.   Yes.
14  Q.   Okay.  And how much have you paid him to
15  date?
16       MR. CAREY:  I'm not --
17  A.   Paying these --
18       MR. ALVAREZ:  Are you making an
19  objection?  Are you making an objection?  Let's make
20  it on the record or else you have no basis for
21  saying anything to this witness unless you're making
22  an objection, Mr. Carey.
23       MR. CAREY:  Please note for the
24  record that Counsel is trying to bait me into a
25  situation to have me instruct this witness how to

247

1   answer or not answer this question because he
2   obviously is trying to make arguments for -- future
3   arguments for the three motions to compel that were
4   filed against his client.  I will not do so.  I
5   think if the client wants to assert -- which she
6   already has -- attorney/client privilege, she's on
7   her own on that issue.  I'm not going to make any
8   instruction to the witness, Counsel.
9   Q.   So you can answer the question.
10       MR. ALVAREZ:  Could you read back my
11  question?
12       (Whereupon, the requested portion of
13       the record was read by the reporter.)
14  A.   It's a roundabout question to which I
15  answered before.  That's between my attorney and
16  myself.
17  Q.   So you won't tell me?
18  A.   That's attorney/client privilege.
19  Q.   So you won't tell me the answer to that
20  question?
21  A.   Based on that.
22  Q.   Has anybody assisted you in paying
23  Mr. Carey?
24  A.   No.
25  Q.   So any monies that you've paid him have

248

1   been paid solely through your own financial
2   resources?
3   A.   That's correct.
4   Q.   Has anybody told you that if you were
5   unable to pay the costs of attorney's fees that they
6   would pay them for you?
7   A.   No.  I wish.
8        MR. CAREY:  Just note for the record
9   that Counsel is still continuing to ask the witness
10  about privileged matters.  He's obviously deriving
11  answers from the witness.  I've still not instructed
12  the witness whatsoever with regard to the subject
13  matter.
14       MR. ALVAREZ:  You just -- Withdrawn.
15  What time did we go on the record?
16       THE COURT REPORTER:  10:17.
17  Q.   Miss Milde, did anyone ever tell you that
18  you were being reprimanded for violating the Housing
19  Authority's media, slash, public relations policy?
20  A.   Yeah.
21  Q.   Who told you that you were being
22  reprimanded for violating the media/public relations
23  policy?
24  A.   Mr. Little.
25       MR. ALVAREZ:  Mark this.

249

1  (Whereupon, media/public relations policy
2  was marked as Defendants' Exhibit 65 for
3  Identification.)
4     Q.   Mrs. Milde, I'm going to show you a
5  document that's been marked as Defendants' Exhibit
6  Number 65. Do you recognize this as the
7  media/public relations policy for the Housing
8  Authority?
9     A.   Yes.
10    Q.   And I'll ask you again: Has anybody ever
11 told you that you were reprimanded for violating
12 this policy which is Defendants' Exhibit Number 65?
13    A.   Yes.
14    Q.   And your testimony is Mr. Little told you
15 that?
16    A.   Yes.
17    Q.   Did anybody other than Mr. Little tell
18 you that?
19    A.   No.
20    Q.   Did Mr. Little tell you verbally or in
21 writing?
22    A.   I believe he sent a memo as one of those
23 many memos about that after the May 22nd open board
24 meeting.
25    Q.   And those are one of -- the memo --

250

1  Withdrawn. The memo you're referring to is one of
2  the exhibits that were admitted on your first day of
3  deposition?
4     A.   It could be, could be, yeah.
5     Q.   Do you remember --
6     A.   I don't remember whether it was used in
7  the deposition, but I remember that there was some
8  memo to that effect after that.
9     Q.   Are you claiming that -- Withdrawn. Are
10 you referring to his request that you apologize to
11 the board?
12    A.   Partially, but I believe there also was
13 some other memo saying that things have to be
14 cleared with the executive director, the CEO, first
15 before the media -- before talking with the media
16 and then the two memos having to do with an apology.
17    Q.   Let me show you what's been marked as
18 Defendants' Exhibit Number 33 and direct you to the
19 third page, the third bullet.
20         MR. CAREY: Counsel, is she allowed
21 to see the documents? You have the original
22 exhibits.
23         MR. ALVAREZ: I'm showing her the
24 original exhibit.
25         MR. CAREY: Is she entitled to

