# EXHIBIT H-2

LEXSEE 1997 U.S. DIST. LEXIS 12544

CHARLES D. KIM, Plaintiff, -v- DIAL SERVICE INTERNATIONAL, INC.; DIAL SERVICE COMPANY, LTD.; and YURI KONNO, Defendants.

96 CIV. 3327 (DLC)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1997 U.S. Dist. LEXIS 12544

August 7, 1997, Decided
August 11, 1997, Filed Opinion

**DISPOSITION:** [*1] Defendants' motion for judgment as a matter of law granted in part and denied in part. Defendants' motion for remittitur granted. Plaintiff's motion for attorney's fees and costs granted

**COUNSEL:** For Plaintiff: John A. Beranbaum, Michael D. Paley, LAW OFFICE OF JOHN A. BERANBAUM, New York, NY.

For Defendants: Ronald M. Green, Patricia A. Murphy, EPSTEIN BECKER & GREEN, P.C., New York, NY.

**JUDGES:** Denise Cote, United States District Judge.

**OPINION BY:** Denise Cote

**OPINION:**

OPINION & ORDER

DENISE COTE, District Judge:

Defendants Dial Service International ("DSI"), Dial Service Company ("DSC") and Yuri Konno ("Ms. Konno") move for (1) judgment as a matter of law, pursuant to *Rule 50, Fed. R. Civ. P.*, or in the alternative for a new trial pursuant to *Rule 59, Fed. R. Civ. P.*, and (2) for a new trial or, in the alternative for remittitur of the damage awards. The plaintiff Charles Kim ("Mr. Kim") moves for attorney's fees and costs pursuant to Section 1988, Title 42, United States Code. For the reasons given below, the defendants' motion for judgment as a matter of law is granted in part and denied in part. The defendants' motion for remittitur is granted. The plaintiff's motion for attorney's [*2] fees and costs is granted.

BACKGROUND

On May 6, 1996, Mr. Kim filed a claim for employment discrimination for unlawful termination and differences in pay because of his age, race, and national origin. He brought this claim pursuant to Title VII of the Civil Rights Act of 1964, *42 U.S.C. §§ 2000e et seq.*, as amended by the Civil Rights Act of 1991, *42 U.S.C. § 1981A* ("Title VII"); the Age Discrimination in Employment Act, *29 U.S.C. §§ 621 et seq.* ("ADEA"); the Civil Rights Act of 1870, *42 U.S.C. § 1981*, the New York State Human Rights Law, *N.Y. Exec. Law § 290 et seq.* ("NYSHRL"); and the Administrative Code of the City of New York §§ 8-101 et seq. ("Administrative Code"). In an Opinion issued on January 8, 1997, this Court dismissed the plaintiff's claims under Title VII and the ADEA, and gave plaintiff leave to amend his Complaint to add state law claims for breach of contract and quasi-contract -- arising out of defendants' alleged failure to pay plaintiff for services he performed under a contract defendants negotiated with another entity.

This Court conducted a jury trial from May 27 to June 5, 1997, on the plaintiff's claim of (1) race discrimination [*3] under Section 1981 and related state-law claims; (2) national origin discrimination under the NYSHRL and Administrative Code; (3) age discrimination under the NYSHRL and Administrative Code; and (4) state-law contract claims. With respect to his employment discrimination claims, the jury returned a verdict for the plaintiff and against all three defendants on plaintiff's claim of race discrimination. The jury returned a verdict for the defendants on the claims of national origin and age discrimination. The jury awarded the plaintiff $ 170,000 in back pay, $ 325,000 in front pay to cover five years of lost work, and $ 300,000 in compensatory damages. After indicating that they felt an award of punitive damages was warranted against all three defendants, and after additional evidence and instructions,

Case 3:00-cv-02423-AVC    Document 213-10    Filed 11/16/2006    Page 3 of 19

Page 2
1997 U S Dist. LEXIS 12544, *

the jury awarded the plaintiff $ 750,000 in punitive damages.

With respect to his state law contract claims, the jury returned a verdict for the plaintiff on his claim of breach of contract and awarded him $ 7,000 The jury also found for the plaintiff on his quasi-contract claim of unjust enrichment and made an award of $ 70,000.

Although familiarity with this Court's earlier Opinion [*4] is presumed, I will briefly outline the evidence introduced at trial relevant to the motions now before this Court Mr Kim is of Korean national origin and was the only permanent non-Japanese employee of DSI. DSI is a New York corporation and is the subsidiary of DSC, a Japanese corporation with its principal place of business in Tokyo DSC offers telephone consultation services for a variety of needs, including health inquiries, pet care, and child care. DSI offers the same services but is directed towards Japanese living abroad Ms Konno is the sole owner, President and Chief Executive Officer of DSC and DSI She controls the employment relations and management functions of both DSI and DSC and makes regular business trips to New York to oversee the DSI business and decide personnel issues. DSI executives do not make personnel decisions without consulting and receiving approval from Ms. Konno. DSC controls the management functions of DSI, including the hiring, firing, and setting of terms and conditions of employment for DSI's employees DSI and DSC have common officers and directors and DSC owns 100% of DSI's shares. Ms. Konno also makes final decisions about major expenditures [*5] at DSI. DSI is financially dependent on DSC, relying on monthly transfers of funds to pay the salaries of DSI's employees and meet other obligations

Mr Kim worked at DSI from February 1989, when Ms. Konno hired him, until his discharge in July 1995 He was 63 years old when DSI terminated his employment With degrees in electrical engineering and public administration, and accounting experience from working in a variety of small and large businesses, he was hired to help with immigration, tax and accounting issues for DSI. His initial salary was $ 30,000, which was raised to $ 40,000 a year later Ms. Konno then promoted him in November 1990 to the positions of Vice President and Treasurer, with a salary of $ 53,000 He held these positions from November 1990 until his termination

When she promoted the plaintiff, Ms Konno demoted the then-Vice President, a Japanese man, and gave Mr Kim some of the former Vice President's responsibilities The former Vice President earned $ 85,000 a year and two other Vice Presidents, who were both Japanese, earned $ 60,000 The plaintiff's primary responsibilities revolved around the fiscal side of the business, while the Japanese executives [*6] supervised operations.

There was some evidence of racial animus in comments made by DSI and DSC employees. For example, a memo written by Ms. Konno in August 1992 to the DSI president stated that the company should not move its offices to Fort Lee, New Jersey because Koreans and other minorities lived in the area making it less safe There was also evidence that plaintiff was told not to hire Korean accountants or utilize a Korean limousine service because DSI/DSC is a Japanese company. Finally, Ms Konno addressed Mr. Kim in a demeaning manner

When the plaintiff's employment was terminated in July 1995, he was the fifth DSI officer to leave the company since the company first started in 1987 Indeed, none of the Japanese officers at DSI had a long tenure there -- only one survived beyond a year -- and the plaintiff had the longest tenure by far as an officer at DSI There was evidence that DSI was never a financial success. DSI lost a total of $ 120,000 since it was started in 1987, and received regular subsidies from its Japanese parent, DSC. In an effort to stem the DSI losses, DSC reduced the staff at DSI By the time the plaintiff was fired, it had significantly fewer employees [*7] than when he began. A Japanese employee was fired at the same time as Mr. Kim.

In 1993, after losing $ 50,000 in the previous year, defendants asked Mr Kim to reduce his hours and take a cut in pay in order to help defray expenses He refused and threatened that he would report DSI's violation of immigration laws -- DSI employed Japanese individuals who did not have work visas -- to the American authorities to keep his job On July 28, 1995, Mr Kim was discharged A younger employee who is Japanese assumed most of Mr Kim's responsibilities for far less pay

The plaintiff testified that the actions of the defendants caused him mental anguish, weight loss and depression; his wife corroborated this testimony After losing his job, the plaintiff made very little effort to secure other employment and still does not have full-time employment

In connection with his contract claims, Mr. Kim introduced evidence that he was not paid overtime for work he performed pursuant to a contract DSC negotiated with a Japanese organization, the National Institute for Research Advancement ("NIRA") for a 1990 symposium. The only evidence introduced at trial of a promise to pay plaintiff additional [*8] sums the NIRA work was the plaintiff's testimony of a conversation he had with the former Vice President The plaintiff testified that the former Vice President said that the work would be "paid for specially." The President of DSI testified that the former Vice President did not have the authority to make

a promise regarding compensation as all compensation decisions were made by the DSC office in Japan. The plaintiff testified that he knew that compensation decisions were made in Tokyo. There was also evidence that the plaintiff was a salaried employee who was not eligible for overtime compensation.

