# EXHIBIT H-3

LEXSEE 1992 U.S. DIST. LEXIS 17370

DONALD A. MINER, Plaintiff, v. CITY OF GLENS FALLS, GLENS FALLS POLICE DEPARTMENT, BOARD OF PUBLIC SAFETY OF THE CITY OF GLENS FALLS, FRANCIS X. O'KEEFE as Mayor of the City of Glens Falls, and JAMES DUGGAN, Defendants.

89-CV-918

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK

1992 U.S. Dist. LEXIS 17370

November 12, 1992, Decided
November 12, 1992, Filed

COUNSEL: [*1] STEVEN U. TEITELBAUM, ESQ., Attorney for Plaintiff, 1 Columbia Place, Albany, New York 12207

McPHILLIPS, FITZGERALD & MEYER, Attorneys for Defendants, 288 Glen Street, Post Office Box 299, Glens Falls, New York 12801, OF COUNSEL: JOSEPH R. BRENNAN, ESQ.

JUDGES: MUNSON

OPINION BY: HOWARD G. MUNSON

OPINION:

MEMORANDUM-DECISION AND ORDER

I. Introduction

This action was brought pursuant to *42 U.S.C. § 1983* for the alleged deprivation of plaintiff's property interest in his job without due process of law in violation of the Fourteenth Amendment to the United States Constitution. n1 In the spring of 1991, plaintiff filed a motion pursuant to *Fed. R. Civ. P. 56* for summary judgment against defendants on the issue of liability, asserting that no genuine issues of material fact existed to warrant a trial. The court granted plaintiff's motion in a decision delivered from the bench on May 28, 1991, and directed that a hearing be conducted on the issue of damages. The damages hearing was held in Albany, New York on June 25, 1991, and continued to its conclusion on July 30, 1991. This Memorandum-Decision and Order represents the court's findings based on the evidence presented at the damages [*2] hearing, so they will not be specifically set forth.

n1 Knowledge of the factual background is assumed, and therefore will not be set forth herein except as necessary to analyze plaintiff's damage claims.

II. Discussion

A. Procedural Due Process

The importance of procedural due process has been well established in this country for more than 100 years. E.g., *Baldwin v. Hale, 1 Wall (68 U.S.) 223, 233 (1863)* ("Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified."); *In re Gault, 387 U.S. 1, 20-21, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967)* ("Due process of law is the primary and indispensable foundation of individual freedom."). In this context, the purpose of procedural due process is to protect an individual's "use and possession of property from arbitrary encroachment -- to minimize substantively unfair or mistaken deprivations of property . . . ." *Fuentes v. Shevin, 407 U.S. 67, 81, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (1972)* [*3] (emphasis in original). As the Fuentes Court described, "the requirement of notice and an opportunity to be heard raises no impenetrable barrier to the taking of a person's possessions. But the fair process of decisionmaking that it guarantees works, by itself, to protect against arbitrary deprivation of property. For when a person has an opportunity to speak up in his own defense, and when the [officials] must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented." Id.; see also *Carey v. Piphus,*

Case 3:00-cv-02423-AVC    Document 213-11    Filed 11/16/2006    Page 3 of 15

Page 2
1992 U.S. Dist. LEXIS 17370, *

*435 U.S. 247, 259, 55 L. Ed. 2d 252, 98 S. Ct. 1042 (1978)*

When procedural due process has been denied, as in this case, damages are awarded to compensate plaintiff for injuries actually caused by the denial. *Memphis Community School Dist. v. Stachura, 477 U.S. 299, 306, 91 L. Ed. 2d 249, 106 S. Ct. 2537 (1986)* While deterrence of future denials is also an objective, "it operates through the mechanism of damages that are compensatory -- damages grounded in determinations of plaintiffs' actual losses." *Id. at 307* (emphasis in original). Where no actual losses are shown to have occurred [*4] as a result of the denial of due process, no compensatory damages can be awarded. *Carey, 435 U.S. at 264* However, nominal damages are available in such cases, to recognize the importance of adherence to procedural due process rights in our society. *Id. at 266,* see also *Morgan v. Ward, 699 F. Supp. 1025, 1045 (N.D.N.Y. 1988)* (Munson, J.)

The Second Circuit places the burden on plaintiff to prove that the damages claimed were actually caused by defendants' procedural violation. *McCann v. Coughlin, 698 F.2d 112, 126 (2d Cir. 1983).* In other words, when a denial of procedural due process is followed by a deprivation of plaintiff's right to life, liberty, or property, plaintiff must prove not only that he suffered actual damages but also that the damages stemmed from the procedural violation rather than from the underlying deprivation. *Patterson v. Coughlin, 905 F.2d 564, 568 (2d Cir. 1990)* If the evidence reveals that the underlying deprivation would have occurred regardless of whether proper procedure had been observed, the [*5] deprivation is justifiable and plaintiff is limited to nominal damages. If, however, the underlying deprivation would not have occurred but for the procedural violation, then plaintiff is entitled to recover compensatory damages for all losses he establishes with reasonable certainty as a result of the denial of his right to procedural due process. See id.; see also *Carey, 435 U.S. at 263* (plaintiff must "convince the trier of fact that he actually suffered distress [and any other damage] because of the denial of procedural due process itself")

Plaintiff bears a heavy burden under this scheme, to prove that the underlying deprivation and related damages were caused by the procedural violation. In some cases, such proof is impossible to produce because of the circumstances surrounding the underlying deprivation. Hence, the Patterson court recognized that "even as to an issue on which plaintiff normally has the burden of proof, it would be inappropriate to rule that the defendants should prevail where they have made proof impossible." *Patterson, 905 F.2d at 570,* see also *Burka v. New York City Transit Authority, 747 F. Supp. 214, 221 (S.D.N.Y. 1990)* [*6] (quoting same) The plaintiff in Patterson claimed that he was deprived of his right to liberty without due process of law when, without a fair hearing, he was confined to the special housing unit of the prison in which he was incarcerated after being found guilty of assaulting a guard. Although a disciplinary hearing was held, the plaintiff was not permitted to call the two witnesses he requested to call in his defense. Rather, the Hearing Board took testimony only from the plaintiff and the guard involved in the altercation. *Patterson, 905 F.2d at 566* On appeal after the district court granted partial summary judgment to the plaintiff on his § 1983 claim, defendants argued that plaintiff would have been found guilty even if he had called his witnesses, because their testimony would merely have corroborated his own and the impartial hearing officer would have disbelieved it just as he disbelieved the plaintiff's. *Id. at 569* The Second Circuit held that, "to the extent that the record is silent as to what [Patterson's witnesses] would have testified . . ., [defendants] are not entitled [*7] to rely on that record to show that Patterson would have been found guilty of [the charge against him], since the record's silence is the result of [defendants'] violation of Patterson's due process rights." Id. Having thus made it impossible for the plaintiff to meet his burden of proving that the underlying deprivation of his liberty would not have taken place had he been accorded his due process rights, the court shifted the burden to defendants to prove that the same result would have occurred if proper procedures had been followed. *Id. at 570* The court then inferred, because defendants did not request a trial on the issue of causation, that defendants knew they could not carry this burden. Accordingly, the Second Circuit affirmed the district court's conclusion that the plaintiff had established to the best of his ability that the deprivation of his liberty was caused by defendants' denial of his right to due process, and therefore that plaintiff was entitled to more than nominal damages Id

Plaintiff at bar is in a similar "fix." The main thrust of defendants' post-hearing memorandum is their argument that plaintiff would have been [*8] terminated even if he had been given notice and an opportunity to be heard, and he therefore suffered only nominal damages as a result of the violation of his right to due process Defendants' Post-Hearing Memorandum of Law, Document ("Doc") 29, at 6-12 Yet, the record before the court is silent on the rationale behind plaintiff's termination. Plaintiff has no means of establishing, and this court has no means of determining from the record, that plaintiff would or would not have been terminated, precisely because no pre-termination hearing was held. Plaintiff did establish, through the testimony of Edward Bartholomew, the Mayor of the City of Glens Falls from 1978-1985, that as recently as 1984 "the Board of Public Safety and the City felt that there was a need to retain

