# EXHIBIT H-4

LEXSEE 2005 U.S. DIST. LEXIS 19902

FERRON SHORTER, JR., Plaintiff, vs. HARTFORD FINANCIAL SERVICES GROUP, INC., Defendant.

No. 3:03cv0149 (WIG)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

2005 U.S. Dist. LEXIS 19902

May 31, 2005, Decided

**SUBSEQUENT HISTORY:** Costs and fees proceeding at *Shorter v. Hartford Fin. Servs. Group, Inc.*, 2005 U.S. Dist. LEXIS 19903 (D. Conn., July 15, 2005)

**COUNSEL:** [*1] For Ferron Shorter, Jr., Plaintiff: Rachel M. Baird, Law Office of Rachel M. Baird, Torrington, CT.

For Hartford Financial Svcs Group Inc, Defendant: James F. Shea, Margaret J. Strange, Jackson Lewis - Htfd, CT, Hartford, CT.

**JUDGES:** WILLIAM I. GARFINKEL, United States Magistrate Judge.

**OPINION BY:** WILLIAM I. GARFINKEL

**OPINION:**

RULING ON PLAINTIFF'S POST-TRIAL MOTIONS

Following a five-day trial, the jury returned a verdict in favor of Plaintiff, Ferron Shorter, Jr., on his claims of race and gender discrimination under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, *42 U.S.C. § 2000e, et seq.*, and his state-law claim of negligent infliction of emotional distress. n1 The jury awarded Plaintiff $ 170,000.00 in back pay and benefits and $ 85,000.00 in general compensatory damages. Plaintiff now moves for equitable relief in the form of reinstatement or, alternatively, an award of front pay and benefits [Doc. # # 125, 133]. Additionally, Plaintiff has asked the Court to award prejudgment interest, postjudgment interest, and attorney's fees and costs [Doc. # # 27, 133]. Plaintiff's motions will be granted [*2] to the extent set forth below.

n1 The jury returned a verdict in favor of Defendant on Plaintiff's claims of intentional infliction of emotional distress and hostile work environment.

DISCUSSION

A. Front Pay

1. Reinstatement vs. Front Pay

To compensate a victim of discrimination for future damages, a court, in the exercise of its sound discretion, may order reinstatement or an award of front pay as further equitable relief. See *42 U.S.C. § 2000e-5(g)(1)*; *Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 145 (2d Cir. 1993)*, cert. denied, *510 U.S. 1164, 127 L. Ed. 2d 539, 114 S. Ct. 1189 (1994)*; see also *Dominic v. Consolidated Edison Co., 822 F.2d 1249, 1258 (2d Cir. 1987)* (ADEA claim). Although reinstatement is the preferred remedy, front pay may be awarded when it would be inappropriate to order reinstatement due to excessive hostility or antagonism between the parties. *Shaw v. Greenwich Anesthesiology Assocs., P.C., 200 F. Supp. 2d 110, 114 (D. Conn. 2002)* [*3]

In Shaw, this Court held that a plaintiff must first seek reinstatement and have that remedy denied before he or she can seek front pay. *Id. at 114-15.* To hold otherwise, the Court explained, would allow a plaintiff to deny an employer the opportunity to obtain his or her services in exchange for compensation, as opposed to the employer's having to compensate a plaintiff without receiving any services in return. *Id. at 114.*

In keeping with the holding of Shaw, Plaintiff has first moved for reinstatement. He notes that following his termination by The Hartford, he sought reinstatement. n2 See Pl.'s Reply Br. Ex. 1 containing Letters between Plaintiff's counsel and The Hartford regarding reinstatement, dated Jan. 29, 2002, Mar. 11, 2002, May 7, 2002,

2005 U.S. Dist. LEXIS 19902, *

and June 14, 2002. Plaintiff continues to remain interested in returning to The Hartford, despite this litigation since, in his view, reinstatement is the only way he will ever regain the position, status, seniority, and benefits that he had achieved through more than twelve years with The Hartford.

n2 During the trial, the Court instructed the jury that The Hartford's failure to reinstate Plaintiff was not part of the case. (Tr. 130.) However, the fact that Plaintiff sought reinstatement is relevant to his claim that he is willing to be reinstated.

[*4]

The Hartford, on the other hand, vehemently opposes reinstatement. It relies largely on the Plaintiff's arrest, evidence of which the Court excluded, as well as Plaintiff's violation of The Hartford's Electronic Communications Policy. The Hartford argues that, although the jury found in favor of Plaintiff on his discrimination claims, it did not conclude that his termination was unjust or unwarranted, but rather that his former girlfriend and co-worker, Maryanne Rhodes, should also have been terminated. Additionally, The Hartford maintains that reinstatement would not be practical because over three years have passed since Plaintiff's termination, during which time he has not worked in the information technology field nor updated his skill level to stay current in the field. Thus, it argues, the Court has no basis for concluding that Plaintiff retains the skills and knowledge to perform his former job. (Def's Mem. at 8-9.)

The Court is not persuaded by the arguments advanced by The Hartford for not reinstating Plaintiff. The Court is not convinced that a company as large as The Hartford could not find a position for which Plaintiff would be qualified, given the variety of positions [*5] that Plaintiff competently filled over the twelve years he was with the company. Additionally, the Court disagrees with The Hartford's assessment of the jury's verdict. The jury found that Plaintiff's race and gender were motivating factors in The Hartford's decision to terminate him. The Court fails to understand how The Hartford could construe the jury's verdict as anything other than a finding that Plaintiff's termination was unjust. The Hartford further ignores the jury's verdict in arguing that an award of any further equitable relief is inappropriate because Plaintiff would have been terminated in any event for violating the company's Electronic Communications Policy. This evidence was presented to the jury and the jury disagreed, finding that Plaintiff's termination was unlawful, for which it awarded him back pay. n3 As to Defendant's argument that reinstatement is not appropriate in light of Plaintiff's alleged criminal conviction, twelve days after Plaintiff was terminated, The Hartford received evidence that Plaintiff did not, in fact, have a record of a criminal conviction. See Def's Mem. in Opp'n to Pl.'s Mot. for Equitable Relief, Ex. 2. Although The Hartford argues [*6] that these records were unclear, the Court is not willing to deny reinstatement on the basis of these records, particularly when Plaintiff established that he did not have a criminal conviction. n4

n3 The Hartford could have sought a mixed-motive instruction but did not. The Court will not speculate how the jury would have responded to mixed-motive interrogatories.

