# EXHIBIT H-5

LEXSEE 1999 U.S. DIST. LEXIS 9209

PATRICIA SKOLD, Plaintiff, -against- AMERICAN INTERNATIONAL GROUP, INC., Defendant.

96 Civ. 7137 (HB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1999 U.S. Dist. LEXIS 9209; 81 Fair Empl. Prac. Cas. (BNA) 126

June 16, 1999, Decided
June 18, 1999, Filed

**DISPOSITION:** [*1] Defendant's motions for judgment as a matter of law, a new trial and to amend the judgment to reduce the jury award DENIED, plaintiff's motions for an award of attorney fees, costs and prejudgment interest GRANTED in part and DENIED in part

**COUNSEL:** For PATRICIA SKOLD, plaintiff: Judith P Vladeck, Vladeck, Waldman, Elias & Engelhard, P.C., New York, NY

For AMERICAN INTERNATIONAL GROUP, INC., defendant: Carol S Bernheim, Epstein Becker & Green P C, New York, NY

**JUDGES:** Harold Baer, Jr., U.S.D.J.

**OPINION BY:** Harold Baer, Jr.

**OPINION:**

OPINION AND ORDER

Hon. HAROLD BAER, JR., District Judge:

The plaintiff, Patricia Skold, commenced this action on September 19, 1996, and alleged that the defendant, American International Group, Inc. ("AIG") violated her rights under Title VII and the New York State and City Human Rights Laws. In its original complaint, plaintiff advanced nine causes of action including age discrimination, sex discrimination and retaliation in violation of Title VII, the Age Discrimination in Employment Act of 1967, 29 U S C § § 621 et seq ("Title VII"); the New York State Human Rights Law, N Y Exec Law § § 290 et seq; and the New York City Human Rights Law, [*2] N.Y.C Admin Code § § 8-101 et seq. While the first trial resulted in a verdict for the defendant on plaintiff's sex and age discrimination claims, the jury was hung on plaintiff's retaliation claims In the second trial devoted to plaintiff's three retaliation claims, the jury returned a verdict in favor of Skold and awarded her $ 125,000 in back pay.

The defendant now moves pursuant to *Rule 50(b) of the Federal Rules of Civil Procedure* ("Fed. R Civ P.") for judgment as a matter of law with respect to plaintiff's retaliation claims, a new trial pursuant to *Fed. R Civ P 59* and to amend the judgment to reduce the $ 125,000 jury award by the amount of unemployment insurance benefits plaintiff received Plaintiff moves for an award of attorney fees, costs and an award of prejudgment interest on the jury's award of back pay. Both sides move without objection to supplement the record

For the reasons stated below, the defendant's motions for judgment as a matter of law, a new trial and to amend the judgment to reduce the jury award are DENIED, n1 plaintiff's motions for an award of attorney fees, costs and prejudgment interest are GRANTED in part and DENIED in part. The Court [*3] agrees to supplement the record

n1 With respect to an additional deduction of the jury's award for unemployment insurance benefits, that request is denied. The jury was specifically instructed by the Court to deduct unemployment insurance benefits. (Tr. 649.) As a jury is presumed to have followed the Court's instruction, see *Bingham v Zolt, 66 F 3d 553, 564 (2d Cir 1995)*, the Court will not make any deductions of the jury's award

I Background

Case 3:00-cv-02423-AVC    Document 213-13    Filed 11/16/2006    Page 3 of 10

Page 2
1999 U.S. Dist. LEXIS 9209, *; 81 Fair Empl. Prac. Cas. (BNA) 126

The plaintiff brings this action against her former employer AIG a worldwide insurance company that writes domestic and international policies of insurance. (Tr 11.) Skold was employed with AIG for almost eight years before she resigned (Tr 12.) In May 1988, plaintiff was hired as the Vice President of country research in the international division of AIG (Tr 36.) In December 1988, she was promoted to Vice President of Political Risk which gave her responsibility for North America and underwriting authority for any business based out of North America [*4] (Tr 39.)

The plaintiff claims that she suffered an adverse employment action i.e. retaliation for lodging a discrimination complaint against John F Hegeman, Senior Vice President of Political Risk. The complaint was lodged with Sal DeFini, North American Division President. She claims that she was among other things, denied a salary adjustment at year-end 1995 and constructively discharged. The defendant contends, in response, that plaintiff was not treated differently after making her complaint of discrimination.