251

1  review them in front of her if she wants to?
2         MR. ALVAREZ: No. I'm showing her
3  the document that I'm asking a question about.
4         MR. CAREY: Right. But those
5  exhibits are a matter of this record, aren't they,
6  Counsel?
7         MR. ALVAREZ: Counsel, just if you
8  have an objection, note it.
9         MR. CAREY: I'm not making an
10 objection. I'm just asking you --
11        MR. ALVAREZ: Do you --
12        MR. CAREY: -- as a matter of
13 administrative record of this proceeding, is she
14 allowed to look at the exhibits that you already
15 premarked and had her testify about?
16        MR. ALVAREZ: I'm not answering your
17 questions.
18        MR. CAREY: Because you don't want
19 to?
20        MR. ALVAREZ: No, because it's
21 wasting my time.
22        MR. CAREY: No. You use that phrase
23 all the time, Frank. She's entitled to have --
24        MR. ALVAREZ: Court reporter, can
25 you please note the time?

252

1         MR. CAREY: You know, what, Frank?
2  I'll give you the time off my time on this line of
3  questioning to protect my client allowing her to
4  look at exhibits --
5         MR. ALVAREZ: Just note the time,
6  then.
7         THE COURT REPORTER: 10:53.
8         MR. ALVAREZ: Please note that.
9         MR. CAREY: She's entitled to look
10 at the exhibits that are part of this deposition.
11 And you're objecting saying she's not, and I'm
12 saying she is. That's all I have to say.
13        MR. ALVAREZ: Can you note the time?
14    A.   I --
15        THE COURT REPORTER: 10:54.
16    A.   Sorry. I recognize the document. I
17 recognize that bullet point and --
18        MR. ALVAREZ: Let the record reflect
19 that Mr. Carey is --
20        MR. CAREY: I'm looking at the
21 exhibit.
22        MR. ALVAREZ: -- is taking -- I've
23 already told you it's Defendants' Exhibit Number 33.
24        MR. CAREY: Can you express any
25 courtesy to me, Frank?

285

1  deposition, were you present during that deposition?
2  A. Yes.
3  Q. Do you recall him testifying about the
4  Pro Gas contract?
5  A. Yes.
6  Q. And do you recall him testifying about --
7  Withdrawn. Do you have any knowledge about the
8  amount of the contract?
9  A. While I was still employed, Mr. Kemp
10 talked to me about that contract. And he was
11 disturbed, in the way I saw it, by the fact that it
12 was -- he stated 68,000-a-year contract and that it
13 never went to the Board of Commissioners for
14 approval.
15 Q. What did you see -- Withdrawn. Was
16 Mr. Kemp a managerial employee at the time?
17 A. Yes.
18 Q. And what time frame is this?
19 A. This was in -- either the end of '99 or
20 in 2000. I don't recall, but I recall several
21 conversations actually about that this was -- there
22 was this contract and that Russ was disturbed about
23 the fact that it wasn't presented to the
24 commissioners.
25 Q. Okay. Now, you sat through the testimony

286

1  of Mr. Little, correct?
2  A. Yes.
3  Q. Okay. You sat through the deposition
4  testimony of Miss McClenachan?
5  A. Yes.
6  Q. Have you formed an opinion about
7  Mr. Little with respect to that Pro Gas contract?
8       MR. ALVAREZ: Objection as to form.
9  A. I think he did not present it to the
10 board. I think he was trying to withhold that
11 information from the board and he wasn't truthful.
12 Q. "He wasn't truthful"? What do you mean?
13      MR. ALVAREZ: Objection as to form.
14 A. He kind of -- From what I recall during
15 the deposition, he kind of -- sometimes he said the
16 contract didn't have to be presented to the board,
17 and then other times he said contracts had to be
18 presented. So he was very -- you know, was trying
19 to cover up untruthful statements. And when you do
20 that -- The beauty about speaking the truth is that
21 you can always remember it and you don't have to try
22 to, you know, make contradictory statements. And I
23 felt that he was very contradictory.
24 Q. Okay.
25 A. And let me just add one other thing: I