Plaintiff also introduced evidence to support his quasi-contract claim that he was not compensated for the work he performed under the NIRA contracts, apart from the 1990 symposium, from 1989 to 1993. The plaintiff testified that he expected to be paid for this work but never was. The defendants introduced evidence that the NIRA work was within the plaintiff's scope of employment, that he was told of the duties before he accepted employment at DSI, and was compensated for the work through two pay raises. The defendants also introduced evidence that the plaintiff remained at DSI for four [*9] years even after complaining of not getting paid additional compensation for the NIRA work.

Finally, there was evidence at trial that the plaintiff forged DSI checks and deposited them into his own account. The plaintiff testified that he was told to do this in order to use the money to pay the salaries of DSI employees who did not have necessary immigration papers to work legally in the United States and to pay certain vendors in cash. The majority of the checks were made out to plaintiff's wife, Charlotte Kim, and then used to pay the illegal workers. The evidence demonstrated that the defendants were aware of this practice, and at least tacitly approved Mr. Kim's solution to the problem of how to pay their illegal employees. The checks payable to Charlotte Kim were made on a regular basis and always in the same amount -- either $ 1,142.40 or $ 734.65 -- with a notation of "payroll." A much smaller group of checks for relatively modest sums were made out to vendors, such as a delivery service, but then cashed by Mr. Kim after he forged their endorsements. The defendants contend they did not learn of these forged checks until discovery in this case. The plaintiff pointed to evidence [*10] that the defendants were well aware of this practice while he was there. The plaintiff testified that he needed to make the checks payable to a specified payee, rather than to cash, since he was not allowed to make checks payable to cash. The defendants introduced evidence that the plaintiff had written many checks payable to cash during his employment at DSI. The plaintiff asserted his Fifth Amendment privilege against self-incrimination when asked whether he fraudulently endorsed the checks or did so with the authority of the defendants.

## STANDARDS

A. Judgment as a Matter of Law or a New Trial

A party may move for judgment as a matter of law pursuant to *Rule 50(b), Fed. R. Civ. P.* after having made such a motion during a trial at the close of all the evidence. n1 Rule 50(b) states that

> if, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury . . . . The movant may renew its request for judgment as a matter of law by filing a motion no later than ten days after entry of judgment . . . .

*Fed. R. Civ. P. 50(b).* The Second [*11] Circuit has held that the standard for granting judgment as a matter of law is as follows:

> In ruling on a motion for . . . [judgment as a matter of law], the district court is required to deny the motion unless, viewed in the light most favorable to the nonmoving party, the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.

*Binder v. Long Island Lighting Co., 57 F.3d 193, 199 (2nd Cir. 1995)* (quoting *Sir Speedy, Inc. v. L & P Graphics, Inc., 957 F.2d 1033, 1038-39 (2nd Cir. 1992))* (internal quotations and citations omitted). Further, the Second Circuit has held that a motion for judgment as a matter of law should be granted when

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair-minded [persons] could not arrive at a verdict against it.

*Eagleston v. Guido,* [*12] *41 F.3d 865, 875 (2nd Cir. 1994)* (citation omitted) (brackets in original), cert. denied, *133 L. Ed. 2d 18, 116 S. Ct. 53 (1995).*

Case 3:00-cv-02423-AVC    Document 213-10    Filed 11/16/2006    Page 5 of 19

Page 4
1997 U.S. Dist. LEXIS 12544, *

n1 The defendants preserved this right as they moved for judgment as a matter of law as to all of the plaintiff's claims at the close of all the evidence. The Court reserved judgment on the motion.

The standard for granting a new trial, pursuant to *Rule 59, Fed. R. Civ. P.*, is well-settled. This Court may grant a new trial if it is convinced that the jury's verdict was "against the weight of the evidence" or that the jury has reached a "'seriously erroneous result.'" *U.S. East Telecommunications, Inc. v. U.S. West Communications Services, Inc.*, 38 F.3d 1289, 1301 (2d Cir. 1994) (quoting *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir. 1983)); see also *Piesco v. Koch*, 12 F.3d 332, 344 (2d Cir. 1993) ("seriously erroneous" standard reaffirmed as the standard of Second Circuit). The Second Circuit has also characterized this standard as one of determining whether [*13] "the verdict is a miscarriage of justice." *Smith v. Lightning Bolt Prod., Inc.*, 861 F.2d 363, 370 (2nd Cir. 1988).

Under this standard, the Court "is free to weigh the evidence [itself] and need not view it in the light most favorable to the verdict winner." *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992) (quoting *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir. 1978) (citing 11 C. Wright & A. Miller Federal Practice and Procedure § 2806, at 44-45 (1973))). Even if there is substantial evidence to support the jury verdict, a new trial may be warranted. *Song*, 957 F.2d at 1047 (citing *Bevevino*, 574 F.2d at 683 (citing C. Wright & A. Miller, supra, § 2806, at 43)). Nevertheless, the Court must bear in mind that

> where the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial.

*Piesco*, 12 F.3d at 345 (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992), cert. denied, 508 U.S. 952, 113 S. Ct. 2445, 124 L. Ed. 2d 662 (1993)).

B. Remittitur

Remittitur is the "process [*14] by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2nd Cir. 1990) (quoting *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2nd Cir. 1984)) (internal quotation marks omitted). Before a court orders a plaintiff to make this choice, it must first determine whether the verdict is excessive. If it determines the award shocks the judicial conscience, the court should remit the jury's award to the maximum amount that would not be excessive. *Earl*, 917 F.2d at 1330. See also *Pescatore v. Pan American World Airways, Inc.*, 97 F.3d 1, 18 (2nd Cir. 1996) (citation omitted) (in federal question case, district court has discretion to find award excessive if it "shock[s] the judicial conscience") n2

n2 Since this Court had federal question jurisdiction pursuant to *28 U.S.C. § 1331*, I will apply federal law in determining the excessiveness of the award. If this were a diversity case, I would apply New York law. *Gasperini v. Center for Humanities, Inc.*, 135 L. Ed. 2d 659, 116 S. Ct. 2211, 2221 (1996); *Consorti v. Armstrong World Indus.*, 72 F.3d 1003, 1011 (2nd Cir. 1995), vacated on other grounds, 116 S. Ct. 2576 (1996). The difference is important as New York law instructs a court to determine whether the award "materially deviates from what would be reasonable compensation," *N.Y. Civ. Prac. Law & Rules § 5501(c)*, a standard "less deferential to the jury's verdict than the federal standard." *Consorti*, 72 F.3d at 1011. As I am not compelled to follow New York law, I will use the federal standard, but will still draw on New York case law in examining the size of awards given in similar cases.

[*15]

1. Remittitur of a compensatory damage award

While it is properly within the province of the jury to calculate damages, there is "an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable [persons] may differ, but a question of law." *Mazyck v. Long Island R. Co.*, 896 F. Supp. 1330, 1336 (E.D.N.Y. 1995) (quoting *Dagnello v. Long Island R.R. Co.*, 289 F.2d 797, 806 (2nd Cir. 1961)) (internal quotations omitted). Moreover, although a jury has broad discretion to award damages as it feels appropriate, "it may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket." *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2nd Cir. 1993) (citation omitted). A jury verdict cannot stand if it is the result of a miscarriage of justice and represents a windfall to the plaintiff without regard for the actual injury. *Annis v. County of Westchester*, 939 F. Supp. 1115, 1121 (S.D.N.Y. 1996).

To determine whether the award is excessive, it is appropriate to examine awards in similar cases. *Lee v Edwards, 101 F 3d 805, 812 (2nd Cir 1996)* (quoting [*16] *Ismail v Cohen, 899 F 2d 183, 186 (2nd Cir 1990)* (regarding damages, "whether compensatory or punitive")) A court should determine whether the award is "within reasonable range," not just "balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater." *Ismail, 899 F 2d at 187* Additionally, in reviewing a damage award, it is important to examine the particular facts and circumstances of other cases and compare them to the current case. *Scala, 985 F 2d at 684* Finally, a district court should not limit its comparison of awards to Section 1981 claims. *Ismail, 899 F 2d at 186* (citing *Martell v Boardwalk Enterprises, Inc, 748 F 2d 740, 750 (2nd Cir 1984)* (in diversity cases, court should look to awards under comparable state laws); *Zarcone v Perry, 572 F 2d 52, 54-55 (2nd Cir 1978)* (in federal civil rights claims a court should look at general damages principles))

2. Remittitur of a punitive damage award

In Lee, the Second Circuit held that a trial court "may refuse to uphold a punitive damage award when the amount is so high as to shock the judicial conscience and constitute a denial [*17] of justice." *Lee, 101 F 3d at 808* (citation omitted) To determine whether an award is excessive, the court must

> keep in mind the purpose of punitive damages: to punish the defendant and to deter him and others from similar conduct in the future. Thus, [the court's] task is to make certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.