Case 3:00-cv-02423-AVC    Document 213-11    Filed 11/16/2006    Page 4 of 15

Page 3
1992 U.S. Dist. LEXIS 17370, *

Mr. Miner [as] a safety officer;" indeed, that need was part of the reason for the creation of a special administrative position in Resolution 11 of the Board of Public Safety, enacted January 5, 1984, which plaintiff filled from the date of its creation until November of 1985 when defendant Chief Duggan returned him to regular line duty. Transcript of Hearing ("Tr."), dated June 25, 1991, Doc. 27, at 73-75; [*9] Plaintiff's Exhibit ("Exh.") 13. Plaintiff further established that no charges of misconduct or incompetency were ever filed against him, and no notice of discipline was ever served upon him. Tr., Doc. 26, at 6-7, 69; see also Transcript of Bench Decision on Summary Judgment Motion, dated May 28, 1991, Doc. 31, at 5. Plaintiff testified that he had never been issued a direct order to carry a weapon, nor had he ever refused a direct order to carry a weapon. Tr., Doc. 26, at 68-69. In fact, plaintiff testified that the gun that had been issued to him when he began his employment with the Glens Falls Police Department in 1966 was no longer in his possession because it had been reissued to another patrolman in October of 1984. Id. at 68. Although plaintiff testified that he was never asked if he would carry a weapon and that, if he had been asked by the Board of Public Safety, he would have said no id. at 66, this court is unwilling to leap to the conclusion defendants invite that plaintiff therefore would have been terminated anyway, regardless of the process accorded. The court is not in a position to presuppose the Board's reaction to plaintiff's answer of no, had [*10] he been asked the question and been given the opportunity to convey a response to the Board.

The court is satisfied that plaintiff has done all he can do to establish that the deprivation of his property interest in his job was caused by defendants' denial of his right to due process. Thus, under Patterson the burden shifts to defendants to prove that plaintiff would have been terminated even if he had been accorded notice and an opportunity to be heard. Defendants have made no effort whatsoever to carry this burden. They called no witnesses at the damages hearing and offered no proof of any sort to support their theory that plaintiff's termination was inevitable. Defendants cannot now be permitted to rely on the silence of the record to establish plaintiff's fate. The court concludes, on the record before it, that plaintiff's damages were caused by defendants' violation of his right to procedural due process and that he is therefore entitled to collect more than nominal damages.

B. Damages

Plaintiff seeks damages of back pay and benefit contributions from the date of his termination to the date of trial, front pay and benefit contributions until retirement, compensation [*11] for emotional distress, and punitive damages against individual defendant James Duggan. At the damages hearing, plaintiff's economist testified to four specific elements of economic loss incurred as a result of plaintiff's termination: lost wages that plaintiff suffered in the past and will suffer in the future, reduction in pension payments plaintiff will be eligible to receive, reduction in social security payments plaintiff and his wife will be eligible to receive, and loss of the opportunity to participate in the health care program extended to employees of the City of Glens Falls until the date of retirement (whereupon employees are covered under the applicable pension health plan). Tr., Doc. 27, at 10-11. Defendants challenge various aspects of this testimony on legal as well as factual grounds. The court shall individually address each of the damage elements identified by plaintiff's economist, as well as plaintiff's emotional and punitive damages claims.

1. Lost Wages

a. Back Pay

With regard to back pay, plaintiff's economist calculated the loss from plaintiff's termination on August 31, 1986 through to the time of the damages hearing in June 1991, and arrived [*12] at a total of $ 151,010.00 representing the amount plaintiff would have earned had he remained in his position as a police sergeant with the City of Glens Falls Police Department. Subtracting the amount plaintiff actually earned from odd jobs during that period, $ 61,526.00, plaintiff's economist calculated plaintiff's net past loss at $ 89,484.00. Tr., Doc. 27, at 18-21. Defendants question the validity of that figure in their post-hearing submission, based on their contention that plaintiff failed to mitigate his damages. Defendants argue that plaintiff's failure to seek suitable alternative employment, such as with the police department of another governmental entity, precludes an award of back pay as well as an award of front pay. Defendants' Post-Hearing Memorandum of Law, Doc. 29, at 17-18.

While plaintiff's testimony indicates that he in fact did not seek alternative employment as a police officer or security guard, other than to submit his name for the position of Chief of Police in the City of Glens Falls at some point after his termination, Tr., Doc. 26, at 12, the court is not persuaded that plaintiff thereby failed to satisfy his obligation to mitigate damages. Plaintiff's [*13] testimony reveals that he did actively look for and obtain work, see id., and there is no requirement that plaintiff seek identical employment. See *Denton v. Boilermakers Local 29*, 673 F. Supp. 37, 45 (D. Mass. 1987). Rather, his obligation is "to use such means as are reasonable under the circumstances to avoid or minimize the damages." *Ford Motor Co. v. Equal Employment Opportunity Comm'n*, 458 U.S. 219, 231, 73 L. Ed. 2d 721, 102 S. Ct. 3057 n.15 (1982) (quoting general rule on mitigation from C. McCormick, Law of Damages, at 127 (1935));

see also *Koyen v Consolidated Edison Co of New York, Inc , 560 F Supp 1161, 1168 (S D N Y 1983)* (plaintiff in ADEA case "under a duty to mitigate damages by making reasonable efforts to obtain gainful employment in an available market") (emphasis added). Given the circumstance in this case of plaintiff's disinclination to carry a gun, the court is of the opinion that by seeking and obtaining alternative employment plaintiff preliminarily satisfied his obligation to minimize the damages resulting from defendants' wrongful termination of plaintiff in violation of his due [*14] process rights.

In employment discrimination cases, applicable in this context as well, the burden then shifts to defendants to prove that plaintiff's efforts to mitigate damages were deficient. E g , *Jackson v Shell Oil Co . 702 F 2d 197, 202 (9th Cir 1983)* It is not enough for defendants merely to point out further actions plaintiff could have taken to secure employment. *Bonura v Chase Manhattan Bank, N A , 629 F Supp 353, 356 (S D N Y 1986)* (citing *Equal Employment Opportunity Comm'n v Kallir, Philips, Ross, Inc , 420 F Supp 919, 925 (S D N Y 1976)*, aff'd, *559 F 2d 1203 (2d Cir.)*, cert. denied, *434 U S 920, 54 L Ed 2d 277, 98 S Ct 395 (1977)*) Defendant must establish that "suitable work" existed, and that plaintiff "did not make reasonable efforts to obtain it." *Clarke v Frank, 960 F 2d 1146, 1152 (2d Cir 1992)* Defendants at bar fail to carry this burden; they offered no proof at the damages hearing as to the availability of any type of employment for plaintiff, and elicited nothing through cross-examination [*15] to question the reasonableness of plaintiff's own efforts to secure employment The court concludes that plaintiff did use reasonable efforts to mitigate his damages in securing the current job with L E D F O O T Express and the other odd jobs he obtained after his termination from the position of police sergeant. Thus, defendants' argument in opposition to an award of back pay must be rejected The court adopts the method for calculating back pay used by plaintiff's economist and finds that plaintiff is entitled to receive an award of back pay in the amount of $ 89,484.00.

b. Front Pay

On the issue of front pay, plaintiff's economist calculated the projected loss from the time of the damages hearing in June 1991 to April 8, 2000, when plaintiff will reach 62 years of age, and arrived at a total of $ 339,895 00 representing the amount plaintiff would have earned had he remained a police sergeant with the City of Glens Falls Police Department until his alleged date of retirement. Subtracting the projected earnings from plaintiff's job with L E D F O O T for the same time period, $ 217,490 00, plaintiff's economist calculated plaintiff's net future loss at $ 122,405 00 [*16] Tr , Doc. 27, at 21-23 Discounting this figure to present value, plaintiff's lost future earnings total $ 115,980 00 Id at 24-26.