n4 Defendant argues that the Court should not consider the issue of reinstatement because it was precluded from introducing evidence at trial to rebut Plaintiff's claim for reinstatement. This evidence was excluded because, inter alia, the matter of reinstatement was not for the jury but for the Court. See *Banks v. Travelers Companies*, *180 F.3d 358, 364 (2d Cir. 1999)* (holding that if there is a lacuna in the record evidence concerning the issue of reinstatement versus front pay, the court on remand should afford the parties an opportunity to supplement the record); *United States E.E.O.C. v. W & O, Inc., 213 F.3d 600, 618 (11th Cir. 2000)* (rejecting defendant's claim that the EEOC waived the claim of front pay due to the alleged paucity of references to front pay in the pretrial order and its failure to submit evidence of or to argue front pay during the jury trial, since this was an issue for the court, rather than the jury). The Court has reviewed the cases cited by Defendant in support of this argument, *Excel Corp. v. Bosley, 165 F.3d 635, 639-40 (8th Cir. 1999)*, and *Sequa Corp. v. GBJ Corp., 156 F.3d 136, 143-44 (2d Cir. 1998)*, and finds them to be inapposite.

[*7]

Nevertheless, the Court reluctantly concludes that reinstatement is not a viable alternative and that the more appropriate remedy is an award of front pay based upon the animosity between the parties that was exhibited throughout the course of this litigation, as well as the fact that Plaintiff now resides in Georgia. The Second Circuit has held that in cases where the employer-employee relationship has been irreparably damaged by animosity associated with the litigation, reinstatement may not be possible, and "a reasonable monetary award of front pay is necessary as equitable relief . . . appropriate to effectu-

ate the purposes of [the Act]'" *Whittlesey v Union Carbide Corp*, 742 F 2d 724, 728 (2d Cir 1984) (decided under the ADEA) (internal citations and quotation marks omitted); see also *Banks v Travelers Companies*, 180 F 3d 358, 365 (2d Cir 1999); *Padilla v Metro-North Commuter R R*, 92 F 3d 117, 125-26 (2d Cir 1996), cert denied, 520 U S 1274, 138 L Ed 2d 211, 117 S Ct 2453 (1997) It is clear to the Court that, though Plaintiff was liked and respected in his unit, corporate management's negative feelings about Plaintiff [*8] and this case would create an untenable relationship were he to return to The Hartford

"A front pay award 'serves a necessary role in making victims of discrimination whole in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment'" *Padilla, 92 F 3d at 126* (quoting *Whittlesey, 742 F 2d at 729*) Under the facts of this case, the Court finds an award of front pay is appropriate.

### 2. Calculation of the Front Pay Award

As an alternative equitable remedy, Plaintiff has sought front-pay in the amount of $ 869,828 n5 The amount of front pay to be awarded is a matter committed to the Court's discretion. In calculating the size of a front-pay award, the Court must estimate Plaintiff's ability to mitigate his damages in the future See *Dominic, 822 F 2d 1249 at 1257 (ADEA case)*. Additionally, the Court must take into consideration Plaintiff's age, his education and training, his work experience, his skills, the job market, and his reasonable prospects of obtaining comparable employment. See *Fernandez v North Shore Orthopedic Surgery & Sports Medicine, P C, 79 F Supp 2d 197, 204 (E D N Y 2000)* [*9]

n5 Plaintiff has prepared a chart in which he has calculated two alternative front pay figures The first is based upon a minimum annual salary of $ 45,000, which he projects will remain constant from 2005 to 2032, at which time Plaintiff would reach retirement age of 65 From this figure, he has subtracted his current earnings of $ 25,000, increasing each year at the rate of 1% After six years, when he hopes to have completed his college degree, he has used an earnings figure of $ 35,000, which increases at the rate of 1% per year This yields a total front pay figure of $ 268,156 over 27 years. Alternatively, he has computed front pay using the jury's back pay award, which included lost benefits, for a three-year period. Dividing the award of $ 170,000 by three produces an annual back pay award of approximately $ 57,000, including benefits, which he has increased at the rate of 1% per year After subtracting the same projected future earnings, the total front pay is $ 869,828 for 27 years In neither scenario has he included any benefits from future employers.

[*10]

In this case, Plaintiff has produced a detailed affidavit setting forth his efforts to find comparable employment n6 During his twelve years with The Hartford, Plaintiff worked as an insurance rater, an assistant to the underwriter, an actuarial pricing specialist, a specialty actuarial programmer, a technician in the information management department, and last as a developer with an annual salary of $ 44,500 Following the termination of his employment on January 23, 2002, Plaintiff placed his resume on various internet job search web sites. He regularly checked the employment section of the local newspapers, and applied for jobs at numerous temporary work and staffing agencies and with several other insurance companies. He attended a career expo Plaintiff was repeatedly advised that either he was over-qualified, that he did not have enough experience for a particular job, that he was not a good match for a position, or that it had been too long since he had used particular skills Finally, in April of 2003, Plaintiff relocated to Georgia to live with his family while he continued his search for employment

n6 Defendant has challenged this evidence on the ground that it was not produced during the trial. Defendant argues that it is improper for the Court to consider evidence outside the record. The "record" however before the Court on these posttrial motions is not limited to the trial transcript and exhibits. Plaintiff's affidavit was properly submitted in support of a post-trial motion on a matter to be decided by the Court, not the jury, just as his attorney's affidavit was properly submitted in support of the motion for attorney's fees. See Note 4, supra Additionally, the Court notes that the affidavit is largely a recap in narrative form of Plaintiff's Exhibit No 29, consisting of Plaintiff's resume and over thirty letters and e-mails detailing Plaintiff's efforts to find other employment. Plaintiff also testified during his deposition and at trial as to his efforts to find other employment See Def's Mem in Opp'n to Mot for Equitable Relief Ex 1 & 4.

[*11]

Plaintiff submitted his resume to more than fifteen companies and recruiters in Georgia, and met with at least five others. One recruiting firm told him that he

would have difficulty finding a job because his salary at The Hartford had been so high and that he should look for a job with a substantially lower salary, between $ 20,000 and $ 30,000.

Finally, in October of 2003, having found no comparable employment, Plaintiff began work as a courier for $ 12.00/hour (or approximately $ 25,000/year) and has continued in that capacity for several different companies until December 2004, when his employer could no longer afford to pay him due to the loss of a major customer.