Plaintiff's retaliation claims stem from a conversation she had with Hegeman on October 19, 1995 during which she recalls Hegeman stated that he preferred to hire a man for a job opening. Skold alleges that Hegeman stated that "the problem with women is that they all, eventually decide to have babies he wanted to hire a man, he wanted to have someone to talk about sports to." (Tr 57.) This conversation prompted Skold's complaint to DeFini on October 20, 1995 (Tr 59.) On October 23, 1995, plaintiff learned from DeFini that he had informed Peter Fitzpatrick, the head of human resources, about her complaint and that Fitzpatrick had instructed DeFini to report the matter [*5] to John Salinger, President of the Political Risk Division. (Tr 60.) Plaintiff testified that she talked to Fitzpatrick soon after her conversations with DeFini and that she explained to him her concerns about DeFini telling Salinger about her complaint. (Tr 61-62.) Plaintiff also talked to another person in management, Henry Miklas, who told Skold he had already been informed of the situation. (Tr 62.) On November 10, 1995, Skold met with Esther Kornblau, director of employee relations, to discuss her complaint on November 10, 1995 (Tr 63.) Plaintiff described Kornblau as "cold" and that she was not reassuring but rather persisted in asking if there were any witnesses to her conversation with Hegeman (Tr 63-64, 193-94.) Other executives and managers who were informed of plaintiff's complaint in the fall of 1995 included Martin Sullivan, Chief Operating Officer, and Evan Greenburg, President of AIU (Tr 305-306.)

Plaintiff testified that her co-workers treated her differently after her conversations with various AIG supervisory employees in October (Tr 67-70.) Her relationship with DeFini grew "estranged" and they no longer had the same conversations they had with each other [*6] in the past. Further, her regular conversations and strategy sessions with Salinger ceased, and her interaction with Hegeman became difficult and she found him to be unresponsive at times See id. According to the plaintiff, they cut her out of meetings, stopped talking to her, and in short, treated her completely differently from the way they had before the complaint See id.

Next, plaintiff detailed how her working conditions at AIG changed. On December 18, 1995, DeFini informed plaintiff over the phone that she was to receive a 4.3% annual salary increase which plaintiff found highly disappointing. (Tr 74-76.) Plaintiff testified that she spoke to Salinger that same day about the increase and explained to him that she was surprised and disappointed that she wasn't receiving more. (Tr 76-78.) On January 2, 1996, plaintiff spoke to Kornblau about her salary and that she perceived the modest increase to be retaliation for her complaint about Hegeman. (Tr 78-79.) Plaintiff asserted that if the hostile treatment she was receiving was being meted out in an effort to expedite her departure, she would resign after she negotiated a severance agreement. (Tr 79.) The next day, [*7] Salinger called plaintiff into his office for a meeting with himself and DeFini. Skold testified that Salinger told her that her "job was being changed," and that Salinger responded negatively when she asked if she had a choice in the matter because she considered the position a demotion. (Tr 81.) Further, Kornblau testified that Salinger expressed in a conversation with her on January 4, 1996 that he wanted to strip Skold of her underwriting authority. (Tr 359.)

On January 19, 1996, plaintiff had a meeting in Salinger's office with Hegeman and DeFini. During this meeting, plaintiff was given for the first time in her eight-year career at AIG a list of objectives which significantly increased her workload, required extensive travel and stated that she would be routinely assigned extra work. (Tr 89-92.) In addition, plaintiff had an exchange with Hegeman on the morning of February 2, 1996 in her office at which time Hegeman erupted at Skold in a fit of rage and yelled at her about her poor work ethic before storming out. (Tr 93.)

Plaintiff resigned the following Monday due to her stress and unhappiness and because she "couldn't take it anymore." (Tr 95.)

Plaintiff commenced [*8] the original action by filing a complaint on September 19, 1996 which contained nine causes of action based on age discrimination, sex discrimination and retaliation. The case first proceeded to trial from December 22, 1997 to January 2, 1998 on all nine claims. The jury reached a verdict in defendant's favor on all of plaintiff's six age and sex discrimination

1999 U.S. Dist. LEXIS 9209, *; 81 Fair Empl. Prac. Cas. (BNA) 126

claims, but was hung on the remaining three retaliation claims. A second trial was held from August 31, 1998 to September 9, 1998 devoted only to plaintiff's retaliation claims brought in violation of Title VII, New York State Human Rights Law and the New York City Human Rights Law. On September 9, 1998, the jury awarded plaintiff $ 125,000 in back pay.