287

1  also felt that he was picking and choosing when he
2  would follow policies and procedures. And I saw
3  that in other instances, too, while he -- from the
4  time he became the executive director that he didn't
5  follow some policies and procedures when it suited
6  him, and then he didn't follow others when it didn't
7  suit his own purposes.
8       And so when he reprimands me or
9  disciplines me for not following policies and
10 procedures -- which isn't true because I did follow
11 them -- I felt then he was -- he -- that was such a
12 discriminatory action on his part because he didn't
13 always follow policies and procedures himself.
14 Q. Okay. Next I want to move to the issue
15 of your termination. When were you terminated?
16 A. September 8th.
17 Q. Okay.
18 A. 2000.
19 Q. And did you have any prior notice about
20 your being terminated?
21 A. We had a meeting two days before, and at
22 the meeting I asked him whether he was going to
23 terminate me because I was filing -- making -- I had
24 filed with the EEOC for age and gender
25 discrimination in -- sometime in July. And he said

288

1  no. And so I didn't know for certain whether I was
2  going to be terminated, but then once -- That was a
3  very distressing meeting.
4  Q. Are you referring to the meeting that
5  took place which is marked as Defendants' Exhibit
6  Number 61?
7       MR. ALVAREZ: Objection as to form.
8  A. Yes.
9  Q. Okay. And I don't think -- You testified
10 to it on direct, but have you seen this document
11 before?
12      MR. ALVAREZ: Objection as to form.
13 A. I received this document in November of
14 2000 because I requested my personnel file, and I
15 requested the minutes of that meeting. And when I
16 requested that, I first just got the personnel file.
17 And then I sent another letter back saying I got the
18 personnel file but you didn't send me minutes of the
19 meeting. So then in November I was sent those --
20 these minutes.
21      MR. ALVAREZ: Just so the record's
22 clear -- I don't know if you said it -- what exhibit
23 are we referring to?
24      MR. CAREY: 62, Frank.
25 A. So that was the first time I saw that.

289

1  Q. You were obviously present at the
2  meeting?
3  A. Yes.
4  Q. Does that document, Exhibit Number 61,
5  list your name?
6  A. Yes.
7  Q. Okay. Who else is present at that
8  meeting?
9  A. My attorney, you, the -- Benjamin Little,
10 CEO of the Housing Authority; Louis Pittocco,
11 P-i-t-t-o-c-c-o, legal counsel for the Housing
12 Authority; Sim Bernstein, consultant for Human
13 Resources; and Maria Morris, the administrative
14 secretary.
15  Q. Okay. Had you ever had a meeting like
16 this during your tenure of employment?
17         MR. ALVAREZ: Objection.
18  A. No.
19         MR. ALVAREZ: To the form.
20  Q. Is there anything inaccurate about this
21 document? Give you a chance to read it.
22  A. When I first read it, I recall there were
23 small inaccuracies that, you know, I have to really
24 look through it again. Let's see. He said -- it
25 was on page 2 -- "Ursula Milde had no authority to

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

290

1  terminate the contract. The contract is between the
2  Housing Authority and CCI." I did not terminate the
3  contract. The contract had lapsed a year prior to
4  that, and so that's inaccurate.
5   Q. What page is that?
6   A. That's page 2.
7   Q. Anything else inaccurate about the
8  document?
9   A. Well, he said, that same page, "They were
10 not fulfilling the contract. CCI was having a
11 problem. What was the problem?" That's what my
12 attorney -- you asked, and Mr. Little replied, "They
13 were not always there." That was not the problem.
14 The problem was that they were not fulfilling the
15 contract. They didn't -- The contract called for
16 two people, and for 10 and a half months they only
17 had one person. So it wasn't just that they were
18 not always there; they didn't fulfill the terms of
19 the contract they had.
20  Q. Okay. Is there anything else inaccurate
21 about the document?
22         MR. ALVAREZ: Objection as to the
23 form.
24  A. I don't see --
25         MR. CAREY: Frank, if I ask the