*Id at 809* (internal quotations and citations omitted) The concept of deterrence "is directly related to what people can afford to pay." *Id at 813* To determine whether an award of punitive damages shocks the judicial conscience, a court examines three guideposts: (1) the degree of reprehensibility of the conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this penalty and comparable penalties authorized by law or imposed by judges and juries. *Id at 809* (citing *BMW of N Am, Inc v Gore, 134 L Ed 2d 809, 116 S Ct 1589, 1598-99 (1996)*) In Gore, the Supreme Court held that the first factor is the most important and that there are three aggravating factors [*18] that make some conduct more reprehensible than others. *Gore, 116 S Ct at 1599* These factors are (1) whether the defendant's conduct was violent or threatened violence; (2) whether a defendant acted with deceit or malice and not merely negligence; and (3) whether a defendant has repeatedly engaged in the misconduct. *Id at 1599-1600*

After weighing these factors, a court should compare the instant damage award with other awards in comparable cases, *Lee, 101 F 3d at 812*, and examine the record to determine whether the award is supported by the evidence, *Id at 813*

C Attorney's Fees

Section 1988, Title 42, United States Code, provides that

> in any action or proceeding to enforce a provision of section[] 1981 .. of this title .., the court, in its discretion, may allow the prevailing party .. a reasonable attorney's fee as part of the costs.

*42 U S C § 1988*(b) As the Second Circuit has held, "the district court is given broad discretion in granting a fee award and assessing a reasonable fee under the circumstances of the case." *Luciano v Olsten Corp, 109 F 3d 111, 115 (2d Cir 1997)* To determine whether an attorney's fee [*19] is appropriate, the district court must determine whether a party is the "prevailing party," and whether the requested fee is reasonable. *Pino v Locascio, 101 F 3d 235, 237 (2d Cir 1996)* To determine the appropriate amount of an attorney's fee for a prevailing party, the court calculates a "lodestar" figure whereby "the number of hours reasonably expended by counsel on the litigation [is] multiplied by a reasonable hourly rate." *Luciano, 109 F 3d at 115* The reasonable hourly rate should "be in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Id (internal quotations and citation omitted) Adjustments to the lodestar figure are made to account for such items as unnecessary or unproductive services. *Murphy v Lynn, 53 F 3d 547, 1997 WL 371091 at *14 (2d Cir July 8, 1997)* To ascertain whether the fee is reasonable, however, the "most important factor .. is the degree of success obtained." *Pino, 101 F 3d at 237*

DISCUSSION

A Judgment as a Matter of Law

1. Employment discrimination claims

The defendants contend that the jury's [*20] verdict is inconsistent because it found that the defendants had discriminated against the plaintiff on the basis of his race but not his national origin. The defendants argue that since the plaintiff did not distinguish between his race and national origin at trial, these two verdicts cannot be reconciled. The defendants maintain that since the plaintiff's race and national origin are the same -- Korean -- the defendants could not have discriminated against him on one basis but not the other. I disagree. The mere fact that the plaintiff's race and national origin are the same does not mean that the defendants could not and did not discriminate against him because of his Korean race, but not because he was born in Korea. It is entirely possible that it was irrelevant to the defendants where the plaintiff was born, but that they did care about his ethnic characteristics -- that is, his race.

The defendants also contend that plaintiff's claim of discrimination based on pay differentials cannot stand as a matter of law. I disagree again. Although the plaintiff did not assume all of the responsibilities of the former Vice President, and was not responsible for sales, marketing, or even [*21] managing the workforce, his salary was lower than that of other Japanese officers. Based on this evidence, it cannot be said that there was "a complete absence of evidence supporting the verdict" or that the jury's verdict was the result of "sheer surmise and conjecture." In any event, the evidence of race discrimination should not be pigeon-holed into the separate effects that it had on the terms of the plaintiff's employment. The jury was entitled to make a judgment, based on all of the evidence, as to whether the defendants discriminated against the plaintiff because of his race and whether one of these forms of discrimination was the execution of a salary policy and practice to pay a Korean officer at a lower salary level than a Japanese officer.

The defendants contend that there was no basis for a finding that plaintiff's employment was terminated because of his race. The defendants point to the firing of Japanese employees as the primary support for their argument. I agree that this is strong evidence that race was not the motivating factor, but this evidence is not strong enough to support a finding of judgment as a matter of law. Even if others were fired for nondiscriminatory [*22] reasons, it could still be that the plaintiff was fired for discriminatory reasons. Given the sometimes open hostility towards the plaintiff because of his Korean race, it cannot be said that the jury's verdict was the result of sheer surmise or conjecture.

The defendants contend that this Court should rely on the "same actor" inference adopted by other Circuits. See, e.g., *Buhrmaster v. Overnite Transportation Co.*, 61 F.3d 461, 464 (6th Cir. 1995), cert. denied, 133 L. Ed. 2d 736, 116 S. Ct. 785 (1996). That inference instructs the factfinder that there is a strong presumption against a finding of discrimination where the same person both hired and fired the employee. Here, Ms. Konno made the decision to hire the plaintiff and also to terminate his employment six years later. I find that even if I were to give the defendants this presumption, it still is not strong enough to overcome the high standard imposed under a motion for judgment as a matter of law. The jury was well aware that Ms. Konno made both decisions, yet they still found for the plaintiff on his claim of race discrimination. A presumption can always be overcome and the jury's verdict was not so baseless such [*23] that no reasonable person could have reached the same conclusion. The jury could find, based on the evidence, that the defendants discriminated against the plaintiff throughout his employment: by hiring him at a salary below what a Japanese employee would have been paid and by firing him when they would not have fired a Japanese employee. Ms. Konno's testimony about her reasons for firing the plaintiff were so brief and conclusory that they were almost cryptic. Indeed, the defendants did not develop their argument that they terminated the plaintiff's employment due to their own economic exigencies or the plaintiff's poor performance. As a result, the jury was justified in believing that racial animus informed decisions about the plaintiff's employment at every step.

The defendants argue that the plaintiff's claim for pay differential is time barred because it did not arise after the effective date of the amendment to Section 1981 in 1991, an amendment which allowed claims for racial discrimination in the performance, and not just the making, of a contract. Defendants contend that since the pay differential between the plaintiff and the former Vice President arose in November 1990, [*24] it cannot be the basis for a claim. I disagree. The plaintiff's claim was more general, that is, that he was paid less than Japanese Vice Presidents -- a disparity that continued throughout his employment at DSI. With respect to the amendment of Section 1981, the jury was specifically instructed not to make an award for a race discrimination claim for events occurring prior to November 21, 1991.

The defendants maintain that the plaintiff failed to prove a continuing violation and thus cannot recover for any pay disparity that extends beyond May 6, 1993, that is, beyond the three-year statute of limitations imposed for his Section 1981 claim. n3 I disagree. Every Japanese officer was paid more than plaintiff. The jury could reasonably have found that this constituted a policy of unequal pay. The instant case is different from the Second Circuit's recent decision in *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898 (2d Cir. 1997), where the court held that a pay differential that continues after a discrete act, such as a demotion or job transfer is not a continuing violation despite the fact that the plaintiff may continue

Case 3:00-cv-02423-AVC    Document 213-10    Filed 11/16/2006    Page 8 of 19

Page 7
1997 U.S. Dist. LEXIS 12544, *

to feel the effects of the pay differential into the future. [*25] *Id. at 907-08.* In Lightfoot, the plaintiff had failed to present evidence of a discriminatory policy. *Id at 907.* In the instant case, the jury was entitled to find that the defendants had a policy of paying the Japanese employees more than plaintiff and that this policy is what injured the plaintiff.