Defendants challenge plaintiff's claim to future lost wages on several grounds. Citing the test delineated by the Second Circuit in *Whittlesey v. Union Carbide Corp . 742 F 2d 724 (2d Cir 1984)*, defendants argue that plaintiff is not entitled to an award of future lost wages because reinstatement to his position as a police sergeant is neither impossible nor impracticable Further, defendants assert that nothing in the record demonstrates that plaintiff has no reasonable prospect of obtaining comparable alternative employment as a police officer in a city other than Glens Falls. Defendants also argue that the figures projected by plaintiff's economist are unduly speculative in that they are based on a ratio of actual to potential earnings calculated from only one year's earnings. Defendants contend that the more appropriate procedure would have been "to utilize the historical records of the plaintiff's income while employed over the several years prior to 1986 and to then utilize the existing [police] contracts [*17]       for the years 1986 through 1991 as a basis to project reasonable future income from that employment. In addition, inquiry of Mr. Miner's current employer, L E D F O O T , and the historical data regarding salaries or wages paid and annual increases received by employees of L E D F O O T would serve as a more appropriate foundation on which to project lost future income, if any, rather than to base an opinion solely on a ratio determined from data applicable only to a single year." Defendants' Post-Hearing Memorandum of Law, Doc. 29, at 22; see also id. at 18-21 Defendants also challenge the accuracy of the economist's calculation of the present value of plaintiff's alleged lost future earnings, asserting first that he did not explain his methodology and second that he did not use the appropriate methodology, which would have entailed determining the present cost of an annuity in 1991 dollars that would provide the payments due through April 8, 2000. Id. at 24-25. Finally, defendants contend that future lost wages, if awarded, should only be calculated to age 55 since plaintiff clearly indicated in his pre-trial deposition that he intended to retire at age 55, and [*18] his trial testimony placing retirement at 62 apparently is an attempt to increase the projected lost earnings claim Id at 23.

Before analyzing the merits of these arguments, the court notes that defendants are attempting through their post-hearing memorandum to do what they made no effort to accomplish at the hearing itself Defendants did not offer evidence regarding plaintiff's employment potential with the police department for the City of Glens Falls or any other city, nor did defendants offer evidence setting forth economic calculations of plaintiff's damage claims using what they currently argue is the more "appropriate" method. Although counsel for defendants did

Case 3:00-cv-02423-AVC   Document 213-11   Filed 11/16/2006   Page 6 of 15

Page 5
1992 U.S. Dist. LEXIS 17370, *

cross-examine plaintiff's economist to explore the methodology used in some of his calculations, counsel's questioning fell far short of the current attempt to set aside the entirety of the economist's future loss calculations. The time and place to introduce evidence regarding the correct calculation of plaintiff's damages was at the damages hearing, where relevant issues were subject to direct- and cross-examination as well as questioning from the court to clarify ambiguities. Thus, the court finds several [*19] of defendants' arguments in opposition to an award of front pay to be inappropriately raised at this point in the proceedings.

Nonetheless, the court determines that an award of front pay is not warranted in this case. The test delineated by the Second Circuit in Whittlesey v. Union Carbide Corp. and restated by the Southern District in Bonura v. Chase Manhattan Bank, N.A., sets forth the following requirements:

An award of front pay presupposes, first, that reinstatement is either impossible or impracticable. [Whittlesey,] 742 F.2d at 729. Second, a front-pay award is appropriate and may even be necessary "in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment." Id. Finally, front pay may properly be awarded where calculation of both the plaintiff's likely mitigated earnings and the income plaintiff likely would have earned if he or she had continued in the defendant's employ do not involve "undue speculation." Id.

Bonura, 629 F. Supp. 353, 362 n.3 (S.D.N.Y. 1986). While defendants at bar contend that plaintiff [*20] fails to meet all three requirements, the court finds that plaintiff does meet the first requirement. Reinstatement of plaintiff to his former position as police sergeant, although not impossible, is indeed impracticable on the record before the court. Plaintiff testified at the damages hearing that, both before and after receiving the termination letters from defendant Mayor O'Keefe, he had requested to go before the Board of Public Safety to discuss his situation but the requests were denied. Tr., Doc. 26, at 64-66. Plaintiff went so far as to file a grievance with defendant Duggan on August 29, 1986, Plaintiff's Pre-Trial Exh. 14, Doc. 10, at 251, although defendant Duggan denied having received it. Plaintiff's Pre-Trial Exh. 8, Doc. 10, at 97. Plaintiff never received a response to the grievance. At no time did defendants offer to reinstate plaintiff, nor have they offered to do so during the pendency of this litigation. In fact, given plaintiff's reiterated disinclination to carry a gun, id. at 66, it is highly unlikely that defendants would extend such an offer of reinstatement, particularly since defendants have attempted to establish that even if plaintiff had [*21] been accorded due process he would have been terminated because of his refusal to carry a gun. Defendants' Post-Hearing Memorandum, Doc. 29, at 7-10. Moreover, the attitude exhibited by various defendants during the course of this litigation indicates that relations between plaintiff and defendants have deteriorated to the point where reinstatement is no longer a viable remedy. See Whittlesey, 742 F.2d at 728, 729 (reinstatement not feasible where employer-employee relationship "irreparably damaged by animosity associated with the litigation"); see also Eassa v. Hartford Fire Insurance Co., No. 90-CV-321, 1991 WESTLAW 255111, *11 (N.D.N.Y. November 29, 1991) (McAvoy, J.). Hence, the court is satisfied that plaintiff meets the first requirement on his claim for front pay. n2

> n2 In a unique approach to the availability of reinstatement as a remedy for violation of due process, the Ninth Circuit has ruled that reinstatement is only available when another substantive right has been violated along with the right to procedural due process. Brady v. Gebbie, 859 F.2d 1543, 1552 (9th Cir. 1988), cert. denied, 489 U.S. 1100, 103 L. Ed. 2d 943, 109 S. Ct. 1577 (1989). The court declined to hold that reinstatement is an available remedy when procedural due process is the sole claim raised in plaintiff's complaint. If this court were to apply the ruling of the Ninth Circuit, the end result would be the same as that reached above -- plaintiff would not be reinstated as a police sergeant with the City of Glens Falls Police Department.

[*22]

It is the second requirement which halts plaintiff's claim on this aspect of damages. There is no evidence in the record upon which the court as factfinder can conclude that plaintiff has no reasonable prospect of obtaining comparable alternative employment as a result of defendants' conduct. The burden here is on plaintiff, thus distinguishing this factor from the mitigation factor discussed above. See Bonura, 629 F. Supp. at 362-63 n.3. The court's conclusion, supra at 11, that plaintiff reasonably mitigated his damages by seeking and obtaining employment, even though it was not comparable employment, does not mean that there were no comparable employment opportunities available to plaintiff. By his own testimony, plaintiff simply did not seek such opportunities. Tr., Doc. 26, at 12. In his Post-Hearing Reply Memorandum, Doc. 30, at 10-11, plaintiff asserts that since August 31, 1986 he "has operated under a cloud of opprobrium brought about by his illegal discharge. Anyone operating under the cloud that plaintiff was, a cloud created by defendants, could never seriously consider applying for a similar position." There is no evi-

Case 3:00-cv-02423-AVC    Document 213-11    Filed 11/16/2006    Page 7 of 15

Page 6
1992 U.S. Dist. LEXIS 17370, *

dence [*23] in the record, however, to support plaintiff's contention that he was or is operating under a cloud created by defendants. n3 There is no testimony or documentation which demonstrates that plaintiff's prospects of employment in jobs comparable to the police sergeant's position were limited by his termination in violation of due process. In fact, there is no evidence that plaintiff's prospects for comparable employment were limited by anything other than plaintiff's own disinclination to carry a gun. Defendants bear no responsibility for plaintiff's decision, based upon his religious beliefs, not to carry a gun. Absent evidence that plaintiff had (and continues to have) no reasonable prospects for engaging in comparable alternative employment as a result of his termination in violation of due process, the court is unwilling to assign to defendants the liability plaintiff claims for front pay. Plaintiff's claim for front pay is therefore denied. n4

> n3 To the extent that plaintiff includes in this "cloud" his depression as a result of his wrongful termination, that is a separate claim for emotional distress. Plaintiff's feelings of inadequacy cannot be used to argue that he had no reasonable prospects for engaging in comparable alternative employment.