Following the trial in January, 2005, Plaintiff met with a counselor at DeVry University in Alpharetta, Georgia, who advised him that to find a position in information technology he needed to acquire computer networking skills. Plaintiff states that he plans to attend a university n7 to acquire a degree and the skills he needs to obtain a job comparable to the position he held with The Hartford. Because he needs to work, he will have to attend school on a part-time basis. The university guidance counselor has advised [*12] him that it will take him six years to obtain his degree, after which he hopes to obtain a position in the field of Computer Programming/Information Technology. Plaintiff believes that after obtaining his degree, he will be able to find employment at a starting annual salary of $ 30,000 to $ 40,000.

> n7 Plaintiff has looked into several universities. The cost to obtain his degree ranges from $ 58,000 to nearly $ 70,000.

The Court finds that Plaintiff has made reasonable and diligent efforts to find other comparable employment n8 Although The Hartford argues that Plaintiff's efforts at mitigation were insufficient, it is Defendant's burden to prove that comparable positions were available to Plaintiff, and that he did not make reasonable efforts to avail himself of employment opportunities. *Clarke v Frank*, 960 F 2d 1146, 1152 (2d Cir 1992); *Palma v Pharmedica Communs, Inc*, 2003 U S Dist LEXIS 21160, No 3 00CV1128, 2003 WL 22750600, at *3 (D Conn Sept 30, 2003); *Epstein v Kalvin-Miller Int'l, Inc*, 139 F Supp 2d 469, 482 n 4 (S D N Y 2001) [*13] The Hartford has failed to provide any evidence that comparable employment existed for Plaintiff, who had only a high school education and had worked for The Hartford for over twelve years n9

> n8 While employees who have been terminated have a duty to "use reasonable diligence in finding other suitable employment," *Ford Motor Co v E E O C*, 458 U S 219, 231, 73 L Ed 2d 721, 102 S Ct 3057 (1982), the duty is "not onerous." *Dailey v Societe Generale*, 108 F 3d 451, 456 (2d Cir 1997). The Second Circuit has held that the ultimate question "is whether the plaintiff acted reasonably in attempting to gain other employment or in rejecting proffered employment." *Hawkins v 1115 Legal Service Care*, 163 F 3d 684, 695 (2d Cir 1998) (internal quotations and citations omitted). Suitable employment means a job that is "substantially equivalent" to the plaintiff's former job. *Ford Motor Co*, 458 U S at 232. While a plaintiff must demonstrate reasonable diligence in seeking suitable employment, "the employer has the ultimate burden of proving that the discriminatee failed to mitigate damages." *N L R B v Thalbo Corp*, 171 F 3d 102, 112 (2d Cir 1999)

[*14]

> n9 Plaintiff's situation is significantly different than that of the plaintiff in Palma cited by Defendant. In Palma, the plaintiff had obtained another job, where she was very happy. Since obtaining this job, plaintiff had not made any effort to find employment comparable to her former position. The court declined to hold the defendant responsible for maintaining the plaintiff's income level into the future without regard to any continuing efforts on her part to mitigate her damages. *Palma*, 2003 U S Dist LEXIS 21160, 2003 WL 22750600, at *4

The Court finds that under the circumstances of this case, a front pay award is particularly appropriate. Plaintiff had received raises over a twelve-year period from a starting annual salary of $ 13,300 to $ 44,500, based on his seniority, in-house promotions, and merit assessment reviews. Without further training or a college degree, it will be extremely difficult for him to match the salary that he was earning at the time of his termination. The Hartford itself states that it would not be practical to rehire Plaintiff because he had been away from the [*15] information technology field for over three years. (Def's Mem. at 9) ("The IT field is constantly changing and there is no evidence in the record that Plaintiff has updated his skill level to stay current in the field."). Defendant also states that there were few positions in the information technology field available in Connecticut (Def's Mem at 3.)

The Second Circuit has encouraged the district courts to "fashion remedies designed to ensure that victims of [] discrimination are made whole." *Whittlesey*,

Case 3:00-cv-02423-AVC   Document 213-12   Filed 11/16/2006   Page 6 of 13

Page 5
2005 U.S. Dist. LEXIS 19902, *

*742 F.2d at 728.* The amount of time for which front pay will be awarded is committed to the district court's discretion. See *Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1182 (2d Cir. 1996).* The Court finds an award of front pay to be an appropriate equitable remedy in this case and awards front pay for a period of six years following the date of judgment, which will provide Plaintiff with the opportunity to obtain his college degree and to find comparable employment. n10 Plaintiff was making $ 44,500 with The Hartford at the time of his termination. He has been earning approximately $ 25,000 since October 2003 and intends to continue working [*16] while attending college. n11 The Court awards Plaintiff front pay in the amount of $ 117,000, representing the difference between his former salary and what Plaintiff was earning as a courier for a period of six years.

n10 The Court agrees with Defendant that an award of front pay for twenty-seven years, as sought by Plaintiff, is not warranted. Given Plaintiff's relatively young age and the fact that he will be obtaining a college degree, it is far too speculative to assume that Plaintiff will never be able to find a job at a salary level or with benefits comparable to what he would have made with The Hartford. See *Dominic, 822 F.2d at 1258* (holding that it was not an abuse of discretion to limit the front pay award to two years); but see *Padilla, 92 F.3d at 126* (affirming a front pay award for a period of 20 years); *Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1189 (2d Cir.)* (affirming a front pay award for a period of 17 years), cert. denied, *506 U.S. 826, 121 L. Ed. 2d 46, 113 S. Ct. 82 (1992).*

n11 The Court has not factored future salary increases into these calculations and, therefore, it is not necessary to reduce these figures to present value. See *Stratton v. Department for the Aging for City of New York, 132 F.3d 869, 882 (2d Cir. 1997)* (affirming front pay award not discounted to present value); *Dominic, 822 F.2d at 1257-58* (same); *Gusman v. Unisys Corp., 986 F.2d 1146, 1147-48 (7th Cir. 1993)* (same).