**II. Judgment as a Matter of Law and Motion for a New Trial**

A. *Standard for Judgment as a Matter of Law*

Federal Rule of Civil Procedure 50(a) provides:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that [*9] party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

To decide whether judgment as a matter of law is warranted, the Court must decide "whether the evidence is such that, without weighing the credibility of witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [people] could have reached." *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 688 (2d Cir. 1983) (internal citations and quotations omitted). The trial court should grant judgment as a matter of law only when: (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded people could not arrive at a verdict against the movant. *Lambert v. Genesee Hosp.*, 10 F.3d 46, 56 (2d Cir. 1993), cert. denied, 511 U.S. 1052, 128 L. Ed. 2d 339, 114 S. Ct. 1612 (1994). On a motion for judgment as a matter of law, the district court "must view the evidence [*10] in the light most favorable to the party against which the motion was made . . . making all credibility assessments and drawing all inferences in favor of the non-movant." *EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 119 (2d Cir. 1994) (internal citations omitted).

B. *Standard for Motion for a New Trial*

Rule 59 governs the decision whether to grant a new trial motion which "is committed to the sound discretion of the trial judge." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992), cert. denied, 508 U.S. 952, 124 L. Ed. 2d 662, 113 S. Ct. 2445 (1993). This Circuit has stated that "the district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Smith v. Lightning Bolt Prods.*, 861 F.2d 363, 370 (2d Cir. 1988) (internal citations omitted); see also *Minetos v. City University of New York*, 925 F. Supp. 177, 185-186 (S.D.N.Y. 1996) (same).

C. *Evidence to Support Retaliation Claim*

As a preliminary matter, the Court notes that it considers plaintiff's state law claims in conjunction with its Title VII claims because New York [*11] courts rely on federal law when adjudicating New York Human Rights Law claims. See *Reed v. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177 (2d Cir. 1996); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180 (2d Cir.), cert. denied, 506 U.S. 826, 121 L. Ed. 2d 46, 113 S. Ct. 82 (1992) ("New York courts have consistently looked to federal case law in expounding the [New York] Human Rights Law").

The defendant contends that the evidence does not support the jury's verdict on plaintiff's retaliation based claims. Further, the defendant argues that a reasonable jury could not have found for plaintiff, and that the verdict constituted a seriously erroneous result and a miscarriage of justice. I disagree.

To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that (1) she engaged in a protected activity; (2) the employer was aware of the protected activity; (3) the employer took adverse employment action; and (4) a causal connection exists between the protected activity and the adverse action. See *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 465 (2d Cir. 1997); *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993). In addition, [*12] the causal condition "can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) (internal citations omitted).

Once a plaintiff has established a prima facie case of retaliation by a preponderance of the evidence, the burden of going forward shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). See also *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-508, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993). If the defendant successfully articulates a nondiscrimina-

Case 3:00-cv-02423-AVC    Document 213-13    Filed 11/16/2006    Page 5 of 10

Page 4
1999 U.S. Dist. LEXIS 9209, *; 81 Fair Empl. Prac. Cas. (BNA) 126

tory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *See id at 510-11*. The plaintiff must then show that the employer's decision was motivated at least in part by a discriminatory reason. *See Peterson v. City College, 32 F. Supp. 2d 675, 683 (S.D.N.Y. 1999)* The defendant misstates the law when it argues that a prima facie case requires the plaintiff [*13] to satisfy the more stringent standard that "defendant's real reasons were retaliatory." Defendant's Memorandum in Support of Motion for Judgment as a Matter of Law ("Def. Mem."), p. 5.

According to defendant, plaintiff did not present a prima facie case of retaliation because she failed to demonstrate that the circumstances she encountered after making her complaint constituted adverse employment action and that she never established any type of causal connection between the protected activity and the alleged adverse employment action.

To the contrary, plaintiff presented evidence at trial that could have easily persuaded a reasonable jury that plaintiff had carried her burden. First, Skold testified that she had engaged in protected activity. In October 1995, she complained to DeFini about Hegeman's discriminatory remarks about not wanting a woman for the open position. (Tr. 58-59.) Skold recounted how Hegeman stated in the context of discussing candidates for an open position that "the problem with women is that they all, eventually all decide to have babies . he wanted to hire a man, he wanted to have someone to talk about sports to." (Tr. 58.) In fact, defendant does not dispute [*14] the fact that plaintiff engaged in protected activity when she talked to DeFini about her conversation with Hegeman *See* Def's Mem., p. 6 n. 4. Plaintiff further confided to DeFini during that exchange that she was not comfortable talking to Kornblau because she did not trust her ability to deal fairly with people who lodged complaints. (Tr. 58.)

Next, Skold testified that members of AIG management were made aware of her complaint. Plaintiff learned from DeFini in late October 1995 that he had informed Fitzpatrick about her complaint and Fitzpatrick had instructed DeFini to go to Salinger (Tr. 60-62.) Further, DeFini testified that in addition and following his conversation with the plaintiff he had informed Fitzpatrick, Kornblau and Sullivan and Greenburg about the complaint. (Tr. 283-84, 305-06.)