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

291

1  question "Is there anything accurate about this
2  document," what would be your objection to that?
3         MR. ALVAREZ: Well, my objection is
4  that you're leading her because you've already asked
5  her once to explain what else inaccurate and she
6  didn't testify to that, so you keep asking the
7  question until you get the answer you want. That's
8  my objection. It's leading.
9         MR. CAREY: That's my point exactly.
10 No matter what I ask the witness in this deposition
11 right now, you're going to object and I'm going to
12 note every single objection you make today.
13        MR. ALVAREZ: That's fine.
14        MR. CAREY: Thank you.
15  Q. Okay. Anything else, Miss Milde?
16  A. Well, the whole issue with the Sam Romeo,
17 the ombudsman.
18  Q. What page?
19  A. That's on the last page. He said that
20 I -- Let's see -- I consulted with -- Let's see.
21 Yeah. I said that I didn't have time to send him
22 the memo before the meeting which is correct, and I
23 did not -- I timed the cc to Sam Romeo. That means
24 I just wrote cc to Sam Romeo on the bottom of the
25 memo and sent it to Sam Romeo. So I mean, that's a

292

1  little peculiar.
2   Q. Okay.
3   A. And also he said that I should have cc'd
4  the ombudsman on an issue that had been resolved and
5  the issue had not been resolved.
6   Q. All right. And the third page of this
7  document, Exhibit Number 61, you make the statement
8  here, it says "U.M." and it says, quote, I am
9  correct -- or "Am I correct in assuming that you
10 want to terminate me because of the EEOC charges I
11 have brought against you," question mark, closed
12 quote. Is that still true today?
13  A. Yes.
14        MR. ALVAREZ: Objection as to form.
15  Q. And can you tell me why you said that?
16        MR. ALVAREZ: Objection.
17  A. That's what I believed. I believed and I
18 still do believe that, that one of the reasons why I
19 was being terminated was because I brought charges
20 for age and gender discrimination to the EEOC and
21 that was retaliation for -- I was terminated in
22 retaliation for that. They could have awaited the
23 decision of the EEOC, but --
24  Q. Okay. Back to your termination date, can
25 you describe for me the events that took place

317

1  appeared on this license after December 31, 2000?
2       A.   No, I don't know.
3       Q.   Did you attend the deposition of Penny
4  Lore in this case?
5       A.   Yes.
6       Q.   Do you know who she is?
7       A.   Yes. She's the current administrator,
8  but she -- her name is probably on the current
9  license. I don't know.
10           MR. ALVAREZ: Speak up.
11      A.   I presume her name is on the current
12 license.
13      Q.   And why do you presume that?
14      A.   Because the administrator is the person
15 in charge. That's what I always assumed because
16 that's the way it was when I was there.
17      Q.   Okay. Did you ever have that license
18 revoked that was listed in your name?
19      A.   No.
20      Q.   How would a revocation of that license
21 occur?
22           MR. ALVAREZ: Objection.
23      A.   If we had a survey with serious
24 violations, if the State felt that the residents
25 were not receiving the services we -- they were

318

1  supposed to have and they would find serious
2  deficiencies. And that could be both in the
3  services as well as problems with the building, the
4  safety of the building.
5       Q.   Okay. Now -- One second. Let me show
6  you what's been marked Defendants' Exhibit Number 37
7  entitled Milde Number 37.
8       A.   Yes.
9       Q.   And you testified to Mr. Alvarez
10 regarding something that had to do with the quote
11 from the paper?
12      A.   Yes.
13      Q.   And the quote from the paper said we
14 don't have a violation at this moment, correct?
15      A.   That's correct, yeah.
16      Q.   Was that your statement?
17      A.   Yes.
18      Q.   Okay. And what did you mean by that
19 statement?
20      A.   A violation is not to provide any
21 recreation services at all because according to the
22 code, we are mandated to provide recreation
23 services. So the violation is the extreme form of,
24 you know -- if you have a violation, then that could
25 lead to the revocation of your license.