> n3 The jury was given the following instruction with respect to the continuing violation doctrine and the statute of limitations:
>
>> The law requires a plaintiff to act with some speed in order to protect his rights. Under the applicable laws in this case, a plaintiff must file a complaint within three years of the allegedly discriminatory conduct. The rule is that only the conduct that occurred within the three years before the filing is the basis for a legal claim. If the conduct falls outside this three-year period, the plaintiff cannot recover for that alleged discrimination.
>>
>> There is an exception to this rule for a plaintiff who has experienced a continuous policy and practice of discrimination. Discrete incidents of discriminatory treatment that are not related to discriminatory policies or mechanisms, however, cannot be considered by you. Instead, the plaintiff must prove that there were specific ongoing discriminatory policies or practices. If a defendant was aware of specific and related instances of discrimination and permitted them to continue unremedied over a significant period of time, you may find that those instances reflect the existence of a discriminatory policy or practice. If you find that there was a continuous policy of discrimination, then the plaintiff can recover for all the discrimination, no matter when it occurred, so long as the last discriminatory act in furtherance of the policy and practice fell within the three-year period.
>>
>> In this case, Mr. Kim filed his complaint on May 6, 1996. Therefore, you may consider any actions that happened three years prior to that date. That is, between May 6, 1993 and when he left DSI on July 28, 1995.
>>
>> To recover for any discriminatory employment decisions prior to May 6, 1993, Mr. Kim must prove that such decision was part of a continuous policy and practice of discrimination at DSI, and that one act in furtherance of this policy or practice occurred after May 6, 1993 and before Mr. Kim left DSI on July 28, 1995.
>
> Ct. Exh. 5.

[*26]

Finally, the defendants contend that plaintiff cannot recover for any back pay award that extends beyond the three-year statute of limitations. As support, the defendants cite *Thomas v. Denny's, Inc., 111 F.3d 1506 (10th Cir. 1987),* and *Kornegay v. Burlington Indus., Inc., 803 F.2d 787 (4th Cir. 1986).* Both the Tenth and Fourth Circuits, however, have determined that the continuing violations doctrine does not apply to Section 1981 claims. Such a determination has not been made in the Second Circuit and indeed in this case, this Court held that the continuing violations doctrine did apply to the Section 1981 claims. *Kim v. Dial Serv. Int'l, 1997 U.S. Dist. LEXIS 66, 1997 WL 5902,* at *5 (S.D.N.Y. Jan. 8, 1997) (relying on *Cornwell v. Robinson, 23 F.3d 694, 704 (2d Cir. 1994)* and *Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993)).* For this reason, I will not reduce the back pay award on the basis that Section 1981 does not allow recovery beyond the statute of limitations.

For these reasons, I deny defendants' motion for judgment as a matter of law on the plaintiff's employment discrimination claims.

In the alternative, defendants move for a new trial. For the same reasons given above, [*27] I find that the jury's verdict was not against the weight of the evidence or a serious miscarriage of justice. There was substantial evidence to support the jury's findings and, moreover, these findings were based in large part on assessments of credibility as they had to ascertain the reasons for the

Case 3:00-cv-02423-AVC    Document 213-10    Filed 11/16/2006    Page 9 of 19

Page 8
1997 U.S. Dist. LEXIS 12544, *

termination of Mr. Kim's employment and the pay differentials. Given this importance of credibility, I decline to disturb the jury's findings and therefore deny the defendants' motion for a new trial on the plaintiff's employment discrimination claims.

2. State-law contract claims

As this Court charged the jury, in order to recover on a claim for breach of contract, a plaintiff must prove the existence of an agreement with reasonably certain terms and vague or non-specific promises cannot form the basis for a claim. n4 The only promise referred to in the testimony was the promise that the work would be "paid for specially." This statement, standing alone, is insufficient as a matter of law to form a binding contract on which the plaintiff can recover. The promise was too vague. In *Saunder v. Baryshnikov*, 110 A.D.2d 511, 487 N.Y.S.2d 51 (N.Y. App. Div. 1985), the court held that [*28] a promise "to take care" of the plaintiff and her "financial needs" was too vague and lacked material terms such as the "form, frequency and amount of payment." 487 N.Y.S.2d at 52.

n4 The Court gave the jury the following instruction:

> Mr. Kim alleges that DSI and DSC ("the corporate defendants") breached a contract that they had with Mr. Kim to pay him additional overtime wages for work on the 1990 NIRA symposium. To succeed on this claim, Mr. Kim must establish each of the following four elements by a preponderance of the evidence:
>
> (1) that he entered into a valid contract with the corporate defendants that they would pay him additional compensation for his work on the 1990 NIRA symposium; . . . .
>
> A contract is a promise or set of promises. The law recognizes a duty to perform these promises and provides a remedy if a party breaches one of these promises.
>
> In order for a contract to be binding, there must be "mutual assent" to the terms and conditions of the contract. This is referred to as the "meeting of the minds." There must be a meeting of the minds of the parties on all essential terms of the contract. Assent may take the form of written or spoken words or may be shown by the actions of the parties. Thus, assent may be implied when a party has conducted itself in such a manner that its assent may fairly be inferred. In sum, the intent of the parties is determined by what they said, what they did, their relationship and all of the surrounding circumstances.
>
> To bind an employer, an individual must have the authority to make a promise on behalf of that employer. Therefore, if you find that a promise was made, you must find that the person who made the promise had the actual or apparent authority to bind the corporation. Apparent authority exists where the words or conduct of the corporate defendants caused Mr. Kim reasonably to believe that the individual had the authority to act on behalf of the employer.
>
> Further, to find there was a valid contract, there must also be "consideration" for the promise to pay Mr. Kim additional wages. Consideration is a legal term that means either that some right or benefit accrues to one party, or that some loss, forbearance or responsibility falls to the other party. If a party makes a promise to do something which he is already bound to do, then there is no consideration. . . .
>
> The law requires that a contract be reasonably certain as to its material terms. If a promise is too

1997 U S Dist LEXIS 12544, *

vague or non-specific, it is not an enforceable contract.

Ct Exh 5 The plaintiff did not object to this charge.

[*29]

Additionally, the plaintiff did not demonstrate that the former Vice President had either the actual or apparent authority to promise plaintiff additional money Plaintiff testified that he knew that only DSC, DSI's parent company, had the authority to make decisions about his compensation The President of DSI also testified that he did not have the authority to make decisions regarding compensation, only DSC had such authority

Finally, the plaintiff submitted no evidence of any consideration for the promise to pay him additional compensation Indeed, plaintiff was a professional employee who was not eligible for overtime compensation He was expected to perform a variety of tasks without additional pay As the New York Court of Appeals held in the seminal case,

> a promise made to induce a party to do that which he is already bound by contract to perform is without consideration ...
> Any change in an existing contract, such as a modification of the rate of compensation, or a supplemental agreement, must have a new consideration to support it

*Schwartzreich v Bauman-Basch, Inc, 231 N Y 196, 202-03, 131 N E 887 (N Y 1921)*

For all these reasons, I find [*30] that defendants are entitled to judgment as a matter of law on the plaintiff's claim for breach of contract.

Similarly, the plaintiff's quasi-contract claim for unjust enrichment cannot stand as a matter of law. n5 The plaintiff claimed that he was not paid for his work under the NIRA contracts, apart from the work on the 1990 symposium The plaintiff did not, however, introduce any evidence to support his claim There was ample evidence that the duties he performed under the contracts were within the scope of his employment and that he ratified these terms of his employment by continuing to work at DSI The plaintiff testified that before he accepted employment at DSI he was told that his duties would include some of the NIRA work and that as his duties expanded he would receive additional pay He did receive this additional pay as his salary increased from $ 30,000 to $ 40,000 within the first 18 months of his employment. When he was promoted to Vice President he received a salary of $ 53,000 There was ample evidence that plaintiff performed other jobs in addition to his accounting responsibilities, such as help Ms Konno purchase art and perform work in connection with litigation. [*31]

n5 The jury was given the following instruction with regard to this claim:

> Mr. Kim claims that from October 1989 through April 1993 he was not compensated for work he did under the corporate defendants' annual contracts with NIRA To recover under this claim, Mr. Kim must prove the following elements by a preponderance of the evidence:
>
> > (1) that he performed the services in good faith;
> >
> > (2) that the corporate defendants accepted those services;
> >
> > (3) that Mr Kim expected to be paid for the performance of the services;
> >
> > (4) that Mr. Kim was not paid for those services; and
> >
> > (5) the reasonable value of the services
>
> When a salaried employee sues his employer to recover for services rendered, he must show that the duties for which he seeks recovery were outside the scope of his employment such that it would be unreasonable for the employer to assume that the employee would not

> expect additional compensation beyond the employee's salary.
>
> Further, if an employee keeps working under the terms and conditions imposed by his employer which the employee deems unacceptable or unsatisfactory, you may find that the employee has agreed to these terms of employment. If you find he so agreed, he cannot later sue for damages. Thus, if you find that Mr. Kim continued to work for DSI after knowing that he would not be paid extra money under the NIRA contracts, then he is said to have assented to those conditions of employment and they cannot form the basis for his claim.
>
> If you find for Mr. Kim on this theory, then you should award him the reasonable value of the services he performed.
>
> Ct Exh 5

[*32]

Since the work was not beyond the scope of his employment contract and since plaintiff ratified any possible change to that contract by continuing to work at DSI, I grant defendants' motion for judgment as a matter of law with regard to plaintiff's quasi-contract claim for unjust enrichment.