[*24]

> n4 Even if the court were to conclude that plaintiff satisfies the second requirement of the Whittlesey-Bonura test, plaintiff's evidence of loss is too speculative to satisfy the third requirement. Plaintiff's economist used a pay ratio of 63%, representing the amount plaintiff earns in his current employment as compared to what he would have earned as a police sergeant, to calculate plaintiff's lost future earnings until the year 2000. This ratio was derived from a comparison of wages for only one year, with no effort to determine the accuracy of this ratio in the future. Tr., Doc. 27, at 60-62. Moreover, the evidence in the record reveals a discrepancy as to whether plaintiff intended to retire at age 55 or at age 62. While plaintiff testified on direct examination at the damages hearing that he would have worked until age 62, Tr., Doc. 26, at 22, on cross-examination he conceded that he had testified at his deposition on June 9, 1988 that he lost everything "up until whenever I am 55." Id. at 56 (quoting deposition testimony). Apparently plaintiff's economist received information at some point that plaintiff would retire at age 55, as he calculated plaintiff's lost medical benefits only until age 55 whereupon plaintiff would receive medical coverage under the retirement plan. Id. at 38. This discrepancy in retirement age leads the court to conclude that the calculations of lost front pay from age 55 to age 62 are clearly improper, even if the 63% pay ratio were to be accepted from the date of the damages hearing until plaintiff reaches age 55. Because plaintiff's evidence in support of an award of front pay is unduly speculative, the court denies the claim for front pay on this basis as well. See, e.g., *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992).

[*25]

2. Pension Benefits

Plaintiff's economist testified that when plaintiff turns 55 in 1993 he will be eligible to receive pension benefits of $9,822.00 per year. This calculation was based upon his 20 years of service in the police department and final average salary of $24,557.00. Tr., Doc. 27, at 28. Had he continued working with the police department until age 62, plaintiff's economist testified that plaintiff would be eligible to receive $42,156.00 per year beginning in the year 2000. Id. at 29. The latter figure is substantially larger for two reasons, according to plaintiff's economist: first, because plaintiff would have had more years of service and second, because his final average salary would be higher. Id. at 28-29. Plaintiff's economist used standard life expectancy tables to compute the total amount plaintiff would be eligible to receive if he had worked to age 62, $616,320.00, and subtracted the total amount plaintiff is projected to receive given his early termination, $222,173.00, to reach projected lost pension benefits totaling $394,147.00. Id. at 30. Discounting this figure to present value, plaintiff's economist testified that plaintiff's [*26] lost pension benefits equal $108,552.00. Id.

Defendants contend, as an initial point in opposition to plaintiff's claim for lost pension benefits as well as lost social security and medical benefits, that reinstatement would obviate the need for consideration of such claims. Defendants' Post-Hearing Memorandum of Law, Doc. 29, at 25. In view of the court's conclusion above that reinstatement is impracticable, this initial argument warrants no further consideration. Defendants challenge several aspects of the arithmetic formula used by plaintiff's economist in his calculation of lost pension benefits. They claim the 2% multiplier is without foundation; the final average salary if plaintiff had worked until age 62 is unspecified, and even if it were specified it would be too speculative; and finally, because plaintiff had previously indicated his intent to retire at age 55, the calculation of retirement at 62 is invalid. Id at 25-27. Defendants also

argue that no evidence was presented as to whether plaintiff is a member of another retirement plan by virtue of his current employment. Id. at 27. For these reasons, defendants assert that plaintiff has not established [*27] his claim to lost retirement benefits with sufficient certainty to sustain such an award.

The court is not persuaded that plaintiff's claim for lost retirement benefits fails altogether, although it must be reduced from what plaintiff's economist calculated for retirement at age 62. As noted in footnote 4 above, plaintiff testified at his deposition n5 that he was going to lose retirement contributions up to the time when he reaches age 55, thus revealing his intent to retire at that age. He at some point apparently also advised the economist that he intended to retire at age 55, as evidenced by the following testimony from plaintiff's economist at the damages hearing:

[Plaintiff's lost medical benefits were calculated] from the present to the year 1993, at the time when he will be 55 years of age. I understand that if he takes his retirement pension at age 55, he will also be entitled to some health benefits at that point in time. So, I've stopped the health benefits on the day he is 55 years old. That would be April 8, 1993.

Tr., Doc. 27, at 38. Thus, despite plaintiff's contradictory testimony at trial that he would have worked until age 62, the court credits his deposition [*28] testimony and concludes that plaintiff intended to retire from the police department at age 55.

  n5 The transcript of plaintiff's June 9, 1988 deposition was made a part of the record in this case through plaintiff's introduction of Exh. 12, the Record on Appeal before the New York State Supreme Court, Appellate Division, Third Department. Also, the specific testimony referred to here was introduced through defendants' cross-examination of plaintiff. Defense counsel read the pertinent question and answer into the record, and plaintiff conceded that he had given that answer. Tr., Doc. 26, at 56.

Given this conclusion, plaintiff's lost retirement benefits must be recalculated. Defendants' challenge to the 2% multiplier plaintiff's economist used in his calculation is insufficient to question the foundation of that calculation, as defendants had the opportunity to introduce contradictory evidence regarding their version of plaintiff's lost retirement benefits but failed to do so. Similarly, defendants' attempt during [*29] cross-examination to challenge the use of 1.37% as the real increase per year in projecting plaintiff's salary as a police sergeant is insufficient to disturb the economist's method of calculation of final average salary for purposes of calculating lost pension benefits. Tr., Doc. 27, at 43-46. The court is satisfied that plaintiff's economist laid an adequate foundation for his calculation, id. at 9-10, 21, 27-28, 43-46, 52-53, and the court therefore adopts the formula and method used by plaintiff's economist. Had plaintiff not been terminated in 1986, he would have worked until age 55, rendering a total of 27 years of service. The final average salary would be calculated, according to plaintiff's economist, id. at 28, from the last three years of service which would mean 1991, 1992, and 1993 if plaintiff was to retire at age 55. The economist projected plaintiff's salary, had he continued in his employment as a police sergeant, to be $ 36,329.00 for 1991, $ 36,826.00 for 1992, and $ 37,331.00 for 1993, using a 1.37% real increase per year. Id. at 21, 44. Averaging these figures, the court derives a final average salary of $ 36,829.00. Using the 2% multiplier [*30] for 27 years of service times a final average salary of $ 36,829.00, plaintiff will be eligible to receive $ 19,887.66 per year in pension benefits upon reaching the age of 55. Multiplying this figure times a life expectancy of 21.62 more years, id. at 29, plaintiff will be eligible to receive a total of $ 429,971.20 in pension benefits. Subtracting from the total the amount plaintiff's economist testified plaintiff is expected to receive given his early termination, $ 222,173.00, id., plaintiff's net loss in pension benefits is $ 207,798.20. Discounting this figure to present value, n6 plaintiff's lost pension benefits equal $ 57,244.68.

  n6 Plaintiff's economist did not specify the discount rate he was applying to reach the present value of plaintiff's lost pension benefits, although he did indicate that it was different from the discount factor applied to lost future wages because no provision for inflation is included. Tr., Doc. 27, at 30. Using the figures plaintiff's economist placed on the record to approximate the discount rate he failed to specify, the court derives a discount rate of 3.63% to compute the present value of plaintiff's net lost pension benefits.