[*17]
### 3. Back Pay Until the Date of Judgment

Additionally, the Second Circuit has held that, because the jury cannot anticipate the date on which judgment will enter in calculating a back pay award, "any lag time between the jury's verdict and the district court's ultimate judgment ordinarily should be remedied by the court, in the form of a pro rata increase of the back pay award." *Banks, 180 F.3d at 364*; see also *Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 167 (2d Cir. 1998)* (holding that a "plaintiff who has proven a discharge in violation of the ADEA is, as a general matter, entitled to back pay from the date of discharge until the date of judgment"); *Dunlap-McCuller v. Riese Organization, 980 F.2d 153, 159 (2d Cir. 1992)* (holding that back pay award runs from the date of termination until the date of judgment), cert. denied, *510 U.S. 908, 126 L. Ed. 2d 239, 114 S. Ct. 290 (1993)*; *Nord v. United States Steel Corp., 758 F.2d 1462, 1472-73 (11th Cir. 1985)* (back pay award should extend to date of judgment, rather than to earlier date on which court announced findings of fact following bench trial).

Based [*18] on the Court's instructions, the jury's back pay award of $ 170,000 was calculated from the date of Plaintiff's termination, January 23, 2002, to the date of the verdict, January 28, 2005, a period of three years. This back pay award should continue until the date of judgment at the rate of $ 4,722 per month.

### 4. Lost Benefits

In addition to his lost wages, Plaintiff seeks compensation for the pension benefits that he has lost because of his termination and his loss of seniority and earnings. Plaintiff states that, under The Hartford's retirement plan, he would have been eligible for retirement with full medical benefits as of October 29, 2018. n12 He has produced some calculations by an actuary, which show the difference between the pension benefits Plaintiff will receive given his termination in 2002 and the pension benefits he would have received had he retired from The Hartford in 2032, at the age of 65, to be $ 11,383 per year. This evidence, however, is not properly before the Court. As Defendant points out, this "expert" witness was not disclosed in Plaintiff's Trial Memorandum or elsewhere. Further, this individual has not been properly qualified as an expert witness [*19] Indeed, Plaintiff has not even disclosed his name. Additionally, his calculations are offered to prove the truth of the matters asserted therein and are, therefore, inadmissible hearsay. *Fed. R. Evid. 801(c).* Therefore, the Court will not consider this evidence in ruling on this motion.

n12 This is based on the "Rule of 80." On October 29, 2018, Plaintiff will be 51 years old and would have had 29 years of service with The Hartford.

The Second Circuit has held that compensation for lost pension benefits is an essential component of the relief to which victims of discrimination are entitled. See *Sharkey v. Lasmo (AUL Ltd.), 214 F.3d 371, 374 (2d Cir.*

Case 3:00-cv-02423-AVC    Document 213-12    Filed 11/16/2006    Page 7 of 13

Page 6
2005 U.S. Dist. LEXIS 19902, *

2000) Relief for lost pension benefits may take one of two forms, legal or equitable Id (citing *Banks v Travelers Cos.*, *180 F 3d 358, 365 (2d Cir 1999))* Legal relief, which is properly awarded by the jury, involves the payment of money damages directly to the plaintiff as compensation for [*20] the value of the pension benefits that were lost See Id Equitable relief, which is committed to the sound discretion of the Court, entails the restoration of lost service and salary credits to the plaintiff's pension plan to put him in the same place he would have been had he not been unlawfully terminated. See Id (citing *Banks, 180 F 3d at 365*, and *Geller v Markham, 635 F 2d 1027, 1036 (2d Cir 1980))* "Unlike damage awards, 'which are payable to the plaintiff, pension benefits are paid into pension annuity funds They merely replace the benefits that would have accrued during the [period] of employment wrongfully denied to [the plaintiff]'" *Banks, 180 F 3d at 365* (quoting *Geller, 635 F 2d at 1036*)

The jury was instructed to take into consideration lost benefits, including pension benefits, in its calculation of damages for back pay Based on the amount of the jury's award, it appears that they included compensation for lost benefits. To award additional relief for lost pension benefits would be speculative given the record before the Court and possibly duplicative of the benefits already awarded [*21] by the jury Moreover, Plaintiff may later qualify for a pension with another employer. Thus, the Court declines to award additional relief for lost pension benefits See *EEOC v Yellow Freight Sys., Inc., 2002 US Dist LEXIS 16826, No 98 Civ 2270, 2002 WL 31011859, at *31 (S D N Y Sept 9, 2002)*

**B. Prejudgment Interest**

Plaintiff has also sought an award of prejudgment interest In *Loeffler v Frank, 486 U S 549, 100 L Ed 2d 549, 108 S Ct 1965 (1988)*, the Supreme Court held that consistent with the "make-whole" remedial scheme of § 706(g), "Title VII authorizes prejudgment interest as part of the backpay remedy in suits against private employers." *Id at 557-58* However, the fact that prejudgment interest may be awarded does not mean that it must be awarded. See II Barbara Lindemann & Paul Grossman, Employment Discrimination Law 1785 (3d ed. 1997) "As the Second Circuit has noted, it is within the sound discretion of the trial court whether or not to award prejudgment interest at all, and the same considerations that inform that decision should also inform the choice of interest rate." *Security Ins Co of Hartford v Old Dominion Freight Line, Inc., 314 F Supp 2d 201, 202 (S D N Y 2003)* [*22] Nevertheless, in cases involving the award of compensation for lost wages, the Second Circuit has held that "it is ordinarily an abuse of discretion not to include pre-judgment interest." *Saulpaugh, 4 F 3d at 145* (backpay award under Title VII); see also *Clarke, 960 F 2d at 1154* (same); *Sands v Runyon, 28 F 3d 1323, 1327 (2d Cir 1994)* (same under Rehabilitation Act); *Miner v City of Glens Falls, 999 F 2d 655, 661 (2d Cir 1993)* (upholding prejudgment interest award in a § 1983 case); *Equal Employment Opportunity Commission v County of Erie, 751 F 2d 79, 81 (2d Cir 1984)* (same under Equal Pay Act); *Donovan v Sovereign Security, Ltd., 726 F 2d 55, 58 (2d Cir 1984)* (same under Fair Labor Standards Act). The rationale for awarding prejudgment interest in such cases is to prevent the defendant-employer from attempting to "enjoy an interest-free loan for as long as it can delay paying out back wages," *Saulpaugh, 4 F 3d at 145*, and to help ensure that the plaintiff is made whole. *Loeffler, 486 U S at 558* (holding that prejudgment interest is an element [*23] of compensation)

The Court finds that prejudgment interest should be awarded in this case to compensate Plaintiff for not having had access to the wages that he would have received had he not been wrongfully terminated See *Chandler v Bombardier Capital, Inc., 44 F 3d 80, 83 (2d Cir 1994)*; *Reichman v Bonsignore, Brignati & Mazzotta, P C, 818 F 2d 278, 281-82 (2d Cir 1987)* The more difficult questions are what rate should apply and the how prejudgment interest should be calculated.