Plaintiff further introduced evidence that the deterioration of her working relationships and work responsibilities was severe and led to her constructive discharge. Specifically, Skold testified that the nature of her working relationship with Salinger, DeFini and John Hegeman significantly changed and deteriorated after she raised her complaint. (Tr. 67-70.) The jury heard testimony [*15] that plaintiff's relationship with DeFini grew "estranged" and he no longer treated her in the same manner. *See id.* In addition, her regular conversations and strategy sessions with Salinger no longer took place, and her interaction with Hegeman became strained and he became unresponsive or gave conflicting responses to her questions. *See id.* Plaintiff even learned that Salinger proposed to Kornblau that Skold be stripped of her underwriting authority once he learned of her complaint (Tr. 359.) Further testimony revealed that the decision to move plaintiff into the Country Risk manager position, which she characterized as a demotion, may have been finalized in as soon as early 1996 (Tr. 314.)

Defendant argues that none of these activities constituted an adverse employment action or that any of it can be causally connected to her original complaint to DeFini. However, defendant concedes that a constructive discharge constitutes adverse employment action satisfying the third element of a prima facie case of retaliation. *See* Def. Mem. p. 16 n.14 (*citing Richardson v State, 1997 U.S. Dist. LEXIS 20719, No 94 Civ. 1065, 1997 WL 797527, at *7 (N.D.N.Y. Dec. 22, 1997) (ruling that a constructive* [*16] *discharge is an adverse employment action))*. Further, this Circuit has stated that the causal condition need not be directly established and that it can be proved by showing that the adverse action closely followed temporally the protected activity *Manoharan, 842 F.2d at 593* The jury could easily have found that the events testified to in this case satisfy these standards. Skold complained in October of 1995 and the incidents of retaliation and hostility towards plaintiff occurred during the fall of 1995 and early 1996. Plaintiff then resigned in early February of 1996 - within six months of her original conversation with Hegeman during which he made the discriminatory remarks and her conversation with DeFini during which she complained about Hegeman. Accordingly, plaintiff introduced sufficient evidence to find a prima facie case of retaliation.

Despite the fact that defendant proffered non-retaliatory justifications for its actions, the jury is entitled to weigh the evidence and shift the burdens, as it was instructed, to determine whether plaintiff satisfied her burdens of proof under the *McDonnell-Douglas* framework. Based on a review of the trial transcripts and the [*17] evidence presented at trial, the Court is persuaded that a reasonable jury could have arrived at a verdict in favor of the plaintiff without running afoul of Rules 50 or 59.

D. *Evidence to Support Constructive Discharge Claim*

To establish a claim of constructive discharge, the inquiry is whether an employer, "rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit

Case 3:00-cv-02423-AVC    Document 213-13    Filed 11/16/2006    Page 6 of 10

Page 5
1999 U.S. Dist. LEXIS 9209, *; 81 Fair Empl. Prac. Cas. (BNA) 126

involuntarily." *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996) (internal citations omitted). The trier of fact must consider whether working conditions were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. *See Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987). Further, a finding of constructive discharge can be based on a totality of the circumstances. *See Chertkova*, 92 F.3d at 90.

Taking all the facts and testimony presented at trial, the Court is convinced that ample evidence was introduced to support the jury's finding of constructive discharge. Skold introduced testimony that she was subjected to an escalating pattern [*18] of adverse treatment following her complaint in October (Tr. 68-69, 75-76, 321-322, 500-501). For example, Hegeman stopped asking her for input (Tr. 69), DeFini was "estranged" from her and no longer joked at meetings (Tr. 68), Salinger stopped dropping by to discuss issues with her, *see id.*, a promised salary adjustment was not forthcoming at year end (Tr. 75-76), Skold was confronted with a demotion in early January 1996, she alone was given overwhelming job objectives in mid-January, 1996 (Tr. 321-322); and Hegeman erupted at her and behaved in a way he had never behaved before, neither to her nor to other employees under his supervision. (Tr. 500-01).

Since the jury was entitled to view all these circumstances "as a whole," *Chertkova* 92 F.3d at 90, it is reasonable that the jury could have concluded that plaintiff's work atmosphere was so intolerable that she was forced to resign. Similarly, the Court does not view the verdict as a seriously erroneous result or a miscarriage of justice.

Further and especially here, jury findings with respect to credibility were important and the jury apparently disbelieved the defendant's witnesses. The Court "must give deference to [*19] all credibility determinations and reasonable inferences of the jury." *Galdieri-Ambrosini v. National Realty and Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998). This Circuit has expressly stated that "where the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Metromedia*, 983 F.2d at 363.

For the reasons stated, plaintiff's motions for judgment as a matter of law and for a new trial are DENIED.