319

1       Q.   Was your --
2       A.   And that's what I meant by that. And
3  obviously I don't want our license to be revoked,
4  and I didn't want to have a violation. So whenever
5  CCI didn't do what they were supposed to do in the
6  contract, however minimal it was, I would try to
7  have the staff fill in. And that meant sometimes I
8  had to pay them overtime or I had to -- you know,
9  they had to do -- It's like, you know, in my current
10 job, if we have a shortage of people in the
11 department, the other people have to fill in in
12 order to provide what -- you know, the services
13 you're supposed to provide.
14           So I -- you know, it put a burden on my
15 staff and myself to do things that had to be done to
16 avoid a violation and -- But obviously it was
17 important to do that and necessary. And so we --
18 you know, we strained resources when we did it in
19 order to avoid a violation. And that is what I was
20 saying there.
21      Q.   What's the date of this article which is
22 marked as Defendants' Milde Exhibit Number 37?
23      A.   Oh, Greenwich Time, that's 5/26/2000.
24      Q.   Did you have your license revoked at this
25 point in time?

320

1       A.   No.
2       Q.   Okay. And was there a violation that
3  existed on May 22nd?
4            MR. ALVAREZ: Objection to the form.
5       A.   Violation in the sense I just defined it,
6  not -- because the way I defined violation is there
7  are no services whatsoever. I have to kind of refer
8  to another document that was used in one of the
9  other depositions to explain what, you know --
10 what --
11      Q.   We don't have all the documents from the
12 other depositions. Whose deposition are you
13 referring to?
14      A.   Yeah. I don't remember what deposition.
15 It may have been Penny Lore's. I don't remember,
16 but I can describe the document and maybe then --
17      Q.   Okay. Go ahead.
18      A.   -- you can find it. Prior to that date,
19 I talked about -- I sent a memo to Mr. Little with
20 the cc to all the commissioners. And it had to do
21 with the code we had, the code for licensed homes;
22 and I quoted excerpts from the code, and the
23 excerpts I quoted was what the responsibility of th
24 administrator is and the responsibility of the staf
25 and also that recreation services are to be

321
provided.

Now, the code for licensed homes is not spelled out in great detail the way it might be in a nursing home in terms of hours, and you know, amounts of time and so on and so forth. However, the code says that it's the licensee's responsibility to be -- to insure the health -- the health and comfort and safety -- to reasonably insure the health, comfort and safety of the residents.

So the administrator is charged to make sure that the residents are cared for, to maintain their health as much as is possible and to be safe and to be comfortable and that recreation services have to be provided. So the administrator is really the one who has to set the standard there.

And if -- For example, our staff had to help residents with bathing; many of our residents needed help when they take a shower or bath because they were frail and it was, you know, for safety reasons. Now, if the staff would neglect that and the resident would get a bath maybe every six weeks, the resident wouldn't die from that; but the resident -- I would clearly consider that an abuse of the resident because the resident should get a

322
bath at least once a week.

And if that was what was in their service plan, then that was the standard way of caring for the resident. And I would not -- I would be amiss in my duty as the administrator if I would allow substandard care, as I explained in this example.

Well, likewise with the recreation services. Recreation services are necessary for the mental health and the emotional health of the residents. And if the services were substandard in my judgment and as the administrator of Parsonage, then it's my responsibility to make sure that they would be brought up to standard.

And so in that way, while there wasn't a violation because we had some services but they were not up to the standard, that would -- that they should be and if they are not up to that standards similarly to what, you know, the example I gave with the showering, helping shower a resident, then that's a form of neglect and I have the responsibility to prevent that.

Q. Okay. Miss Milde, I'm going to take you back to Defendants' Exhibit Number 20. It's Milde Number 20. Is that the document you're referring to where -- your testimony regarding the -- some

323
statute?

A. Yes.

Q. Okay. Can you tell me what this document is?

MR. ALVAREZ: I'm sorry. What document are we on?

MR. CAREY: Twenty, Frank.

A. It's a memo I sent to Mr. Little on April 26th.

Q. Okay. And what was the purpose of this memo to Mr. Little?

MR. ALVAREZ: By the way, I'm objecting to the question. I've caught up to what document you're referring to, and I'm objecting to that as leading.

MR. CAREY: The statement "What is the purpose of the letter?"

MR. ALVAREZ: No, the memo and asking her if this was the memo she was referring to, objecting to it's leading.