B. New Trial Due to Inconsistent Verdicts

The defendants contend that the jury's award of $ 170,000 in back pay and $ 325,000 in front pay are logically inconsistent and thus defendants are entitled to a new trial. *Brooks v. Brattleboro Mem. Hosp., 958 F.2d 525, 529 (2d Cir. 1992).* Defendants contend that the jury's award of $ 170,000 in back pay appears to be compensation for the time between the termination of plaintiff's employment in late July 1995 and the verdict, in early June 1997, 22 months later. The defendants contend that this represents a salary of $ 85,000 a year, while the award of $ 325,000 over the 5 years designated by the jury for front pay is an annual salary of $ 65,000.

There is another analysis of the verdict, however, which comfortably reconciles the awards of front and back pay. As noted, it appears that the jury felt that plaintiff was entitled to an annual [*33] salary of $ 65,000 when it made its award of front pay. If the jury awarded the plaintiff this amount for the nearly two years between his termination and the trial, this leaves $ 40,000 as back pay to recompense plaintiff for the pay differential between him and the Japanese officers while he was employed. Indeed, his salary was $ 53,000 and thus the difference was $ 12,000. After awarding the plaintiff $ 130,000 for the two years of lost earnings, the remaining $ 40,000 represents slightly less than $ 12,000 a year for the recoverable period between November 1991 and July 1995 -- three years and eight months. Although these figures do not add up with exactitude, they are a rough approximation, and I believe an accurate one, of the jury's intention. Indeed, given the clear message sent by the front pay award -- $ 65,000 a year for five years -- and the fact that this amount is a compromise between the $ 85,000 salary of the former Vice President and the $ 60,000 salary of the other two Japanese Vice Presidents, I find that the jury's verdict is quite consistent and shows that they determined the damages with precision.

For this reason, I find that the jury awards of front and back [*34] pay are not inconsistent and therefore do not merit a new trial.

C. Unclean Hands

In response to the plaintiff's damages of front and back pay as well as his awards under his contract claims, the defendants assert the equitable defense of unclean hands, claiming that the plaintiff's forging of checks and blackmail of DSI not to reduce his hours or he would expose the immigration irregularities bars his recovery. The defendants did not argue the blackmail theory to the jury as a basis to deny the plaintiff an award of front and back pay, nor did they request a charge to the jury on this issue. As a consequence, it is waived. While I find that there was evidence supporting the defendants' claim of misconduct with regard to the forgeries, the jury was charged in this respect as to both the front and back pay awards n6 as well as the contract claims n7 The jury was also told that they were allowed to draw a negative inference from the plaintiff's invocation of the Fifth Amendment privilege n8 Thus, it cannot be said that the jury's determination of the issue -- resting as it did on an assessment of the credibility of the witnesses -- is the result of sheer conjecture or surmise. [*35] For this reason, I will not grant defendants' motion for judgment as a matter of law on this issue.

> n6 With regard to the award of front and back pay, the jury was given the following instruction:

1997 U.S. Dist. LEXIS 12544, *

Defendants contend that in the course of litigating this case, they recently discovered that Mr. Kim engaged in misconduct by cashing checks he had made payable to others. Defendants contend that if they had known of this misconduct during his employment with DSI they would have terminated Mr. Kim's employment for that reason alone, apart from their other allegedly nondiscriminatory reasons for their decision to terminate his employment. The defendants have the burden of proving by a preponderance of the evidence that they would have terminated his employment on the basis of the misconduct alone.

If you find that Mr. Kim did engage in misconduct and such misconduct was so grave that defendants would have terminated his employment immediately after its disclosure and on the grounds of that misconduct alone, then this has two ramifications. First, you should not make an award of front pay. Second, Mr. Kim is entitled to back pay only until the defendants discovered the alleged misconduct.

Ct. Exh. 5.

[*36]

n7 With regard to the contract claims, the jury was given the following instruction:

Defendants claim that Mr. Kim engaged in serious misconduct and that this should bar his recovery for each of his contract claims. If an employee is disloyal to his employer, he may forego his right to compensation.

Thus, if you find that Mr. Kim was cashing DSI checks made payable to others in order to keep that money for himself or otherwise not using the money for his employer's benefit, this fact alone would be sufficient for you to deny the plaintiff recovery on his contract claims. Defendants bear the burden of proving this defense by a preponderance of the evidence.

Ct. Exh. 5.

n8 With respect to the plaintiff's Fifth Amendment privilege, the jury was given the following charge:

You have heard the plaintiff decline to answer certain questions on the ground of his Fifth Amendment privilege against self-incrimination. The Fifth Amendment of the United States Constitution affords every person the right to decline to answer any questions if he believes that the answers may tend to incriminate him. However, in civil cases, you are permitted, but not required, to draw the inference that the withheld information would have been unfavorable to the plaintiff. Any inference you draw should be based upon all of the facts and circumstances in this case as you find them.

Ct. Exh. 5.

[*37]

D. Remittitur

The defendants move for remittitur or a new trial on the jury's compensatory and punitive damage awards, claiming that they are excessive and should shock the judicial conscience. As discussed above, before granting such a motion, this Court must first determine whether the awards are excessive -- in this case, $ 300,000 in compensatory damages and $ 750,000 in punitive damages. A court makes such a determination by comparing the instant award with other verdicts in similar cases and examining the evidentiary record to ascertain whether

there is adequate evidentiary support for the award. I will apply this test to each award.

1. Compensatory damage award

The jury's award of $ 300,000 is clearly excessive given other verdicts in this area. An examination of other cases -- circuit and district court cases discussed in reverse chronological order -- demonstrates that upholding a $ 300,000 award for compensatory damages for emotional distress would be unprecedented. For example, in an age discrimination case brought under New York and federal law, the Second Circuit affirmed the trial court's remittitur of a jury award of nearly $ 498,000 for pain and suffering [*38] to $ 5,000. *Binder, 57 F.3d at 198, 202.* The defendants terminated plaintiff and did not find him similar employment within the company, although other positions were available. These positions were given to younger employees. *Binder v. Long Island Lighting Co., 847 F. Supp. 1007, 1009 (E.D.N.Y. 1994).* The trial court found that the award was "grossly excessive" based on the plaintiff's scanty evidence of emotional distress. *Id. at 1028.* It also found that the jury award was likely the product of a specific calculation -- because the actual award was for a specific amount, $ 497,738 -- yet the jury had no evidence on which to base a calculation. *Id.*

In *Miner v. City of Glens Falls, 999 F.2d 655 (2nd Cir. 1993),* the trial court determined that a $ 12,000 award in a Section 1983 suit was not excessive for a police officer, denied due process and forced to retire, who suffered humiliation as he applied for public assistance, sold his new home, and had deteriorating relations with his family. *Id. at 662-63.*

In a suit brought by an African American corrections officer under *42 U.S.C. §§ 1981, 1983,* and Title VII, for inter alia racial harassment, failure to [*39] promote, poor job assignments, an unwarranted disciplinary sanction and unjustified public embarrassment, the Second Circuit upheld the district court's determination that a $ 50,000 award was not excessive. *Wade v. Orange County Sheriff's Office, 844 F.2d 951, 955 (2nd Cir. 1988).*