[*31]

3. Social Security Benefits

With regard to social security benefits, plaintiff's economist testified that plaintiff has lost $ 30,706.00 in employer contributions as a result of his termination. Calculating that plaintiff would have earned a total of $ 490,905.00 in his position as a police sergeant from September 1986 to April 2000 when he turns 62, and projecting that plaintiff will earn a total of $ 279,016.00

Case 3:00-cv-02423-AVC    Document 213-11    Filed 11/16/2006    Page 9 of 15

Page 8
1992 U.S. Dist. LEXIS 17370, *

from L.E.D.F.O.O.T. and his other employers during the same time period, plaintiff's economist stated that "[plaintiff's] and his wife's lost social security, the reduced contribution that will be made on his behalf by the City amounts to $ 30,706.00." Tr., Doc. 27, at 31. No further explanation of this calculation was provided on direct-examination. On cross-examination, plaintiff's economist testified that the City of Glens Falls presently contributes 7.65% of an employee's compensation toward social security and, even though that percentage is scheduled to increase in the future, he conservatively based his calculation on the 7.65% figure. Id. at 49. Plaintiff's economist also revealed that, of the $ 30,706.00 in lost contributions, two-thirds is attributable [*32] to plaintiff himself and one-third is attributable to his wife. Id. at 51.

During the damages hearing, the court also questioned plaintiff's economist in an attempt to clarify the loss being asserted by plaintiff on this claim. Id. at 62-65. Plaintiff's economist explained that $ 20,471.00 of the figure he testified to represents the additional amount plaintiff's employer would have paid in social security contributions on his behalf, while the $ 30,706.00 figure "represents the loss of the benefit to Mr. Miner and the loss of the benefit to Mrs. Miner, . . . which is an additional half of his. He loses twenty, she loses an additional ten." Id. at 64. Plaintiff's economist did not further explain his methodology, other than to state that he used one of the two methods economists use to calculate benefits. Id.

In their post-hearing submission, defendants oppose any award of social security benefits attributable to plaintiff's wife because she is not a party to this action. Defendants challenge the calculation of plaintiff's projected lost social security contributions through age 62, asserting that the use of a 63% pay ratio of plaintiff's earnings in his current [*33] employment compared to what he would have earned as a police sergeant, derived from 1991 figures only, with no effort to ascertain the accuracy of this pay ratio in the future, makes the calculation unduly speculative. Defendants further challenge the failure of plaintiff's economist to calculate projected lost benefits as opposed to projected lost contributions, on the ground that plaintiff's loss cannot be measured by the cost to the City. Finally, defendants point to the failure of plaintiff's economist to compute the present value of projected lost benefits as a fatal defect in plaintiff's proof on this claim. Defendants' Post-Hearing Memorandum of Law, Doc. 29, at 28-29.

The court is of the opinion that plaintiff has failed to prove damages with reasonable certainty on his claim for social security benefits. Clearly plaintiff is not entitled to an award for social security contributions attributable to his wife because, as defendants assert, she is not a party named in this lawsuit. Moreover, given the court's conclusion that plaintiff would have retired at age 55, plaintiff's economist's calculation of social security contributions attributable to plaintiff until age 62 [*34] is incorrect. Neither the methodology nor the specific facts necessary for the court to recalculate plaintiff's loss are contained in the record. Plaintiff's economist did not explain how he derived any of the figures testified to, nor did plaintiff introduce into evidence as part of the economist's file the actual calculation of lost social security contributions, through which the court could garner the information necessary to recalculate plaintiff's loss up to retirement at age 55. Absent the essential data necessary to calculate damages on this particular claim with reasonable certainty, the court is compelled to deny plaintiff any relief on his claim for social security benefits.

4. Medical Benefits

The fourth and final element of loss identified by plaintiff's economist involves the comprehensive family medical plan the City of Glens Falls extends to its employees through Blue Cross-Blue Shield. By terminating plaintiff on August 31, 1986, defendants also terminated his coverage under the medical plan from that date until he retires. Plaintiff's economist calculated the value to plaintiff of the loss of this coverage by adding the amounts the City would have contributed [*35] to Blue Cross-Blue Shield from August 1986 to the time of the damages hearing, $ 18,168.00, and projecting the amounts the City would have to contribute from the time of the damages hearing to April 1993 when plaintiff's retirement will enable him to obtain coverage through the retirement plan, $ 11,632.00 in discounted present value terms, for a total of $ 29,800.00 in lost medical coverage. Tr., Doc. 27, at 31-32.

Defendants attack this calculation on the ground that it is premised not on any expenditure by plaintiff for actual care during the relevant time period, nor the cost to plaintiff of replacement coverage, but rather on the cost to the City of Glens Falls for coverage under Blue Cross-Blue Shield. In fact, no evidence was introduced as to any medical expenses plaintiff has incurred since his termination, for medical care or for replacement insurance. Defendants argue, just as they did on the social security claim, that plaintiff's loss cannot be measured by calculating what the cost to the City would be to cover plaintiff's medical insurance from the time of termination to the time of retirement. Defendants' Post-Hearing Memorandum of Law, Doc. 29, at 29-30. Moreover, [*36] defendants point out that plaintiff's economist apparently made no inquiry to determine whether plaintiff currently has medical insurance provided by L.E.D.F.O.O.T., which would reduce any loss plaintiff may have on this claim. Based on all of these reasons, defendants argue that plaintiff has failed to provide suffi-

cient and appropriate evidence to sustain an award of damages for medical benefits Id. at 31

The court agrees It is within the court's discretion to award lost medical benefits. *Syvock v Milwaukee Boiler Mfg Co, 665 F 2d 149, 161 (7th Cir 1981); Merriweather v Hercules, Inc, 631 F 2d 1161, 1168 (5th Cir 1980)* However, where there is no evidence in the record that plaintiff purchased replacement medical insurance, no evidence that he expended money on health care as an uninsured which would have been covered under the Blue Cross-Blue Shield plan, and no evidence even to indicate that he may have held back on seeking health care because he was uninsured, there is no basis for the court to exercise its discretion See *Kossman v Calumet County, 800 F 2d 697, 703-04 (7th Cir 1986)* [*37] (citations omitted), cert denied, *479 U S 1088, 94 L Ed 2d 151, 107 S Ct 1294 (1987)* Cf *Galindo v Stoody Co, 793 F 2d 1502, 1517 (9th Cir 1986)* (in breach of contract context, "lost insurance coverage, unless replaced or unless actual expenses are incurred, is simply not a monetary benefit owing to the plaintiff"). Including the cost of insurance coverage in a damage award when the plaintiff fails to obtain replacement coverage, or fails to demonstrate that he was unable to secure coverage so paid out of his pocket for a medical expense, would, as the Kossman court stated, allow the plaintiff "to recover an unwarranted windfall " *Kossman, 800 F 2d at 703* In the absence of proof on the record in this case that plaintiff purchased replacement insurance or incurred a specific medical expense after his termination which would have been covered under the City's Blue Cross-Blue Shield plan, the court finds no justification for awarding plaintiff medical insurance premiums which would, in effect, make him more than whole Plaintiff's claim for lost medical benefits is therefore denied