Since no federal statute controls the rate of prejudgment interest, see *Jones v UNUM Life Ins Co of America, 223 F 3d 130, 139 (2d Cir 2000)*, and since the Second Circuit has not expressly endorsed a particular interest rate, see *Worthington v City of New Haven, 1999 US Dist LEXIS 16104, No 3 94cv00609, 1999 WL 958627, at *17 (D Conn Oct 5, 1999)*, the courts in the Second Circuit have adopted a variety of approaches, including the post-judgment interest rate provided in 28 USC § 1961, state statutory interest rates, or market rates See, e g, *Chandler, 44 F 3d at 84* (approving the trial court's use of the [*24] federal post-judgment rate of interest, 28 USC § 1961); *E E O C v County of Erie, 751 F 2d at 82* (applying the adjusted prime rate of interest as established by the Secretary of the Treasury in an employment discrimination case); *Shaw, 200 F Supp 2d at 119* (applying a prejudgment interest rate of 7 5%, compounded semi-monthly, in an employment discrimination case); *Malarkey v Texaco, Inc., 794 F Supp 1237, 1243 (S D N Y 1992)* (applying the New York statutory rate to an employment discrimination case), aff'd, *983 F 2d 1204 (2d Cir 1993)* "Regardless of the interest rate used as a starting point by a court evaluating a motion for prejudgment interest, the Second Circuit has made clear that a court 'need not limit the award of prejudgment interest to the rate at which the injured party would have lent money to the government'" *In re Livent, Inc., 360 F Supp 2d 568, 572 (S D N Y 2005)* (quoting

Case 3:00-cv-02423-AVC    Document 213-12    Filed 11/16/2006    Page 8 of 13

Page 7
2005 U.S. Dist. LEXIS 19902, *

*Jones, 223 F.3d at 139*) In *Jones*, the Second Circuit emphasized that circumstances must be reviewed individually to determine the fairness of an award [*25] of prejudgment interest in a particular case, taking into consideration: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Jones, 223 F.3d at 139* (quoting *SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1476 (2d Cir. 1996)*, cert. denied, *522 U.S. 812, 139 L. Ed. 2d 21, 118 S. Ct. 57 (1997)*)

The remedial scheme of Title VII clearly contemplates that victims of discrimination should be made whole and, in keeping with this philosophy, the Second Circuit has encouraged the award of prejudgment interest on back pay awards in employment discrimination cases. Although the courts have applied different interest rates in employment discrimination cases, the majority of courts appear to favor the post-judgment statutory rate of *28 U.S.C. § 1961*, "because it takes into account the effects of inflation, but does not overly compensate the plaintiff." *Worthington, 1999 U.S. Dist. LEXIS 16104, 1999 WL 958627, at *17* [*26] (citing cases); *Fisher v. Town of Windsor, 1997 U.S. Dist. LEXIS 23542, No. 3:94CV02050, 1997 WL 76669, at *6 (D. Conn. Feb. 7, 1997)* (using the rates set forth in *§ 1961(a)*, compounded monthly, to calculate prejudgment interest in an employment discrimination case); *Association against Discrimination in Employment, Inc. v. Bridgeport, 572 F. Supp. 494, 495 (D. Conn. 1983)* (same). This Court will follow the approach taken in Worthington, Fisher, and the City of Bridgeport cases, supra, and award Plaintiff prejudgment interest at the *§ 1961(a)* rate, which is the "rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System." See also *Norville v. Staten Island Univ. Hosp., 112 Fed. Appx. 92, 94, 2004 WL 2291388 (2nd Cir. 2004)* (applying the rate of interest found in *§ 1961(a)* in an employment discrimination case); *EEOC v. Yellow Freight Sys., Inc., 2002 U.S. Dist. LEXIS 16826, 2002 WL 31011859, at *33* (same). That still leaves the question of how prejudgment interest is to be calculated.

In Saulpaugh, the Second Circuit held that the court must calculate prejudgment [*27] interest in a Title VII case based upon a compound rate of interest. "Given that the purpose of back pay is to make the plaintiff whole, it can only be achieved if interest is compounded." *Saulpaugh, 4 F.3d at 145*. In Chandler, the Second Circuit held that it was error for the district court to award prejudgment interest as of the date of discharge on the entire amount of the back pay award, rather than calculating the interest separately for each lost salary payment. "Interest should have run from the date of the missed payments, rather than from the date of termination." *Chandler, 44 F.3d at 84*.

Because interest must be compounded, and should only be based upon the back pay due as of a particular point in time, the interest rate will change pay period to pay period. (The interest rates range from 2.18% on January 25, 2002, to a low of 0.95% on June 20, 2003, to over 3.0% in April 2005) n13 The Court instructs Plaintiff's counsel to submit a calculation of the amount of prejudgment interest from January 23, 2002, to the date of this ruling, compounded either monthly or biweekly (depending on how Plaintiff was paid by The Hartford), using the [*28] weekly rate of interest under *§ 1961(a)* as of the Friday on or immediately preceding the date on which Plaintiff would have been paid. See *EEOC v. Yellow Freight Sys., Inc., 2002 U.S. Dist. LEXIS 16826, 2002 WL 31011859, at *33*. This calculation should be submitted within twenty (20) days of the date of this ruling, to which defense counsel will have ten (10) days to object and, if so, to offer an alternative calculation. Either side may enlist the help of an expert not previously disclosed in the trial memorandum.

---

n13 The most recent rates, i.e., those not appearing in *28 U.S.C. § 1961*, can be found at www.federalreserve.gov.

---

### C. Post-Judgment Interest

Plaintiff is also entitled to an award of post-judgment interest under *28 U.S.C. § 1961(a)* on the entire money judgment. See Employment Discrimination Law at 1787 ("*After* an award of back pay, *postjudgment* interest is allowed in all cases." (original emphasis)) "Post-judgment interest is designed [*29] to compensate the plaintiff for the delay it suffers from the time damages are reduced to an enforceable judgment to the time the defendant pays the judgment." *Andrulonis v. United States, 26 F.3d 1224, 1230 (2d Cir. 1994)*. Under *§ 1961(a)*, post-judgment interest is calculated "from the date of entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." *28 U.S.C. § 1961(a)*. The judgment entered by the Court shall include an award of post-judgment interest in accordance with this section.