### III. Attorneys' Fees

#### A. Standard

A plaintiff who prevails in a Title VII action may collect attorneys' fees from a defendant under Title VII, which permits a court "in its discretion, [to] allow the prevailing party . . . a reasonable attorney's fee . . . as part of the costs" of the action. 42 U.S.C. § 2000e-5(k). The district court is afforded broad discretion in assessing a reasonable fee award based on the circumstances of the case. *See Hensley v. Eckerhart*, 461 U.S. 424, 437, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983). In this case, the time spent by plaintiff's lawyers on this case is described in the Schnell Affidavit and the [*20] contemporaneous time records attached thereto. Plaintiff requests attorneys' fees for Judith P. Vladeck, who provided overall direction and strategy for the case, Laura S. Schnell, who was lead counsel on this case, co-counsel Robert H. Stroup, associates Christopher D. Berner and Katherine B. Harrison, as well as law students and paralegals.

The plaintiff is entitled to the lodestar amount which is calculated from the product of a reasonable hourly rate and the number of hours reasonably expended by each attorney. *See Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999); *Greenbaum v. Svenska Handelsbanken, N.Y.*, 998 F. Supp. 301, 303 (S.D.N.Y. 1998). The lodestar figure may be adjusted based on several factors, however, there is a strong presumption that it represents a reasonable fee. *See Quaratino*, 166 F.3d at 425.

#### B. Reasonably Hourly Rate

The lodestar figure should be consistent with the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. *Blum v. Stenson*, 465 U.S. 886, 896 n.11, 79 L. Ed. 2d 891, 104 S. Ct. 1541 (1984). The Southern District of New York is the relevant [*21] community for purposes of the lodestar calculation. *See Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997).

Plaintiff has proposed lodestar rates of $400 per hour for Vladeck, $275 for Schnell, $225 for Stroup, $175 for Berner, $75 for law students and $65 for paralegals. The defendant challenges only the rates of Schnell, Berner and the non-lawyer rates but makes no objection to the rates for Vladeck or Stroup. Plaintiff has cited a number of cases in its papers which support the proposition that the proposed rates are not uncommon in the Southern District of New York. For example, Judge Chin noted affidavits from three attorneys practicing employment discrimination law which attested to the fact that "the range of rates charged for similar services by lawyers who practice in the metropolitan area [were] $175 to $375 per hour" and awarded fees in that range. *Altman v. Port Authority of New York and New Jersey*, 879 F. Supp. 345, 353 (S.D.N.Y. 1995). *See also Ragin v. Harry Macklowe Real Estate Co.*, 870 F. Supp. 510, 518 (S.D.N.Y. 1994) (awarding $300 and 275 as hourly rates to lead counsel in housing discrimination case); *Maddalone v. United Bhd. of* [*22] *Carpenters*, 1999 U.S. Dist. LEXIS 6310, No. 95 Civ. 2112 (JSM), 1997 WL

Case 3:00-cv-02423-AVC    Document 213-13    Filed 11/16/2006    Page 7 of 10

Page 6
1999 U.S. Dist. LEXIS 9209, *; 81 Fair Empl. Prac. Cas. (BNA) 126

*269913*, at *1 (S.D.N.Y. May 4, 1999) (stating that a rate of $ 340 per hour is within the range of reasonable attorney's fees in the New York market).

Further, plaintiff provided examples of cases where Schnell had been awarded that rate in the past by judges of the Southern District. *See, e.g., DeGaetano v. Smith Barney, Inc., 1998 U.S. Dist. LEXIS 15052, No. 95 Civ. 1613 (DLC), 1998 WL 661491* (S.D.N.Y. Sept. 25, 1998) (adopting the Report and Recommendation of Magistrate Judge Ellis). Similarly, plaintiff's rates for law students and paralegals are well within the range recently awarded in the Southern District of New York. *See, e.g., Ayres v. 127 Restaurant Corp., 1999 U.S. Dist. LEXIS 7935, No. 96 Civ. 1255 (DC), 1999 WL 328348*, at *2 (S.D.N.Y. May 21, 1999) (stating that hourly rates of $ 75 for law students and $ 60 for paralegals are reasonable); *Paulino v. Upper West Side Parking Garage, Inc., 1999 U.S. Dist. LEXIS 7544, No. 96 Civ. 4910 (MGC), 1999 WL 325363*, at *4 (S.D.N.Y. May 20, 1999) (holding that $ 75 per hour was a reasonable rate for a recent law graduate); *Rivera v. Baccarat, Inc., 1999 U.S. Dist. LEXIS 6792, No. 95 Civ. 9478 (MBM), 1999 WL 294874*, at *4 (S.D.N.Y. May 10, 1999) (indicating that paralegals should [*23] be compensated at the same rate as law students which the court valued at $ 75 per hour). Thus, based on a review of the cases and the affidavit submitted in support of the motion, I find these rates to be reasonable.