Q. Mrs. Milde, was this a document that came out in Miss Lore's deposition, to your recollection?

MR. ALVAREZ: Objection, still leading.

A. I guess that's where it came out. I'm

324
not sure anymore where, but it came out in one of the depositions. It was presented.

Q. How many other documents in this case refer to a statute?

A. That's the only one. That's the only one where I quote a statute.

Q. Okay. Now, my question was what's the purpose of this letter to Mr. Little on April 26, 2000?

A. Well, the purpose is to explain to him why the recreation issue was such a vital issue.

Q. How about, read the first paragraph for me.

A. "It is my responsibility both legally and ethically as administrator of this licensed home to safeguard the rights and well-being of the residents who entrust themselves to our care. This is expressed in the Code for Licensed Homes, Section C, Administration."

Q. Okay. Why don't you read Section C for us?

A. "Administration: Number 1, the proprietor or licensee of the institution shall be responsible for operation of the institution in compliance with these regulations."

333

1  that you filed already. I don't -- It's not going
2  to help. I'm going to state objections to the form
3  of the question when I think it's appropriate.
4       MR. CAREY: Okay. Did I not say
5  before, Mr. Alvarez, that I said I understand your
6  objection? And then you launched into your speaking
7  objection.
8       Q.  Let's continue. Okay. Can you read the
9  next paragraph, please, for the record?
10      A.  "The decision to hire an in-house
11 recreation coordinator (which was the original plan
12 anyway), as well as the idea of hiring Agata
13 Wilinski was arrived at through careful deliberation
14 and observation by our staff and myself because we
15 realized how much it would benefit the residents and
16 meet their needs. As I explained in my previous
17 memoranda, the position is allowable since we have a
18 mandate for recreational programming."
19      Q.  What's the "mandate for recreational
20 programming" you're referring to?
21      A.  Well, it says in the code that we are
22 mandated to provide recreation services.
23      Q.  Is that part of the Section G,
24 Recreation, in the first page of this document?
25      MR. ALVAREZ: Objection as to the

334

1  form of the question.
2       A.  Yeah, that's what it is.
3       MR. CAREY: I assume that, Frank,
4  that's a leading objection?
5       MR. ALVAREZ: Yes, it is.
6       MR. CAREY: Okay. Frank, your
7  attempt is not to trap me and cause me frustration
8  and think about every little question I have to
9  answer -- or ask this witness, is it?
10      MR. ALVAREZ: I'm not responding to
11 that question.
12      MR. CAREY: I thought so,
13 Mr. Alvarez.
14      Q.  Okay. Let's continue. Can you read the
15 next paragraph, please, starting with the word "I"?
16      A.  "I can only conclude that the way in
17 which you and the board proceeded regarding this
18 matter and the way the decision was 'uncommunicated'
19 to me" -- "uncommunicated" in quotation marks -- in
20 parentheses, "(I learned it first through the
21 newspaper) showed a high disregard for me and for my
22 staff, but more importantly it demonstrated a lack
23 of concern for the needs of the residents whom we
24 have, after all, pledged to serve."
25      Q.  Okay. My question to you, Miss Milde,

335

1  what do you mean by the word "uncommunicated" in
2  that paragraph?
3       A.  I mean that it wasn't communicated to me,
4  that the -- I learned the board's decision through
5  the newspaper. The newspaper came in the morning,
6  and there was an article that the board was going to
7  hire a recreation coordinator.
8       Q.  Well, did the board hire a recreation
9  coordinator?
10      A.  No.
11      Q.  What did the board do?
12      A.  They -- Later on that day I got a memo
13 from Mr. Little like in the late afternoon in which
14 he states that the board authorized him to do a
15 request for a proposal for recreational services.
16      Q.  Okay. Ben Little didn't tell you about
17 this?
18      A.  No. When I wrote the memo -- No, I wrote
19 the memo before I got the memo from him. I wrote
20 the memo after I got -- I read the newspaper
21 article.
22      Q.  Okay. And this letter's addressed to
23 whom?
24      A.  To Mr. Little.
25      Q.  Okay. And are you complaining to him in