In an employment discrimination case brought under Title VII, Section 1981, and the NYSHRL, the jury awarded over $ 219,000 in compensatory damages. *McIntosh v. Irving Trust Co., 887 F. Supp. 662, 663 (S.D.N.Y. 1995).* The court found that the award shocked the judicial conscience, was out of line with other compensatory damage awards for emotional distress, and was not founded in the evidence introduced at trial and therefore reduced the award to $ 20,000. *Id. at 669.* The court in that case also conducted a survey of recovery under New York law for emotional distress and found that jury awards range from $ 5,000 to $ 15,000. *Id. at 666-69.*

In a case of housing discrimination brought by an interracial couple and their child under *42 U.S.C. §§ 1981, 1983,* the Fair Housing Act *(42 U.S.C. §§ 3601-19),* and New York law, a jury awarded each parent $ 100,000 and the child $ 80,000 for emotional [*40] distress associated with the discrimination. In addition to determining that a causation issue needed to be reexamined in connection with the jury award, the trial court found that the $ 280,000 award shocked the judicial conscience and granted a new trial on compensatory damages. *Portee v. Hastava, 853 F. Supp. 597, 612-13 (E.D.N.Y. 1994), aff'd, 104 F.3d 349 (2d Cir. 1996).*

Based on this survey of compensatory damage awards in other cases, I find that the $ 300,000 award is excessive and should be remitted to $ 25,000. I find that this is the appropriate award given the sparse evidence introduced at trial regarding the plaintiff's mental anguish. An examination of similar cases -- again, organized by level of court and age -- reveals that plaintiff did not present either the quality or quantity of evidence to support a $ 300,000 award.

Some courts have upheld awards with speculative evidence, but the awards have been for much smaller amounts. For example, in an age discrimination case brought under New York law, the Second Circuit determined that an "extremely modest" award of $ 18,000 for emotional distress did not shock the judicial conscience. *Tyler v. Bethlehem Steel* [*41] *Corp., 958 F.2d 1176, 1190 (2nd Cir. 1992).* In that case, a 48-year-old salesman was terminated and denied a transfer to a different office. Subsequently, thirteen salespeople, all of whom were younger than plaintiff, were hired in positions similar to the one plaintiff sought. *Id. at 1179.* Plaintiff testified that losing his job was "like a divorce, your wife died or state of shock." *Id. at 1190.*

A trial court did find sufficient substantiation to uphold an award in *Marfia v. T.C. Ziraat Bankasi, New York Branch, 903 F. Supp. 463 (S.D.N.Y. 1995), vacated on other grounds, 100 F.3d 243 (2d Cir. 1996).* In that case, the trial court let stand a jury award of $ 100,000 for pain and suffering where a bank employee of Italian national origin was fired from a Turkish bank in New York and was subject to harassment while employed at the bank because of his national origin. The plaintiff tried to kill himself but was stopped by his 15-year-old son. The plaintiff then spent two weeks in the hospital under a suicide watch. *Id. at 467, 471.*

In *Lightfoot v. Union Carbide Corp., 901 F. Supp. 166 (S.D.N.Y. 1995), aff'd in part and vacated and remanded in part, 110* [*42] *F.3d 898 (2d Cir. 1997),* an age discrimination suit brought under New York and federal law, the court remitted a compensatory damages award of $ 750,000 to $ 75,000 because the award was

Case 3:00-cv-02423-AVC    Document 213-10    Filed 11/16/2006    Page 14 of 19

Page 13
1997 U.S. Dist. LEXIS 12544, *

not in accord with other awards and was not founded in the evidence at trial. Id. at 169-70 n9 The court specifically compared that case with *Marfia, supra,* and found no such compelling circumstances.

> n9 Although the Second Circuit remanded this portion of the District Court's opinion, finding that the court should have given the plaintiff the option of a new trial, the Second Circuit did not disagree with the amount of, or reasons for, the remittitur. *Lightfoot,* 110 F.3d at 914-15.

In the instant case, there was no compelling evidence such as that found in Marfia. The testimony regarding the plaintiff's mental anguish was essentially the following: Mr. Kim testified that he felt "gloomy" and had difficulty sleeping. He also testified that he lost his appetite and as a result lost 20 pounds. The plaintiff testified [*43] that he drank at home and took sedatives. The plaintiff's wife testified that the plaintiff did not like to socialize as a result of the discrimination, had difficulty sleeping, drank and took sedatives. The plaintiff's wife also testified that plaintiff did not enjoy leisure activities such as going to a health spa or playing golf. She testified that this lack of interest in life continues, although somewhat improved, to the present.

The defendants contend that the plaintiff did not prove that his mental suffering was connected with the discrimination. I disagree. I find that although the testimony was generalized, it was sufficiently specific to show that the symptoms started while he worked at DSI and continued during his employment there. Much of the testimony regarding mental anguish, however, was tied by the plaintiff to the conversations which he contended proved age discrimination. As a consequence, a certain amount of his suffering must be attributed to a theory on which he did not recover. While I do find that the plaintiff suffered some mental anguish from the race discrimination which he proved, I do not find that the evidence introduced merits an award of $ 300,000. Rather, [*44] the maximum amount that would not be excessive is $ 25,000. For this reason, I will grant the defendants' motion for a remittitur of the compensatory damages award in the amount of $ 275,000, and thus make an award of compensatory damages in the amount of $ 25,000.

2. Punitive damage award

The defendants challenge the jury's award of $ 750,000 in punitive damages. They claim that there is no basis for any punitive damage award, or in the alternative, it should be radically reduced. I will not disturb the jury's determination that punitive damages were warranted in this action. There was sufficient, albeit not overwhelming, evidence to uphold such a finding. Indeed, the defendants mounted almost no defense to the plaintiff's case, instead relying on weaknesses in the plaintiff's case. Ms. Konno briefly testified about her commitment to world peace and intercultural understanding. Based on the lack of contradictory evidence, the jury could well have determined that the defendants' actions were willful or malicious.

I do find, however, that the award is grossly excessive and should be reduced. Using the Second Circuit decision in Lee and the Supreme Court's decision in Gore, [*45] I find that the three guideposts for an award of punitive damages -- reprehensibility, ratio to compensatory damages, and other authorized penalties all militate in favor of reducing the award.

First, the degree of reprehensibility is low in this case. Weighing the three factors relevant to reprehensibility discussed above, I find that there was no violence and very little repetition of the misconduct. The gravamen of the plaintiff's case was wrongful termination, which, obviously, occurred only once. There was evidence, however, to support the plaintiff's claim for a pay disparity and this conduct did persist throughout the plaintiff's employment at DSI. For these reasons, I find that the first factor weighs in the defendants' favor and the third factor weighs in neither party's favor. It is the second factor -- the malice of the defendants' actions -- that weighs more strongly for the plaintiff. I place reliance here on the jury's determination that the defendants acted with malice when they discriminated against the plaintiff on the basis of his race. As discussed above, there was evidence to support such a finding. I do not find, however, that there was particularly strong evidence [*46] such that it would support a punitive damage award of $ 750,000.

Finding that the defendants' actions were reprehensible but not overly so, I turn to the ratio of the award to compensatory damages. The total of non-exemplary damages to which the plaintiff is now entitled, after remitting the compensatory damage award and deducting the contract claims, is $ 520,000. The jury's award of $ 750,000 in punitive damages does not result in a gross disproportion between the exemplary and non-exemplary damages. If, however, a comparison is made of compensatory damages awarded through the remittitur -- $ 25,000 -- and the punitive damage award, there is a material disproportion. I realize that, standing alone, such a disproportion is not determinative since punitive damages may be awarded under Section 1981 when the only non-exemplary damages are nominal damages. *Lee.* 101 F.3d at 811. Nonetheless, in this case, it is appropriate to measure the punitive damages against the far smaller figure for compensatory damages, since, in my view, the

award of front pay, and indeed back pay for the period following the plaintiff's termination of employment, must be viewed as largely punitive. Many Japanese [*47] employees lost their jobs at DSI due to its continual loss of money. Only the plaintiff will receive $ 65,000 a year for approximately seven years after leaving the company. He will receive this money despite scant evidence that he made any effort to mitigate his damages or ever intended to work that long. As a consequence, when viewed against the $ 25,000 in compensatory damages that I have determined to be appropriate, the award of $ 750,000 in punitive damages is disproportionate.