5 Emotional Damages [*38]

Although no dollar figure for emotional damages was quoted on the record during the damages hearing, plaintiff's testimony revealed the mental anguish he felt after having been terminated by defendants Plaintiff testified to his feelings of inadequacy as a result of being unable to provide for his family, and candidly stated that "for the first time thoughts of suicide crossed my mind because I felt totally exasperated with the situation " Tr , Doc 26, at 19-20 He testified to the embarrassment he felt when in 1987 he was forced to apply for public assistance in the form of food stamps, heat benefits, and Medicaid Id at 17-18 Particularly uncomfortable, according to plaintiff, was the lack of confidentiality in the application process; he was interviewed in a large room, in the presence of people whom he had encountered through his former job as a police sergeant Id Plaintiff's wife also testified regarding the change in plaintiff as a result of his termination. n7 She stated that before August 31, 1986 her husband was conscientious and attentive and supported her and her children "in a good way." Tr , Doc. 27, at 67 After August 31, 1986, "it was like the whole [*39] bottom had fallen out of his life, ours " Id at 68. Mrs Miner testified that drastic changes had to take place, but they "never quite regained the balance" that they had prior to plaintiff's termination Id The implication from both plaintiff and his wife was that part of the stress was due to the fact that they had just purchased a house in Athol, New York in June 1986, which they were forced to sell in 1988 because they could not keep up with their bills See Tr , Doc 26, at 21; Tr , Doc 27, at 68

Defendants argue in their post-hearing submission that the record is devoid of evidence that plaintiff suffered emotional harm as a result of the procedural due process violation itself, which is the standard plaintiff must meet to recover on this claim Emotional damages flowing from the underlying deprivation are not recoverable, according to defendants, because termination was substantively justified in this case even though the procedure followed was deficient Defendants' Post-Hearing Memorandum of Law, Doc. 29, at 10-11

---

n7 The testimony of Mrs Miner regarding her own emotional and physical condition is not relevant to this case, as she is not a named plaintiff and therefore is not eligible to receive a damage award for her own mental or physical anguish

---

[*40]

Given the court's conclusion, supra at 6-7, that plaintiff did all he could do to prove that his termination was a result of defendants' denial of his right to due process, and the conclusion, supra at 7-8, that defendants failed to prove plaintiff would have been terminated regardless of the process accorded, the court cannot accept defendants' argument in opposition to the claim for emotional damages. The record before the court does not demonstrate that plaintiff's termination was substantively justified; thus, it would be inappropriate to limit plaintiff's recovery of emotional damages, as the Supreme Court did for a justified deprivation in *Carey v Piphus, 435 U S at 263-64*, to only those damages attributable to the procedural violation On the facts of this case, plaintiff is entitled to recover damages as well for the personal embarrassment and mental anguish proven to stem from the unjustified deprivation of his job See *Carrero v New York City Housing Authority, 890 F 2d 569, 581 (2d Cir 1989), Busche v Burkee, 649 F 2d 509, 519 (7th Cir ),* cert denied, *454 U S 897, 70 L Ed 2d 212, 102 S Ct

Case 3:00-cv-02423-AVC    Document 213-11    Filed 11/16/2006    Page 11 of 15

Page 10
1992 U.S. Dist. LEXIS 17370, *

*396 (1981) [*41] Obviously such damages are subjective, as it is difficult to put a price tag on one's pride and emotional tranquility. However, where the proof demonstrates, as it does in this case, that plaintiff suffered emotional distress as a result of his termination in violation of due process, the court must quantify the damage. E.g., *Busche*, 649 F.2d at 519 (affirmed $ 10,000.00 award for depression, moodiness, marital difficulties, and financial difficulties suffered by police officer terminated without due process); *Carrero, 1990 WESTLAW 104007*, *9 (S.D.N.Y. July 13, 1990)* (on remand of § 1983 claim, $ 12,500.00 awarded for harassment, humiliation, and emotional distress); *Richards v. New York City Bd. of Education, 668 F. Supp. 259, 267 (S.D.N.Y. 1987)* ($ 15,000.00 awarded for personal anger and humiliation at being passed over for a promotion because of racial discrimination). Plaintiff's testimony reveals that, although the impact of his termination was not so serious as to require professional medical attention, Tr., Doc. 26, at 19, he did suffer feelings of inadequacy and embarrassment as [*42] well as financial difficulties. Id. at 18-21. Similarly, plaintiff's wife testified regarding the detrimental effect plaintiff's termination had on his personality. Tr., Doc. 27, at 67-68. The court concludes, on the basis of this testimony, that plaintiff is entitled to an award of $ 12,500.00 for emotional distress caused by defendants' actions.

6. Punitive Damages

Plaintiff seeks an award of punitive damages against individual defendant James Duggan. While plaintiff's pre-hearing submission correctly set forth the law on punitive damages, see Doc. 22 at 6, plaintiff made no attempt therein, nor did he offer any proof at the damages hearing, to establish that defendant Duggan's conduct was "motivated by evil motive or intent or . . . involve[d] reckless or callous indifference" to plaintiff's federally protected rights. *Smith v. Wade, 461 U.S. 30, 56, 75 L. Ed. 2d 632, 103 S. Ct. 1625 (1983); Morgan v. Ward, 699 F. Supp. 1025, 1045-46 (N.D.N.Y. 1988)* (Munson, J.). Notwithstanding the Second Circuit's ruling in *Vasbinder v. Ambach, 926 F.2d 1333, 1342-43 (2d Cir. 1991)* (subsequent history omitted), that [*43] the threshold proof required for an award of punitive damages is no greater than that required for compensatory damages, this court declines to award punitive damages where plaintiff makes no effort to establish the appropriateness of such an award on the facts of the case. The record before the court reveals none of the type of affirmative steps taken by the individual defendants in Vasbinder to create an unfavorable personnel file and to disguise the retaliatory nature of the plaintiff's demotion, which the Second Circuit recognized as being sufficient to substantiate a finding of callous disregard for plaintiff's rights in that case. Id. at 1343. There being no evidence in the record to demonstrate evil intent or callous indifference on the part of defendant Duggan, plaintiff's request for an award of punitive damages is denied.

7. Prejudgment Interest

Although there is no automatic right to prejudgment interest, when "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such [*44] other general principles as are deemed relevant by the court," warrant such prejudgment interest it is within the district court's discretion to include as part of the damage award. *Wickham Contracting Co. v. Local Union No. 3, Int'l Brotherhood of Electrical Workers, 955 F.2d 831, 834-35 (2d Cir. 1992)* (and cases cited therein), cert denied, U.S. , S. Ct. , 60 U.S.L.W. 3783, 62 L. Ed. 2d 757 (U.S. Oct. 19, 1992); see also *McKnight v. General Motors Corp., 973 F.2d 1366, 1372-73 (7th Cir. 1992)* ("prejudgment interest should be presumptively available to victims of federal law violations") (internal quotation omitted); *Winter v. Cerro Gordo County Conservation Bd., 925 F.2d 1069, 1073 (8th Cir. 1991)* (prejudgment interest awarded on procedural due process violation at rate set by Iowa statute). Cf. *Clarke v. Frank, 960 F.2d 1146, 1153-54 (2d Cir. 1992)* (in Title VII case, "it is ordinarily an abuse of discretion not to include prejudgment interest in a back-pay award") (internal quotation omitted).

In this case, defendants' [*45] wrongful termination of plaintiff has given the City of Glens Falls full use of the money which would have paid plaintiff's salary from August 31, 1986 to the date judgment is entered awarding plaintiff backpay, while plaintiff has been deprived of the use of that money. Plaintiff has suffered both financial and emotional hardship as a result. Thus, both the need to fully compensate plaintiff for actual damages incurred and considerations of equity weigh in favor of an award of prejudgment interest in this case. See *Wickham, 955 F.2d at 834*. Moreover, since the filing of this action in 1989, the litigation has moved slowly with defendants fighting every step from discovery to damages, and on occasion evincing quite uncooperative conduct, while plaintiff has diligently pursued his claims. Upon the conclusion of the damages hearing and submission of post-hearing papers, plaintiff has repeatedly contacted the court in an effort to track the progress of his case. Although plaintiff delayed in filing this lawsuit for several years after his termination, none of the delay associated with the litigation since its filing is attributable to plaintiff. The [*46] passage of time also weighs in favor of prejudgment interest to provide plaintiff with meaningful compensation for his damages. E.g., *Malarkey v. Texaco, Inc., 794 F. Supp. 1237, 1243 (S.D.N.Y. 1992)* (prejudgment interest awarded for retaliation which be-

gan in 1981). Finally, as the *Wickham* court carefully set forth, the degree of speculation inherent in the calculation of damages that will accrue after a wrongful termination diminishes in importance in the analysis when the need for full compensation and fairness under the circumstances of a particular case warrant an award of prejudgment interest. *Wickham, 955 F.2d at 835-36.* For all of these reasons, the court holds that plaintiff is entitled to prejudgment interest on the backpay award of $ 89,484.00, to be calculated from August 31, 1986 on an annual basis corresponding to the backpay figures testified to by plaintiff's economist, Tr., Doc. 27, at 18, until judgment is entered pursuant to this Memorandum-Decision and Order.