### D. Attorney's Fees and Costs

Case 3:00-cv-02423-AVC   Document 213-12   Filed 11/16/2006   Page 9 of 13

Page 8
2005 U S Dist. LEXIS 19902, *

Last, Plaintiff seeks an award of attorney's fees and costs In support of this request, his attorney Rachel M. Baird has submitted an affidavit, twenty-six billing invoices, a table summarizing these invoices, a list of costs, and an affidavit of Attorney Peter B Prestley, a Connecticut attorney who handles employment discrimination cases Based on these affidavits and records, Plaintiff seeks an award of attorney's fees in the amount of $ 110,718 00, [*30] to which Plaintiff asks the Court to apply a multiplier of two, plus costs of $ 2813 41.

### 1. The Standard for Awarding Fees

In Title VII cases, "the court may, in its discretion, allow the prevailing party . . . a reasonable attorney's fee." *42 U S C § 2000e-5(k)*; see *Cowan v Prudential Ins Co of America, 935 F 2d 522, 524 (2d Cir 1991)* The district court is afforded broad discretion in determining a reasonable fee award based on the circumstances in the case *Hensley v Eckerhart. 461 U S 424, 437, 76 L Ed 2d 40. 103 S Ct 1933 (1983)* The "normal starting point for calculating reasonable attorneys' fees to be awarded to a prevailing civil rights plaintiff is the calculation of a so-called 'lodestar' figure, which is arrived at by multiplying 'the number of hours reasonably expended in the litigation ... by a reasonable hourly rate'" *Kirsch, 148 F 3d at 172* (quoting *Hensley, 461 U S at 433*) The rates to be used in calculating the lodestar are the market rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." [*31] *Blum v Stenson, 465 U S 886, 896, 79 L Ed 2d 891, 104 S Ct 1541 & n 11 (1984)*; see also *Gierlinger v Gleason, 160 F 3d 858, 882 (2d Cir 1998)* There is a strong presumption that the lodestar figure represents a reasonable rate. *Quaratino v Tiffany & Co. 166 F 3d 422, 425 (2d Cir 1997)*.

"The fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley. 461 U S at 437* "Applications for fee awards should generally be documented by contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." *Kirsch, 148 F 3d at 173.* The Court should exclude from the fee calculation hours that were not reasonably expended *Hensley, 461 U S at 434* Hours that are excessive, redundant, or otherwise unnecessary should be excluded from the lodestar calculation *Kirsch, 148 F 3d at 173.* "The task of determining a fair fee requires a conscientious and detailed inquiry into the validity of the representations that a certain number of hours [*32] were usefully and reasonably expended." *Lunday v City of Albany. 42 F 3d 131, 134 (2d Cir 1994)* (remanding award of attorneys' fees and directing the magistrate judge to review critically counsel's time records) The Court must

> examine the hours expended by counsel and the value of the work product of the particular expenditures to the client's case. In making this examination, the district court does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties.

*Gierlinger, 160 F 3d at 876* (quoting *DiFilippo v Morizio. 759 F 2d 231, 235-36 (2d Cir 1985))* The Second Circuit has further directed that if the Court determines that certain hours are not deserving of compensation, it must state the reasons for excluding those hours "as specifically as possible." *LeBlanc-Sternberg v Fletcher, 143 F 3d 748, 764 (2d Cir 1998)* (internal quotations omitted); *Orchano v Advanced Recovery, Inc., 107 F 3d 94, 99 (2d Cir 1997)*.

"The product of reasonable [*33] hours times a reasonable rate does not end the inquiry." *Hensley, 461 U S at 434* There are other considerations that may lead a court to adjust the fee upward or downward. Id. The lodestar figure may be adjusted on the basis of the "results obtained." Id. "Indeed, 'the most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.'" *Farrar v Hobby, 506 U S 103, 114, 121 L Ed 2d 494. 113 S Ct 566 (1992)* (quoting *Hensley, 461 U S at 436*) "This factor is particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief." *Hensley. 461 U S at 434* A plaintiff who prevails on some but not all of his claims is not entitled to a fee award for unsuccessful claims that were based on different facts and different legal theories Id However, a plaintiff's lack of success on some of his claims does not require the court to reduce the lodestar amount where the successful and unsuccessful claims were interrelated and required essentially the same proof. *Murphy v Lynn, 118 F 3d 938, 951 (2d Cir 1997),* [*34] cert denied, *522 U S 1115, 140 L Ed 2d 114, 118 S Ct 1051 (1998)*; *DeLeon v Little, 2000 U S Dist LEXIS 18378. No 3 94CV902, 2000 WL 435494, at *4 (D Conn Mar 2. 2000).* The following factors also may be considered: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the

Case 3:00-cv-02423-AVC   Document 213-12   Filed 11/16/2006   Page 10 of 13

Page 9
2005 U.S. Dist. LEXIS 19902, *

customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Hensley, 461 U.S. at 430 n.3.*

### 2. Plaintiff's Fee Request

#### a. Reasonableness of the Hours Claimed

Plaintiff bases his fee request on 369.06 hours of time billed by Attorney Baird for services rendered over a three-year period.

Attorney Baird's representation of Plaintiff began on or about January 26, 2002. She was the only attorney who [*35] represented Plaintiff in connection with this matter and she alone provided all of the legal services for which Plaintiff now seeks fees. Attorney Baird represented Plaintiff throughout the administrative proceedings before the Connecticut Commission on Human Rights and Opportunities ("CCHRO") and then filed a complaint in federal court on his behalf on January 22, 2003. As attested to by Attorney Baird, and as reflected in the court file and docket sheet, this case has involved a considerable number of pretrial matters, including a motion to dismiss, an amended complaint based on newly acquired evidence, substantial discovery, motions for summary judgment, and motions in limine, followed by jury selection, a five-day jury trial, and several post-trial motions. The docket sheet currently lists 148 documents filed by the parties. The total number of hours billed over a three-year period, from January 26, 2002 through February 21, 2005, was 383.57, of which Plaintiff is claiming 369.06 for purposes of this motion.

The Court has thoroughly reviewed all of Attorney Baird's time records and finds that the hours billed were reasonable. Attorney Baird has carefully documented the services [*36] rendered, and has recorded her time in increments of hundredths of an hour. Without exception, her billing entries reflect a reasonable amount of time for the legal services provided.