C. *Reductions in Attorneys' Fees Award*

1. *Unsuccessful Claims*

To determine the number of hours reasonably expended, "the district court should exclude excessive, redundant or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims." *Quaratino, 166 F.3d at 425*. First, defendant requests that plaintiff's fee request be reduced to exclude work performed on the claims at the first trial. On this score, the Supreme Court is instructive:

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants    counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved. The congressional intent to limit awards to prevailing [*24] parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

*Hensley, 461 U.S. at 434-35* (internal quotations and citations omitted). Here, plaintiff advanced nine causes of action based on age discrimination, sex discrimination and retaliation. The case was first tried from December 22, 1997 to January 2, 1998 on all nine claims. The jury reached a verdict in defendant's favor on plaintiff's six age and sex discrimination claims, but hung on the remaining three retaliation claims. A second trial was held from August 31, 1998 to September 9, 1998 limited to plaintiff's retaliation claims. On September 9, 1998, the jury awarded plaintiff $ 125,000 in back pay. "Where a plaintiff has achieved only partial or limited success, full compensation of attorney's fees would not be reasonable. The district court may either attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Ragin, 870 F. Supp. at 523* (citing *United States Football League v. National Football League, 887 F.2d* [*25] *408, 413-414 (2d Cir. 1989). See also New York State Ass'n for Retarded Children v. Carey, 711 F.2d 1136, 1146 (2d Cir. 1983)* (recognizing that it was impractical for court to evaluate each and every entry and more efficient to make percentage cuts).

To determine whether a plaintiff's partial success requires a reduction in the attorneys' fees, the district court must first consider "whether the plaintiff failed to succeed on any claims wholly unrelated to the claims on which the plaintiff succeeded." *Grant v. Martinez, 973 F.2d 96, 101 (2d Cir. 1992)*. If that question is answered in the affirmative, then the court will exclude those hours from the calculation. Next, the court must consider "whether there are any unsuccessful claims interrelated with the successful claims." *See id.*

Where successful and unsuccessful claims share a "common core of facts or are based on related legal theories," the movant may be entitled to obtain attorney fees for the unsuccessful claims. *Quarantino, 166 F.3d at 425* (internal citations and quotations omitted). In that case, the court concluded that the time spent on the plaintiff's unsuccessful pregnancy discrimination claim was "sufficiently [*26] related" to the successful retaliation claims and that a reduction of the lodestar was unwarranted. *See id. at 427*.

Here, plaintiff's discrimination complaint which gave rise to the retaliation claim was not the same discrimination claim that gave rise to Skold's claim for relief on her separate discrimination claim. Skold's claim

Case 3:00-cv-02423-AVC    Document 213-13    Filed 11/16/2006    Page 8 of 10

Page 7
1999 U.S. Dist. LEXIS 9209, *; 81 Fair Empl. Prac. Cas. (BNA) 126

for relief for age and sex discrimination, tried in the first case, was based on plaintiff's having been paid less than her younger male peers. Her claims of retaliation, tried in both trials, were based on retaliation and constructive discharge. These claims are conceptually distinct. In fact, plaintiff voluntarily reduced by fifty percent her request for fees for time expended up to and through the first trial based on the intricacy of these facts. To award plaintiff full attorneys' fees for both trials would circumvent the congressional intent articulated in *Hensley*. Thus, since I find that plaintiff's discrimination claims unsuccessfully tried in the first case are "severable unsuccessful claims," *Quaratino, 166 F.3d at 425*, attorneys' fees are unwarranted.

Nonetheless, since the retaliation claims tried in both trials are identical and undoubtedly [*27] share a "common core of facts or are based on related legal theories," *see id*, I find it fair and reasonable that plaintiff should be awarded attorneys' fees expended in the first trial in connection with her retaliation and constructive discharge claims in addition to the fees incurred with respect to the second trial. Although the defendant accurately contends that there is no explicit authority to award attorneys' fees for an unsuccessful first trial where plaintiff prevailed in the second, fairness requires that I award attorneys' fees for these claims because they are "sufficiently related" in their factual and legal bases.