336

1  this letter about this issue?
2       A.  Yes.
3       Q.  Okay. Are you protesting about this
4  recreation issue to Mr. Little in this letter?
5       MR. ALVAREZ: Objection.
6       A.  Yeah.
7       Q.  What did you think his reaction would be
8  when you wrote this?
9       MR. ALVAREZ: Objection.
10      A.  I was hoping that he would -- he would
11 realize that, you know, he as my manager and as the
12 CEO, that he would remember his responsibility
13 towards the clients and the staff.
14      Q.  Okay. And --
15      A.  And I wanted to speak for them, so I --
16 and I really felt that somebody has to speak for the
17 residents. Throughout that whole time I always felt
18 that there has to be somebody who has to stand up
19 for the residents and say, "This is the right thing
20 to do." And I really felt I was the person because
21 I was the administrator and the residents couldn't
22 do that on their own.
23      Q.  Why couldn't the residents do that on
24 their own?
25      A.  First of all, because they never saw

337

1  Mr. Little; and, secondly, they are dependent on the
2  agency for the care and living there. And they are
3  in a very vulnerable position and they would be very
4  much afraid to say things.
5      Q.   What's the role of the ombudsman?
6      A.   Well, the ombudsman is appointed by the
7  Department of Social Services by the State of
8  Connecticut; and he goes into nursing homes and
9  long-term care facilities to make sure that the
10 residents' rights are not violated. But the
11 ombudsman isn't there on a daily basis, and he --
12 Now, the ombudsman we had, Sam Romeo, was aware of
13 some of the issues that were going on because he
14 came and he had developed a relationship with the
15 residents.
16      And he was concerned about this whole
17 issue with recreation services; that's why he comes
18 in the picture there. But the ombudsman also has to
19 make sure -- The ombudsman in a way can be
20 adversarial to the administration of a facility if
21 he sees things that the facility isn't doing right.
22 And I have seen that at times in nursing homes.
23      So fortunately, you know, the ombudsman
24 at Parsonage and I had a very good relationship;
25 and, you know, and I took -- I invited him to be

338

1  there. And, as I said, he was very involved with
2  the residents, especially one resident. So I -- you
3  know, it didn't -- we didn't have that adversarial
4  relationship.
5      But the ombudsman is there to make sure
6  that residents' rights are safeguarded. And I, as
7  the administrator, am responsible for
8  residents -- that the residents get what we are
9  supposed to do under the license so --
10     Q.   Okay. Did the -- Withdrawn. Can you
11 read the last paragraph -- I'm sorry, the second to
12 the last paragraph on that Exhibit Number 20,
13 Defendants' Exhibit Number 20?
14     A.   "I like to remind you, therefore, that
15 what matters is not your or my authority nor who is
16 in charge here," in quotation marks, "but what best
17 serves the residents of Parsonage Cottage Senior
18 Residence. All of us including you as the CEO of
19 the managing agent as well as the Board of
20 Commissioners, the Parsonage Cottage staff and I
21 must always be cognizant of this responsibility."
22     Q.   Okay. Is that a true and accurate
23 statement still sitting here today?
24          MR. ALVAREZ: Objection.
25     A.   Yes.

339

1      Q.   Why do you use the word "cognizant" in
2  that paragraph?
3      A.   To me "cognizant" means we always have to
4  remember that that has to be uppermost in our mind
5  that that's our responsibility. So it's not like
6  sometimes we think about it and sometimes we don't.
7  It means that this, as I said, has to be uppermost
8  in our minds, that we are there to serve the
9  residents and make sure that their needs are met.
10     Q.   Okay.
11     A.   So it's a very important responsibility.
12     Q.   In your opinion sitting here today, was
13 Mr. Little cognizant of this, of the residents?
14     A.   No.
15     Q.   Can I ask you why not?
16     A.   He -- In my opinion, he really didn't
17 care what -- whether the residents received the care
18 they needed. And that was very upsetting to me, and
19 that's why I felt all the stronger that he -- that I
20 had to stand up for the residents.
21     Q.   Do you dislike him?
22     A.   I do now. I didn't.
23     Q.   Why do you do now?
24     A.   Because he used the residents adversely
25 to discriminate against me. It was almost like