The final factor -- the comparison with civil penalties for similar conduct -- demonstrates that the $ 750,000 award is far too great. Under the NYSHRL, a plaintiff may recover no punitive damages. *Thoreson v Penthouse Int'l, Ltd., 80 N.Y.2d 490, 591 N.Y.S.2d 978, 981-82, 606 N.E.2d 1369 (N.Y. 1992)*. Title VII places a strict control on damage awards depending on the number of employees of a defendant. Even if all of the defendants' approximately 320 employees counted towards the statutory cap -- and I explicitly found in my prior Opinion that the employees in Japan did not count toward the statutory requirements of Title VII -- the plaintiff's damages for future economic loss, compensatory damages [*48] and punitive damages would be capped at $ 200,000. *42 U.S.C. § 1981a(b)(3)(C)*. The front pay award alone already exceeds this limitation and certainly the punitive damage award is far greater than this limit. Moreover, if the number of employees at DSI exceeded the 15-person statutory minimum -- and, as I noted in my prior Opinion, it is undisputed that DSI employs fewer than 15 people -- the applicable limitation would cap plaintiff's damages at $ 50,000. *42 U.S.C. § 1981a(b)(3)(A)*.

Finally, although there was conflicting evidence introduced at trial regarding the financial resources of the defendants, I find that a punitive damage award of $ 750,000 exceeds a proper amount to achieve the dual purpose of deterrence and punishment. A punitive damage award is not intended to bankrupt a defendant. *Smith v. Lightning Bolt Prod., Inc., 861 F.2d 363, 373 (2d Cir. 1988)*. There was evidence that Ms. Konno's income in 1996 was $ 370,000, but there was also evidence that she carries substantial debts. DSI lost $ 50,000 in 1996 and owed $ 180,000 in debts. DSC's profits in 1996 were only $ 70,000.

The plaintiff cites only one case in this Circuit where a large punitive damage award was [*49] upheld. In Marfia, the district court upheld a $ 1 million punitive damage award, but noted expressly that in doing so it relied on the callousness of the defendant's conduct and the large size of the international business run by defendant. *Marfia, 903 F Supp at 472*. Neither factor is present here to the degree found in Marfia.

For all these reasons, I find that a punitive damage award of $ 25,000 is proper and therefore grant the defendants' motion for remittitur of the punitive damage award in the amount of $ 725,000.

To summarize, the plaintiff's entire damages consist of the following amounts: $ 170,000 in back pay, $ 325,00 in front pay, $ 25,000 in compensatory damages and $ 25,000 in punitive damages.

E. New Trial on all Issues versus Damages

When a court grants a new trial as an alternative to remittitur, it must determine whether to grant a new trial on all issues, or a discrete issue, such as damages but not liability. The standard set by the Second Circuit is that

> a partial new trial may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone [*50] may be had without injustice.

*In re Joint E. Dist. & S. Dist. Asbestos Lit., 995 F.2d 343, 346 (2nd Cir. 1993)* (quoting *Bohack Corp. v. Iowa Beef Processors, Inc., 715 F.2d 703, 709 (2nd Cir. 1983)* (internal quotation marks and citation omitted)). In that case, the Second Circuit determined that since

> the same jury heard the liability and damage phases of the trial, [it makes] partial reversal more problematic than it would be if separate juries had been impaneled.

Id. The determination, therefore, rests on the separability of the issues.

In the instant case, the punitive damage award was closely linked to the evidence of liability -- that is, whether the defendants' actions were malicious -- such that it would be difficult to re-try only that portion of the case. The compensatory damage award also requires the jury to understand the context for the mental anguish. For these reasons, I find that it is appropriate to grant a motion for a new trial on the issues of both damages and the defendants' liability for the race discrimination claim.

F. Attorney's Fees

The plaintiff moves for an award of attorney's fees pursuant to Section 1988, [*51] Title 42, United States Code. I find that such an award is appropriate, but in a lower amount than the requested lodestar. Having excluded some time already, n10 the plaintiff requests reimbursement for the remainder of his work on all of the claims, contending that they are intertwined and cannot be separated.

unsuccessful Title VII and ADEA claims as well as additional time spent to amend the Complaint to include the contract claims as there is no right to recovery of attorney's fees for those claims.

The plaintiff requests the following lodestar in connection with work performed through the time of trial:

n10 The plaintiff has already deducted 97 hours of work performed in connection with the

| Attorney | Hours | Rate | Total |
|---|---|---|---|
| John Beranbaum | 600.2 | $ 250 | $ 150,050 |
| Michael Paley | 620.9 | $ 175 | $ 108,657.50 |
| Paralegal (lawyer) | 26.9 | $ 75 | $ 2,010 |
| Law student | 11.5 | $ 65 | $ 747.50 |
| | | Lodestar: | $ 261,465 |

Defendants contend that (1) the hourly rates are excessive; (2) the lodestar [*52] should be reduced by 66% to reflect the plaintiff's limited success on his employment discrimination claims -- he did not win on his claims of age and national origin discrimination -- and the contract claims for which there is no statutory authority for awarding attorney's fees; (3) the lodestar should be further reduced by 30% to account for vague billing entries; and (4) the lodestar should be further reduced by 30% to account for duplicative and excessive billings. I will address each argument in turn.

1. Hourly rates

A reasonable hourly rate should "be in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Luciano, 109 F.3d at 115* (internal quotations and citation omitted). The defendants contend that the requested hourly rates are excessive and propose hourly rates of $ 225 for Mr. Beranbaum and $ 150 for Mr. Paley. I find that the requested rates are not excessive.

Mr. Beranbaum graduated from New York University Law School in 1981 and has been practicing law in the public interest ever since. He worked for the Legal Services Corporation for four years, doing litigation [*53]. He then worked for developmentally disabled children and represented them in administrative proceedings and in trials in federal court. He also worked for two private firms, representing labor unions. At one of the firms, he specialized in employment discrimination

cases. He founded his own firm in August 1995 to represent plaintiffs in employment discrimination cases. He acknowledges that he does not have a regular billing rate as nearly all cases are taken on a contingency basis. Similarly, Mr. Paley graduated from New York University Law School in 1992, where he was a recipient of the prestigious Root-Tilden-Snow scholarship for students pursuing careers in the public interest. Mr. Paley clerked for a federal judge in the Southern District of New York after graduation, then worked for nearly three years at a mid-size commercial firm in New York City. Mr. Paley joined Mr. Beranbaum's office in August 1996. The plaintiff submitted affidavits that his requested rate of $ 250 per hour and Mr. Paley's rate of $ 175 reflect appropriate rates for attorney's of like skill and experience in Manhattan.

Based on my knowledge of prevailing rates for attorneys in this district and the evidence [*54] offered in support of the rates, I find that requested rates are appropriate. n11

n11 The defendants do not contest the hourly billing rates for the paralegal work performed by an attorney as well as the work performed by the law student.

2. Limited success and contract claims

The plaintiff seeks an award for the fees for litigating all of his claims, maintaining that the claims are so intertwined that they cannot be separated. The defen-

dants contend that the lodestar should be reduced by 66% to reflect the unsuccessful employment discrimination claims and the contract claims for which there is no basis for recovering an attorney's fee.

As noted above, to ascertain whether a fee is reasonable, the "most important factor . . . is the degree of success obtained," *Pino, 101 F 3d at 237,* and a plaintiff's award should be reduced where he does not achieve full success, although a court need not apportion the fee award mechanically based on the successful claims *Farrar v Hobby. 506 U S 103, 114, 121* [*55] *L Ed 2d 494, 113 S Ct 566 (1992). Hensley v Eckerhart, 461 U S 424, 436, 438, 76 L Ed 2d 40, 103 S Ct 1933 (1983), Chambless v Masters, Mates & Pilots Pension Plan. 885 F 2d 1053, 1056 (2d Cir 1989)* If a court finds, however, that the successful and unsuccessful claims are so intertwined that separation is impossible, the court may award the full application. *Hensley, 461 U S at 438* In Hensley, the Supreme Court found that the district court did not err when it refused to apportion the fee based on successful and unsuccessful claims because of "the relative importance of various issues, the interrelation of the issues, the difficulty in identifying issues, or the extent to which a party may prevail on various issues" Id. Despite this, the Court reversed the district court's award because it held that "the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees," *id at 440,* and the district court had not made an explicit finding to this effect. *Id at 439* The Supreme Court held that

> where the plaintiff achieved only limited success, the district court should award only that [*56] amount of fees that is reasonable in relation to the results obtained

*Id at 440* Even though the plaintiff's claims were "non-frivolous, and raised in good faith" and even if counsel tried the case with "devotion and skill," an award of fees is not appropriate where the plaintiff has not had success *Id at 436*

The Second Circuit has held that

> where the district court determines that the successful and unsuccessful claims are "inextricably intertwined" and "involve a common core of facts or [are] based on related legal theories," it is not an abuse of discretion for the court to award the entire fee.