Neither party has suggested an interest rate to use in this calculation. The court notes that, absent an argument to the contrary, the [*47] 9% rate set in *N.Y. Civ. Prac. L. & R. § 5004* would appear to be appropriate. E.g., *Malarkey, 794 F. Supp. at 1243.* At the conclusion of this Memorandum-Decision and Order, the parties will be directed to submit proposed judgments consistent with the awards made herein. In their proposed judgments, the parties will also be directed to calculate prejudgment interest at the rate or rates they consider appropriate under the circumstances. The court will then select the prejudgment interest rate to be applied and direct the clerk of the court to enter judgment accordingly.

8. Postjudgment Interest

Plaintiff is entitled to collect postjudgment interest on the entirety of the money award set forth in this Memorandum-Decision and Order. Pursuant to *28 U.S.C. § 1961*, such interest shall be calculated from the date judgment is entered at the rate "equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment." See, e.g., *McKnight v. General Motors Corp., 768 F. Supp. 675 (E.D. Wis. 1991)* [*48] (subsequent history omitted). The court will specify the applicable rate in the judgment.

C. Attorney's Fees

As the court acknowledged in its May 28, 1991 bench decision granting plaintiff's motion for summary judgment on the issue of liability, plaintiff's success on the motion entitles him to attorney's fees under *42 U.S.C. § 1988* as a prevailing party in a § 1983 action unless special circumstances render such an award unjust. *Hensley v. Eckerhart, 461 U.S. 424, 429, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983),* quoted in *Blanchard v. Bergeron, 489 U.S. 87, 89, 103 L. Ed. 2d 67, 109 S. Ct. 939 n.1 (1989).* No special circumstances have been identified by defendants, nor does the court find any such circumstances in the record before it to preclude an award of attorney's fees for all work reasonably expended on plaintiff's case.

Plaintiff requests an award of $ 68,075.00 in attorney's fees, calculated using the lodestar method for 132.75 hours of work at an hourly rate of $ 150.00 from 1987-1989, and an untotaled number of hours at an hourly rate of $ 175.00 from 1990 to date, enhanced by a .75 contingency multiplier to reflect the difficulty of the issues [*49] and the expertise of counsel. Plaintiff also requests reimbursement for costs, including $ 2,746.25 in expert witness fees and $ 2,112.20 in disbursements associated with the filing and process of this litigation. See Teitelbaum Affidavit and attachments, Doc. 23; Court Exh. 1 (receipts).

In their post-hearing submission defendants raise no objection to plaintiff's request for costs, but do raise several objections to the fee amount claimed by plaintiff's counsel. Defendants assert that plaintiff is not entitled to attorney's fees for the 16 hours counsel spent in connection with the New York State Unemployment Insurance claim because it was not a procedural prerequisite to plaintiff's § 1983 action. Defendants also assert that the number of hours counsel claims for items such as receiving and reviewing defendants' answer, and preparing and serving eight virtually identical Notices to Take Deposition, are clearly excessive and must be reduced. Regarding the contingency multiplier plaintiff requests to enhance the fee award, defendants contend that the record is devoid of evidence that such enhancement is necessary to attract competent counsel to a claim such as this. Plaintiff [*50] having failed to carry his burden of demonstrating the appropriateness of a fee enhancement, defendants argue that the enhancement should be denied. Finally, defendants continue to argue that plaintiff is entitled only to nominal damages, and therefore a large fee award is not warranted. Defendants' Post-Hearing Memorandum of Law, Doc. 29, at 12-16.

The court disagrees. Plaintiff is a prevailing party on the majority of his claims, the most important of which are liability for the due process violation itself and the award of backpay. Plaintiff has obtained much more than a moral victory here, even though he has not been completely successful. Thus, defendants' overarching argument for reduction of plaintiff's request for fees is rejected.

As for the time counsel spent representing plaintiff during the Unemployment Insurance Appeal Hearings, the Supreme Court has found compensation appropriate for hours spent in administrative proceedings where such proceedings are a statutory prerequisite to the federal action, *New York Gaslight Club, Inc. v. Carey, 447 U.S.*

Case 3:00-cv-02423-AVC    Document 213-11    Filed 11/16/2006    Page 13 of 15

Page 12
1992 U.S. Dist. LEXIS 17370, *

54, 71, 64 L. Ed. 2d 723, 100 S. Ct. 2024 (1979), and where such proceedings are "both useful and of a type ordinarily necessary [*51] to advance the civil rights litigation . . ." *North Carolina Dep't of Transp. v. Crest Street Community Council, Inc.*, 479 U.S. 6, 15, 93 L. Ed. 2d 188, 107 S. Ct. 336 (1986), quoting *Webb v. County Bd. of Education of Dyer County*, 471 U.S. 234, 243, 85 L. Ed. 2d 233, 105 S. Ct. 1923 (1985). If the administrative proceeding does not fit within either of these categories, attorney's fees under § 1988 are not compensable because the time spent cannot be said to have been "reasonably expended on the litigation." *Webb*, 471 U.S. at 242-43 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983) (emphasis added by Webb Court)).

Plaintiff at bar contends that his administrative appeal of the denial of his claim for unemployment insurance by the New York State Department of Labor was indeed a procedural prerequisite to his federal suit because, had he not pursued the denial, the Department's finding that he lost his job as a result of misconduct would collaterally estop any claim to the contrary. Plaintiff's Post-Hearing Memorandum of Law, Doc. 30, at 12. This court is of the opinion that plaintiff misconstrues [*52] the doctrine of collateral estoppel. The Supreme Court has ruled that, "when a state agency 'acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *University of Tennessee v. Elliott*, 478 U.S. 788, 799, 92 L. Ed. 2d 635, 106 S. Ct. 3220 (1986) (quoting *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 16 L. Ed. 2d 642, 86 S. Ct. 1545 (1966)). It is clear from this ruling that the state agency must be acting in a judicial capacity and must provide the parties with an adequate opportunity to litigate disputed issues in order for its decision to have collateral estoppel effect.

Neither factor was present in the Department of Labor's initial denial of plaintiff's claim for unemployment insurance in this case. Based on the record before the court, it appears as though the agency was acting in an investigative capacity rather than a judicial capacity when it made the initial ruling on plaintiff's claim, and it gave plaintiff no opportunity to refute [*53] his employer's version of the circumstances surrounding his discharge before rendering its decision. See Department's Notice of Determination, Plaintiff's Pre-trial Exh. 5, Doc. 10; Plaintiff's Memorandum of Law in Support of Summary Judgment, Doc. 9, at 3 (unemployment payments "initially denied based on the representations of the defendant City that [plaintiff] had been guilty of misconduct and had voluntarily left his employment"). Such a decision would not collaterally estop this court or any other court from analyzing the facts and determining that plaintiff was not guilty of misconduct. Not until plaintiff appealed the decision, and an Administrative Law Judge ("ALJ") held a series of hearings and made findings of fact after giving the parties an opportunity to litigate disputed issues, did the type of administrative proceeding occur to which this court must accord collateral estoppel effect. See *University of Tennessee v. Elliot*, 478 U.S. at 799.