Defendant has objected to the hours claimed as excessive because they include time spent on Plaintiff's claims against Defendant Maryanne Rhodes, whom Plaintiff voluntarily dropped from the case following the trial. n14 Defendant suggests that a reasonable number of hours would be 362.56, as opposed to the 369.06 claimed by Plaintiff. n15 Although Maryanne Rhodes would still have been a critical witness had she not been a party, Attorney Baird would not have been able to serve her with interrogatories and might not have had separate dealings with her attorney. n16 The Court finds that Defendant's proposed reduction in the hours claimed is reasonable and warranted and will award Plaintiff fees based upon total hours of 362.56.

> n14 The Court had severed all claims against Defendant Rhodes from the claims against The Hartford.

> n15 Defendant asks the Court to exclude time spent on interrogatories to Ms. Rhodes and for a letter prepared to David Metzger, Ms. Rhodes' attorney.

[*37]

> n16 Plaintiff has voluntarily excluded from his claimed attorney's fees and costs, the cost of serving the complaint on Ms. Rhodes, and 8.01 hours in time for responding to Ms. Rhodes' motion to strike.

#### b. Reasonableness of the Rate Requested

Plaintiff has requested a fee award based upon an hourly rate of $300 per hour. In support of this requested rate, he has offered the affidavits of Attorney Baird and Attorney Prestley, who practices in Connecticut.

Attorney Baird received her law degree in 1992 from Yale Law School and was admitted to the Connecticut Bar in December 1991. She had thirteen years of legal experience at the time of this trial. She is a member of the District of Columbia Bar and Massachusetts Bar. She has been a sole practitioner for the past four years. During that time, at least fifty percent (50%) of her practice has been representing plaintiffs in employment matters, with a significant number of cases in federal court. From 1992 to 2000, she served as an Assistant Attorney General for the State of Connecticut. Attorney Baird billed Mr. Shorter at the hourly [*38] rate of $150, although she states that she has billed other clients as much as $300 per hour.

Defendant challenges the requested rate of $300 per hour on the grounds that it is twice what Attorney Baird was actually billing Plaintiff; that it is neither her customary rate nor a reasonable rate; and that the requested rate exceeds what the courts have awarded to other attorneys with her level of experience in Connecticut.

The Supreme Court in Blum noted the inherent difficulty in determining an appropriate "market rate" for a lawyer's services but explained that

the burden is on the fee applicant to produce satisfactory evidence - in addition to the attorney's own affidavits - that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation. A rate determined in this way is normally deemed to be reasonable, and is referred to - for convenience - as the prevailing market rate.

*Blum*, 465 U.S. at 896, n.11; see also *Gierlinger*, 160 F.3d at 882; *Kirsch*, 148 F.3d at 172 (holding that the lodestar should be based [*39] on prevailing market rates for comparable attorneys of comparable skill and standing in the pertinent legal community); *Luciano v. Olsten Corp*, 109 F.3d 111, 115-16 (2d Cir. 1997) (holding that the lodestar figure should be in line with the prevailing rates in the community, that being the district in which the court sits); *Omnipoint Communications, Inc v Planning & Zoning Comm'n, 91 F Supp 2d 497, 499 (D Conn 2000)* (basing the determination of a reasonable hourly rate on the Court's extensive experience and knowledge of rates within the western Fairfield County area). Moreover, the courts have held that the actual billing arrangement between an attorney and his client does not necessarily establish a ceiling on the rates that can be awarded, although it is a significant factor. See *Blanchard v Bergeron*, 489 U.S. 87, 93, 103 L. Ed 2d 67, 109 S. Ct. 939 (1989) (holding that a fee award under § 1988 is not limited by a contingent fee agreement between the attorney and his client. "Should a fee agreement provide less than a reasonable fee calculated [according to the lodestar method], the defendant should nevertheless be required to pay the [*40] higher amount."); *Crescent Publishing Group, Inc v Playboy Enterprises, Inc*, 246 F.3d 142, 148 (2d Cir. 2001) (allowing a higher rate than that actually billed in a Copyright Act case).

Plaintiff has provided the Affidavit of Attorney Peter B. Prestley, who has been practicing in Connecticut for thirty-three years and has extensive experience in the field of employment law. Attorney Prestley states in his affidavit that the hourly rate of $300 is "reasonable and consistent with the prevailing fee for attorneys with [Attorney Baird's] degree of experience and expertise." (Prestley Aff. P 12.) His hourly rate for handling similar matters is $385 per hour. Id.

Additionally, the Court has reviewed a number of fee award in cases in this district over the past ten years. In *Conn State Dep't of Soc Servs v Thompson*, 2003 U.S. Dist. LEXIS 18987 (D Conn 2003), Judge Underhill awarded fees at the rates of $325 per hour and $375 per hour. In so doing, he noted that other District of Connecticut judges who have considered this issue had concluded that an hourly rate of $250 to $300 was the prevailing market rate for attorneys [*41] with a high degree of expertise in their field of law. n17 *2003 US Dist LEXIS 18987 at *17-18*. The Court notes that many of these cases are five or more years old and presumably rates charged by attorneys with comparable experience have increased since then.

n17 The Court cited the following cases: *Lieberman v Dudley*, 1998 U.S. Dist. LEXIS 16809, 1998 WL 740827, at *4 (D Conn July 27, 1998) (approving an hourly rate of $250 for an experienced civil rights litigator with over 30 years of experience in Connecticut); *Calovine v City of Bridgeport*, 1998 U.S. Dist. LEXIS 4764, 1998 WL 171432, at *1 (D Conn Feb 4, 1998) (same); *Russo v Coppola*, No. 3:93CV1734 (AHN), slip op (D Conn Feb 6, 1995) (Ruling on Application for Attorneys' Fees and Costs Feb 6, 1995) (awarding fees under § 1988 based on an hourly rate of $250 for a partner with over thirty years' experience in this district, and $150 per hour for two associate attorneys with two and three years of experience in this district); *Omnipoint Communications, Inc v Planning and Zoning Comm'n of Town of Wallingford*, 91 F Supp 2d 497 (D Conn 2000) (allowing fees at the hourly rate of $300 and $250 for partners in a Stamford firm); *LaPointe v Windsor Locks Board of Education*, 162 F Supp 2d 10, 18 (D Conn 2001) (finding $275 to be a reasonable hourly rate for an attorney from Manchester, Connecticut with 20 years of experience); *Evanauskas v Strumpf*, 2001 U.S. Dist. LEXIS 14326, 2001 WL 777477 (D Conn June 27, 2001) (finding reasonable an hourly rate of $275 for a solo practitioner in a consumer case based upon similar awards in other cases and the Court's knowledge of hourly rates in Connecticut); *Tsombanidis v City of West Haven*, 208 F Supp 2d 263, 276 (D Conn 2002) (granting a fee award based on an hourly rate of $275 under § 1988).