There is no doubt or objection from defendant that the retaliation and constructive discharge claims from the two trials are "interrelated." Without all the hard work and time expended in the first trial, plaintiff most likely could not have successfully prosecuted her claims the second time around and certainly would have piled up more hours. The Court cannot view the second trial's success in a vacuum since it was inextricably connected to all the time expended during the preceding trial with respect to the three claims of retaliation and constructive [*28] discharge. To bar the award of damages for these three claims tried in the first case undermines the reasoning in *Hensley* because that decision was based on the principle that unrelated claims are severable and not compensable. In fact, the Supreme Court expressly stated in *Hensley* that, "work on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved" where the claims are unrelated. *Hensley, 461 U.S. at 434-35*. That is simply not the case here. Here, the work expended in the first trial in connection with plaintiff's identical retaliation and constructive discharge claims can reasonably and fairly be deemed to have been expended in pursuit of the ultimate result achieved in this case. Accordingly, reasonable attorneys' fees are warranted for the expenses of these claims from the first trial.

However, since it is impossible to ascertain from plaintiff's records which attorneys' fees were charged in connection with the three claims on which the jury hung in the first trial, I will adjust the lodestar amount to include attorneys' fees for the period following January 2, 1998 of $145,593.75 and deduct an additional thirty percent [*29] from the already voluntarily reduced amount of $142,161.87 requested to reflect the period up to and including January 2, 1998 which totals $244,077.49. *See United States Football League, 887 F.2d at 415* (affirming district court's determination that bill be reduced by 20% to reflect a reasonable fee in light of the limited success achieved); *Ragin, 870 F. Supp. at 523* (reducing the lodestar amount by 50% for limited success of claims); *Myree v. Local 41, International Brotherhood of Electrical Workers, 847 F. Supp. 1059, 1068 (W.D.N.Y. 1994)* (reducing lodestar by 75% of time spent litigating losing issues in a Title VII case).

2. *Vague, Excessive Entries and Other Reductions*

Defendant also seeks a further reduction to account for vague billing entries, excessive and duplicative billings and because plaintiff allegedly pursued the second trial in part to recover attorneys' fees. Similarly, defendant seeks a corresponding reduction in plaintiff's costs.

Plaintiff's counsel is required to produce detailed contemporaneous records of the hours they billed on plaintiff's behalf. *Hensley, 461 U.S. at 433*. Counsel is not required to "record in great detail how each [*30] minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures." *Id. at 437 n.12* (citation omitted). The defendant contends that some of the records submitted by plaintiff's counsel lack the specificity and detail necessary to make a fair evaluation of the time expended. After carefully reviewing the time records submitted by plaintiff's attorneys, this Court agrees and finds that a number of the plaintiff's entries are vague.

Entries such as "telephone call," "consultation," and "review of documents" are not sufficiently specific so as to enable the court to determine whether the hours billed are duplicative or excessive. *Dailey v. Societe Generale, 915 F. Supp. 1315, 1328 (S.D.N.Y. 1996), aff'd in part, vacated in part on other grounds, 108 F.3d 451 (2d Cir. 1997)*. Here, plaintiff's records included, among some others, entries such as "read documents," "calls" and "review documents." *See* Laura Schnell Affidavit sworn to October 8, 1998, Exhibit A ("Schnell Aff., Ex. A"), p. 66 entry for 5/28/97, p. 69 entry for 7/9/97, p. 85 entry for 1/16/98, p. 109 entry for 8/20/98.

Further, a plaintiff should not recover [*31] fees for a duplication of effort. *See Luciano, 109 F.3d at 111*. A court may properly reduce a fee for work that is excessive. *See Hensley, 461 U.S. at 436, Luciano, 109 F.3d at*

111. The defendants contend that plaintiff's counsel did not work in an efficient manner and that experienced attorneys were performing the work of junior associates or that efforts were often duplicated for no reason. However, depending on the task, an hour spent by experienced counsel can be more efficient and in the end save time than when spent by less experienced staff with inadequate supervision and guidance. Further, I found no entry so excessive that it required a lodestar reduction. Accordingly, I have only reduced the adjusted lodestar amount by 10% to account for the vague entries, and attorneys' fees are awarded in the amount of $ 219,669.74.

The Court reviewed the defendant's remaining arguments and finds them to be without merit.

### 3. Costs

Finally, a prevailing plaintiff is also entitled to reasonable out-of-pocket expenses incurred by the attorney which fee paying clients are normally charged and not part of the office overhead. *See Reichman v Bonsignore, Brignati, and Mazzotta* [*32] *P C , 818 F 2d 278, 283 (2d Cir 1987)* The plaintiff seeks $ 30,183.58 in costs for both sides. The defendant argues that plaintiff's request for costs is excessive. I agree to the extent that plaintiff seeks costs in connection with the severable unrelated claims tried in the first trial. However, plaintiff is entitled to costs that it would normally charge its fee paying clients and Schnell states in her affidavit that these "costs are of the type normally charged to clients of the firm, were necessarily incurred in the litigation, and reflect services which were actually and necessarily performed." Schnell Aff , P 35. Therefore, I will limit the award to the costs incurred in connection with the second trial, and a third of those costs reported for the first trial. I have taken into consideration the statements in Schnell's Reply Affidavit that some of the transportation expenses from the first trial were not posted to the computer until well after the conclusion of the first trial. *See* Reply Affidavit of Laura Schnell sworn to November 13, 1998, P 6. Accordingly, the Court will award costs in the amount of $ 14,153.35 making the total award for attorneys' fees and costs [*33] $ 233,823.09.