340

1  he --
2      Q.   Speak up.
3      A.   He used the residents -- abused, I should
4  say. He abused the fact that I was devoted to the
5  residents, and he did things that hurt the residents
6  in order to carry on his -- his prejudices, his
7  discriminatory behaviors towards me. And that was a
8  terrible thing to do.
9      Q.   You said that you didn't dislike him --
10 Well, I don't want to confuse you. You didn't
11 dislike him back then. What were you referring to
12 to the time frame?
13     A.   To -- Really up to even the beginning
14 of -- even the first half of 2000 or --
15     Q.   Can you give me a month?
16     A.   I think I began to feel that there was
17 something wrong going on when -- you know, sometime
18 around April of 2000.
19     Q.   What about April in particular that's
20 causing you to begin to dislike him?
21     A.   Well, the whole thing started in --
22 really in March, the end of March. I had informed
23 him of, you know, my plan to hire an in-house
24 recreation person on February 3rd. And then I
25 proceeded with doing that the way I proceeded with

413

Q. Okay.
MR. CAREY: Frank, you asked for a break so why don't we stop there for a break for the rest of us. It's now 4:27.
(Whereupon, a recess was taken. The deposition resumed at 4:37 p.m.)
(Whereupon, rules and performance checklist was marked as Plaintiff's Exhibit 15 for Identification.)
Q. Mrs. Milde, I show you what's been marked Plaintiff's Exhibit Number 15. Can you tell me what the document is?
A. This is the Housing Authority rules and personal performance checklist.
MR. CAREY: Please note for the record, this is also Kemp Exhibit Number 13 and Ben Little Exhibit Number 13 as well.
Q. This is the rules and personal performance checklist of the Housing Authority?
A. Yeah.
Q. Okay. I'm going to ask you a question, a couple questions on this. During your employment, were you courteous and helpful to your residents, patrons and visitors?
A. Yes.

414

Q. Okay. During your employment were you -- did you ever make false -- this is number 20 on the list. Did you ever make false or slanderous statements about the authority, its employees or residents?
A. No.
Q. Did you ever make false or slanderous statements about Mr. Little?
A. No.
Q. Number 33, did you ever commit any act of dishonesty against the Housing Authority?
A. No.
Q. Okay.
(Whereupon, Performance Evaluation dated 6/2/00 was marked as Plaintiff's Exhibit 16 for Identification.)
Q. I show you what's been marked Plaintiff's Exhibit Number 16.
A. Yes.
Q. And -- for Identification. Can you tell me what that document is?
A. That's a performance evaluation.
Q. And -- Go ahead.
A. My performance evaluation.
MR. ALVAREZ: Keep your voice up.

415

A. I'm sorry, my performance evaluation.
Q. The date of that document is -- or let me rephrase it. And for what period is that performance review for?
A. Looks like 7/3/99 to 6/30/2000, could be 8/3. It's kind of smudged. It's hard to see.
Q. Okay. And turn to the last page. And who is it signed by?
A. By Mr. Little.
Q. And what date did he sign it?
A. 6/2.
Q. Did you sign that?
A. No.
Q. Okay. And was this the first performance review you received -- rephrase -- first written performance review you received while working as the Parsonage Cottage administrator?
A. Yes.
Q. Did you ever receive any verbal performance reviews from Mr. Little during your tenure of employment?
A. He once said in -- at a meeting with some staff that he wished he had 10 Ursulas.
Q. Okay. When did he say this?
A. In 1998 or so.

416

Q. 1998 he made what --
A. When Mr. Crawford was still there.
Q. Can you repeat the statement he made again?
MR. ALVAREZ: Objection.
A. He said he wished he had 10 Ursulas within the Housing Authority.
Q. Okay. And where was this statement made at?
A. It was at Parsonage Cottage.
Q. And what was the -- And was there a meeting being conducted then?
A. Yeah.
Q. What was the nature of the meeting?
A. It was with my staff, and it had to do -- I think it was -- it had to do with one of the facility workers who was transferred to the Housing Authority. And he -- and Mr. Little and I believe John Banks was there too; I'm not sure anymore. And Felix Andreoni and Tammy Smith were there.
Q. You don't remember what day of the week this was?
A. I don't remember. It was during the week sometime.
Q. Was it raining out?