*Reed v A W Lawrence & Co, 95 F 3d 1170, 1183 (2d Cir 1996)*

In the instant case, the plaintiff prevailed only on his claim of race discrimination. His claims for national origin discrimination, and to a lesser extent age discrimination, however, were intertwined with the race discrimination claim Thus, although he lost on these claims, he did win a substantial award for his claim of race discrimination, even after this Court remits the compensatory and punitive damage awards I find that the additional work to bring the age and national origin [*57] discrimination claims is not so great that it merits a substantial decrease in the lodestar. I do, however, find that a decrease of 15% to reflect the age discrimination claim primarily is warranted. Additionally, I will reduce the lodestar by a further 15% to reflect the work on the contract claims. There is no basis for awarding attorney's fees on these claims, and I disagree with the plaintiff's argument that the work to prove these claims was encompassed within the work on the employment discrimination claims. They were separate claims with separate theories that had to be proved at trial I find that the 15% reduction is appropriate. Although this total reduction of 30% is less than half of the reduction requested by defendants, I find that it is sufficient

The defendants further request that the fee be reduced to reflect work performed for the Title VII and ADEA claims, which were dismissed by this Court in the January 8, 1997 Opinion, as well as work arising from the plaintiff's invocation of his Fifth Amendment privilege and from his use of interpreters In this last connection, the plaintiff contends that his trial preparation work was particularly time consuming because [*58] he had to use interpreters in speaking with his client and certain other witnesses As we all discovered at trial, however, these witnesses had a sufficient command of English to give their testimony largely without the use of an interpreter I find that a further reduction is appropriate for each of these reasons and reduce the lodestar by a further %5. Thus, the total deduction for the above reasons is 35%.

3 Vague billing entries

In making an application for attorney's fees, a party is required to submit adequate documentation of the work performed by each attorney. *New York State Ass'n for Retarded Children, Inc v Carey, 711 F 2d 1136, 1148 (2d Cir 1983)* The defendants contend that the plaintiffs have not done so and thus the lodestar should be reduced by 30% I find that this is far too great and will impose only a 5% reduction to account for the vague billing entries.

Case 3:00-cv-02423-AVC    Document 213-10    Filed 11/16/2006    Page 18 of 19

Page 17
1997 U.S. Dist. LEXIS 12544, *

4 Unnecessary and duplicative work

A plaintiff should not recover fees for a duplication of effort. *Luciano, 109 F.3d at 111.* A court properly reduces a fee for work that is excessive. *Hensley, 461 U.S. at 436. Luciano, 109 F.3d at 111.* The defendants contend that Mr. Beranbaum [*59] performed work that should have been performed by an associate and that Mr. Paley performed work that should have been done by a paralegal. I agree, although to a far less extent than is described by the defendants. Depending on the task, an hour spent by experienced counsel can be far more efficient and effective than time spent by less experienced staff with insufficient guidance. Nonetheless, I find in this case that senior counsel's involvement was to some extent inefficient and requires an adjustment to the fee award.

In addition, the lodestar should be reduced to reflect duplicative work by the two plaintiff's attorneys. Many of the entries show that both attorney's did the same work at the same time when only one attorney's time was necessary. For these reasons, I will reduce the lodestar by 10%.

G. Summary of Attorney's Fees Calculation

To summarize, I find that the plaintiff's proposed lodestar of $261,465 should be reduced in the following manner. First, I will reduce the original lodestar by 5% to reflect the vague billing entries and a further 10% to reflect duplicative or unnecessary work. This is a total reduction of 15%, thus equalling a new lodestar of $ [*60] 222,245.25. I will then reduce this amount by 35% to reflect the plaintiff's limited success and for his contract claims. Thus the total award is for $144,459.41.

H. Costs

When a court makes an award of attorney's fees, it should also award the prevailing party "reasonable out-of-pocket expenses incurred by the attorney and which are normally charged fee-paying clients," so long as these costs are "incidental and necessary to the litigation." *Reichman v. Bonsignore, Brignati & Mazzotta P.C., 818 F.2d 278, 283 (2d Cir. 1987)* (internal quotations and citations omitted). The plaintiff seeks reimbursement for $29,920.32 in costs and has produced documentation for all of the requested expenses.

The defendants contend that the award should be reduced by the same percentage as the fee award to reflect the plaintiff's limited success and contract claims. I agree and will reduce the award of costs by 35%, as I did with the award of attorney's fees. The defendants also contend that plaintiff should not be reimbursed for specific items. First, the defendants contend that the use of interpreters for the plaintiff and another witness at trial and at their depositions was unnecessary [*61] because these witnesses spoke English. Although these witnesses did speak English, an interpreter was sometimes needed to ensure that the testimony was accurately presented and understood by the court and jury. For this reason, I find that these expenses should be reimbursed.

Second, the defendants contend that the plaintiff should not be reimbursed for (1) his own use of taxis and for bridge tolls -- apart from the travel expenses of the attorneys -- a total of $309.40; (2) attorney travel expenses, a total of $275.68; (3) postage expenses, a total of $80.05; (4) miscellaneous items such as temporary secretarial work, use of facsimiles, paralegal help and office supplies, for which the defendants do not provide a total; (5) service of witnesses, a total of $963; and (6) translation of documents, a total of $6,843. Although the defendants provide scant legal authority for these reductions, I agree that the plaintiff should not be reimbursed for his own travel, that postage should be included in the overhead of a law firm, and that the services of a translator were unnecessary given the plaintiff's expertise as a translator. Only if there were disputes as to the accuracy of a [*62] translation -- and there were none -- would the services of another translator have been required. Given the overarching 35% reduction, however, I find that I need not further reduce the award of costs to reflect these specific items. Thus, I find that the plaintiff is entitled to an award of costs in the amount of $19,448.21.

I. Supplemental Attorney's Fees and Costs

Plaintiff requests an award of $40,142.50 in supplemental fees to reimburse him for work performed in connection with the post-trial motions and preparing this fee application. n12 I will award the plaintiff fees associated with the post-trial motions and the work on his application for attorney's fees. *Reed, 95 F.3d at 1183-84* (finding it appropriate to award fees incurred in making an application for attorney's fees). The defendants oppose this request, making the same arguments as they did against the original request.

n12 The plaintiff has already made reductions in the request to reflect unnecessary work as well as work performed on the state-law contract claims.

[*63]

I find that it is appropriate to reduce the supplemental fee request as the work performed since the trial suffers from the problems discussed above. That is, plaintiff performed some unnecessary, duplicative and excessive work, and filed a fee application that still includes some of the work for the contract claims even though there is

no basis for recovering those fees For these reasons, I will reduce the award by 35%, for a total award of $ 26,092.63

## CONCLUSION

For the reasons given above, it is hereby

ORDERED that defendants' motion for judgment as a matter of law with regard to the plaintiff's claim of race discrimination is denied

IT IS FURTHER ORDERED that the defendants' motion for judgment as a matter of law with regard to the plaintiff's contract and quasi-contract claims is granted

IT IS FURTHER ORDERED that plaintiff's attorney may file with the Clerk of Court on or before August 29, 1997, an acceptance of a remittitur of $ 275,000 for his compensatory damage award and $ 725,000 for his punitive damage award, for a final judgment of $ 25,000 in compensatory damages and $ 25,000 in punitive damages

IT IS FURTHER ORDERED that in the event plaintiff's attorney [*64] does not file an acceptance of the remittitur on or before August 29, 1997, a new trial on liability and damages for the race discrimination claim will commence on a date to be set by the Court.

IT IS FURTHER ORDERED that the plaintiff's motion for attorney's fees and costs is granted in the following amounts: $ 144,459 41 in attorney's fees, and $ 19,448 21 in costs

IT IS FURTHER ORDERED that the plaintiff's motion for an award of supplemental attorney's fees is granted in the amount of $ 26,092.63

SO ORDERED:

Denise Cote

United States District Judge

Dated: New York, New York

August 7, 1997