Thus, plaintiff's argument in support of attorney's fees for the administrative proceedings is unavailing. The proceeding before the ALJ, while certainly useful to this court on the summary judgment [*54] motion, was neither a procedural prerequisite nor of the type ordinarily necessary to advance plaintiff's civil rights litigation. Indeed, the focus of the administrative proceeding was whether plaintiff was eligible to receive unemployment insurance benefits, not whether plaintiff's civil rights were violated. Although the Supreme Court has acknowledged that a "discrete portion of the work product" may be compensable "even if the prior proceeding is not a 'proceeding to enforce' one of the § 1988 civil rights laws," *North Carolina Dep't of Transp.*, 479 U.S. at 15, counsel has not designated any discrete portion of the 16 hours he spent on the administrative proceeding as being "of the type ordinarily necessary" to proceed with plaintiff's civil rights suit. Id. On the record before the court, there is no basis to conclude that any portion of the time counsel spent in an optional administrative proceeding more than two years before plaintiff's § 1983 suit was commenced, was necessary to advance this suit. Cf. *Kyreakakis v. Paternoster*, 732 F. Supp. 1287, 1295 (D.N.J. 1990) (in § 1983 malicious [*55] prosecution case, fees denied for time spent defending and appealing the underlying municipal court conviction on the ground that such work was not of the type ordinarily necessary to litigate § 1983 claim). Plaintiff's request for attorney's fees for the 16 hours counsel spent on the administrative proceeding pursuing unemployment insurance benefits is therefore denied.

Defendants' challenge to the time claimed for specific items on Plaintiff's fee request is, for the most part, rejected by this court. Plaintiff's time summary is not required to detail every function performed in connection with a particular item to substantiate the amount of time claimed. The court accepts counsel's summary and supplemental explanations in his post-hearing submission, Doc. 30, at 12-13, and, with the exceptions noted below, approves plaintiff's base fee request. The court reduces counsel's time billed on March 14, 1990 and April 5, 1990 in connection with correspondence from defendants on the substitution of attorneys from 1.0 hours to 4 hours, as the amount claimed is excessive. The court also

Case 3:00-cv-02423-AVC    Document 213-11    Filed 11/16/2006    Page 14 of 15

Page 13
1992 U.S. Dist. LEXIS 17370, *

reduces the total number of hours counsel billed for 1990-1991 to correspond to the lodestar amount [*56] calculated for that time period, as counsel's figures did not "add up." n8 In sum, plaintiff's fee request is reduced by 16 hours for the 1987-1989 time period, and 4.1 hours for the 1990-1991 time period. Defendants do not challenge the hourly rates plaintiff requests, and the court finds such rates to be fair and reasonable, and consistent with the prevailing rates billed in the Northern District of New York. See Levy v. Scranton, No. 88-CV-1103, *1992 WESTLAW 265936*, *3 (N.D.N.Y October 1, 1992) (McCurn, C.J.); Blaine v. Board of Trustees, Onondaga Community College, No. 86-CV-903, *1992 U.S. Dist. LEXIS 5953* (N.D.N.Y Jan. 27, 1992) (Hurd, M.J.); Della Rocca Affidavit, attached to Doc. 23, P 8; Carr Affidavit, attached to Doc. 23, P 8. Therefore, plaintiff is entitled to attorney's fees for 116.75 hours at a rate of $ 150.00 per hour, and 107.9 hours at a rate of $ 175.00 per hour, for a total of $ 36,395.00.

> n8 In calculating the total hours and amounts claimed for 1990-1991, counsel omitted the sum of the itemized hours but provided the product of hours times rate. Adding the itemized hours, the court reaches a sum of 112 hours. However, dividing the $ 175.00 rate into the lodestar product of $ 18,987.50, the court reaches a figure of 108.5 hours. The court accepts the lower number, and therefore reduces counsel's itemized hours by 3.5 to correspond to counsel's lodestar calculation.

[*57]

The final issue the court must resolve is whether plaintiff has demonstrated that a .75 contingency multiplier is warranted to enhance the attorney's fees award in this case. The Supreme Court recently addressed the issue of fee enhancement in City of Burlington v. Dague, noting that the fee applicant who seeks enhancement bears "the burden of showing that 'such an adjustment is necessary to the determination of a reasonable fee.'" *Dague, 120 L. Ed. 2d 449, U.S. ___, 112 S. Ct. 2638, 2641 (1992)*, quoting *Blum v. Stenson, 465 U.S. 886, 898, 79 L. Ed. 2d 891, 104 S. Ct. 1541 (1984)* (emphasis added by Dague Court). The Court restated the "'strong presumption' that the lodestar represents the 'reasonable fee,' and that "enhancement for contingency would likely duplicate in substantial part factors already subsumed in the lodestar." *Dague, 112 S. Ct. at 2641* (internal quotation omitted). Then, elaborating on and clarifying its twin decisions in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 92 L. Ed. 2d 439, 106 S. Ct. 3088 (1986)* (Delaware Valley I) and *483 U.S. 711, 97 L. Ed. 2d 585, 107 S. Ct. 3078 (1987)* [*58] (Delaware Valley II), the Court concluded that contingency enhancement is "not consistent with our general rejection of the contingent-fee model for fee awards, nor is it necessary to the determination of a reasonable fee." Id. at 2643. Therefore, the enhancement of the fee award by a .25 contingency multiplier was reversed. Id. at 2644. Although the Dague Court was addressing the fee shifting provisions of the Solid Waste Disposal Act and the Federal Water Pollution Control Act, the Court pointed out that its decisions regarding what constitutes a reasonable fee apply uniformly to all fee shifting provisions. Id. at 2641. This court adopts the conclusion reached by the Dague Court that contingency enhancement is not necessary to the determination of a reasonable fee. In fact, the court has already taken into consideration the degree of difficulty presented by the issues in this case and the degree of expertise exhibited by plaintiff's counsel in determining the reasonableness of the rates and number of hours claimed. Plaintiff has placed nothing on the record to persuade the court that the circumstances of this case warrant enhancement of the reasonable [*59] lodestar calculation. Therefore, plaintiff's request for fee enhancement using a .75 contingency multiplier is denied.

III. Conclusion

Judgment for plaintiff on the issue of liability in this case was entered on June 5, 1991, following the court's decision on May 28, 1991 granting plaintiff summary judgment as to the liability issue. For the reasons provided above, judgment on the issue of damages shall also be entered in favor of plaintiff. Plaintiff is awarded $ 89,484.00 in back pay plus prejudgment interest calculated as appropriate from August 31, 1986, $ 57,244.68 in pension benefits, $ 12,500.00 in emotional damages, and postjudgment interest on the entirety of the judgment to be calculated pursuant to *28 U.S.C. § 1961* from the date judgment is entered until the date judgment is paid. Plaintiff's claims for front pay, social security benefits, medical benefits, and punitive damages against defendant Duggan are denied. Plaintiff's request for attorney's fees and costs as a successful plaintiff under *42 U.S.C. § 1988* is granted. Plaintiff is awarded $ 36,395.00 in attorney's fees, $ 2,746.25 in expert witness fees, [*60] and $ 2,112.20 in costs. Each of the parties is directed to submit no later than December 4, 1992 a proposed judgment consistent with the awards set forth above. Each party is directed to select a rate or rates appropriate for the calculation of prejudgment interest on the back pay award. Each party is also directed to submit a letter explaining the rate or rates chosen and setting forth the specific calculations of prejudgment interest. The court will review the parties' proposals and direct the clerk of the court to enter judgment accordingly.

It is So Ordered.

1992 U.S. Dist. LEXIS 17370, *

Dated: November 12, 1992  
Syracuse, New York

HOWARD G. MUNSON  
SENIOR UNITED STATES DISTRICT JUDGE