[*42]

Based on the affidavits submitted by Plaintiff, other awards in this District, as well as the Court's own knowledge of fees generally charged by attorneys practicing in this District with similar levels of experience as Attorney Baird, the Court finds that Plaintiff's requested rate of $

300 per hour is reasonable Applying that rate to the 362.56 hours yields an attorney's fee award of $ 108,768.00.

### c. Plaintiff's Requested Multiplier

Additionally, Plaintiff requests that the fee award be increased by a multiplier of two based upon his measure success at trial, the degree of risk associated with the claims in this litigation, and the fact that this litigation precluded counsel from representing other clients.

Defendant opposes the application of a multiplier based on the limited success Plaintiff achieved Five of the original eleven counts never reached the jury and two of the claims submitted to the jury resulted in verdicts for The Hartford Additionally, the jury's verdict was substantially less than Plaintiff's last settlement demand and the damages claimed in Plaintiff's damages analysis.

The Court agrees with Defendant that a multiplier is not appropriate in [*43] this case. As noted above, there is a strong presumption that the lodestar is reasonable See See *Orchano, 107 F 3d at 99*; *Lunday v Albany, 42 F 3d at 134*. The party asking the Court to depart from the lodestar amount bears the burden of proving that such a departure is necessary to the calculation of a reasonable fee See *Grant v Martinez, 973 F 2d 96, 99 (2d Cir 1992)* An upward adjustment is warranted only in rare instances See *Blum. 465 U S at 901*

In this case, most, if not all, of the reasons Plaintiff has cited for justifying a multiplier are subsumed within the initial lodestar calculation See *Id at 899-901* (holding that the novelty and complexity of issues, quality of representation, special skill and experience of counsel, results obtained, and a contingency fee arrangement and risk of nonpayment are most often reflected in the lodestar calculation and cannot serve as independent bases for adjusting the basic fee award.) The Court denies Plaintiff's request to apply a multiplier of two to the attorney's fee award.

### 3. Defendant's Request for a Downward Departure

Based largely on [*44] Plaintiff's lack of success on a number of his original claims, Defendant urges the Court to reduce the fee award by thirty-three percent (33%) Defendant argues that Plaintiff's claim of sexual harassment, on which he did not prevail, was based on conduct that arose from his personal relationship with Ms Rhodes and was unrelated to his violation of The Hartford's electronic communication policy and subsequent termination of his employment Likewise, Plaintiff's claims of retaliation and invasion of privacy concerned post-termination events

Whether to reduce an attorney's fee award based on unsuccessful claims is a matter left to the sound discretion of the Court. See *Saulpaugh, 4 F 3d at 145*. The Second Circuit held in Dominic, that where the court determines that the successful and unsuccessful claims are "inextricably intertwined" and "involve a common core of facts or [are] based on related legal theories," it is not an abuse of discretion for the court to award the entire fee *Dominic, 822 F 2d at 1259*; see also *Hensley, 461 U S at 435*

In this case, the relationship between Plaintiff and Ms Rhodes was the catalyst [*45] for the events leading up to Plaintiff's termination The facts underlying Plaintiff's sexual harassment claim were "inextricably intertwined" with the facts surrounding his termination. Although several of Plaintiff's claims involving post-termination events did not go to the jury, the damages Plaintiff received on his successful claims afforded him full relief and any additional damages would have been duplicative. The Court concludes that a downward departure is not appropriate based on Plaintiff's success on less than all of his claims

### 4. Plaintiff's Request for Costs

Last, Plaintiff seeks an award of costs in the amount of $ 2,813.41. The Second Circuit has held that an award of fees in a civil rights suit includes reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients *LeBlanc-Sternberg, 143 F 3d at 763* Defendant has not opposed this request for costs

As documented by contemporaneous computer print-outs, the costs that Plaintiff seeks to recover are comprised of the following:

> District Court Filing Fee: $ 150 00
> Service of Process on The Hartford: $ 71.25
> Subpoenas for Trial Witnesses: $ 242.50
> [*46]
> Deposition Transcripts: $ 1,813.98
> Postage: $ 160.22
> Legal Research: $ 13.13
> Copies: $ 344.43
> Cassette Tapes for Exhibits: $ 18.00

These costs have been well-documented and are recoverable

### CONCLUSION

As set forth above, the Court GRANTS IN PART AND DENIES IN PART Plaintiff's Motions for Equitable Relief **[Doc. # # 125, 133]** Plaintiff's request for reinstatement is DENIED Plaintiff's request for an award of front pay is GRANTED The Court awards Plaintiff $

Case 3:00-cv-02423-AVC    Document 213-12    Filed 11/16/2006    Page 13 of 13

Page 12
2005 U.S. Dist. LEXIS 19902, *

117,000 as front pay. In addition to the jury's award of $ 170,000 in back pay, Plaintiff is awarded back pay of $ 4,722 per month from the date of the jury's verdict, January 28, 2005, until the date judgment is entered. Plaintiff's Motions for an Award of Prejudgment Interest, Post-Judgment Interest, and Attorney's Fees and Costs [Doc. # # 127, 133] are GRANTED to the following extent: Plaintiff shall be awarded prejudgment interest on his back pay award, based upon the rates set forth in *28 U.S.C. § 1961(a)*. Plaintiff's counsel is directed to submit a calculation of prejudgment interest in accordance with this Opinion within twenty (20) days, to which Defendant shall [*47] have ten (10) days to object. Plaintiff is also awarded post-judgment interest pursuant to *28 U.S.C. § 1961(a)* on the entire damage award. Plaintiff is awarded attorney's fees in the amount of $ 108,768.00 and costs in the amount of $ 2,813.41.

It is SO ORDERED, this 31st day of May, 2005, at Bridgeport, Connecticut.

/s/ William I. Garfinkel

United States Magistrate Judge