### IV. Prejudgment Interest

Title VII authorizes prejudgment interest and leaves the decision to award the interest to the discretion of the district court. *See Saulpaugh v Monroe Community Hosp , 4 F 3d 134, 144 (2d Cir 1993), cert denied, 510 U S 1164, 127 L Ed 2d 539, 114 S Ct 1189 (1994).* The Second Circuit has held that "it is ordinarily an abuse of discretion not to include pre-judgment interest in a back pay award." *Clarke v Frank, 960 F 2d 1146, 1153-54 (2d Cir 1992)* (citation omitted); *see also Luciano v Olsten Corp . 912 F Supp 663, 677 (E D N Y 1996) aff'd 109 F 3d 111 (2d Cir 1997).* The purpose of prejudgment interest is in part "to prevent an employer from attempting to enjoy an interest-free loan for as long as it can delay paying out back wages." *Frank, 960 F 2d at 1154* (citation omitted). An award of prejudgment interest, "even where [the plaintiff] has recovered punitive damages, will not overcompensate her." *Olsten, 912 F Supp at 676 (citing Wickham Contracting Co , Inc , v Local Union No 3. 955 F 2d 831, 835 (2d Cir 1992), cert denied, 506 U S 946, 121 L Ed 2d 302, 113 S Ct 394* [*34] *(1992))*

To determine whether a prejudgment award is appropriate, the Court must consider a variety of factors including" (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham, 955 F 2d at 834* (citations omitted).

The defendant makes the unsupported argument that prejudgment interest is inappropriate because its award would "constitute a windfall to the plaintiff" and "unjustly enrich her beyond the very generous compensation she now receives from her current employer." Affirmation of Kenneth W. DiGia in Opposition to Plaintiff's Motion for Prejudgment Interest sworn to on September 28, 1998, at P 2. The Court is not persuaded by this argument.

Based on a consideration of the *Wickham* factors, I find that prejudgment interest is appropriate. Plaintiff was deprived of money that she would have otherwise earned but for the discriminatory actions of the defendant and the defendant had the use thereof until now.

The plaintiff requests that the [*35] Court calculate the prejudgment interest rate in accordance with *28 U S C § 1961*, and the defendant does not dispute that the Court should employ this approach. Further, other district courts in this Circuit have endorsed this approach. *See, e.g., Ware v ABB Air Preheater, Inc , et al , 1995 U S Dist LEXIS 14159, 1995 WL 574464, at *10 (W D N Y. Sept. 28, 1995); McIntosh v Irving Trust Co , 873 F Supp 872, 882-84 & n 13 (S D N Y 1995); Dailey v Societe Generale, 889 F Supp 108, 114 & n 4 (S D N Y 1995), aff'd 108 F 3d 451 (2d Cir 1997)* Therefore, "such interest shall be calculated . at a rate equal to the coupon issue yield equivalent of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment." *28 U S C § 1961* Here, the judgment was dated September 15, 1998. While plaintiff proposes that the Court apply an interest rate of 5.271% that reflects the 52-week Treasury Bill rate as of August 19, 1998, the defendant opposes this

1999 U.S. Dist. LEXIS 9209, *; 81 Fair Empl. Prac. Cas. (BNA) 126

rate because it will not be the Treasury Bill rate in effect when the Court rules on plaintiff's request. The defendant proposes the rate of 4.73%. I agree [*36] with the plaintiff. The appropriate interest rate is 5.271%, the rate settled on August 19, 1998, which was "settled immediately prior to the date of the judgment." 28 U.S.C. § 1961 (emphasis added). Thus, prejudgment interest is awarded in the requested amount of $ 10,433.40 plus the additional amount of 19.55 from September 16th to the date of entry of judgment.

### V. Conclusion

For the reasons set forth above, the defendant's motions for judgment as a matter of law, a new trial and to amend the judgment to reduce the jury award are DENIED, plaintiff's motions for an award of attorney fees, costs and prejudgment interest are GRANTED in part and DENIED in part.

**SO ORDERED.**

New York, New York
June 16 1999

 Harold Baer, Jr.

 U.S.D.J.